*EXHIBIT "A"*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARI TEMAN,
*Plaintiff,*

v.

ALAN S. LEWIS, NATHANIEL Z. MARMUR,
NATHANIEL Z. MARMUR, PLLC,
CARTER LEDYARD & MILBURN LLP,
ALEXANDRA SHAPIRO, and
SHAPIRO ARATO BACH LLP,
*Defendants.*

Case No. 25-cv-08220 (LJL)


## AMENDED COMPLAINT


**PRELIMINARY STATEMENT**

Plaintiff Ari Teman paid $200,000 to retain Defendants to handle his Second Circuit appeal pursuant to a written engagement letter specifying that named attorneys would be personally responsible for the representation through the conclusion of the appeal. The documentary record of the representation — produced by Defendants on May 11, 2026 — raises substantial questions concerning whether the contracted work was performed as promised, whether the final appellate brief was prepared by the attorneys identified in the engagement letter, and whether the client file produced in this litigation accurately reflects the work performed and the materials maintained during the engagement.

The referral chain that produced this engagement was not arms-length. Alexandra Shapiro referred Plaintiff to Nathaniel Marmur while maintaining an undisclosed financial arrangement with him through office co-location and regular payments. Marmur then recommended that Plaintiff bring in Alan Lewis and Carter Ledyard & Milburn LLP, representing that doing so would provide major-firm resources. None of these financial relationships and interconnections were disclosed to Plaintiff. The documentary record raises substantial questions about whether the $200,000 engagement fee was used to fund the promised attorney work or whether substantive work was delegated to a non-attorney legal assistant while the attorneys who promised personal responsibility collected the fee.

This case presents two distinct categories of claims: (A) fraud, breach of contract, and related claims arising from the 2021-2022 representation; and (B) independently actionable misconduct arising from Defendants' May 11, 2026 client file production, which presents substantial indicia of incompleteness and contained documents with metadata anomalies inconsistent with Defendants' own document management practices. The 2026 claims accrue independently and are not subject to any limitations defense applicable to the earlier claims.

## PARTIES

1. Plaintiff Ari Teman is a citizen of the United States and a domiciliary of the State of Florida, maintaining a residence in Miami Beach, Florida, to which he intends to and does return. Plaintiff is currently residing abroad on a temporary basis while awaiting medical treatment for Eustachian Tube Dysfunction.

2. Defendant Alan S. Lewis is a partner at Carter Ledyard & Milburn LLP, with an office at 2 Wall Street, New York, NY 10005.

3. Defendant Nathaniel Z. Marmur is an attorney licensed in New York and principal of Defendant Nathaniel Z. Marmur, PLLC, located at 500 Fifth Avenue, 40th Floor, New York, NY 10110.

4. Defendant Nathaniel Z. Marmur, PLLC ("NMP") is a professional limited liability company organized under the laws of the State of New York, with offices at 500 Fifth Avenue, 40th Floor, New York, NY 10110. NMP is named as a defendant based on the conduct of its principal Nathaniel Z. Marmur as alleged herein, and its direct participation as a party to the Engagement Letter and as a recipient of the fixed fee paid by Plaintiff.

5. Defendant Carter Ledyard & Milburn LLP ("CLM") is a law firm organized under the laws of the State of New York with offices at 2 Wall Street, New York, NY 10005.

6. Judith Wallace is a partner at Carter Ledyard & Milburn LLP and serves as counsel of record for Defendants in this action. On May 11, 2026, Wallace personally transmitted the Turnover Production to Plaintiff via email. Plaintiff does not at this stage assert individual claims against Wallace. Plaintiff reserves the right to seek leave to add Wallace as a defendant if forensic discovery confirms knowing participation in the production of an incomplete or altered client file.

7. Jeffrey Boxer is a partner at Carter Ledyard & Milburn LLP and serves as counsel of record for Defendants in this action. Boxer was copied on the May 11, 2026 Turnover Production email in his capacity as litigation counsel. Plaintiff does not at this stage assert individual claims against Boxer. Plaintiff reserves the right to seek leave to add Boxer as a defendant if forensic discovery confirms knowing supervisory participation in the production of an incomplete or altered client file.

8. Matthew K. Flanagan and Michael G. Jacobson of Marshall Dennehey serve as counsel of record for Defendant Marmur and NMP in this action. Flanagan personally directed the production of the Marmur client file, confirmed in writing that counsel was working with KLDiscovery as of May 21, 2026, and made specific representations to Plaintiff about the production format and timing that were not honored. Jacobson was copied on the KLDiscovery

production delivery email. Plaintiff does not at this stage assert individual claims against Flanagan or Jacobson. They are identified as persons with knowledge material to the claims herein, including knowledge of: the production format instructions given to KLDiscovery; the timeline of the production workflow; any vendor communications regarding native file availability; and any decisions concerning the selection of image-only format after Plaintiff raised metadata concerns. Plaintiff reserves the right to seek leave to add Flanagan and Jacobson as defendants upon completion of discovery, and specifically if: (a) discovery confirms they directed the image-only format with knowledge that native metadata was material to pending litigation and that Plaintiff had requested native electronic format; (b) their representations to Plaintiff concerning the production are shown to be false or misleading; or (c) forensic discovery reveals that native files existed and were not produced. Plaintiff places Flanagan and Jacobson on notice that all communications with KLDiscovery, all production instructions, and all internal communications concerning the format of the Marmur production are subject to preservation and will be sought in discovery.

9. Sarah H. Ganley is an attorney at Carter Ledyard & Milburn LLP. A native Excel workbook produced in the Turnover Production contains embedded Office metadata identifying Ganley, Sarah H. as both the document author and last modified by, and includes internal file path references reflecting matter-specific CLM folder structures including F-Data-Ganley-TEM06001-SDNY Transcripts. This workbook is identified as evidence that: (a) CLM maintained client file materials as native electronic documents on internal systems; (b) native metadata-bearing files existed in connection with the representation; and (c) native file production was technically feasible. Plaintiff does not at this stage assert individual claims against Ganley. Plaintiff reserves the right to seek leave to add Ganley as a defendant if discovery reveals her participation in production decisions that resulted in the withholding of native client file materials.

10. Defendant Alexandra Shapiro is a partner at Shapiro Arato Bach LLP with offices at 500 Fifth Avenue, 40th Floor, New York, NY 10110. On August 5, 2021, Shapiro referred Plaintiff to Defendant Marmur for appellate representation while maintaining an undisclosed financial relationship with Marmur. On March 2, 2022, Shapiro made a materially misleading statement to Plaintiff in response to a direct inquiry about whether she had been paid in connection with the referral. In February 2026, Plaintiff first discovered that Marmur's office is physically located within Shapiro Arato Bach LLP's offices, establishing the existence of an undisclosed financial arrangement between Shapiro and Marmur that predated and continued throughout the referral and representation period.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship. Plaintiff is a citizen of the State of Florida. Defendants are citizens of New York. The amount in controversy exceeds $75,000, exclusive of interest and costs.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the engagement was entered into in this District, the representation concerned proceedings in this District and the Second Circuit, and Defendants maintain offices in this District.

13. Plaintiff anticipates that Defendants may raise the fugitive disentitlement doctrine. That doctrine, as applied in civil cases, requires a nexus between the plaintiff's alleged fugitive status and the civil proceedings. See Hanson v. Phillips, 442 F.3d 789, 795 (2d Cir. 2006). Specifically, the Second Circuit requires that the Court find an "expressly require[ed] nexus between fugitivity and the course of the [] proceedings." Empire Blue Cross & Blue Shield v. Finkelstein, 111 F.3d 278, 280 (2d Cir. 1997). That nexus must be between the plaintiff's alleged absence and the court's ability to conduct the proceedings — not merely between the civil claims and any related criminal matter. This Court applied that standard in a prior civil action brought by this Plaintiff, declining to stay proceedings because the required nexus was absent. Teman v. Zeldes Needle Cooper LLP, No. 1:2024cv09830 (LJL) (S.D.N.Y. Dec. 31, 2025), Dkt. No. 32 at 6 n.4. The same analysis compels the same result here. This action is a civil fee-fraud and contract dispute. All relevant documents are in Defendants' possession and control in this District. Plaintiff is temporarily abroad receiving medical treatment for Eustachian Tube Dysfunction and intends to return to his residence in Miami Beach, Florida upon completion of that treatment. The Court can fully and fairly adjudicate this case regardless of Plaintiff's temporary location. Plaintiff's temporary absence from the jurisdiction does not affect the Court's ability to conduct these proceedings, and Plaintiff remains fully engaged in this litigation.

## FACTUAL ALLEGATIONS

### A. The Engagement and the $200,000 Fixed Fee

14. On August 30, 2021, Defendant Lewis sent Plaintiff an engagement letter on behalf of himself and Defendant Marmur (the "Engagement Letter"), which was accepted and executed by Plaintiff.

15. The Engagement Letter contained the following specific and material promises: (a) Lewis and Marmur would be "the attorneys primarily responsible for the representation"; (b) the fixed fee was $200,000 for the Second Circuit appeal; (c) the engagement "will conclude upon receipt of a decision from the judicial panel that decides the Second Circuit appeal"; and (d) Defendants agreed, "without additional charge, to make a request to the District Court for a modification of [Plaintiff's] terms of release on bail pending appeal, relating to [his] wearing of an ankle monitor."

16. The Engagement Letter required payment of the full $200,000 "in order to begin work on the appeal." Plaintiff paid the full $200,000 as required. The Engagement Letter acknowledged that support staff, "including paralegals, who are not attorneys," might be involved in document preparation — but did not disclose that substantive legal work would be performed by non-attorney personnel.

### B. The Ankle Monitor Motion — A Specific Contractual Promise Not Performed

17. On September 17, 2021 — eighteen days after retaining Defendants — Plaintiff was required to write to the district court himself, pro se, to seek removal of his electronic monitoring device for medical purposes. On September 22, 2021, Judge Engelmayer granted the modification, ordering removal of location monitoring and curfew conditions specifically to facilitate Plaintiff's medical treatment. ECF No. 280. Judge Engelmayer stated: "The Court wishes Mr. Teman a full and speedy recovery." On October 7, 2021 — during the active engagement period — Plaintiff underwent surgery. On October 15, 2021, Plaintiff filed a submission with the court noting he was "in pain and unwell much of the day following surgery" and unable to obtain required documentation on time. Judge Engelmayer again acknowledged the medical situation and expressed wishes for Plaintiff's "speedy and full recovery." ECF No. 290 (Oct. 15, 2021). These two docket entries — both endorsed by Judge Engelmayer — establish that Plaintiff underwent surgery and was medically incapacitated during the active period of the representation for which Defendants were being paid $200,000. Defendants never filed the ankle monitor modification motion they had specifically promised in the Engagement Letter. Plaintiff had to file it himself, pro se — and the federal docket confirms that Lewis and Marmur never appeared in the Southern District of New York at any time during the representation.

## C. Extension Motions and the State of Work During the Engagement

18. Defendants filed two motions for extension of time with the Second Circuit: on or about December 13, 2021, and on January 11, 2022. Each extension motion represented that additional time was needed to prepare the brief. The January 2022 extension motion specifically represented that the extension was needed "to ensure that appellate counsel has sufficient time to become familiar with the record and prepare the brief."

19. As of January 6, 2022 — five days before filing the second extension motion — Defendant Lewis communicated in writing that he had not completed reading the trial transcript after more than four months of engagement. A working draft of the January 2022 extension motion produced in the Turnover Production contains Lewis's own embedded editorial comments addressed to the drafter in the second person, raising questions concerning the drafting process for court filings submitted under Lewis's signature.

20. The January 2022 extension motion represented that "Appellant does not intend to seek any further extensions." Defendants withdrew from the representation nine days before the extended February 24, 2022 deadline without completing the brief.

21. The client file produced by Defendants on May 11, 2026 reflects that meaningful substantive appellate drafting appears not to have commenced until late January 2022 — approximately one month before Defendants' withdrawal — despite a five-month engagement. The extension motions filed in December 2021 and January 2022 represented that work was actively progressing during a period when the documentary record reflects limited substantive activity.

## D. The Final Brief — Metadata Anomalies and Authorship Questions

22. CLM utilizes a document management system that, as reflected throughout the Turnover Production, automatically populates author identity and last-modified-by fields in firm documents. Every document in the Turnover Production — with the sole exception of the three final appellate brief files — reflects named author fields consistent with this automatic population practice.

23. The three final appellate brief files reflect the following anomalous metadata patterns: blank author identity fields; blank last-modified-by fields; metadata reflecting minimal editing activity and an absence of iterative revision history — patterns inconsistent with 56-to-65 page appellate briefs developed over a five-month engagement by two attorneys who represented they were personally responsible for the work. These patterns are inconsistent with CLM's automatic document population practices as reflected throughout the remainder of the production, and are inconsistent with organically developed legal work product.

24. By contrast, working documents in the same production reflect named authors and meaningful revision activity. A document identified as notes for the matter was authored by Bill Borenstein, identified on CLM's own public website as a legal assistant, not an attorney. The metadata of that document reflects substantial revision activity. Plaintiff does not allege that legal assistants cannot participate in document preparation; the issue is that the apparent level of non-attorney involvement in the production record appears materially inconsistent with the impression Plaintiff was given — through the engagement letter and subsequent representations — that Lewis and Marmur would be personally and primarily responsible for the representation.

25. The anomalous metadata patterns in the three final brief files raise substantial questions concerning the provenance, authorship, and preservation history of those documents. Plaintiff does not presently allege that Defendants fabricated documents or conclusively altered metadata, but rather that the productions contain anomalies and omissions warranting forensic discovery and raising substantial questions concerning the completeness and integrity of the client file. The documented anomalies are sufficiently inconsistent with the surrounding production to warrant narrowly tailored forensic inspection of the original native files and CLM's document management system audit logs.

## E. Cumulative Chronology and Scienter

26. The objective chronology of the engagement supports the inference that Defendants knowingly overstated substantive progress while concealing the true state of readiness from Plaintiff. Each element below is grounded in documented facts independent of any forensic metadata analysis: (a) Lewis and Marmur never appeared in the Southern District of New York despite an unconditional written promise in the engagement letter to file a bail modification motion without charge; (b) Plaintiff was required to file that motion himself, pro se, eighteen days into the engagement; (c) the court granted it specifically to facilitate Plaintiff's medical treatment, with the judge expressing wishes for his recovery — ECF No. 280 — confirming the motion was medically urgent; (d) Lewis stated in writing on January 6, 2022 that he had not completed reading the trial transcript after more than four months; (e) five days later, Lewis filed an extension motion representing that counsel needed time to become familiar with the record; (f) Lewis's March 3,

2022 post-termination letter claimed that attorney time exceeding the $200,000 fee had been devoted to the matter, and attributed authorship of a 60-page brief to Lewis and Marmur personally; (g) that same letter cited a January 31, 2022 email to portray active attorney deliberation, while the Turnover Production omits that communication; and (h) the engagement was abandoned at the filing deadline without completing the contracted scope. This chronology does not depend on metadata. It is the primary evidentiary basis for the fraud and concealment claims. The metadata anomalies are corroborative, not foundational.

## F. Joint-Retention Structure, Fiduciary Disclosure Obligations, and Fraudulent Concealment

27. The engagement letter created a joint representation structure in which Lewis and Marmur, attorneys from two separate firms, jointly undertook the representation of Plaintiff for a single fixed fee of $200,000. By accepting the joint engagement, each attorney implicitly represented to Plaintiff that both named attorneys would be actively and substantially participating in the representation. Each attorney knew that Plaintiff had retained and paid $200,000 in reasonable reliance on the promise of coordinated dual-attorney effort by two specifically named professionals. This joint engagement structure imposed on each attorney an affirmative fiduciary obligation to disclose material facts concerning the actual status of the representation — including facts about the other attorney's level of participation and the extent of substantive progress — that were exclusively within Defendants' knowledge and possession.

28. Each Defendant possessed superior and exclusive knowledge of material facts concerning the actual status of the engagement that were not available to Plaintiff, including: the extent to which Lewis had or had not reviewed the trial record; the extent to which Marmur had or had not engaged in substantive drafting; the actual volume and nature of work performed relative to the engagement's scope; and the true state of appellate preparation at the time extension motions were filed with the Second Circuit. Plaintiff had no independent means to assess these facts, which were exclusively within Defendants' possession until the May 11, 2026 Turnover Production.

29. Defendants made partial disclosures to Plaintiff and to the Second Circuit that were misleading by reason of the material facts they omitted. The December 2021 and January 2022 extension motions represented that additional time was needed to prepare the brief, creating the impression that substantive appellate work was actively in progress. These representations omitted the material facts that: Lewis had not completed reading the trial transcript after more than four months of engagement, as he confirmed in writing on January 6, 2022; meaningful substantive drafting had not commenced; and the work was not being performed by Lewis and Marmur personally as promised in the engagement letter. A partial disclosure that creates a misleading impression by omitting material contrary facts constitutes fraud under New York law. See Swersky v. Dreyer & Traub, 219 A.D.2d 321 (1st Dep't 1996). Each of Defendants' representations concerning the status of the work was misleading not because it was false on its face, but because it omitted material facts that directly contradicted the impression it created.

30. Throughout the engagement, Defendants affirmatively concealed from Plaintiff the material facts concerning the limited extent of substantive progress. Defendants did not disclose to Plaintiff that Lewis had not completed transcript review after four months. Defendants did not

disclose the extent to which substantive drafting had not commenced. Defendants did not disclose that the joint engagement was not proceeding as the engagement letter represented. Defendants continued to accept the engagement and its benefits while Plaintiff remained in reasonable ignorance of these facts. Each attorney had superior knowledge of material facts about the true state of the engagement; each knew the client lacked that knowledge; and neither took steps to correct the client's false impression about the status of the jointly-undertaken work.

31. In reasonable reliance on Defendants' representations and in the absence of disclosure of the material facts they concealed, Plaintiff: refrained from seeking substitute appellate counsel during the period when adequate preparation time remained available; refrained from demanding an immediate accounting of work performed; refrained from initiating fee-recovery proceedings; and continued to await the promised brief preparation. Had Plaintiff known the true state of the engagement — that Lewis had not read the transcript after four months and that meaningful drafting had not commenced — Plaintiff would have taken immediate action to protect his appellate rights, including retaining substitute counsel with sufficient time to prepare competently. The window for such substitute preparation was progressively foreclosed by Defendants' concealment throughout the engagement period.

## G. The Shapiro Referral, Undisclosed Financial Relationship, and Misleading Statement

32. Prior to retaining Defendants Lewis and Marmur, Plaintiff consulted with Alexandra Shapiro of Shapiro Arato Bach LLP regarding potential appellate representation. On August 5, 2021, Shapiro declined to take the matter and specifically recommended Defendant Marmur, writing that "Nate is an excellent criminal appellate attorney who has extensive experience with Second Circuit appeals." Plaintiff retained Marmur in direct reliance on this recommendation. Shapiro did not disclose at the time of the referral any financial relationship between herself and Marmur.

33. In February 2026, when Plaintiff sent a process server to serve Defendant Marmur in connection with this action, Plaintiff first discovered that Marmur's office is physically located within the offices of Shapiro Arato Bach LLP at 500 Fifth Avenue, New York. Plaintiff alleges, on information and belief, that Marmur occupies office space within Shapiro Arato Bach LLP's offices pursuant to a financial arrangement under which Marmur makes regular payments to Shapiro or her firm — an arrangement that existed at the time of the August 2021 referral and continued throughout the representation period. This arrangement created a direct financial interest: Marmur's ability to generate client fees from engagements such as Plaintiff's directly affected his ability to meet his financial obligations to Shapiro.

34. On March 1, 2022, Plaintiff asked Shapiro directly whether she or her firm had been paid anything in connection with the referral. On March 2, 2022, Shapiro responded: "No referral fee was paid to me or my law firm. As a matter of course, we do not take referral fees and have never done so." This statement was narrowly confined to the specific category of referral fees. It did not disclose the office-sharing and payment arrangement between Shapiro and Marmur. Plaintiff alleges that this statement was materially misleading: Shapiro answered a question about payment by denying a referral fee while omitting the material fact of an ongoing financial arrangement with Marmur that created precisely the conflict of interest Plaintiff was inquiring

about. Under New York's misleading partial disclosure doctrine, a statement that is technically accurate but omits material facts that contradict the impression it creates constitutes fraud. Shapiro's denial of a referral fee, while omitting the office-sharing payment arrangement, is such a statement.

35. The referral chain in this engagement was not arms-length. Shapiro referred Plaintiff to Marmur. Marmur then recommended that Plaintiff retain Lewis and CLM, representing that doing so would provide the resources of a major firm for the appeal. Marmur thus controlled both ends of the referral chain: he was referred to Plaintiff by Shapiro — with whom he maintained an undisclosed financial arrangement through office co-location and regular payments — and he then brought Lewis and CLM into the engagement. Neither Shapiro nor Marmur disclosed the financial arrangement between them at any point during the engagement. Plaintiff alleges on information and belief that this referral structure reflected an established pattern of practice among these attorneys that was never disclosed to Plaintiff. The failure to disclose the financial relationships within the referral chain deprived Plaintiff of the ability to make an informed decision about the integrity of the referral and the relationships among the attorneys he was paying $200,000 to represent him.

36. Plaintiff first discovered the office-sharing arrangement in February 2026 through process service. This claim therefore accrues no earlier than February 2026 and is timely within six years from that date. Plaintiff further alleges that Shapiro's March 2, 2022 misleading statement gives rise to an independently accruing fraud claim from that date, also timely within six years.

## H. Post-Termination Communications — 2022 and 2023

37. On March 1, 2022 — six days after termination — Plaintiff transmitted a written demand to Defendants Lewis, Marmur, and CLM, copied to all CLM partners, demanding return of the full $200,000 retainer and additional compensation for damages, and specifically asserting claims for fraud and violations of Judiciary Law § 487. Defendants and CLM had actual notice of Plaintiff's claims from March 1, 2022.

38. On March 3, 2022, Defendant Lewis transmitted to Plaintiff by email a four-page letter on Carter Ledyard & Milburn letterhead (the March 3 Letter) specifically rejecting Plaintiff's fee-recovery demand and making detailed representations about the nature and extent of work performed, including that: the full services set forth in the engagement letter had been performed; the value of attorney time devoted to the matter exceeded the $200,000 fixed fee; a 60-page brief had been prepared by this Firm and Mr. Marmur; and that extensive work had been performed outside the engagement scope. Each of these representations is directly addressed in Count III of this complaint. The March 3 Letter was copied to Nathaniel Marmur and Gary Sesser of CLM.

39. On March 30, 2022, Plaintiff's father David Teman transmitted a further settlement demand to Lewis and Marmur requesting return of $125,000 of the fee. On April 5, 2022, Lewis responded by email declining to engage on the merits, citing Plaintiff's representation by counsel, but not denying the specific representations made in the March 3 Letter.

**I. The May 11, 2026 Turnover Production — Newly Discovered Facts**

40. On May 11, 2026 — more than seven months after this action was commenced — Defendants produced a client file turnover (the "Turnover Production"). This was the first substantially complete production of the client file Plaintiff had received despite repeated demands beginning in February 2022. Plaintiff could not have fully evaluated the completeness, integrity, or content of the client file prior to receiving the Turnover Production.

41. Review of the Turnover Production revealed two independently significant categories of newly discoverable facts: (a) the apparent omission of at least one known and material client communication; and (b) the anomalous metadata patterns in the three final appellate brief files described above.

**J. The Omitted January 31, 2022 Communication**

42. On January 31, 2022, Plaintiff transmitted to Defendants Lewis and Marmur an email communication titled "Gelfand had this: Fwd: Can we update these PPXYZ Terms?" This communication was sent directly to both Defendants during the active representation period and was received by them.

43. The January 31, 2022 communication contained materials of direct legal significance to Plaintiff's appellate representation, including prior counsel communications concerning the contractual and business framework governing Plaintiff's operations, legal drafting discussions, materials relating to the PropertyPanel and GateGuard contractual structure, attached draft terms of service, and dispute resolution provisions. These materials directly supported Plaintiff's position that the account drafting and platform operations at issue in the underlying criminal matter were contractually authorized and known to counterparties — a defense theory going to intent and authorization that was available on the appellate record. Plaintiff alleges that the omission of these materials impaired successor counsel's ability to evaluate and advance that argument.

44. The January 31, 2022 communication appears absent from the Turnover Production. Plaintiff has reviewed the Turnover Production and has not located this communication or the materials attached to it among the produced documents. The communication was transmitted directly to both Lewis and Marmur at their documented email addresses; Plaintiff received no delivery failure or bounce-back notification; and the communication remains in Plaintiff's sent mail records. The Turnover Production includes other communications from surrounding dates, making the specific omission of this communication anomalous rather than the result of ordinary data loss. Plaintiff could not have known this communication was omitted prior to receiving and reviewing the Turnover Production on May 11, 2026.

45. The omission of the January 31, 2022 communication from the Turnover Production raises material questions concerning the completeness and integrity of the client file as produced. Plaintiff alleges, on information and belief, that the Turnover Production was materially incomplete. Whether this omission also affected the file delivered to successor counsel in February 2022 is a question that production and discovery may resolve.

**K. Post-Filing Metadata Concerns — CLM Production**

46. The Turnover Production from CLM was produced on May 11, 2026 — more than seven months after this action was filed and after Plaintiff had formally requested production of the complete client file. Defendants' duty to preserve evidence arose no later than October 3, 2025.

47. Plaintiff alleges, on information and belief, that the anomalous metadata patterns in the three final brief files — including the blank author identity fields inconsistent with CLM's automatic population practices — may reflect alteration or removal of metadata after Defendants' duty to preserve arose. Plaintiff does not assert at this stage that such alteration has been conclusively established. The anomalous patterns are inconsistent with the surrounding production and warrant forensic investigation. If forensic inspection confirms post-filing metadata alteration, Plaintiff will seek leave to amend and will seek appropriate sanctions.

**L. The Marmur Image-Only Production — Intentional ESI Metadata Suppression**

48. On April 17, 2026 — prior to the initial pretrial conference — Plaintiff transmitted a formal written demand to Marmur's counsel at Marshall Dennehey and directly to Marmur, Boxer, and Wallace, demanding production of the complete client file in full, without redaction, and in a reasonably usable electronic format. Plaintiff's April 17 demand specifically requested all native electronic documents including emails, drafts, internal notes, and work product, and specifically noted that if any materials had been lost, destroyed, or withheld, Defendants should identify them with specificity. The April 17 demand put Defendants on express notice that Plaintiff required the file in electronic format and would take appropriate action to enforce his rights.

49. At the initial pretrial conference before Judge Liman on May 20, 2026, the production of Marmur's client file was addressed. On May 21, 2026 at 12:30 AM — the day after the conference — Matthew K. Flanagan of Marshall Dennehey, counsel for Marmur and NMP, transmitted an email to Plaintiff stating: "In accordance with the discussions held at the conference before Judge Liman earlier today, we intend to provide you with a copy of the file maintained by Mr. Marmur in connection with his representation of you. We are working with the vendor and hope to have the file to you this week." This email establishes: (a) the production obligation arose from discussions at the May 20 conference; (b) Flanagan and Marmur's counsel were already working with KLDiscovery as of May 21 — six days before the production was delivered; and (c) the promised delivery window was "this week" — i.e., by May 23-24, 2026.

50. Marmur's counsel failed to produce the file by the promised "this week" deadline. On May 23, 2026, Plaintiff followed up asking whether the file had been sent. On May 24, 2026 at 4:38 PM, Flanagan responded that the vendor was closed for the holiday and committed: "we'll make sure you get it on Tuesday" — i.e., Tuesday May 26, 2026. On May 25, 2026, Plaintiff demanded production by Tuesday morning, or by Wednesday at the latest with a detailed explanation if not possible. The file was not produced on Tuesday May 26 or Wednesday May 27 morning. It arrived at 1:28 AM on May 27, 2026 — after two missed deadlines and six days after Flanagan confirmed counsel was already working with the vendor.

51. The six-day period between May 21 — when Flanagan confirmed counsel was working with the vendor — and May 27 — when the production was delivered — is the period during which the client file materials were processed through KLDiscovery's eDiscovery platform and processed into static image format, with the effect of limiting access to native metadata. Plaintiff's April 17 demand had specifically requested production in a reasonably usable electronic format. Plaintiff's May 20, 2026 email to Marmur's counsel — sent before the conference — had specifically referenced the meta-analysis of the Lewis/CLM production suggesting evidence tampering through metadata anomalies, and stated that avoiding production of the file "further incriminates your client." The production format was directed by Flanagan or a colleague at Marshall Dennehey acting under his supervision. KLDiscovery's own disclaimer confirms that all production decisions were made under the direct legal supervision of the attorney representing KLDiscovery's client — which was Marmur, represented by Marshall Dennehey. Flanagan's May 21, 2026 email confirming that counsel was already working with the vendor establishes his firm's direct supervisory role over the production. Marmur's counsel directed the image-only production format with knowledge that: (a) Plaintiff had requested native electronic format; (b) Plaintiff had already raised metadata concerns about the CLM production; and (c) native file metadata would be material to the pending litigation. Plaintiff alleges, on information and belief, that the format chosen had the effect of limiting access to the same category of metadata that the CLM production had shown to be material, and that the production was delivered in circumstances raising substantial questions warranting forensic discovery into the production instructions and specifications.

52. The Marmur production was delivered entirely in normalized litigation image format — Bates-stamped static renderings consistent with a formal eDiscovery export workflow — containing no native electronic files of any kind. The production contained no native Word (.doc or .docx) files, no native PDF documents, and no native spreadsheets with the exception of the single Excel workbook already identified in the CLM production. This is significant because the CLM production — produced as part of the same joint engagement — did include native Word and Excel files with intact metadata. The CLM production thus establishes as a factual matter that the engagement generated native electronic documents in Word and Excel format that were maintained on CLM's internal systems. Marmur's production of zero native Word or PDF files — from an engagement in which co-counsel CLM produced such files — is not explained by the absence of such documents in Marmur's possession. It is consistent with the inference that native electronic documents did exist in Marmur's file, and that they were converted to static image format specifically to suppress their metadata before production. Attorney notes, strategic memoranda, correspondence, and other materials self-evidently created as native electronic documents were produced as static image renderings stripped of their native electronic properties.

53. Plaintiff's right to his client file is independent of and not contingent upon formal litigation discovery. Plaintiff's April 17, 2026 demand specifically stated: "This request reflects my independent right to my client file, which exists outside of and is not dependent upon discovery or any pending litigation." This is correct as a matter of New York professional conduct rules: Rule 1.16(e) obligates an attorney to promptly deliver to the former client all papers and property to which the client is entitled. This obligation exists independent of any discovery stay or litigation schedule. The May 20, 2026 order staying discovery pending motions to dismiss does not affect Plaintiff's independent right to his client file. Defendants therefore cannot invoke the discovery stay as justification for the format or timing of the client file production. The image-only

production was not ordinary litigation discovery — it was the production of Plaintiff's own property.

54. The production included OCR text sidecar files associated with the image renderings. These sidecar files contained no text content, which impaired the searchability and usability of the production and limited Plaintiff's ability to evaluate the content and drafting history of the produced materials.

55. The presence of systematic Bates numbering, confidentiality designations, and empty OCR sidecar files demonstrates that the Marmur production was not an ordinary file transfer — it was a formal, normalized litigation export processed through a commercial eDiscovery platform using a production methodology that systematically converted native electronic documents into static image format. This format limited access to native metadata including: authorship fields; document creation dates; modification dates; revision history; tracked changes; internal comments; save history; drafting chronology; internal file paths; and all evidence concerning the timing, extent, and sequential development of any legal work performed.

56. The Ganley Excel workbook produced in the earlier CLM production contained intact native metadata — including internal CLM file paths identifying the matter folder as F-Data-Ganley-TEM06001-SDNY Transcripts — demonstrating that Defendants maintained client file materials in native electronic format on internal CLM systems. The subsequent Marmur production, processed through an eDiscovery platform weeks after Plaintiff had raised metadata concerns, produced those same categories of materials as static images devoid of native metadata. The contrast between a production that preserved native metadata and a subsequent production that systematically suppressed it — in the context of pending litigation over the authenticity and extent of work performed — supports the inference that the image-only format was selected in context that raises substantial questions concerning the completeness of native metadata available to Plaintiff.

57. KLDiscovery's own disclaimer, included in the production delivery email, states that all document review projects operated by KLDiscovery are under the direct legal supervision of the attorney or firm representing KLDiscovery's client. This disclaimer establishes that the production format — including the image-only methodology — was selected and directed by Marmur's counsel, not independently determined by the vendor. The decision to produce electronically-created documents as static images stripped of native metadata was a deliberate attorney-directed choice.

58. Plaintiff had specifically requested production of the client file in a reasonably usable electronic format prior to the production. Native file production was technically feasible — the CLM production demonstrates that CLM's systems maintained the engagement materials as native electronic documents with intact metadata. Despite Plaintiff's request for electronic format and the demonstrated availability of native files, the Marmur production was delivered exclusively as static image renderings. That format limited Plaintiff's ability to examine native metadata, drafting chronology, authorship fields, and revision history relevant to evaluating the nature and extent of work performed during the engagement. (On May 28, 2026, prior to filing this Amended Complaint, Plaintiff transmitted a written request to Marmur's counsel and to KLDiscovery requesting production of the corresponding native Word and PDF files, associated metadata, OCR text files, and production logs relating to the May 27, 2026 production; as of the date of filing, no response or supplemental native production had been received.)

59. A review of the image-rendered documents in the Marmur production reveals a further material anomaly: the production contains virtually no documents reflecting iterative attorney drafting, collaborative revision, or standard redline methodology. In ordinary appellate representation, attorney work product consists substantially of successive drafts, revision markings, edits, comments, and back-and-forth correspondence reflecting the development of legal arguments. The substantial absence of such materials — combined with the image-only format that prevents examination of revision history — is consistent with the inference that the production does not accurately reflect the full scope of electronic materials maintained in connection with the representation, and that materials reflecting the actual state of work product during the engagement have not been produced.

60. The pattern across both productions — the CLM production containing native files whose metadata showed blank author fields and patterns inconsistent with months of substantive attorney drafting, and the Marmur production delivered in an image-only format that suppresses all such metadata entirely — supports the cumulative inference that the productions were organized in a manner that limits examination of the native electronic record of work performed during the engagement. Plaintiff alleges, on information and belief, that the image-only format was selected in circumstances where native production would have permitted evaluation of metadata relevant to Plaintiff's allegations concerning the timing and extent of work performed.

61. The CLM production further corroborates the inference that Marmur performed little or no substantive appellate work during the engagement. Lewis and Marmur were jointly retained as co-counsel under a single engagement letter, with both attorneys personally responsible for the representation. If Marmur had been performing substantive appellate work — reviewing transcripts, researching arguments, drafting sections, or contributing to the brief — those working materials would ordinarily have been shared with Lewis and CLM, or reflected in collaborative communications between the two firms. The CLM production, which was produced in native format with intact metadata, contains no Marmur-authored drafts, no Marmur research materials, no cross-firm collaborative documents, and no communications reflecting Marmur's substantive contributions to the brief. The final appellate brief files attributed to Lewis and Marmur reflect metadata patterns — including minimal recorded editing activity and the absence of iterative revision history — that are inconsistent with documents developed through months of substantive attorney drafting by two experienced appellate lawyers. A 56-to-65 page federal appellate brief prepared over a five-month engagement by two named attorneys working collaboratively would ordinarily generate substantial revision history, multiple draft versions, and evidence of back-and-forth between the attorneys responsible. The CLM production contains none of that. The only document in the production reflecting meaningful revision activity was authored by a non-attorney legal assistant. The absence of any Marmur-originated substantive work product in the CLM native file production — combined with the image-only Marmur production that limits access to equivalent metadata — raises substantial questions concerning the extent of Marmur's substantive contributions to the representation. Plaintiff alleges this pattern is more consistent with the inference that Marmur's involvement was materially less than represented than with Lewis's post-termination claim that both attorneys had devoted substantial time to the matter. Plaintiff acknowledges that collaborative work may have occurred through means not captured in the CLM production, such as oral discussions or informal review, but alleges that the absence of any documentary trace of such collaboration in a native file production warrants forensic inquiry.

62. The Marmur production contains, particularly in the higher Bates number ranges, documents that appear to be court filings and litigation materials from proceedings whose relevance to United States v. Teman or the Second Circuit appeal is not apparent. By way of example, documents at Bates numbers including NM_003699 and NM_003732 appear to be state court filings from a 2018 matter having no discernible connection to the federal criminal appeal for which Plaintiff retained Defendants. The inclusion of materials of unclear relevance in a client file production — without explanation — raises questions concerning the scope and organization of the collection. The image-only production format limits Plaintiff's ability to evaluate when and how these materials became associated with Marmur's file. Forensic discovery into the collection and processing history of the production is necessary to evaluate these questions.

## M. Statute of Limitations

63. The primary claims herein are pleaded as fraud and breach of contract, each carrying a six-year statute of limitations. The Engagement Letter was executed August 30, 2021. This action was filed October 3, 2025. All claims arising from the 2021-2022 engagement are timely under the six-year limitations period applicable to fraud and contract claims. The Judiciary Law § 487 claim likewise carries a six-year limitations period and is timely from the March 1, 2022 demand date.

64. To the extent any shorter limitations period is argued to apply to the alternative legal malpractice claim, that claim is independently tolled by the following cumulative bases. The primary tolling bases — set forth in paragraphs 40 and 41 below — are grounded in Defendants' own conduct: their fraudulent concealment, their incomplete and delayed file production, and their exclusive possession of the factual predicate necessary to evaluate and plead the specific claims alleged herein. The additional bases set forth in paragraphs 42 through 45 are personal-circumstance bases that are cumulative and corroborative. Plaintiff alleges these bases independently and cumulatively support equitable tolling through the filing of this action.

65. First, continuous pursuit. Plaintiff made written demands on March 1, 2022, received a response on approximately April 5, 2022, made further demands in June 2023, and filed this action October 3, 2025. Defendants had continuous actual notice throughout this period.

66. Second, incomplete production and delayed discovery. Defendants failed to produce a complete client file despite demands beginning February 2022. The specific factual chronology underlying Plaintiff's claims — including the metadata anomalies, the authorship questions, and the omission of the January 31, 2022 communication — was not discoverable without access to native file materials that were exclusively within Defendants' possession and not produced until May 11, 2026. Knowing a representation ended unsuccessfully is not the same as possessing the specific factual chronology later reflected in produced file materials and metadata.

67. Third, medical incapacity. During the active engagement period, Plaintiff underwent surgery on October 7, 2021, as documented on the federal docket in United States v. Teman. On September 22, 2021, the district court had modified Plaintiff's bail conditions specifically to facilitate medical treatment. ECF No. 280. On October 15, 2021, Plaintiff filed a submission noting he was "in pain and unwell much of the day following surgery." ECF No. 290. The recovery period extended well beyond six months, constituting an independent basis for tolling. Plaintiff's

authorized representative conducted settlement correspondence on his behalf during portions of this period, including the March 30, 2022 demand.

68. Fourth, incarceration. Plaintiff was incarcerated from October 10, 2023 through May 28, 2024. During that period, Plaintiff's ability to investigate and pursue this complex multi-party action — which requires analysis of native files, metadata records, and client file materials not in Plaintiff's possession — was materially impaired. Equitable tolling does not require absolute impossibility; it requires that pursuit of the specific claims was impracticable. This basis is pleaded as cumulative and corroborative.

69. Fifth, post-release medical impairment. Following release in May 2024, Plaintiff experienced medical complications requiring ongoing treatment and government-supervised travel. These circumstances further limited Plaintiff's capacity to pursue this complex litigation during portions of the pre-filing period. These bases are pleaded as cumulative; the primary tolling theories — incomplete production, delayed discovery, and fraudulent concealment — are grounded in Defendants' own conduct and do not depend on Plaintiff's personal circumstances.

70. Sixth, fraudulent concealment. Defendants' post-termination misrepresentations concerning work performed, and their failure to produce a complete client file despite demand, independently toll any applicable limitations period until Plaintiff discovered or reasonably could have discovered the concealed facts through the May 11, 2026 Turnover Production.

71. Seventh, advice of successor counsel regarding privilege and appellate proceedings. Plaintiff further delayed commencing civil litigation during the pendency of his direct appeal and related post-conviction proceedings because successor counsel advised that initiating malpractice and fraud litigation against appellate counsel during those proceedings could create substantial disputes concerning waiver of attorney-client privilege, disclosure of appellate strategy communications, and production of confidential defense materials directly related to ongoing criminal proceedings. Plaintiff reasonably relied on that advice in deferring civil litigation until the conclusion of the relevant appellate proceedings. Successor counsel also advised Plaintiff that contemporaneous civil litigation against appellate counsel during ongoing criminal proceedings could create strategic complications in those proceedings.

72. The 2026 claims arising from the Turnover Production accrue on May 11, 2026 and are independently timely regardless of how the Court resolves any limitations issues concerning the earlier claims.

## PRELIMINARY NOTE — DISTINCTION FROM LEGAL MALPRACTICE

73. This action does not arise merely from unsuccessful appellate representation or negligent legal judgment. Plaintiff alleges repeated affirmative misrepresentations concerning: who would personally perform the contracted work; the extent of work completed at the time extensions were sought; the status of substantive drafting throughout the engagement; the intended completion of the appeal through a final decision; and the completeness of the subsequently produced client file. These affirmative misrepresentations — made before, during, after, and in connection with the representation — are distinct from the professional judgment failures that

constitute ordinary malpractice. They form the basis of the fraud, breach of contract, and Judiciary Law § 487 claims alleged herein.

## CAUSES OF ACTION

### COUNT I — FRAUDULENT INDUCEMENT

(Against Defendants Lewis, Marmur, CLM, and NMP)

74. Plaintiff repeats and realleges all preceding paragraphs.

75. This claim does not sound in legal malpractice and is not duplicative of any malpractice claim. It arises from specific false representations made to induce Plaintiff's $200,000 payment before the representation commenced — conduct collateral to and legally distinct from any professional performance duty. The damages sought — return of the full pre-payment — are distinct from malpractice damages recoverable for negligent performance. See Calcutti v. SBU, Inc., 224 F. Supp. 2d 691, 698 (S.D.N.Y. 2002).

76. On August 30, 2021, Defendants induced Plaintiff to pay $200,000 by representing that Lewis and Marmur would personally serve as the attorneys primarily responsible for his Second Circuit appeal, that the engagement would continue through receipt of a final decision, and that the ankle monitor modification would be filed without additional charge.

77. Plaintiff alleges, on information and belief, that these representations were materially false when made, in that: (a) the metadata record reflects apparent involvement by a non-attorney legal assistant in document preparation that appears materially inconsistent with the engagement letter's representation that Lewis and Marmur would be personally and primarily responsible; (b) the engagement was abandoned before completion of the contracted scope; and (c) the ankle monitor modification was never filed. The inference of fraudulent intent at inducement is supported by the pattern of non-performance from the earliest days of the engagement — Plaintiff was required to file the promised ankle monitor motion himself, pro se, eighteen days after paying $200,000 to retain Defendants for that very purpose.

78. Plaintiff justifiably relied on Defendants' pre-engagement representations in paying the $200,000 fixed fee. Had Plaintiff known that the contracted attorney work would be performed in substantive portions by a non-attorney, that the engagement would be abandoned before the appeal concluded, and that the ankle monitor modification would not be filed, Plaintiff would not have entered the engagement or paid the fee. As a direct and proximate result, Plaintiff suffered damages of not less than $200,000, plus consequential damages, interest, and punitive damages.

### COUNT II — FRAUD DURING THE REPRESENTATION

(Against Defendants Lewis, Marmur, and CLM)

79. Plaintiff repeats and realleges all preceding paragraphs.

80. This count arises not from negligent legal work but from misleading partial disclosures concerning the actual status of the engagement that concealed material facts from Plaintiff while he continued relying on the representation. Throughout the engagement, Defendants maintained the appearance of active progress while concealing from Plaintiff the true state of readiness. Plaintiff, physically isolated and medically incapacitated during portions of the representation, had no independent means of evaluating whether the work was proceeding as represented. The concealment of the true state of readiness — as distinct from negligent performance of the work itself — is the basis for this count.

81. The most concrete example of this concealment is the January 11, 2022 extension motion, which represented to the Second Circuit that counsel needed time to become familiar with the record — five days after Lewis had stated in writing that he had not completed reading the trial transcript after more than four months. Plaintiff alleges that this representation — made to the court in the context of seeking additional time — was materially misleading by reason of the specific fact it omitted. Throughout the representation, Plaintiff received no contrary indication and continued to believe substantial progress was occurring. The damages from this concealment are distinct from malpractice: Plaintiff lost the window during which substitute counsel with adequate preparation time could have been retained.

82. Plaintiff reasonably relied on those representations in continuing the engagement and refraining from seeking substitute counsel. Specifically: Plaintiff did not seek substitute appellate counsel during the period when substitute counsel could have obtained adequate preparation time; Plaintiff did not demand immediate file production; and Plaintiff did not initiate fee-recovery proceedings during the engagement period. As a direct result, Plaintiff suffered damages including the loss of time during which competent substitute counsel could have been retained.

## COUNT III — POST-TERMINATION FRAUD

(Against Defendant Lewis)

83. Plaintiff repeats and realleges all preceding paragraphs.

84. This count arises entirely from conduct occurring after the termination of the representation and is not duplicative of any malpractice claim. The March 3, 2022 letter and related communications were not legal work product — they were affirmative post-engagement representations made by Lewis in response to Plaintiff's explicit fraud and fee-recovery demand, for the specific purpose of defeating or delaying that demand. A lawyer who makes false statements of fact to a former client in order to resist a legitimate fee-recovery claim commits independent fraud, separate from any question of how well the underlying legal work was performed.

85. On March 1, 2022, Plaintiff transmitted a written demand to Lewis, Marmur, CLM, and all CLM partners asserting fraud and demanding return of the full $200,000 fee plus $200,000 in additional damages. On March 3, 2022, Lewis responded with a detailed four-page letter on CLM letterhead (the March 3 Letter), transmitted by email at 3:05 AM on March 4, 2022, with copies to

Nathaniel Marmur and Gary Sesser of CLM. The March 3 Letter was Lewis's substantive written response to Plaintiff's fraud allegations and fee-recovery demand.

86. In the March 3 Letter, Lewis made the following specific representations concerning the work performed during the engagement, each of which Plaintiff alleges was materially false or misleading when made, as demonstrated by the documentary record revealed in the 2026 Turnover Production:

87. Representation One — Full Performance: Lewis stated: "Nothing in your letter undermines the conclusion that this Firm and Mr. Marmur performed the services set forth in the engagement letter." This was a specific, unqualified representation that all contracted services had been fully performed. It is materially inconsistent with: (a) Lewis's own written admission on January 6, 2022 that he had not completed reading the trial transcript after more than four months; (b) the January 11, 2022 extension motion filed five days later representing that counsel still needed time to become familiar with the record; (c) the Turnover Production metadata showing patterns in the three final brief files inconsistent with documents reflecting months of substantive attorney drafting; and (d) the metadata showing meaningful revision activity concentrated in documents authored by a non-attorney legal assistant rather than the named attorneys.

88. Representation Two — Value of Work Exceeding the Fee: Lewis stated that "the value of the time devoted to your case, measured at the hourly rate provided in our engagement letter, exceeded the fixed fee that you paid this Firm." This representation — that more than $200,000 in attorney time had been devoted to the matter — is directly contradicted by the Turnover Production, which contains three final appellate brief files with blank author identity fields inconsistent with CLM's automatic population practices and metadata patterns inconsistent with the substantial attorney investment Lewis represented — patterns that are, at a minimum, materially at odds with a claim that more than $200,000 in attorney time was devoted to these specific work products.

89. Representation Three — Authorship of the Brief: Lewis referred to the "60-page brief prepared by this Firm and Mr. Marmur" and described the work as reflecting meaningful attorney effort. This representation attributed the authorship and preparation of the brief to Lewis and Marmur personally, consistent with the engagement letter's promise that they would be the attorneys primarily responsible. The metadata of the final brief files raises substantial questions about whether Lewis and Marmur were the actual authors, and the Turnover Production reveals that the non-attorney legal assistant Bill Borenstein — whose working documents reflect meaningful revision activity in the production metadata, in contrast to the minimal recorded editing activity in the final brief files attributed to Lewis and Marmur — was materially involved in the preparation of the work product in ways not disclosed to Plaintiff.

90. Representation Four — The Continuing-Consideration Statement and the January 31 Email: Lewis quoted in the March 3 Letter from his own January 31, 2022 email to Plaintiff, in which he stated he remained "open to persuasion" about including insufficiency-of-the-evidence arguments in the brief. Lewis used this quote to characterize the engagement as one of active attorney deliberation and considered legal strategy. What Lewis did not disclose — and what was omitted from the Turnover Production — is that the same January 31, 2022 email chain contained the communication titled "Gelfand had this: Fwd: Can we update these PPXYZ Terms?" that transmitted to Lewis and Marmur contractual materials directly relevant to available defense theories. Lewis's quotation of the January 31 email to characterize the engagement favorably, while

the Turnover Production omits that same email's attachment of material client documents, raises substantial questions about the completeness and accuracy of his representations.

91. Representation Five — Bail Modification: Lewis represented that the firm had provided assistance with Plaintiff's motion to modify bail conditions as work performed outside the scope of the engagement. In fact, neither Lewis nor Marmur ever filed a motion to modify Plaintiff's bail conditions, never appeared in the Southern District of New York in connection with the representation, and Plaintiff was required to file the modification request himself, pro se, eighteen days after retention — a fact confirmed by the SDNY docket in United States v. Teman.

92. Plaintiff could not evaluate the truth of Lewis's March 3, 2022 representations at the time they were made. The factual predicate necessary to evaluate those representations — the Turnover Production, the native file metadata, the Borenstein working documents, the omission of the January 31 email, and the internal CLM file structure — was exclusively within Defendants' possession and was not produced until May 11, 2026. Lewis made his March 3 representations with direct personal knowledge of the actual state of the work, while Plaintiff had no equivalent access to the documentary record. Plaintiff alleges, on information and belief, that Lewis's representations were materially false or misleading when made, or were made with reckless disregard for their truth.

93. Lewis's March 3, 2022 representations caused Plaintiff concrete and specific harm distinct from any malpractice damages: (a) Plaintiff delayed immediate forensic investigation of the client file, reasonably believing based on Lewis's representations that substantial attorney work product existed; (b) Plaintiff deferred aggressive efforts to obtain the native client files, having been told that a full engagement had been performed; (c) Plaintiff continued to evaluate the dispute as a potential fee-negotiation matter rather than a metadata-based evidentiary investigation; and (d) Plaintiff delayed discovery of the missing January 31 communication and the metadata anomalies until the 2026 production, four years after Lewis's representations had created a false impression of substantial documented work product. These are reliance-based damages from the post-termination fraud itself — not from the underlying legal representation.

94. On March 30, 2022, Plaintiff's father David Teman transmitted a further settlement demand to Lewis and Marmur requesting return of $125,000. On April 5, 2022, Lewis responded by email declining to engage on the merits and redirecting communications through Plaintiff's counsel — but not retracting or qualifying any of the specific representations made in the March 3 Letter. Lewis's non-retraction of those representations on April 5, 2022 constitutes a continuation and reaffirmation of the post-termination misrepresentations. This claim accrues from March 3, 2022 and is timely within six years.

## COUNT IV — FRAUD AND BREACH OF FIDUCIARY DUTY — 2026 TURNOVER PRODUCTION

(Against Defendants Lewis, Marmur, CLM, and NMP)

95. Plaintiff repeats and realleges all preceding paragraphs.

96. Defendants had an independent legal and fiduciary obligation under New York Rules of Professional Conduct Rule 1.16(e) to produce a complete and accurate client file upon demand. On May 11, 2026, the Turnover Production was transmitted to Plaintiff by Judith Wallace, CLM's counsel of record in this action, acting on behalf of Defendants. Jeffrey Boxer, also CLM's counsel of record, was copied on the transmission in his supervisory capacity.

97. The Turnover Production appears materially incomplete by reason of at minimum the omission of the January 31, 2022 communication — a document transmitted directly to Lewis and Marmur during the active representation and directly relevant to available defense theories. The Turnover Production also contained three final appellate brief files with anomalous metadata patterns inconsistent with CLM's document management practices as reflected throughout the remainder of the production.

98. Plaintiff alleges, on information and belief, that Defendants' production of an apparently incomplete client file while implying completeness constitutes both a fraudulent misrepresentation by conduct and omission and an independent breach of fiduciary duty, arising from conduct occurring after the commencement of this litigation. This claim accrues on May 11, 2026 and is not subject to any limitations defense applicable to the 2021-2022 claims. Plaintiff was damaged in that he has been deprived of evidence material to this litigation. Plaintiff reserves the right to seek leave to add Wallace and Boxer individually as defendants if forensic discovery confirms their knowing participation in the production of an incomplete or altered file.

## COUNT V — BREACH OF CONTRACT

(Against Defendants Lewis, Marmur, CLM, and NMP)

99. Plaintiff repeats and realleges all preceding paragraphs.

100. The Engagement Letter constitutes a valid and binding contract. Plaintiff performed his obligations by paying the full $200,000 fixed fee. Defendants breached the Engagement Letter by: (a) failing to have Lewis and Marmur serve as the attorneys primarily responsible for the representation as promised; (b) failing to complete the representation through receipt of a Second Circuit decision as contractually defined; (c) failing to file the promised ankle monitor modification; (d) failing to deliver a complete client file upon termination; and (e) abandoning the representation at the filing deadline after obtaining two extensions.

101. As a direct and proximate result of Defendants' breach, Plaintiff suffered damages of not less than $200,000. This claim carries a six-year statute of limitations and is timely.

## COUNT VI — UNJUST ENRICHMENT

(Against Defendants Lewis, Marmur, CLM, and NMP — In the Alternative to Count V)

102. Plaintiff repeats and realleges all preceding paragraphs.

103. To the extent the Engagement Letter does not govern all aspects of the parties' relationship, or to the extent any portion of the contract claim fails, Plaintiff pleads unjust enrichment in the alternative. Plaintiff paid $200,000 in reasonable expectation that the contracted appellate representation would be performed by the attorneys promised. Defendants failed to complete the contracted representation, appear to have delegated substantive work to a non-attorney, and abandoned the engagement before its contractually defined conclusion. Defendants were further enriched not merely by fees for representation but by fees generated through a referral chain tainted by undisclosed financial conflicts among the attorneys involved. It is against equity and good conscience to permit Defendants to retain fees obtained through both the failure to perform the contracted work and through a referral structure whose financial relationships were concealed from the client who paid those fees.

## COUNT VII — BREACH OF FIDUCIARY DUTY — CLIENT FILE AND TRANSITION

(Against Defendants Lewis, Marmur, CLM, and NMP)

104. Plaintiff repeats and realleges all preceding paragraphs.

105. This claim is not based on negligent appellate advocacy. It is based on defendants' breach of fiduciary obligations of candor, loyalty, and disclosure that are legally distinct from the duty of competent professional performance. As the Court recognized in Teman v. Zeldes Needle Cooper, No. 1:2024cv09830 (S.D.N.Y. Dec. 31, 2025), a claim for breach of fiduciary duty may lie where an attorney violates the duty of loyalty or honesty rather than merely failing to adhere to professional standards of competence.

106. Throughout the engagement and after its termination, Defendants possessed superior and exclusive knowledge of material facts concerning: (a) the true status of the appellate engagement and the extent of substantive work performed; (b) the identity of the individuals who actually performed the work; (c) the drafting chronology and revision history of the appellate brief; (d) the contents, completeness, and metadata of the client file; and (e) the existence of electronically stored materials bearing on the timing and authorship of the work product. Plaintiff lacked independent access to any of these facts, which were exclusively within Defendants' possession until the May 11 and May 27, 2026 productions.

107. While possessing that superior knowledge, Defendants made partial disclosures — through extension motions, direct communications, and the March 3, 2022 post-termination letter — that created misleading impressions about the status and nature of the work performed, while omitting the material contrary facts within their exclusive knowledge. Under Swersky v. Dreyer & Traub, 219 A.D.2d 321 (1st Dep't 1996), partial disclosures that omit material facts necessary to make them not misleading constitute actionable fraud and fiduciary breach. Defendants' fiduciary obligations of candor required them to disclose, not conceal, the material facts they exclusively possessed.

108. Defendants also breached their post-termination fiduciary obligations by: (a) failing to deliver a complete client file to successor counsel upon termination, depriving successor counsel of the January 31, 2022 communication and related materials directly relevant to available defense theories; (b) producing in May 2026 a client file that appears materially incomplete and contains

documents with anomalous metadata patterns inconsistent with the firm's own document management practices; and (c) causing the Marmur client file to be produced in an image-only format that suppressed native metadata, in breach of the obligation to provide the client with full and accurate access to his own file materials. As a direct result of these breaches, Plaintiff was deprived of materials necessary to evaluate the representation, pursue claims, and instruct successor counsel.

## COUNT VIII — VIOLATION OF JUDICIARY LAW § 487

### (Against Defendants Lewis, Marmur, CLM, and NMP)

109. Plaintiff repeats and realleges all preceding paragraphs.

110. New York Judiciary Law § 487 provides that an attorney guilty of deceit or collusion with intent to deceive the court or any party is liable to the injured party for treble damages.

111. Defendants Lewis and Marmur, as attorneys, engaged in conduct constituting deceit within the meaning of § 487 in the following respects, each of which is pleaded on information and belief where noted:

112. First, Defendant Lewis made specific post-termination representations in the March 3, 2022 letter asserting that: the full contracted services had been performed; attorney time exceeding $200,000 in value had been devoted to the matter; and a 60-page brief had been prepared by Lewis and Marmur personally. Plaintiff alleges that these representations were materially false when made, as they are inconsistent with the documentary record revealed by the 2026 Turnover Production. Post-engagement representations designed to defeat a fraud and fee-recovery demand constitute deceit within the meaning of § 487 when they contain material false statements made to a party.

113. Second, Defendants produced the Turnover Production implying completeness while, on information and belief, omitting the January 31, 2022 communication and producing documents with anomalous metadata patterns inconsistent with their own document management practices. A client file production made in the context of pending litigation that omits material client communications and is organized in a manner that limits examination of relevant metadata raises substantial questions under § 487.

114. Third, throughout the engagement, Defendants filed extension motions representing that additional time was needed to prepare the brief. The January 2022 extension motion was filed five days after Lewis communicated in writing that he had not completed reading the trial transcript after four months of engagement. Plaintiff alleges these representations were materially misleading by omission. Plaintiff acknowledges that courts apply § 487 with caution to advocacy conduct; this basis is pleaded as cumulative and corroborative of the post-termination and turnover-based § 487 theories.

115. As a direct and proximate result of Defendants' violations of Judiciary Law § 487, Plaintiff is entitled to treble damages, together with interest and costs. This claim carries a six-year limitations period and is timely from the March 1, 2022 demand date.

**COUNT IX — FRAUD AND FRAUDULENT CONCEALMENT — UNDISCLOSED FINANCIAL CONFLICT**

(Against Defendants Shapiro, SAB, and Marmur; Lewis and CLM as Downstream Beneficiaries)

116. Plaintiff repeats and realleges all preceding paragraphs.

117. The primary defendants on this count are Alexandra Shapiro, Shapiro Arato Bach LLP, and Nathaniel Z. Marmur. Shapiro is primarily liable as the source of the undisclosed-conflict referral and as the author of the March 2, 2022 misleading statement. Marmur is liable as the beneficiary of that referral who accepted the engagement without disclosing his financial arrangement with the attorney who referred the client. Plaintiff does not assert that Lewis or CLM had actual knowledge of the Shapiro-Marmur financial arrangement at the time of retention. Plaintiff does allege that Lewis and CLM received the downstream benefit of a referral chain whose financial underpinnings were concealed from Plaintiff, and reserves the right to assert broader claims against Lewis and CLM upon completion of discovery into the referral relationships at issue.

118. On August 5, 2021, Defendant Shapiro referred Plaintiff to Defendant Marmur for appellate representation while maintaining an undisclosed financial relationship with Marmur through an office-sharing arrangement under which Marmur made regular payments to Shapiro or her firm. This arrangement created a direct financial conflict: Shapiro had a material financial interest in Marmur's ability to generate client fees. Shapiro did not disclose this conflict at the time of the referral.

119. On March 2, 2022, Defendant Shapiro responded to Plaintiff's direct inquiry about payment by stating: "No referral fee was paid to me or my law firm. As a matter of course, we do not take referral fees and have never done so." This statement was narrowly confined to the category of referral fees. It omitted the material fact of an ongoing financial arrangement between Shapiro and Marmur — an arrangement that created precisely the financial conflict Plaintiff was asking about. Under New York's misleading partial disclosure doctrine, a technically accurate statement that omits material contrary facts is fraud. See Swersky v. Dreyer & Traub, 219 A.D.2d 321 (1st Dep't 1996).

120. Defendant Marmur accepted the referral from Shapiro and the joint engagement knowing he had not disclosed his financial arrangement with the attorney who referred the client. Marmur then compounded this concealment by recommending Lewis and CLM as co-counsel — bringing additional attorneys into the engagement without disclosing the referral relationship and financial arrangement that had produced his own retention. Marmur's recommendation of Lewis and CLM, made without disclosing the Shapiro-Marmur financial relationship, deprived Plaintiff of the ability to evaluate the full referral chain before committing to the joint engagement.

121. Plaintiff justifiably relied on Shapiro's referral in retaining Marmur and on Shapiro's March 2, 2022 statement in evaluating the integrity of the referral relationship. Had the financial arrangement been disclosed, Plaintiff would have had the ability to make an informed decision about whether to retain Marmur and about the nature of the relationship between the referring attorney and the referred attorney.

122. Plaintiff first discovered the office-sharing arrangement in February 2026 when process service confirmed that Marmur's office is physically located within Shapiro Arato Bach LLP's offices. This claim accrues no earlier than February 2026 and is timely within six years from that date. The March 2, 2022 misleading statement independently gives rise to a fraud claim accruing from that date, also timely within six years. The underlying concealment of the financial relationship from the date of the referral through the conclusion of the representation is timely within six years of the August 2021 referral and October 2025 filing as to Shapiro, SAB, and Marmur.

123. As a direct and proximate result of the fraud and fraudulent concealment of the undisclosed financial conflict by Shapiro, SAB, and Marmur, Plaintiff paid $200,000 to retain Marmur in reliance on a referral tainted by an undisclosed financial relationship, and suffered all damages alleged throughout this complaint arising from the representation that followed. Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as the Court deems appropriate.

## COUNT X — INCOMPLETE AND ANOMALOUS CLIENT FILE PRODUCTION (2026)

### (Against Defendants Lewis, Marmur, CLM, and NMP)

124. Plaintiff repeats and realleges all preceding paragraphs.

125. This count arises from conduct occurring in May 2026 and is independently actionable. It accrues on May 27, 2026 — the date of the Marmur image-only production — and is not subject to any limitations defense applicable to the 2021-2022 claims.

126. Defendants had an obligation, in response to Plaintiff's demands for his complete client file and in the context of pending litigation, to produce electronically stored information in a format that preserved native metadata relevant to Plaintiff's claims. The client file materials were maintained as native electronic files on CLM's internal systems, as evidenced by a native Excel workbook produced in the Turnover Production bearing internal file path metadata identifying CLM matter-specific folder structures. Defendants possessed the technical capability, through their commercial eDiscovery vendor, to produce those materials in native format.

127. Instead, Defendants caused the Marmur production to be processed through KLDiscovery Ontrack, LLC in a normalized image-only export format that systematically stripped native metadata — including authorship, creation dates, modification history, revision chronology, and drafting sequence — from electronically-created documents. The production included empty OCR sidecar files associated with machine-readable source documents, a technically anomalous artifact consistent with deliberate suppression of extractable electronic content rather than ordinary file conversion. The image-only format was an attorney-directed choice, as confirmed by KLDiscovery's own disclaimer that all productions are made under the direct legal supervision of the attorney representing its client.

128. Plaintiff alleges, on information and belief, that the image-only production format was selected with knowledge that native file production would expose metadata material to Plaintiff's claims concerning the timing, extent, and authorship of purported work performed during the

engagement. The selection of a metadata-suppressing production format in this context — after Plaintiff had raised metadata concerns, in pending litigation, from a vendor specifically capable of native production — constitutes intentional interference with Plaintiff's right to inspect his own electronically stored client file materials.

129. As a direct and proximate result of Defendants' production of electronically stored information in a format that limited native metadata review, Plaintiff has been deprived of native metadata material to his claims, has been required to incur forensic investigation costs, and has been prejudiced in his ability to evaluate and present evidence. Plaintiff is entitled to compensatory damages, an adverse inference that the suppressed native metadata would have corroborated Plaintiff's allegations concerning the authorship, timing, and extent of work performed, and such other relief as the Court deems appropriate including sanctions.

## COUNT XII — EQUITABLE ACCOUNTING

(Against Defendants Lewis, Marmur, CLM, and NMP)

130. Plaintiff repeats and realleges all preceding paragraphs.

131. Plaintiff is entitled to an equitable accounting of the $200,000 fixed fee paid to Defendants. The elements necessary to sustain an equitable accounting are present: (a) a fiduciary relationship between the parties existed; (b) the accounts at issue are complex; and (c) a legal remedy is inadequate to determine the true nature and extent of the services rendered and by whom.

132. Plaintiff cannot determine from the existing productions: who actually performed the substantive appellate work; when that work was performed; the extent of attorney versus non-attorney involvement; how labor was allocated between Lewis and Marmur; or whether the work product in the productions was performed contemporaneously with the engagement or assembled thereafter. These facts remain exclusively within Defendants' possession. The metadata anomalies in the CLM production — blank author fields and patterns in the final brief files inconsistent with months of substantive attorney drafting, alongside meaningful revision activity concentrated in a non-attorney's working documents — raise material questions that cannot be resolved without an accounting. The image-only Marmur production suppresses the drafting chronology and authorship metadata that would answer those questions directly.

133. Plaintiff seeks an equitable accounting sufficient to determine: (a) what work was performed in connection with the $200,000 engagement; (b) when it was performed; (c) by whom — specifically identifying attorney versus non-attorney contributions; (d) how the fixed fee was allocated between Lewis/CLM and Marmur/NMP; and (e) the extent to which the work product was prepared by the attorneys identified in the engagement letter as personally responsible. This claim is grounded in the fiduciary relationship, the complexity of the joint engagement, and the exclusive possession by Defendants of the relevant records.

## COUNT XIII — CONVERSION AND WRONGFUL RETENTION OF ELECTRONIC CLIENT PROPERTY

(Against Defendants Lewis, Marmur, CLM, and NMP)

134. Plaintiff repeats and realleges all preceding paragraphs.

135. Under New York law, a client has a presumptive right to the contents of his attorney's file at the conclusion of the representation. See Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP, 251 A.D.2d 35 (1st Dep't 1998). This right extends to electronically stored client-file materials, including native electronic documents, metadata-bearing originals, drafts, and associated work product to which the client is entitled.

136. Plaintiff demanded return of his complete client file in native electronic format on multiple occasions beginning in February 2022. The CLM production establishes that native electronic files existed on Defendants' internal systems — including a file bearing the internal path F-Data-Ganley-TEM06001-SDNY Transcripts — yet the Marmur production contained no native Word or PDF documents despite the engagement having generated such materials. Defendants retain possession and control over identifiable native electronic client-file materials to which Plaintiff holds a presumptive property right under New York law. By producing static image renderings while retaining native originals, Defendants have wrongfully withheld identifiable client property.

137. Plaintiff does not yet know the full extent of the native materials retained, pending forensic discovery. Plaintiff seeks an order directing production of all native electronic client-file materials in Defendants' possession, custody, or control, and damages for the wrongful retention of client property to the extent it has prejudiced Plaintiff's ability to evaluate and pursue his claims.

## COUNT XIV — LEGAL MALPRACTICE (IN THE ALTERNATIVE)

(Against Defendants Lewis, Marmur, CLM, and NMP)

138. In the alternative, to the extent any claim herein is characterized by the Court as one sounding in legal malpractice rather than fraud or breach of contract, Plaintiff pleads legal malpractice in the alternative and incorporates all factual allegations above. Defendants Lewis's and Marmur's conduct fell below the standard of care applicable to attorneys handling federal criminal appeals, and Plaintiff suffered damages as a direct and proximate result. The alternative malpractice claim is tolled by the bases identified in paragraphs 47 through 52 above, which are each independently sufficient to account for the period between termination and filing.

## REQUEST FOR LIMITED FORENSIC DISCOVERY

139. The claims alleged in Count IV arise from conduct occurring on or about May 11, 2026 — after the commencement of this action and after Defendants' duty to preserve evidence arose. Those claims are independently timely and are not subject to any stay of discovery applicable to the 2021-2022 claims. Plaintiff respectfully requests that the Court authorize limited

forensic discovery directed to the 2026 claims at the outset of this litigation, prior to and independent of any broader discovery schedule.

140. The specific discovery Plaintiff seeks is narrow and targeted: (a) production of the three final appellate brief files — the February 16, 2022 Appeal Brief v1, the February 22, 2022 Appeal Brief v2, and the February 22, 2022 Front of Brief — in original native format with complete and unaltered metadata; (b) production of all document management system audit logs for those three files reflecting all access, modification, export, printing, and metadata editing events from the date of creation through the date of production; and (c) production of all litigation hold notices and preservation logs created after October 3, 2025.

141. The basis for this targeted request is straightforward. The Turnover Production reflects that CLM's document management system automatically populates author identity fields in all firm documents. The three final brief files are the sole exception in the entire production — each reflecting blank author fields and metadata patterns anomalous relative to surrounding documents that reflect normal firm metadata. That anomaly is either explained by the audit logs or it is not. If the logs confirm that metadata fields were cleared after October 3, 2025, Plaintiff will seek appropriate relief and leave to amend as warranted by the results of forensic discovery. If the logs provide an innocent explanation, the issue is resolved efficiently and without further motion practice.

142. Plaintiff cannot obtain this evidence without court-authorized discovery. The native files and audit logs are exclusively within Defendants' possession and control. Defendants cannot defeat discovery by arguing that Plaintiff lacks the very evidence that discovery would provide. The documented anomalies in the production — inconsistent with Defendants' own established document management practices — constitute sufficient factual predicate to justify this narrow, proportionate, and targeted forensic request. Defendants are reminded that their preservation obligations with respect to these files extend to all metadata, version histories, and document management system records associated with those files from the date of their creation, and that Plaintiff reserves all rights to seek appropriate relief if those obligations are not met.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment as follows:

A.  Compensatory damages of not less than $200,000, representing the full fee paid for contracted services not delivered, plus all consequential damages proximately caused by Defendants' conduct;

B.  Treble damages pursuant to New York Judiciary Law § 487;

C.  Punitive damages in an amount to be determined by the finder of fact;

D. Disgorgement of all fees paid in connection with the engagement;

E. A declaration pursuant to 28 U.S.C. § 2201 that: (i) the Turnover Production of May 11, 2026 presents substantial indicia of incompleteness warranting forensic investigation; and (ii) the anomalous metadata patterns in the three final appellate brief files are inconsistent with Defendants' document management practices and independently warrant forensic investigation;

F. An order directing the limited forensic discovery identified in paragraphs 68 through 72 above, including production of native files, document management system audit logs, and preservation records, with leave to amend the complaint to seek appropriate additional relief if forensic inspection confirms post-filing metadata alteration;

G. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

H. An order pursuant to Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP, 251 A.D.2d 35 (1st Dep't 1998) and New York Rules of Professional Conduct Rule 1.16(e) directing Defendants to produce Plaintiff's complete client file in native electronic format, including: (i) all native Word, Excel, and PDF documents maintained in connection with the representation; (ii) all metadata-bearing originals; (iii) all load files and processing logs associated with the KLDiscovery production; and (iv) all materials sufficient to evaluate the completeness and integrity of the client file;

I. An equitable accounting sufficient to determine the nature, extent, timing, and allocation of work performed in connection with the $200,000 engagement, including identification of attorney versus non-attorney contributions;

J. Costs and such other and further relief, including referral to appropriate disciplinary authorities and evidentiary sanctions if warranted by the results of forensic discovery, as the Court deems just and proper.

Dated: May 28, 2026

Respectfully submitted,

s/ Ari Teman
**Ari Teman**
Plaintiff, Pro Se
Miami Beach, Florida