# EXHIBIT B

## *United States v. Teman*, No. 19-cr-696-1 (PAE), ECF Nos. 373, 375, 376, 379, 382, 400, 406, 414, 450, 453, 454, 471, 474, 475, 478, 480, 495-497, 531, 534, 536 (S.D.N.Y.)

## ADAMS & COMMISSIONG LLP

### ATTORNEYS AT LAW

90 BROAD STREET, 2ND FLOOR
NEW YORK, NY 10006
TEL: 212-430-6590
FAX: 212-981-3305

MARTIN E. ADAMS
KARLOFF C. COMMISSIONG
ADMITTED TO PRACTICE IN NEW YORK
WWW.AMCMLAW.COM

July 6, 2023

**VIA ECF AND ELECTRONIC MAIL**

Hon. Paul A Engelmayer
United States District Court Judge
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

Re: <u>United States v. Ari Teman,</u> 19 Cr. 696 (PAE) – Designation to BOP facility, request
    for motion deadline and request to continue bail and extend date of surrender

Dear Judge Engelmayer:

<u>COURT ORDERS DATED JUNE 15, 2023, AND JUNE 26, 2023</u>

I write in response to the Court's Orders dated June 15, 2023, and June 26, 2023.  In
those Orders, Your Honor instructed counsel to provide the Court with a
recommendation regarding Mr. Teman's designation upon his surrender.  After
speaking with Mr. Teman and an individual experienced in BOP placement, I propose
that the Court recommend to the BOP that Mr. Teman be designated at the Federal
Prison Camp, Miami.

<u>MOTION SCHEDULE AND REQUEST TO CONTINUE BAIL AND EXTEND DATE OF SURRENDER</u>

I also write to ask that the Court schedule a filing deadline for a motion pursuant to 28
U.S.C. §2255, by Monday, September 21, 2023.  We would also ask that the Court extend
Mr. Teman's surrender date to a date after September 21, 2023, and continue bail during
that time.  Counsel was appointed on June 15, 2023, to this matter.  The information in
this case is voluminous, and Mr. Teman is familiar with the trial and sentencing
transcripts, as well as the multiple other submissions on the docket.  His assistance in
quickly understanding the issues in this matter will be invaluable.  To date, I have
discussed with Mr. Teman various significant issues for briefing, and I need time to
continue to speak with Mr. Teman about those issues and continue to identify
additional issues for briefing.

Communication with Mr. Teman once he is incarcerated will be significantly restricted.

Merely scheduling a phone communication with a client at a BOP facility can be an onerous process. Once he is incarcerated, it is not possible to predict, 1) how long it will take to get into contact with Mr. Teman, 2) how much time he will be granted for legal calls, or 3) whether and to what extent the frequency and duration of the calls will be affected by unexpected lockdowns or impromptu inmate counts.

One thing further – continuing his surrender date until after counsel has had a chance to prepare and file a 2255 motion, will also allow the BOP time within which to consider the Court's recommendation and determine an appropriate designation for Mr. Teman.

Mr. Teman has been tried, convicted and sentenced in this matter. He has remained at liberty on bail and has complied with all conditions. He remains today, as he has for the past 4 years, no danger to the community and no risk of flight. An additional 45 days will only prove to be helpful to counsel in preparing a 2255 motion on Mr. Teman's behalf. The government opposes this request. However, there is no prejudice to the government. Accordingly, I request that the Court allow counsel to file a 2255 motion on behalf of Mr. Teman, by September 21, 2023, and extend Mr. Teman's time to surrender to a date after September 21, 2023.

Respectfully Submitted,

Karloff C. Commissiong, Esq.

Cc:  A.U.S.A. Kedar Bhatia

# ADAMS & COMMISSIONG LLP

## ATTORNEYS AT LAW

90 BROAD STREET, 2ND FLOOR
NEW YORK, NY 10006
TEL: 212-430-6590
FAX: 212-981-3305

MARTIN E. ADAMS
KARLOFF C. COMMISSIONG
ADMITTED TO PRACTICE IN NEW YORK
WWW.AMCMLAW.COM

July 7, 2023

**VIA E.C.F. AND ELECTRONIC MAIL**

Hon. Paul A Engelmayer
United States District Court Judge
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

Re: <u>United States v. Ari Teman,</u> 19 Cr. 696 (PAE) – Supplemental letter regarding
     extension of time to surrender

Dear Judge Engelmayer:

I write to supplement the defense letter dated July 7, 2023.  In that letter, counsel requested in part that the Court extend Mr. Teman's time to surrender to a date after September 21, 2023.  We would ask that, if the Court were to impose a date after September 21, 2023, the Court consider setting a date during the week of October 8, 2023.  A date during the week of October 8, 2023, takes into consideration a number of Jewish Holidays during Fall 2023, beginning with Rosh Hashanah on September 15, 2023, and ending with Shemini Atzeret and Simchat Torah on October 8, 2023. Mr. Teman observes the Holidays during this period, and we ask that the Court be mindful of this in setting a date of surrender.

Respectfully Submitted,

Karloff C. Commissiong, Esq.

Cc:   A.U.S.A. Kedar Bhatia



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 17, 2023

**BY CM/ECF**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

Re:     *United States v. Ari Teman*, S2 19 Cr. 696 (PAE)

Dear Judge Engelmayer:

The Government respectfully writes to respond to defendant Ari Teman's request to extend his surrender date until September 21, 2023. Dkt. 373. Given that this surrender date appears to accord with the Court's usual practice in setting surrender dates, the Government do not object to the surrender date.

On January 29, 2020, after a week long jury trial, the defendant was convicted on counts of bank fraud and wire fraud. On July 28, 2021, the defendant was sentenced to 12 months' imprisonment and ordered to pay restitution and forfeiture. Dkt. 253. At the conclusion of the sentencing proceeding, the Court granted bail pending appeal. On June 8, 2023, the Second Circuit affirmed the defendant's conviction. *United States v. Teman*, No. 21-1920 (2d Cir.), Dkt. 150. On July 7, 2023, the defendant filed a motion for reconsideration in the Second Circuit. *United States v. Teman*, No. 21-1920 (2d Cir.), Dkt. 169. In a recent Order, the Court stated that, "As to a surrender date, although the Court will defer setting a date pending input from counsel, the Court would ordinarily set a surrender date eight (8) weeks after the issuance of the Second Circuit's mandate. Mr. Teman should order his affairs so as to be prepared to surrender on such a timetable." Dkt. 367 at 3.

The defendant now seeks a surrender date of September 21, 2023, so that his counsel may communicate with him more frequently than he would be permitted if he were in custody. Dkt. 373. The Government does not find the defendant's stated basis for extending his surrender date to be at all compelling, and instead views it as a delay tactic. The issues in this case, including the basis for a potential § 2255 motion, have been thoroughly briefed before this Court and the Second Circuit. The defendant does not argue that he *could not* assist his current counsel if incarcerated, only that he might have somewhat fewer opportunities than he does now. That is hardly a basis to extend a surrender date for a conviction more than three years after trial. Indeed, the defendant is still represented in the Second Circuit be the same counsel who briefed and argued the appeal, who could assist the defendant's current counsel before this Court if there were issues understanding the record. While the Government has no reason to doubt Mr. Commissiong's good faith in making the request for an extended surrender date, the defendant has hired many sets of new lawyers since

his conviction and frequently used the change in counsel as a basis to delay his sentencing, appeal, and now his surrender. *See, e.g.*, Dkt. 193, 195, 210; *United States v. Teman*, No. 21-1920 (2d Cir.), Dkt. 12, 22, 41, 46, 61, 75.

The Government believes there are compelling reasons for the Court to require the defendant's surrender forthwith upon issuance of the mandate from the Second Circuit or even earlier. Of course, this court retains jurisdiction over bail conditions even while the mandate is in the Second Circuit and the motivating reason for the defendant's bail pending appeal has been exhausted. However, to the extent the Court's practice is to "set a surrender date eight (8) weeks after the issuance of the Second Circuit's mandate," Dkt. 367 at 3, the Government sees no reason to deviate from that practice – certainly not for the reasons set forth in the defense motion. As the mandate has not yet issued and the defendant seeks a surrender date just over eight weeks from the present, *i.e.*, September 21, the Government does not object to that surrender date.[1]

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: ____/s/_____
Kedar S. Bhatia
Assistant United States Attorney
(212) 637-2465

Cc:    Defense counsel (by CM/ECF)

---

[1] In a supplemental letter filed moments ago, the defendant seeks a further adjournment of his surrender date until October 8, 2023, to account for religious holidays. Dkt. 375. Specifically, he asks that "if the Court were to impose a date after September 21, 2023, the Court consider setting a date during the week of October 8, 2023." *Id.* The Government takes no position on this additional adjournment.

2

## ADAMS & COMMISSIONG LLP

### ATTORNEYS AT LAW

90 BROAD STREET, 2ND FLOOR
NEW YORK, NY 10006
TEL: 212-430-6590
FAX: 212-981-3305

MARTIN E. ADAMS
KARLOFF C. COMMISSIONG
ADMITTED TO PRACTICE IN NEW YORK
WWW.AMCMLAW.COM

July 21, 2023

**VIA E.C.F. AND ELECTRONIC MAIL**

Hon. Paul A Engelmayer
United States District Court Judge
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

Re: <u>United States v. Ari Teman,</u> 19 Cr. 696 (PAE) –The Court's July 18, 2023, Order and
Amended Judgment

Dear Judge Engelmayer:

Pursuant to Your Honor's Order dated July 18, 2023, I write to confirm: 1) a copy of the
Court's July 18, 2023, Order has been forwarded via electronic mail to Mr. Teman, and
2) Mr. Teman has received and reviewed the Court's July 18, 2023, Order.

Respectfully Submitted,

Karloff C. Commissiong, Esq.

Cc:    A.U.S.A. Kedar Bhatia

B"H

Ari B. Teman

Sept 4, 2023
18th of Elul, 5783

The Honorable Paul Engelmayer
District Judge
Southern District of New York
40 Foley Square,
New York, NY

**Re:  Motion to be assigned a Federal Defender, to provide them 90 days to prepare a 2255 motion addressing the "significant issues" identified by Mr. Commsiong, and to stay the report date for 90 days to allow the defendant to prepare with counsel**

Your Honor,

On May 31, 2023, the Defendant respectfully motioned for the Court to assign the Federal Defenders (https://www.federaldefendersny.org/ ) as counsel to the Defendant for all post-trial motions in this court (Dkt. No. 364), and again on June 8, 2023 (Dkt. No. 366).

Your Honor instead assigned Mr. Commissiong on June 15, 2023 (Dkt 367).

On June 26, 2023, I wrote to Your Honor (Dkt. No. 369):

> Your Honor,
>
> Mr. Commissiong has suggested that I write to your Honor to request appointment of the Federal Defenders ( https://www.federaldefendersny.org/ ).
>
> Mr. Commissiong has been unable to find time to speak with me or appellate counsel even once since being appointed, still has not provided times he might be able to speak, while suggesting he will be unavailable for yet another week (half the time left), and has even missed a deadline and filed a document without conferring with his client.
>
> I and my counsel and family do not have confidence in his ability to represent me given his lack of time to speak with his client, read documents, or confer with appellate counsel about matters which appellate counsel believes require motion practice in the District Court.

Your honor denied this request (Dkt. No 371).

However, Mr. Commissiong has repeatedly failed to meet his own deadlines (Not only to his client and appellate counsel, but to the Court by his own admission, see Dkt. No. 368) and to this date has been unable to provide an outline or any proof of work.

Mr. Commissiong informed the court that there are  **"significant issues"** (Dkt. 373), but has been repeatedly unable to find time to discuss them with the defendant or appellate counsel. Multiple times, meetings have been missed or rescheduled at the last minute.

A call would be promised and instead an email saying there is "nothing I need to discuss with you" would be sent, as shown below. This became a pattern, and was stressful to the defendant and my family.

**Ultimately Mr. Commissiong agreed that the Defendant should be assigned new counsel in his most-recent letter to the Court.**

As the following email thread shows (medically sensitive & privileged items redacted) Mr. Commissiong was not prepared with any update, even a basic outline of a plan, and expected to need more time:

  **Karloff Commssiong** <karloff@amcmlaw.c... Wed, Aug 30, 12:44 PM (4 days ago)
to me ▾

Just checking in with you to let you know there is nothing I need to discuss with you. Take care.

Get Outlook for iOS

**From:** Ari B. Teman <  ari@teman.com>
**Sent:** Tuesday, August 22, 2023 2:29:11 PM
**To:** Karloff Commssiong < karloff@amcmlaw.com>
**Subject:** Re: PRIVILEDGED - PTSD transcripts

  **Ari B. Teman** <ari@teman.com> Aug 30, 2023, 1:06 PM (4 days ago)
to Karloff ▾

Hi Karloff,
Thank you. When do you expect to have a draft, and when are you targeting to file the 2255 please? Of course, Eden should review (Appellate counsel) and I before just to double check fact/timeline issues.

Please let me know how I can be helpful.

Ari

  **Karloff Commssiong** <karloff@amcmlaw.co... Wed, Aug 30, 1:24 PM (4 days ago)
to me ▾

Hi Ari,

I don't have a date for you on either. There is a chance that I may ask for an extra time to file. If so it would only be a week or two. I had planned to check in with Eden as I work through a draft, because of his familiarity with these issues as appellate counsel. As always, I will keep you updated and I will give you a more firm idea of what I'm thinking regarding timing by the end of next week. That includes whether I intend to request additional time. Take care.

Get Outlook for iOS

However, Mr. Commissiong did not keep his promise, yet again, and did not provide a firm idea regarding timing by the end of the week, nor on Saturday.

Once again, his simple but crucial promise to update a defendant with limited time at liberty where he can work with counsel and have access to relevant files and clear communication with appellate counsel and family was broken.

The defendant, this morning, Sunday, respectfully requested an outline and draft, and addressed the repeatedly broken promises, expressing how disconcerting the broken promises and lack of work have become to him and his family (the redacted email is my father's), and asked Mr. Commissiong to either provide some sign of work and plan or ask Your Honor that I should be appointed a Federal Defendant if he was unable to make deadlines:



Hi Karloff,

We would like to see an outline and draft this week. You told me you would have an update by the end of the week on an estimated time but there was no update.

It is really very disconcerting that there's no work to be seen this far into the process and this close to a deadline. As well you have made promises to update me and failed to keep those promises repeatedly.

I had one lawyer who didn't tell me his wife was a prosecutor and the judge was his mentee and I didn't go with my gut there and fire him when he wasn't doing anything we asked, and that cost me dearly, so I'm going to do the same here if you're unwilling to show any progress this week.

If you are unwilling to do so please withdraw and inform Judge Engelmayer that you are unable to show any work at this point to your client and you have repeatedly failed to meet deadlines. Please ask him to resign the case to a Federal Defender and give 45 days to them.

[Redacted to maintain privilege. No rights waived.]

To be clear, Mr. Commissiong and I have had cordial and (I had hoped) fruitful conversations.

My family and I do not understand why at this point he is unable to provide even a basic outline or meet any deadlines, but I understand that his family was hit by a bad case of COVID and so I am sure it is not personal. I very much like Mr. Commissiong and did not want him to withdraw, but my family, appellate counsel, and I have grown increasingly concerned that there's not a single outline or draft or any written work to be seen this close to the deadline.

**The lack of updates and communication from counsel has been extremely stressful on my mother, as well**

As Your Honor knows, my mother has recently had surgery, and the surgery has ongoing complications, and this additional stress and uncertainty is all the more unhelpful. There is nothing concrete for her or my father, or I to latch onto, no outline, plan, or even a solid deadline. It is very emotionally trying for everyone. She and my father look forward to updates, and then these calls are blown off with such emails and zero updates or outlines and it is causing them tremendous stress.

Thus, without any negative reflections of Mr. Commissiong -- surely it must be issues outside his control causing these delays and missed deadlines, perhaps something personal -- out of respect for my parents and my own mental health, and to protect my rights to file a full and detailed 2255, I must respectfully assert and protect my rights to representation that has the time and ability to focus on my case, is able to meet deadlines, and has the time to speak with their client (the defendant) and appellate counsel to be up on the facts.

**Mr. Commissiong wrote to your Honor (Dkt No. 373), indicating the volume of material to review is far more substantial than 45 days allows for a defense attorney to parse, and that there are "significant issues for briefing":**

> To date, I have discussed with Mr. Teman various **significant** issues for briefing, and I need time to continue to speak with Mr. Teman about those issues and continue to identify additional issues for briefing.

**Mr. Commissiong continued, noting that counsel would be unable to effectively discuss these issues were defendant incarcerated**

> Communication with Mr. Teman once he is incarcerated will be significantly restricted.  Case 1:19-cr-00696-PAE   Merely scheduling a phone communication with a client at a BOP facility can be an onerous process.  Once he is incarcerated, it is not possible to predict, 1) how long it will take to get into contact with Mr. Teman, 2) how much time he will be granted for legal calls, or 3) whether and to what extent the frequency and duration of the calls will be affected by unexpected lockdowns or impromptu inmate counts.

**June 15, when Mr. Commsiong was assigned, was 80 days ago, and he showed that was not sufficient time**

> Given the "significant issues", and considering Mr. Commissioning was planning to ask the Court for *two additional weeks on top o*f the filing deadline of Sept 21 (18 days from today), that would be 80 plus 18 plus 14 days, for a total of 112 days.

> Therefore, 90 days is a fair and reasonable amount of time for any counsel to digest the content, review with myself and appellate counsel.

Therefore the Defendant respectfully requests that Your Honor assign non-conflicted defense counsel to represent the Defendant, and that Your Honor provide them at-least 90 days to work with the Defendant (88 to 112 days being be the amount Mr. Commsiong suggested he ultimately needed).

While Your Honor has made clear the indigent defendant cannot choose his own counsel, these delays and missed deadlines are not at all the fault of the defendant, who has been diligent not only in following-up with Mr. Commsiong, but providing spreadsheets of issues, links to transcripts, and additional resources, together with my father's help and the help of Mr. Quainton  (as my memory of trial is very spotty and at times completely blank due to the severe health issues I faced at the time, they have helped with identifying issues in the transcripts that I did not even recall, for example). Therefore, I respectfully request that Your Honor assign the Federal Defenders or someone who works for that office ( https://www.federaldefendersny.org/ ), such that they will have adequate time and resources to represent me and chase down the issues.

A defendant and defendant's family and appellate asking his counsel for an outline or plan after 80 days of representation is a normal, reasonable, and fair request.

An attorney repeatedly missing deadlines and breaking promises to the Court, defendant, and appellate counsel, refusing to provide even a basic outline or plan after 80 days of representation, is not reasonable, adequate, or effective representation -- even if it is due to external factors. Perhaps there is a personal or health matter -- that is none of the client's business, but the end result is that there is no work to be shown 80 days into this, when Your Honor had originally only granted 45!

Therefore, it is only fair that the Court assign counsel that is non-conflicted and that has adequate time such that it is able to meet and discuss the case with the client and appellate counsel, keep promises to the client and the Court, and have some form of plan and outline after months of representation.

Therefore, the Defendant respectfully re-requests that the Court assign the Federal Defender's office, who can serve as *completely unconflicted counsel*, provide them 90 days to understand and motion upon the "significant issues" identified by Mr. Commsiong. This is a fair amount of time, given it is *less* than what Mr. Commsiong needed.

Because of the "significant issues" identified by Mr. Commsiong and the time required for new counsel to understand these issues and prepare a motion, the defendant respectfully requests that Your Honor stay any possible reporting to prison for 120 days, so that replacement counsel can prepare and file the 2255 and I can help them without being overwhelmed and in a very unstable and unpredictable environment.

As well, it is Appellate Counsel's plan to file a SCOTUS Cert shortly, and that is another reason to stay reporting to prison until, at the very least, counsel has filed a 2255 and it has been argued.

For these reasons, the defendant and his family respectfully request that the Court (a) assign counsel that has the time and ability to meet and discuss with their client, (b) provide replacement counsel 90 days to prepare, and (c) stay reporting to prison until after that counsel motions via 2255 on the "significant issues" identified by and confirmed by Mr. Commisiong, which include new evidence that we believe will convince Your Honor not only of my innocence but of ineffective assistance of counsel.

Respectfully submitted,

*Ari Teman, Defendant*

**Eden P. Quainton**
## Quainton Law, PLLC

**2 Park Ave., 20th Fl.
New York, NY 10016**

**245 Nassau St.
Princeton, NJ 08540**

**Telephone (212) 419-0575, (609) 356-0526
Cell: (202) 360-6296
Eden.quainton@quaintonlaw.net**

October 5, 2023

**<u>VIA ECF</u>**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

  Re: <u>*United States v. Ari Teman, 19-cr-0696 (PAE) – Motion to Extend Surrender Date*</u>

Dear Judge Englemayer,

  I represent the Defendant, Ari Teman (the "Defendant" or "Teman") in the above-referenced matter. I am writing to request an opportunity to respond to the Government's letter in opposition (the "Opp.") to Defendant's Motion to Extend His Surrender Date (the "Mot. to Extend") filed last night. Should your Honor grant the request, the response itself is contained further in the body of this letter.

  By way of background, on September 15, 2023, Teman filed a Rule 33 Motion presenting new evidence with respect to a number of issues, including what he believes to be materially new evidence relating to several of the commercial counterparties of GateGuard, Inc. ("GateGuard"), the entity of which Teman is CEO and that deposited the remotely created checks at issue in Teman's trial. Dkt. 386. Concerned that your Honor might not consider and rule on the new evidence before his contemplated surrender date of October 10, 2023, Teman and his family requested that I enter an appearance to seek an extension of the surrender date so that your Honor could rule on the new evidence before Teman is incarcerated. Dkt. 393. If, as Defendant believes it does, the new evidence establishes that Teman did not have the requisite *mens rea* to commit a crime, that his customers knew of and accepted the Terms and Conditions pursuant to which RCC's were drawn on their accounts, and that material evidence was either suppressed or withheld, it would be fundamentally unfair for Teman to surrender before these issues have been addressed. This is particularly true after your Honor ruled nearly two years ago that he would not consider any *pro se* motions before the Court of Appeals had ruled on Teman's motion. Dkt. 304. Since the mandate of the Second Circuit affirming Teman's conviction was sent to the District Court on August 18, 2023, this left relatively little time to rule on the various motions

Teman had filed since his sentencing. With this overall timing constraint, the Mot. to Extend was filed on September 26, 2023. Dkt. 394. Ordinarily, under Local Rule 49.1, the Government would have 14 days to respond and Defendant would have a week to reply. However, given the timing constraints surrounding the motion, the standard briefing schedule would not have been consistent with the relief sought. Accordingly, your Honor required the Government to respond to the motion by October 4, 2023 and indicated a decision would be made rapidly. Dkt. 397. Your Honor did not indicate whether a reply would be permitted. The general intent of Local Rule 49.1 is that the moving party should be given an opportunity to reply. Moreover, there are a certain number of misleading or inaccurate statements in the Opp. that call out for correction. Accordingly, Defendant respectfully requests that your Honor permit the filing of a response to the Opp. If your Honor is inclined to grant this request, the response follows.

I.      Teman's Rule 33 Motion Is Timely.

The Government first asserts at several points that Defendant's Rule 33 motion is untimely. Opp. at 4, 7. There is no basis for this assertion. Leaving aside that Teman had attempted to raise issues of new evidence promptly after sentencing and to file a Rule 33 motion in early 2022, Dkt. 303, Rule 33 itself clearly provides that a motion under the Rule based on new evidence may be made at any time within three years of the date of conviction. Fed. R. Crim. Pro. 33. The Government's assertion to the contrary is meritless.

II.     The Soon-Osberger and Hom Testimony Was Inaccurate.

The Government attempts to distract from the issues with overblown rhetoric (Teman is "gaslighting" and acting in a "craven" manner, Opp. at 7). The real question is whether the Crimmins-Soon-Osberger email exchange that the Government concedes was not produced to Defendant materially affects the testimony of Soon-Osberger and Hom or Teman's culpability. The Government's answer is that the email exchange is incomplete because it does not include a previous communication from Teman. Opp. at 7. But this is the point. Teman *did not know* and was never told that there was a subsequent internal email exchange, manifestly one among many others that were also never produced, given that Margaret Crimmins is pointedly asking for additional information in the exchange that was furnished by Shelly Pecot. Mot. to Extend at 7. Teman *did not know* and was never told that a Board member had directly confronted Soon-Osberger and told her she was "legally liable" for removing the GateGuard intercom months before Soon-Osberger claimed to be "shocked" by GateGuard's demands. Mot. to Extend at 4. Teman *did not know* and was never told that, months before she claimed GateGuard's RCC came completely out of the blue, Gina Hom was copied on the email exchange in which a visibly upset Board member is demanding additional information about GateGuard's assertion of a right to draw $18,000 as damages for removal of an intercom. Mot. to Extend at 5-6. Teman *did not know* and was never told that the other member of 18 Mercer's management company, Jackie Monzon, was also copied on the email chain. Teman *did not know* and was never told that a Board member had explicitly raised the issue of the binding nature of GateGuard's Terms and Conditions with other Board members and both members of Crystal Management (Gina Hom and Jackie Monzon), when Gina Hom feigned complete ignorance of the contractual nature of GateGuard's claims at trial. Mot. to Extend at 6 and Note 2. With the newly discovered evidence, an even moderately skilled defense attorney could have completely undermined the credibility of

2

Soon-Osbergerger's and Hom's testimony they were unaware of and "shocked" by GateGuard's insistence on the validity of its contractual terms and conditions.

In attempting to deflect the sting of the new emails, the Government places great reliance on the fact that Teman had provided Soon-Osberger with assurances that certain provisions of the Terms and Condition not at issue in the criminal trial would be waived. Opp. at 3. This is irrelevant, however: there was _no_ testimony that GateGuard had waived the key provisions of the Terms and Conditions, notably the device removal fee and the use of RCC's, which are the only issues on which a waiver argument would be probative. Moreover, Soon-Osberger did not operate in a vacuum. The GateGuard contract had to be approved by the Board as a whole and payments thereunder had to be validated by the Board and then effected by Crystal Management. The Crimmins-Soon Osberger exchange makes clear that Board members beyond Soon-Osberger who were called on to approve the GateGuard contract believed there was a contract and contractual liability around the payment of an $18,000 device removal fee, and that far from being "stolen," the amount drawn on 18 Mecer's account was due and payable.

III.     The New Pecot/Soon-Osberger/Hom Evidence Was Not "Available" to Defendant Prior to Sentencing.

The Government's argument depends to a large extent on the claim that the evidence discussed in the Mot. to Extend is not "new" because it was all available to Teman. Opp. 4, 6-7. In support of this argument, the Government submits a lengthy pre-sentencing text exchange between Teman and Shelly Pecot. Opp. Ex. A. In a characteristic _non sequitur_, the Government insinuates that this text exchange somehow means Teman must have known about communications between Ms. Pecot and other parties on which he was _not_ copied. _See_ Opp. at 4. That Ms. Pecot knew what Teman thought is irrelevant to what Soon-Osberger and Hom thought—and it was their testimony which falsely presented their "shock," surprise and complete ignorance that provided the core of the Government's case on Counts II and IV. Put simply, the Pecot text exchange cannot establish that the Soon-Osberger-Cummins exchange, copying other Board members and both members of Crystal Management, was "available" to the defense. On the contrary, the Government subpoenaed Soon-Osberger and Ms. Hom, and the emails provided by Ms. Pecot were _not_ included in the Government's production, which either means they were suppressed by the Government in violation of _Brady/Giglio_ obligations, or that they were withheld by Ms. Soon-Osberger and Ms. Hom. Assuming, _arguendo_, the second hypothesis is correct, material witnesses' deliberate withholding of evidence would destroy their credibility, a problem the Government attempts to dance around by shifting the focus to the Pecot exchange.

But the Pecot exchange itself raises troubling questions. Ex. A begins with a request that the Government stipulate to the Pecot statements in the exchange. It is evident the Government did not agree to the stipulation and Ms. Pecot was (or made herself) unavailable for trial, preventing the admission of the text messages. There is an element of bad faith in arguing that evidence that could only have come in with the Government's assent was available to the defense when the Government withheld that very assent. The Government now concedes that this exchange – to which it refused to stipulate at trial – in fact establishes that Teman believed he had a contract that entitled him to draw the $18,000 device removal fee—directly negating

3

any *mens rea*. Opp at 7.[1] But no worries, says the Government, disingenuously quoting the Court after having effectively admitted to keeping out damning evidence, this a "between-the -eyes case of bank fraud."

IV.     The New Evidence Establishes a *Brady-Giglio* Violation—or Suggests a Concerted Effort by Key Witnesses to Withhold Material Evidence.

The Government claims that Defendant's *Brady* and *Giglio* claims are "baseless" and "without merit" because the Government issued subpoenas to Soon-Osberger, Gina Hom and Jackie Monzon and, allegedly, did not receive the Soon-Osberger-Crimmins emails (copied to Hom and Monzon and other Board members) in response. Opp. at 8. In support of its position, the Government takes Teman to task for not including an email from himself which the Government claims is part of this email "chain." Opp. at 7. But Teman had been clear with the Court that the Pecot/Soon-Osberger/Crimmins emails were a "breakaway" chain of which he had no knowledge. Dkt. 265 at 3. Because Soon-Osberger, Hom and Monzon were all included on emails in question, the Government appears to be promoting the theory that *all three* of these witnesses agreed among themselves to withhold the exact same emails. It is more likely that at least one of the witnesses (say Monzon, who was not called) in fact produced the emails. In this scenario, the Government would come within the cases cited in the Mot. to Extend that the Government cannot willfully turn a blind eye to material evidence. Mot. to Extend at 10-11. Indeed, it is not plausible that, had it exercised the level of diligence required of it, the Government would have come across *no* references to emails that circulated among many members of the 18 Mercer Board and the two members of the 18 Mercer management company directly addressing 18 Mercer's contractual liability and the $18,000 device removal fee, and demanding further information. *Id.*

However, taking the Government at its word, either three different witnesses copied on the same email chain innocently "forgot" to produce the exact same emails, or they coordinated with each other to prevent the emails from being produced to preserve the argument that they were blindsided by Teman's emails in January 2019 and had no knowledge of the GateGuard Terms and Conditions or the legal liability for removing the GateGuard Intercom. Furthermore, the emails provided by Ms. Pecot must logically have created a further paper trail. As Teman argued in the Mot. to Extend, it is not plausible that an email demanding further information from the Board on a matter of legal liability simply went unanswered. Mot. to Extend at 7. Ms. Pecot's trepidation in providing the emails to Teman may relate to knowledge of a degree of coordination between witnesses that prevented Teman from obtaining a fair trial. At a minimum, the Court should order an evidentiary hearing and obtain sworn testimony from the parties on the emails who were subpoenaed by the Government as to how they all conveniently omitted the same emails and, quite likely, many others as well.

---

[1] The Pecot Letter, sworn to before a notary, *would* be admissible and is thus new evidence not available pre-trial confirming that Ms. Pecot knew of the contract terms and that Teman believed he could issue RCC's to enforce GateGuard's contract, again negating Teman's *mens rea*. *See* Mot. to Extend, Ex. C.

4

V.      The Court Should Extend the Surrender Date to Consider the Issues Raised in Teman's
        Rule 33 Motion.

        The Pecot-Soon-Osberger-Crimmins-Hom evidence warrants careful consideration. If
evidence was suppressed or withheld, this would go to the integrity of the trial proceedings and
Teman should not be incarcerated with such a cloud over his conviction. There is no downside to
a modest delay so that the Court can take whatever measures are necessary to assess whether the
new evidence merits a further hearing and/or a new trial. In addition, there are other evidentiary
issues raised in the pending Rule 33 motion – notably relating to the testimony of another key
witness, Joe Soleimani – that the Court should weigh and rule upon before Teman is
incarcerated. These issues have also been pending since August 2021 and have been repeatedly
raised by Teman during the period the Court had postponed consideration of *pro se* motions. *See,
e.g.*, Dkt. 265 at 4-5 and Dkt. 295, Ex. F (admission of communications between defendant in
litigation concerning GateGuard Terms and Conditions and Joseph Soleimani). Having deferred
consideration of Teman's evidence for two years, it would be unnecessarily harsh for the Court
to force Teman to surrender without having ruled on this evidence. Defendant submits this ruling
should be made stepping back from the heated rhetoric that has characterized many submissions
in this matter and asking whether Teman may not be right after all—that his trial was unfair, and
he did not have any criminal intent in enforcing what he believed to be binding contractual
terms.

                                                Respectfully submitted,

                                                *Eden Quainton*
                                                _____
                                                Eden P. Quainton

cc: All counsel of record (via ECF)



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 20, 2023

**BY CM/ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

  Re: <u>United States v. Ari Teman</u>, S2 19 Cr. 696 (PAE)

Dear Judge Engelmayer:

  The Government respectfully writes in response to the Court's October 18, 2023 Order (the "Order") to provide information related to Ari Teman's ("Teman") treatment at the Bureau of Prisons ("BOP") facility, FCI Miami, to which he reported on October 10, 2023. On October 18, 2023, the same date the Court issued the Order, the Government provided to FCI Miami, via email, the Court's Order and Teman's letter of the same date attached thereto. The Government respectfully writes to provide the following information:

  *First*, in response to the Government's request, FCI Miami provided Teman's medical records generated by the BOP since Teman reported to the facility, on October 10, 2023. Those records are attached to this letter as Exhibit A.[1] FCI Miami advised further that Teman's health concerns would be provided to the facility's medical department to ensure that he receives care.

  *Second*, FCI Miami stated that, as of October 19, 2023, there was no record of a request from Teman for compassionate release. FCI confirmed that it would route Teman's October 18, 2023 letter appropriately for processing as a request for compassionate release. The Government will advise if and/or when it learns that FCI Miami has rendered a decision on that request.

---

[1] Because Exhibit A contains Teman's personal medical records and health information, the Government respectfully requests that Exhibit A be filed under seal.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    /s/

Jacob H. Gutwillig
Assistant United States Attorney
(212) 637-2215

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

ARI TEMAN,

Defendant.

---

19 Cr. 696 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion by defendant Ari Teman for compassionate release from

Federal Correctional Institution ("FCI") Miami, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  For

the reasons that follow, the Court denies the motion.

## I.    Background

### A. Teman's Offense Conduct and Trial[1]

In early 2019, Teman carried out a fraud in which he drew and deposited checks on the

accounts of three of his home-security-company customers, while falsely representing to the

depository and clearing banks that the customers had knowingly authorized the checks.  The

fraudulent checks totaled $333,000.

Teman deposited the first two checks, totaling $36,000, in March 2019.  Notwithstanding

the banks placing holds on and then rejecting these checks, in April 2019, Teman deposited an

---

[1] The Court has previously set out Teman's offense conduct in detail, including in a June 5, 2020
decision denying Teman's post-trial motions, *see* Dkt. 138 ("Rule 29/33 Decision") at 3–12, and
an October 6, 2023 decision denying Teman's motion to extend his surrender date, *see generally*
Dkt. 402 ("Surrender Date Decision").  The Court also reviewed Teman's offense conduct at
length at sentencing, held on July 28, 2021.  *See* Dkt. 276 ("Sent. Tr.") at 67–80.  The summary
in text of Teman's offense conduct draws upon these decisions.

additional 27 checks, totaling $297,000. These checks contained new notations that Teman had added to fortify the illusion of customer authorization. Teman's fraud had been triggered by decisions by the customers on the three accounts to cease using his company's security devices. This had prompted angry and sometimes explosive responses and threats from Teman. Teman, by his own admission, had timed his deposit of certain checks for the eve of Passover, to exploit the religious observance of a customer. Teman deposited the checks despite advice in writing from his counsel, a corporate lawyer, that drawing unauthorized checks on customer accounts would likely result in his arrest and prosecution.

Trial was held between January 22 and 29, 2020, when the jury returned a guilty verdict on all four counts: two apiece of wire and bank fraud.

## B. Teman's Sentencing

Sentencing was held on July 28, 2021. The Court calculated a Sentencing Guidelines range of between 30 and 37 months. The Probation Department and the Government each recommended a Guidelines sentence. Dkt. 123, 150. The Court varied downward, imposing a prison sentence of 12 months and 1 day, followed by three years' supervised release. The Court based this sentence on a review of the 18 U.S.C. § 3553(a) factors. *See* Sent. Tr. 64–94. The Court found this sentence the lowest compatible with the § 3553(a) factors, considered together. *Id.* at 93. The Court, over the Government's objection, granted Teman's motion for release on bail pending appeal. *Id.* at 117.

## C. Teman's Appeal, Post-Appellate Request for Relief, and Surrender

On June 8, 2023, the Second Circuit affirmed Teman's conviction, by summary order, finding Teman's challenges meritless. *See United States v. Teman*, No. 21 Cr. 1920, 2023 WL 3882974, at *4 (2d Cir. June 8, 2023). These included claims of improper venue, constructive

2

amendment of the Indictment, a deficient verdict form, an abuse of discretion by the Court in not recusing, judicial bias, and prosecutorial misconduct. *Id.* at *1–3.[2]

This Court, heeding Teman's request, recommended that he be designated to FCI Miami, and set a surrender date of October 10, 2023. Dkts. 374, 377. On August 18, 2023, the Circuit's mandate issued. Dkt. 380.

After the mandate issued, Teman filed a series of motions. These included motions to adjourn his surrender date and stay his reporting requirement, Dkt. 384; to vacate his conviction and order a new trial pursuant to Rule 33, Dkt. 386; to vacate his conviction due to purported "sabotage" by a counsel he had retained in connection with sentencing and Government misconduct, Dkt. 388; and to adjourn his surrender date until his latest motions, including under Rule 33, were resolved, Dkts. 394, 400. In an October 6, 2023 decision, the Court declined to extend Teman's surrender date, *see* Dkt. 402. Although stating that its intention was to resolve Teman's Rule 33 motion alongside his anticipated 28 U.S.C. § 2255 motion, the Court assessed that the Rule 33 motion had an "exceedingly low" chance of success, *see id.* at 4–5.

On October 8, 2023, two days before his scheduled surrender date, Teman, *pro se*, filed a letter styled as an "emergency motion." It sought, anticipatorily, his compassionate release from BOP custody or his resentencing to home confinement without imprisonment, on account of his medical conditions, including being immunocompromised and "at high risk of COVID side effects." Teman's letter stated that, since early December 2021: "I have had severe side effects from the vaccine, requiring surgery, ER and doctor visits, and months of recovery, including

---

[2] The Circuit declined to rule on Teman's claim of ineffective assistance of counsel. Finding that claim premature, the Circuit stated that Teman could raise such a claim in a motion pursuant to 28 U.S.C. § 2255. *Id.* at 6. Following the appeal, this Court appointed counsel to assist Teman in preparing a § 2255 motion. *See* Dkts. 367, 371, 385.

3

significant numbers of supplements and medications, and then still became infected from COVID-19 suffering severe hallucinations, tremors, and requiring additional months of recovery." It added that Teman's risk of exposure to a new COVID-19 variant was heightened because doctors had advised him not to "take another vaccine" due to "severe side effects" and because "there is no evidence the vaccines protect against current variants." In contrast, were Teman at home, the letter stated, he could modulate his diet as he had been advised to do, and limit his exposure to other people. The letter stated, "I am really afraid of getting very sick or dying in prison from COVID." It added that it was "also unfair" that Teman had received "a longer sentence" as a result of an alleged disclosure violation by the Government and his initial sentencing counsel. Dkt. 403.

On October 9, 2023, the Court issued an order declining to alter Teman's surrender date. The order notified Teman that the Court would consider his request for compassionate release after Teman had exhausted his administrative rights with respect to such a motion, pursuant to 18 U.S.C. § 3582(c)(1)(A), and that upon Teman's filing a letter on the docket substantiating that the requirement of administrative exhaustion had been met, the Court would commission a response from the Government.   Dkt. 404.

On October 10, 2023, Teman surrendered to FCI Miami. Dkt. 405; Dkt. 411 at 1.

**D. Teman's Compassionate Release Motion**

On October 18, 2023, the Court received, via an email from Teman's father, a letter from Teman dated the same day, in which Teman claimed not to be receiving adequate medical care at FCI Miami. He wrote that he was experiencing fever, gastro-intestinal issues, nausea, dizziness, headaches, tremors, congestion and mucus, and nasal drip. Dkt. 405, Ex.1. By order the same day, the Court directed the Government to contact the Bureau of Prisons ("BOP") and furnish it

4

with the Court's order and Teman's letter, to inquire about the concerns Teman had raised, and to report back. The Court stated that it would treat Teman's letter as an application for compassionate release, triggering the requirements of administrative exhaustion. Dkt. 405.

On October 20, 2023, the Government filed a letter in response, confirming that, on October 18, it had furnished FCI Miami, via email, with the Court's order and Teman's attached email. Dkt. 406. The Government attached Teman's medical records, obtained from the BOP, as generated since Teman had reported to FCI Miami. These did not substantiate Teman's claims as to his medical conditions. Dkt. 406, Ex. A. The Government further reported that, according to FCI Miami, as of October 19, there was no record of a compassionate release request by Teman, but that FCI Miami had confirmed that it would process and treat Teman's October 18 letter to the Court as such a request. Dkt. 406.

On December 5, 2023, the Government filed a letter reporting it had received a letter that day from the Warden of FCI Miami, denying Teman's compassionate release request. *See* Dkt. 408. The Warden's letter, which was attached, stated that the BOP had evaluated Teman's claim under the guidance applicable to claims of a "[d]ebilitated [m]edical [c]ondition" constituting an extraordinary and compelling reason justifying compassionate release. *Id.*, Ex. A. The BOP stated:

> Your request has been evaluated consistent with this general guidance. However, medical staff has determined that you do not meet the criteria under Debilitated Medical Condition. Specifically, you are not experiencing deteriorating mental or physical health that substantially diminishes your ability to function in a correctional setting. Your claims regarding having a compromised upper respiratory anatomy and physiology and your concerns about potential exposure to COVID-19 do not warrant a reduction in sentence. Currently, your medical status is considered stable and this facility can adequately manage your medical needs at this time.

*Id.*

5

On December 19, 2023, retained counsel appeared for Teman, Dkt. 410, and filed a supplemental motion in support of his release, Dkt. 411 ("Supp. Mtn."). It attached a CorrLinks email, dated December 18, 2023, in which Teman described his symptoms, interactions with BOP medical personnel, and prison conditions between October 11 and December 17, 2023. Dkt. 411, Ex. 1 ("Teman 12/18 Email"). Teman's email recounted experiencing dizziness, nausea, weight loss due to limited kosher food options and sometimes moldy or spoiled food, falls, and difficulty sleeping. It complained of nighttime noise and lights, cold temperatures, flies, and unsanitary issues including a "disgusting toilet seat." It added: "I am having memory issues, breathing issues at night, waking up unable to breath, and am constantly having GI issues." *Id.* On the basis of Teman's email, counsel argued that Teman's health "has deteriorated while in custody, and [that] the BOP has failed to provide adequate medical and dietary treatment for his serious medical conditions." Supp. Mtn. at 4. Counsel argued that Teman's situation constituted a "extraordinary and compelling circumstance" justifying release, as he has a "serious medical condition," U.S.S.G. § 1B1.13(b)(1)(B)(i), which "requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death," *id.* § 1B1.13(b)(1)(C). Supp. Mtn. at 5–6. Counsel also argued that Teman's early release was consistent with the § 3553(a) factors, *id.* at 6–8, and that Teman would not be a danger to the community if released, *id.* at 7.

On January 10, 2024, the Government submitted a letter opposing compassionate release. Dkt. 412 ("Gov't Mem."). It attached a declaration by FCI Miami Unit Manager Ronnie Matthews, Dkt. 412, Ex. 1 ("BOP Decl."), and Teman's BOP medical records, Dkt. 412, Exs. B–D (filed under seal). The declaration noted that Teman has served just over 30% of his sentence; that he has been assigned a transfer date to a Community Corrections Center ("CCC") of May

6

14, 2024; that his current home detention eligibility date is June 27, 2024; that he has signed an agreement attesting to his eligibility for community custody and home confinement; and that his current projected release date is August 1, 2024, assuming good time credit. BOP Decl. ¶¶ 2, 6–7. The Government argued that the BOP's medical records contradict Teman's claims about his medical condition and purported lack of medical care, in that that they reflect that Teman has received regular attention while in BOP custody, that his medical condition is stable, and that his evaluations by BOP medical staff do not reflect issues with his cardiovascular or respiratory systems, fever or chills, and reflect that his lungs were "clear." Gov't Mem. at 5 (citing Dkt. 412, Ex. D). The Government separately argued that Teman remains a danger to the community and that the § 3553(a) factors disfavor his release. *Id.* at 6–7.

On January 12, 2024, Teman's counsel filed a one-page letter attaching a letter from Dr. Alon Seifan. Dkt. 413. Dr. Seifan stated that he had evaluated Teman in September 2023, before Teman had entered BOP custody, and that, based on Teman's account of his incarceration, being in prison had disrupted his sleep, which is "essential for his mental and medical stability," and "caused him significant stress." *Id.* at 2. It opined that Teman's "progressively worsened" condition "most likely has induced [his] fainting, falling, vomiting, headaches, and numbness." *Id.* He urged Teman's release, to enable him to have immediate access to "the level of medical and neuropsychiatric care that he needs." *Id.*

## II.     Discussion

The Court first reviews the legal standards governing compassionate release motions, and then applies them to Teman's motion.

### A.     Standards Governing Compassionate Release Motions

7

Upon the motion of a defendant who has "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," the Court may reduce the defendant's sentence.[3]  18 U.S.C. § 3582(c)(1)(A).  To grant such a motion, the Court must find that (1) "extraordinary and compelling reasons warrant such a reduction"; (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"; and (3) the § 3553(a) factors weigh in favor of a reduction in sentence.  *Id.*; *see also United States v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2021) (per curiam) (recognizing that both "extraordinary and compelling reasons" and support of the § 3553(a) factors are necessary to grant relief).

"Application of the § 3553(a) factors requires an assessment of whether the relevant factors outweigh the extraordinary and compelling reasons warranting compassionate release . . . and whether compassionate release would undermine the goals of the original sentence." *United States v. Daugerdas*, 613 F. Supp. 3d 807, 812 (S.D.N.Y. 2020) (cleaned up) (citation omitted). The defendant bears the burden of proving that he is entitled to compassionate release. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992); *United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010).

Originally, § 3582(c)(1)(A) did not permit defendants to initiate compassionate release proceedings; it required the BOP to seek such release on their behalf. *United States v. Phillibert*, 557 F. Supp. 3d 456, 459 (S.D.N.Y. 2021). But, as part of the First Step Act of 2018, Congress authorized courts to reduce a prison term upon a defendant's motion. *United States v. Amato*, 48 F.4th 61, 63 (2d Cir. 2022) (per curiam). Congress had tasked the Sentencing Commission with

---

[3] It is undisputed that Teman has satisfied § 3582(c)'s requirement of administrative exhaustion.

8

identifying the circumstances that are extraordinary and compelling so as to justify a reduction in sentence. *United States v. Brooker*, 976 F.3d 228, 232 (2d Cir. 2020) (citing 28 U.S.C. § 994(t)). Before November 1, 2023, the Commission's only guidance on this point had been promulgated before the First Step Act. This guidance thus applied only to a "motion of the Director of the Bureau of Prisons," *see* U.S.S.G. § 1B1.13 (historical note), not motions brought by defendants, prompting the Second Circuit to hold in 2020 that the Commission's guidance "[could not] constrain district courts' discretion to consider whether any reasons [were] extraordinary and compelling" in cases involving motions by defendants, *Brooker*, 976 F.3d at 236–37. As a result, through November 1, 2023, a court assessing a defendant's motion was unconstrained by U.S.S.G. § 1B1.13's enumeration of extraordinary and compelling reasons and could "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release." *Id.* at 237.

Effective November 1, 2023, the Commission has amended the Guidelines to also cover defendant-initiated petitions. *See* U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28,254 (effective Nov. 1, 2023). The Commission's amended guidance as to what constitutes extraordinary and compelling reasons now controls a court's analysis of a defendant- or BOP-initiated petition for compassionate release.

The Commission's amended guidance identifies six circumstances that, singly or in combination, may so qualify. Two are potentially germane to Teman's application.[4]

---

[4] The remaining four relate to a defendant's age, U.S.S.G. § 1B1.13(b)(2); family circumstances, *id.* § 1B1.13(b)(3); status as a victim of abuse in custody, *id.* § 1B1.13(b)(4); and unusually long sentence, of which at least 10 years has been served, coupled with a change in the law that would create a gross disparity between the sentence previously imposed and the sentence likely to be imposed at the time of the motion, *id.* § 1B1.13(b)(6).

9

The first relates to a defendant's medical circumstances. *See* U.S.S.G. § 1B1.13(b)(1). It identifies the following four circumstances as supplying "extraordinary and compelling reasons" for release:

>  (A)  The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>  (B)  The defendant is—
>
>>  (i)  suffering from a serious physical or medical condition;
>>
>>  (ii)  suffering from a serious functional or cognitive impairment, or
>>
>>  (iii)  experiencing deteriorating physical or mental health because of the aging process,
>
>  that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
>  (C)  The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.
>
>  (D)  The defendant presents the following circumstances—
>
>>  (i)  the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;
>>
>>  (ii)  due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

10

(iii)    such risk cannot be adequately mitigated in a timely manner.[5]

U.S.S.G. § 1B1.13(b)(1).

The second permits a finding of extraordinary and compelling reasons where "[t]he defendant presents any other circumstance or [a] combination of circumstances" that themselves or with the above circumstances are similar in gravity to those above, such may support sentence reduction.  *Id.* § 1B1.13(b)(5).[6]

The Commission's guidance, tracking the statute, requires that, even where extraordinary and compelling reasons are found, the Court must also assure itself that release is consistent with the § 3553(a) factors "to the extent that they are applicable." *See* U.S.S.G. 1B1.13(a) (citing 18 U.S.C. § 3582(c)(1)(A)).  The Court must also find that the defendant is not "a danger to the safety of any other person or to the community," *id.*, § 1B1.13(a)(2), as defined in the Bail Reform Act, 18 U.S.C. § 3142(g).

## B.    Application to Teman's Motion

The Court, applying the above standards, denies Teman's application for compassionate release for two independent reasons.

---

[5] Factor (D) was informed by compassionate release decisions arising from the COVID-19 pandemic. *See* U.S. Sent'g Comm'n, Guidelines Manual 2023: Supplement to Appendix C at 206 (November 1, 2023).

[6] The Commission "rejected a requirement that 'other reasons' be similar in nature and consequence to the specified reasons.  These need be similar only in gravity." U.S. Sent'g Comm'n, Guidelines Manual 2023: Supplement to Appendix C at 207 ("[T]he Commission continues to believe . . . that judges are in a unique position to determine whether the circumstances warrant a reduction.  Guidance beyond that provided in the amended policy statement regarding what circumstances or combination of circumstances are sufficiently extraordinary and compelling to warrant a reduction in sentence is best provided by reviewing courts." (cleaned up)).

11

### 1.   Absence of Extraordinary and Compelling Reasons

Measured against the standards set by the Sentencing Commission, Teman has not shown extraordinary and compelling reasons to warrant a reduction in his sentence.  Teman's argument on this point is that (1) he suffers from health issues, including respiratory, inflammatory, and digestive issues resulting from an earlier COVID infection and from taking the COVID vaccine, as well as sleep disorders, acute sinusitis, a respiratory illness that causes inflammation, fainting spells, and dietary issues; (2) his health has deteriorated in BOP custody; and (3) the BOP has failed to provide him with adequate medical and dietary treatment for his serious medical conditions.

The Court does not minimize Teman's preexisting conditions, or the extent to which he has found incarceration at FCI Miami arduous and unhappy.  The Court also accepts that the incidents of federal incarceration (cramped quarters, limited food options, and other stressors) may have been responsible for various of the symptoms Teman has reported since October 10, including occasional congestion, GI issues, and dizziness.

In the end, however, the decisive question is not whether Teman would fare better and receive better care if living at home.  It is how Teman's medical conditions measure against the demanding standards set by the Sentencing Commission for when such condition(s) are *extraordinary* and *compelling* so as to qualify for compassionate release.  On that point, Teman's voluminous BOP medical records from FCI Miami supply the most comprehensive and reliable evidence of his present conditions and access to medical care.  These records—which Teman's submissions, counseled and *pro se*, tellingly nowhere reference—bely any claim that these circumstances meet the legal standards governing compassionate release.  On the contrary, they

12

support the BOP's determinations that Teman's conditions are insufficiently serious to meet these criteria, and that the BOP is capable of addressing his medical needs.

To review:

The BOP's medical records reflect that Teman has repeatedly received medical attention within FCI Miami. He received a BOP medical examination on October 10, 2023, the date of his surrender, *see* Dkt. 412, Ex. D at 26–31; *id.*, Ex. B. at 3; *see also id.* at 1 (noting laboratory and radiology tests on October 10–13). The records reflect another medical examination, on October 20, 2023, when Teman reported a sore throat, dizziness, congestion, and GI issues. Teman then denied having fever, chest pain, palpitations, shortness of breath, or unwanted weight loss, and his lungs were found to be clear. *See id.*, Ex. D. at 20. The records reflect another examination on October 23, 2023, several days after Teman's first (post-surrender) compassionate release motion, *see id.*, Ex. D. at 32–45. The notes of this examination, like the earlier ones, do not reflect any issues with Teman's cardiovascular or respiratory systems. They do not reflect fever or chills. They do not reflect symptoms of COVID-19. On the contrary, the examination found that Teman's lungs were "clear." *Id.* at 40.

Teman was also evaluated on November 7, 2023. The records of that examination note that Teman's main complaint was "dizziness," and that he also complained of nausea and "chest pressure, left arm and leg weakness from food services." *Id.* at 13. Although Teman reported having had chest pressure for 2–3 weeks and left arm and leg weakness for 10–12 days, that evaluation—which included a neurological exam, an EKG, and urinalysis—again did not find any issues with Teman's cardiovascular or respiratory systems. *See id.* at 8–14.

Teman was again evaluated on December 2, 2023, after he reported having fallen. The records of that examination reflect Teman stated that he attributed his "ongoing dizziness and

13

chills to [the] prior Johnson & Johnson vaccine," and that he "denie[d] associated symptoms"; the examination notes again do not reflect issues with his cardiovascular or respiratory systems, or other abnormal results, including as to Teman's blood pressure, pulse, and blood oxygenation. *See id.* at 1; *id.* at 2 ("Respirations even and unlabored"). The exam notes add that Teman was encouraged to rest and increase his fluid intake, that he received Pedialyte, and that he was "observed ambulating 2 hours after incident, no acute distress noted[,] reports feeling better." *Id.*

The BOP medical notes also reflect that Teman, on multiple occasions, declined care or examinations. On October 13, 2023, Teman declined a chest x-ray, writing, "I do not need a chest x-ray" and "I do not want excessive radiation [without] a specific need." *Id.*, Ex. B. at 13; *id.*, Ex. D at 79. On October 17, 2023, Teman was offered but refused dental care, writing, "I have a short sentence and do not want Xrays & excessive radiation." *Id.*, Ex. B. at 12. On December 1, 2023, Teman declined a medical examination. *See id.*, Ex. D at 7. That day, the notes state, Teman "was requesting his medical records, but the inmate became defensive, claiming that his outside Doctor and legal team have the documentation and that he does not need to prove anything. Inmate leaves my office without having undergone any medical examination." *Id.* On December 5, 2023, Teman again declined medical treatment, including "labs." Teman wrote, "My doctors have already established my conditions." He acknowledged understanding "that by refusing medical [the BOP] is unable to diagnose any disease of the immune system. *Id.* at 76.

The Court assumes *arguendo* that Teman's chronologic account of his symptoms and experiences is accurate. *See* Dkt. 411, Ex. 1.[7] But even crediting that narrative, the assembled

---

[7] The Court so assumes notwithstanding Teman's track record in this litigation of making false and/or reckless claims in the service of requests for relief. For avoidance of doubt, the Court

14

documentation (medical records plus Teman's account) do not come close to supporting that Teman meets any of the formulations from the Sentencing Commission under which an inmate's conditions qualify as an extraordinary and compelling reason for early release.

Addressing the Commission's four alternative standards in sequence:

The records do not reflect that Teman "is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory)," along the lines of "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." U.S.S.G. § 1B1.13(b)(1)(A). Nothing in the records or Teman's narrative supports this.

The records do not reflect that Teman is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13(b)(1)(B). Even assuming that Teman's conditions—occasional GI issues, chills, and dizziness, which proved redressable at Teman's most recent medical appointment by Pedialyte and rest, and which were unaccompanied by abnormal vital signs—qualify as serious, there is no basis to claim that Teman's conditions are ones "from which he . . . is not expected to recover." *Id.*

The records do not reflect that Teman is "suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant

_____

does not assume to be correct Teman's opinions in that account as to medical matters, or his statements about events to which he was not a percipient witness. The Court has also credited Dr. Seifan's pre-incarceration evaluation of Teman from September 2023. But, to the extent that Dr. Seifan's letter of January 11, 2024 (attached to the defense's reply of the same date) asks the Court to draw inferences about Teman's current medical conditions, Dr. Seifan notably does not state that he has reviewed any of the BOP medical records, despite the fact that Teman's full BOP medical records were filed with the Government's opposition of the previous day, and thereby were readily accessible to defense counsel.

15

is at risk of serious deterioration in health or death." *Id.* § 1B1.13(b)(1)(C). The medical records, and Teman's narrative, do not support that he requires long-term or specialized medical care that he has been unable to access in custody. And, as the BOP notes, Teman stands in relatively short order to be released to a CCC—a halfway house—and thereafter to home confinement. In both these circumstances, an inmate ordinarily has the ability to access external medical care.

Finally, the records do not reflect that, "due to personal health risk factors and custodial status," Teman "is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing" COVID-19 public health emergency, or that "such risk cannot be adequately mitigated in a timely manner." *Id.* § 1B1.13(b)(1)(D). The BOP medical records are devoid of any indication that, in custody, Teman has tested positive for COVID or experienced any COVID-related (or respiratory) issues. The medical records also do not support that the BOP's medical staff would be unable to minister to Teman's needs were he to contract the latest variant of COVID-19, or were he—contrary to his current intentions—to receive and have an adverse reaction to the latest vaccine or were he otherwise to become further unwell.

This case is thus on all fours with the many cases in which courts have denied motions for compassionate release where the defendant's condition, although impaired, did not meet the governing standards for compassionate release, *see, e.g.*, *United States v. Barnett*, No. 90 Cr. 913 (LAP), 2021 WL 3550217, at *3 (S.D.N.Y. Aug. 10, 2021) (defendant's diabetes, hypertension, glaucoma, and enlarged prostate did not qualify), *aff'd*, No. 21-2319, 2023 WL 2375684 (2d Cir. Mar. 7, 2023); where BOP or other medical records did not substantiate the defendant's claims to be at risk of serious medical complications or death, *see, e.g.*, *United States v. Carrasco*, 19 Cr. 475-01 (NRB), 2023 WL 375183, at *2 (S.D.N.Y. Jan. 24, 2023) (BOP's medical records did not

16

support defendant's claims of heart problems); and/or where the defendant did not establish that the BOP was incapable of attending to his medical needs, *see, e.g.*, *United States v. Binday*, No. 12 Cr. 152 (CM), 2020 WL 4017822, at *6 (S.D.N.Y. July 16, 2020) (the BOP "is capable of providing . . . adequate medical care, and appears to be doing so" in the defendant's case, given his detailed health records and the BOP's comprehensive treatment plan). *See also, e.g.*, *United States v. Olivieri*, 18 Cr. 316 (PAC), 2023 WL 2366859, at *3 (S.D.N.Y. Mar. 6, 2023) (denying compassionate release where defendant did not provide sufficient records to show the severity of his gastric ulcers, dementia, coronary artery disease, and congestive heart failure that were alleviated by the "adequacy of BOP's medical care"); *United States v. Bradley*, No. 19 Cr. 632, 2023 WL 3004660, at *2 (S.D.N.Y. Apr. 19, 2023) (denying compassionate release where the BOP was able to manage defendant's diabetes, hypertension, high blood pressure, and urinary tract disorder); *United States v. Castelle*, 18 Cr. 15 (AKH), 2022 WL 4536798, at *2 (S.D.N.Y. Sept. 28, 2022) (denying compassionate release where defendant was unable to substantiate his claim of chronic kidney disease with medical proof); *United States v. Herring*, 10 Cr. 391-67 (CM), 2022 WL 633871, at *3 (S.D.N.Y. Mar. 4, 2022) (denying compassionate release where BOP medical staff was providing "appropriate care" for defendant's complications due to his obesity); *United States v. Borelli*, No. 84 Cr. 63 (LAP), 2021 WL 2228075, at *3 (S.D.N.Y. June 2, 2021) (denying compassionate release where defendant suffered from diabetes, hypertension, heart disease, and cataracts and there was "no indication that his medical conditions cannot be managed—or, for that matter, are not already well-controlled—through BOP-provided medical care"); *United States v. Gotti*, 433 F. Supp. 3d 613, 619 (S.D.N.Y. 2020) (denying motion for compassionate release where defendant with heart and lung conditions could be "adequately treated and monitored" by the BOP); *United States v. LoCascio*, 90 Cr. 1051, 2020 WL

17

12719849, at *2, *6 (E.D.N.Y. July 17, 2020) (denying compassionate release where BOP was able to "manage" the defendant's chronic kidney disease, coronary artery disease, and heart failure); *United States v. Mood*, 19 Cr. 113 (VB), 2020 WL 3256333, at *1 (S.D.N.Y. June 16, 2020) (denying compassionate release where, despite defendant's hypertension, diabetes, and obesity, his "condition is stable and has been effectively managed by routine monitoring and medication").

The Court thus denies Teman's motion for compassionate release based on his inability to present circumstances qualifying as extraordinary and compelling under U.S.S.G. § 1B1.13(b)(1).[8] That said, the Court is sympathetic to Teman's discomfort and wishes Teman well during his limited remaining time in custody and thereafter. The Court expects the BOP's medical staff to continue to attend, with dispatch, to Teman's medical issues when reported.

### 2. Balance of Section 3553(a) Factors

Even if the Court had found extraordinary and compelling reasons qualifying Teman for early release, Teman's release would not be consistent with the § 3553(a) factors, considered in combination.

At sentencing, the Court carefully considered and balanced these factors, on route to finding a term of imprisonment of 12 months and one day the minimum necessary to respect these factors, considered in combination. *See* Sent. Tr. 694.

---

[8] To the extent Teman claims eligibility under the catchall provision of U.S.S.G. § 1B1.13(b)(5), which permits a finding of extraordinary and compelling reasons justifying release where "[t]he defendant presents any other circumstance or [a] combination of circumstances . . . similar in gravity" to the circumstances elsewhere enumerated by the Commission, that argument fails. Teman has not cited bases for release other than his medical and physical condition. Given that Teman's conditions do not satisfy the medical and physical conditions provision, U.S.S.G. § 1B1.13(b)(1), these cannot be considered "similar in gravity" to the conditions listed there.

18

The Court first reviewed factors tending to favor a longer sentence. Just punishment weighed especially heavily, because Teman had schemed to defraud banks of a third of million dollars; because the scheme took time, planning, and effort, and consisted of two waves of fraudulent checks; because Teman carried out the scheme with eyes open and warned by counsel as to its illegal nature; because the scheme exposed not only the banks, but Teman's customers, who were a small co-op board and two landlords, to a meaningful loss; and because Teman's conduct towards these customers had shown "venom, hate and zeal" and had a "distressing" retributive quality. *See id.* at 67–77. General and specific deterrence also favored a meaningful sentence, the latter because Teman had been warned by counsel that he would be arrested and prosecuted, yet persisted in the scheme; because Teman was an adult in his late 30s who had led an advantaged life; and because Teman had continued to blame his customers for his prosecution. *Id.* at 74–78. The interest in public protection was also present because "the record does not inspire complete confidence that once you're done serving your sentence, you will not take liberties with other people's money, particularly if you feel yourself provoked to anger by them," and because Teman had not shown the "self-examination and self-awareness that is a key to future self-restraint." *Id.* at 78–80.

The Court next reviewed mitigating factors. These included Teman's challenges in his youth with bullying; his mental health issues, including treatment for depression and anxiety; complications Teman had from surgery for nasal issues; an unexplained rift that Teman had had with his parents; and the inner turmoil with which Teman appeared to struggle. *Id.* at 80–81. The Court also noted Teman's long and commendable history of philanthropic engagement, *id.* at 82–83, and character letters from friends, family, and co-workers attesting to his philanthropy and acts of kindness, *id.* at 82–88. The Court also took account of COVID-19. Although the

19

pandemic had largely abated, it still affected imprisonment, and Teman's respiratory history put him at greater risk from COVID-19. *Id.* at 89–90 ("I view the fact of the ongoing pandemic and its uncertain course and its likely impact on the nature of your confinement as mitigating to a degree today, albeit not nearly so much as would have been the case back in September").

In the end, balancing the factors, the Court, although it had "considered seriously" imposing a sentence within the 30–37 month Guidelines range, concluded that a sentence materially below that range was reasonable, including on account of the mitigating factors the Court had identified. *Id.* at 92–93. However, the Court held, "[n]o lesser sentence" than a 12 month and 1 day sentence "would fairly respect the 3553(a) factors considered in totality." *Id.* at 93.

The Court's considered assessment of the just and reasonable sentence remains the same today. There have not been material developments since July 2021 that alter the balance of the § 3553(a) factors. The Court's assessments of Teman's offense conduct and the interests in just punishment, general and specific deterrence, and protection of the public remain as articulated. As at sentencing, Teman continues not to accept responsibility for his offense, as reflected in his disingenuous post-sentencing bids to blame his conviction on improprieties by his customers, the banks that handled their checks, the prosecution, the Court, and various of his own counsel.

At sentencing, the Court also took into account Teman's medical history (including his prior respiratory surgery and complications from it) and the rigors that imprisonment might present for Teman. The Court also took into account that COVID-19 might affect Teman in prison. Thus, the factors on which Teman bases his compassionate release motion were baked into the sentence imposed. And the Court does not find it, at all, unexpected that Teman has

20

found incarceration unusually trying. Teman himself forecast as much in anticipatorily moving for compassionate release before even reporting to FCI Miami. *See* Dkt. 408.[9]

The Court therefore finds that Teman's early release would be inconsistent with the § 3553(a) factors, taken as a whole. *See United States v. Garcia*, No. 21-1181-CR, 2022 WL 2154675, at *2 n.1 (2d Cir. June 15, 2022) (cleaned up) ("a defendant may not use a compassionate release motion to second-guess the sentence previously imposed"); *see also, e.g., United States v. O'Bryant*, No. 16 Cr. 317-3 (PAE), 2022 WL 17168192, at *3 (S.D.N.Y. Nov. 22, 2022) (denying compassionate release where defendant's "spleen removal" and resulting health effects were "known at the time of [his] original sentencing"); *United States v. Hayward*, No. 19 Cr. 61 (PKC), 2021 WL 1820158, at *3 (S.D.N.Y. May 5, 2021) (denying compassionate release where defendant's "potentially serious underlying health condition" was "known at the time of sentencing"). And Teman's release now, a little more than three months into service of a sentence for a brazen $333,000 fraud scheme, would disrespect the central factors of just punishment and promotion of respect for law. *See, e.g., United States v. Sellick*, No. 21-2328, 2022 WL 16936829, at *2 (2d Cir. Nov. 15, 2022) (summary order) (noting that "[t]he fact that [defendant] has served less than half of his 50-year sentence further supports the district court's decision" to deny compassionate release, given that such an early release "would undermine" the "interests codified in § 3553(a)" (citation omitted)); *United States v. Graham*, No. 16 CR 786 (NSR) (02), 2023 WL 3222483, at *4 (S.D.N.Y. May 3, 2023) (denying compassionate release where defendant "has only served about half of her sentence" and "her early release would

---

[9] As the Sentencing Commission has recognized, a court of course may find extraordinary and compelling reasons for release based on information foreseen as of sentencing. U.S.S.G. § 1B1.13(e). Here, however, the Court took account of Teman's medical circumstances in fashioning the well-below-Guidelines sentence, and does not find the balance of § 3553(a) factors to be consequentially different now.

21

thereby undermine the sentencing goals"); *United States v. Cook*, No. 13 Cr. 777 (AJN), 2020 WL 7248973, at *2 (S.D.N.Y. Dec. 9, 2020) (denying compassionate release where defendant "has only served approximately 84 months of his 240-month sentence" and to "release [him] at this juncture would cut strongly against the Court's stated purpose of promoting respect for the law, providing a just punishment, and deterring [the defendant] and others from engaging in this type of behavior in the future").

Finally, the year-and-a-day sentence the Court imposed made Teman eligible to earn credit for good behavior in prison and today makes Teman eligible for transfer, relatively soon, out of FCI Miami. According to the BOP, Teman, assuming good behavior, is scheduled to be released to a residential reentry center—a halfway house—on or about May 14, 2024, and from there to home confinement on or about June 27, 2024. BOP Decl. ¶¶ 2, 6–7. On those projections, Teman will have served barely more than seven months in prison, some five months less than the stated sentence imposed. Teman's request for release from FCI Miami in advance of this timetable is unjustified.

## CONCLUSION

For the reasons above, the Court denies Teman's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). The Clerk of Court is respectfully requested to terminate the motion at Docket 411.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: January 24, 2024
New York, New York

22

**Eden P. Quainton**
# Quainton Law, PLLC

**2 Park Ave., 20th Fl.**
**New York, NY 10016**

**245 Nassau St.**
**Princeton, NJ 08540**

---

**Telephone (212) 419-0575, (609) 356-0526**
**Cell: (202) 360-6296**
**Eden.quainton@quaintonlaw.net**

June 26, 2024

**VIA ECF**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

Re: *United States v. Ari Teman, 19-cr-0696 (PAE) –*
*Letter Motion to Modify Conditions of Supervised Release*

Dear Judge Englemayer,

I represent the Defendant, Ari Teman (the "Defendant" or "Mr. Teman") in the above-referenced matter.

As your Honor knows, Mr. Teman was released from FCI Miami (Low) on May 14, 2024 and from a residential re-entry facility on May 28, 2024. Mr. Teman is now subject to supervised release under the direction of a Probation Officer, Jimmy Wong. Mr. Teman has been receiving medical care from his spine specialist, Dr. Brusavonik, and has had a series of MRIs taken that confirm spinal herniation and degenerative disc disease. Although he remains in severe pain, Mr. Teman is focusing on returning to work, both at GateGuard, Inc., ("GateGuard"), the smart intercom company he founded in 2016, and as a stand-up comic. He is also hoping to visit his parents in Israel, who need comfort in light of all the tragic developments over the past months. As your Honor also knows, Mr. Teman's mother has serious health issues of her own and Mr. Teman hopes to be able to visit her at some point soon. In addition, Mr. Teman has a deposition scheduled for July 8 and 9 in New York in connection with a pending lawsuit, *GateGuard, Inc. v. Amazon.com, Inc., et al.*, 21-cv-9321.

In light of the foregoing, Mr. Teman is seeking the modification of certain of his conditions of supervised release. I have discussed Mr. Teman's requests with both AUSA Jacob Gutwillig and Mr. Teman's Probation Officer, Jimmy Wong. *See* Ex. A. Reproduced below for the convenience of the Court are Mr. Teman's requests (as I communicated them to Mr. Gutwillig) and the responses of Mr. Gutwillig and Mr. Wong (in blue):

1.    Mr. Teman does not need to do drug testing. Mr. Teman has no history of drug use, and this condition was already removed post-trial. **Probation does not object to removing this condition. The Government defers to Probation.**

2.    Mr. Teman may travel domestically within the United States for comedy performances, volunteering, and work. He may travel to New York and New Jersey for medical, family, and religious reasons as well. Mr. Teman is due to sit for a two-day deposition in New York next week.  While he must notify his probation officer of his travel plans, he should not need to seek approval for each trip, but should be required to notify his probation officer about the times and destinations of contemplated travel. **Probation does not object Teman's travel within the United States. Probation requires that Teman notify his Probation Officer, in writing, seven days prior to any such travel, and to provide the details of that travel, including the location, dates, and itinerary.**

3.    Following 60 days of probation, Mr. Teman may travel to Israel to visit and assist in care for his mother who is unable to travel due to recent surgeries, for religious purposes, work, volunteering, and/or to perform standup comedy for periods of up to 40 days at a time. **Probation objects to Teman's request for blanket permission for international travel. For any international travel, Teman must provide notice to his Probation Officer, in writing, 14 days prior to such travel, and provide the details of that travel, including the location, dates, and itinerary. After obtaining Probation's position on the travel request, Teman must then make an application to the Court requesting permission for such travel. If any such international travel is permitted, Teman must contact his Probation Officer to check in on the days of his departure and return to the United States, and, consistent with the conditions currently in place, Teman must surrender his passport to his Probation Officer 48 hours after returning to the U.S.**

4.    He may travel to any other international destination for any of the above reasons with 14 days-notice to his probation officer. **See above.**

5.    Mr. Teman may interact with individuals who have been convicted (and may still be incarcerated) for volunteering, work, and religious purposes. **Neither Probation nor the Government has an objection to Teman's contact with such individuals for**

2

**volunteering and religious purposes. However, for any "work" purposes, before having any such contact, Teman must identify for the Probation Office the individual(s) he seeks to contact and the nature of the work purpose, and obtain Probation's position on any such contact.**

6.      Mr. Teman may run JCorps volunteering and a Jewish Prison Book Project to fulfill his community service. The Prison Book project would involve providing books to incarcerated men and their children so that inmates could maintain a bond with their children that would also help the children escape the difficult circumstances in which many of them find themselves. **No objection from Probation or the Government.**

7.      As Mr. Teman has paid off his restitution and assessment, he should be permitted to maintain a credit card for travel and car rental (which requires a credit card), and to pay for basic goods and services. In addition, he would request the ability to apply for a line of credit to cover such things as housing and overdraft protection. **Probation does not object to these requests, provided Teman provides (i) advance notice of any such applications, *i.e.*, for credit cards or lines of credit; and (ii) full information to the Probation Office about the use of any such credit cards, lines of credit, or bills, and any other relevant information requested by the Probation Office.**

Under 18 U.S.C.A. § 3583(e), after considering the factors set forth in 18 § 3553(a)(1), (the nature and circumstances of the offense and history and characteristics of the defendant) (a)(2)(B) (the need for adequate deterrence), (a)(2)(C) (the protection of the public), (a)(2)(D) (the goal of facilitating rehabilitation and reentry), (a)(4) (the range of sentences available), (a)(5) (any relevant policy statements), (a)(6) (the avoidance of sentencing disparities), and (a)(7) (the need to provide restitution), the Court may:

> extend a term of supervised release if less than the maximum authorized term was previously imposed, and may modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation and the provisions applicable to the initial setting of the terms and conditions of post-release supervision

18 U.S.C.A. § 3583 (e)(2). *See United States v. Parisi*, 821 F.3d 343, 347 (2d Cir. 2016).

3

Consideration of the above factors supports approval of the proposed modifications to Mr. Teman's supervised release conditions. As noted in my communication with Mr. Gutwillig, pre-trial services has already found, in connection with Mr. Teman's release on bail, that drug testing for Mr. Teman is not required, given the total absence of any history of drug abuse in Mr. Teman's background. Dkt. 8. Accordingly, in light of the response of Mr. Gutwillig and Mr. Wong, Mr. Teman respectfully requests that the Court modify his conditions of release as set forth in point No. 1 above, consistently with 18 U.S.C.A. § 3553(a)(1).

With respect to domestic and international travel, your Honor has already found that Mr. Teman is not a flight risk, Dkt. 425, and has authorized domestic and international travel on multiple occasions. Dkts. 78, 297, 299, 302, 323, 362. Accordingly, Mr. Teman requests that the Court modify his conditions of release in accordance with the responses of Mr. Gutwillig and Mr. Wong in points 2-4 above, and the considerations in 18 U.S.C.A. § 3553(a)(1) and (a)(2)(C).

Points 5 and 6 relate to two separate issues. First, while he was incarcerated, Mr. Teman developed the concept of creating a book program for inmates with children. Mr. Teman would coordinate with existing Jewish charities to provide reading material for the children that would be shared with fathers "on the inside" thus encouraging the literacy of the children and creating a shared bond between incarcerated fathers and their children. This is the Jewish Prison Book Project, "Jewish" only in that Mr. Teman would work with existing Jewish groups in providing reading materials, not that the reading materials would have any necessary religious component. In addition, Mr. Teman intends to continue running the JCorps volunteering program with which the Court is familiar and hopes to contact incarcerated men in connection with volunteering opportunities. As noted, the Government and the Probation Office do not have any objection to the foregoing and an order memorializing this modification, which would be consistent with 18 U.S.C.A.§ 3553(a)(2)(D). I have further spoken to Officer Wong, and he recommends requesting that any volunteering work performed by Mr. Teman through JCorps or as part of the Jewish Prison Book Project described above be explicitly credited towards the fulfillment of Mr. Teman's required 300 hours of community service. This is a helpful clarification that Mr. Teman respectfully requests the Court include in any order modifying his conditions of supervised release.

Second, Mr. Teman is considering providing re-entry opportunities for inmates at GateGuard and potentially other business with which he is or may become affiliated. The Government responds that Mr. Teman should be free to contact incarcerated individuals for volunteering and religious purposes, but that he must identify the individuals to whom any "work" would be given and the nature of such work, and obtain the position of the Probation Office for any such work-related contacts.

4

Mr. Teman believes the Government's and Probation Office's response to points 5 and 6 above is fair and urges the Court to endorse this response, which is consistent with § 3553(a)(2)(D).

Finally, Mr. Teman needs a credit card for car rental, hotel accommodations and every-day living expenses, and requests the ability to apply for a mortgage or other lines credit, such as for overdraft protection. The Government and the Probation Office do not object to this proposal, provided the Probation Office has advance notice of any credit application and Mr. Teman supplies the Probation Office with all requested information relating to the application for, and intended use of, any credit card, lines of credit or other forms of credit. Mr. Teman accepts the conditions of the Probation Office, which he submits appropriately reflect the considerations set forth in 18 U.S.C.A §§ 3531(a)(1), (a)(2)(D) and (a)(7).

Accordingly, Mr. Teman respectfully requests the entry of an order modifying his conditions of release by:

1. Removing any requirement that Mr. Teman undergo drug testing;
2. Authorizing Mr. Teman to engage in domestic travel without further Court approval, provided he notifies his Probation Officer in writing seven days prior to any such travel, and provides the details of such travel, including the location, dates, and itinerary, to the Probation Office.
3. Authorizing Mr. Teman to engage in international travel, provided (i) he gives his Probation Officer, in writing, 14 days prior to such travel, the details of the travel, including its location, dates, and itinerary; (ii) after obtaining the Probation Office's position on the travel request, Mr. Teman seeks and obtains Court permission for such travel; (iii) if such travel is authorized, Mr. Teman checks in with his Probation Officer on the days of his departure and return to the United States; and (iv) consistently with the conditions currently in place, Mr. Teman surrenders his passport to his Probation Officer 48 hours after returning to the U.S.
4. Authorizing Mr. Teman to contact incarcerated individuals for religious and volunteering purposes and crediting any volunteering work conducted through JCorps or in connection with his Jewish Prison Book Initiative towards his obligation to perform 300 hours of community service.
5. Allowing Mr. Teman to contact incarcerated individuals for work purposes, provided he furnishes his Probation Officer with the names of any such individuals and the nature of any work to be performed, and obtains the position of the Probation Office.
6. Permitting Mr. Teman to obtain one or more credit cards, lines of credit or other forms of credit, provided he gives his Probation Officer advance notice of any credit

5

application and supplies the Probation Office will all requested information relating to the application for, and intended use of, any form of credit.

Please do not hesitate to contact me if your Honor requires clarification on any of the above points.

A proposed order is attached to this Letter Motion.

Respectfully submitted,

*Den Quainton*
_____
Eden P. Quainton

cc: All counsel of record (via ECF)

6

 **Gmail**

# USA v Teman - 19-cr-696 --Conditions of supervised release

**Gutwillig, Jacob (USANYS)** <Jacob.Gutwillig@usdoj.gov>

Tue, Jun 25, 2024 at 12:39 PM

To: Eden Quainton <equainton@gmail.com>

Cc: Jimmy Wong <jimmy_wong@flsp.uscourts.gov>

To the extent any of those would result in a change to conditions of supervised release imposed by the Court at sentencing, I think a formal application to the Court would be necessary, but that is a question probably best addressed by Officer Wong.

---

**From:** Eden Quainton <equainton@gmail.com>
**Sent:** Tuesday, June 25, 2024 12:35 PM
**To:** Gutwillig, Jacob (USANYS) <JGutwillig@usa.doj.gov>
**Cc:** Jimmy Wong <jimmy_wong@flsp.uscourts.gov>
**Subject:** Re: [EXTERNAL] USA v Teman - 19-cr-696 --Conditions of supervised release

Jake,

Just to be clear. With respect to matters on which there is no issue, a formal application to the Court is still required?

Eden

On Tue, Jun 25, 2024, 12:32 PM Gutwillig, Jacob (USANYS) <Jacob.Gutwillig@usdoj.gov> wrote:

> Eden,
>
> I spoke with Officer Wong yesterday, who I am copying here as well.
>
> My understanding of Probation's positions, as well as mine, on your requests is set out below **in bold**.
>
> Thanks,
>
> Jake
>
> ***

1. Mr. Teman does not need to do drug testing. Mr. Teman has no history of drug use and this condition was already removed post-trial.  **Probation does not object to removing this condition.  The Government defers to Probation.**

2. Mr. Teman may travel domestically within the United States for comedy performances, volunteering, and work. He may travel to New York and New Jersey for medical, family,  and religious reasons as well. Mr. Teman is due to sit for a two-day deposition in New York next week.  While he must notify his probation officer of his travel plans, he should not need to seek approval for each trip, but should be required to notify his probation officer about the times and destinations of contemplated travel.  **Probation does not object Teman's travel within the United States. Probation requires that Teman notify his Probation Officer, in writing, seven days prior to any such travel, and to provide the details of that travel, including the location, dates, and itinerary.**

3. Following 60 days of probation, Mr. Teman may travel to Israel to visit and assist in care for his mother who is unable to travel due to recent surgeries, for religious purposes, work, volunteering, and/or to perform standup comedy for periods of up to 40 days at a time.  **Probation objects to Teman's request for blanket permission for international travel.  For any international travel, Teman must provide notice to his Probation Officer, in writing, 14 days prior to such travel, and provide the details of that travel, including the location, dates, and itinerary.  After obtaining Probation's position on the travel request, Teman must then make an application to the Court requesting permission for such travel.  If any such international travel is permitted, Teman must contact his Probation Officer to check in on the days of his departure and return to the United States, and, consistent with the conditions currently in place, Teman must surrender his passport to his Probation Officer 48 hours after returning to the U.S.**

4. He may travel to any other international destination for any of the above reasons with 14 days notice to his probation officer.  **See above.**

5. Mr. Teman may interact with individuals who have been convicted (and may still be incarcerated) for volunteering, work, and religious purposes.  **Neither Probation nor the Government has an objection to Teman's contact with such individuals for volunteering and religious purposes.  However, for any "work" purposes, before having any such contact, Teman must identify for the Probation Office the individual(s) he seeks to contact and the nature of the work purpose, and obtain Probation's position on any such contact.**

6. Mr. Teman may run JCorps volunteering and a Jewish Prison Book Project to fulfill his community service. The Prison Book project would involve providing books to incarcerated men and their children so that inmates could maintain a bond with their children that would also help the children escape the difficult circumstances in which many of them find themselves.  **No objection from Probation or the Government.**

7. As Mr. Teman has paid off his restitution and assessment, he should be permitted to maintain a credit card for travel and car rental (which requires a credit card), and to pay for basic goods and services. In addition, he would request the ability to apply for a line of credit to cover such things as housing and overdraft protection.  **Probation does not object to these requests, provided Teman provides (i) advance notice of any such applications, *i.e.,* for credit cards or lines of credit; and (ii)  full information to the Probation Office about the use of any such credit cards, lines of credit, or bills, and any other relevant information requested by the Probation Office.**

I have spoken to Mr. Teman's probation officer, who has told me that he will defer to whatever the Court decides on each of the above points. Please let me know if the Government would be willing to stipulate to the above modifications of Mr. Teman's release conditions. Please let me know if you would like to discuss any of the foregoing.

---

**From:** Eden Quainton <equainton@gmail.com>
**Sent:** Tuesday, June 25, 2024 12:06 PM
**To:** Gutwillig, Jacob (USANYS) <JGutwillig@usa.doj.gov>
**Subject:** [EXTERNAL] USA v Teman - 19-cr-696 --Conditions of supervised release

Jake,

Can you please get back to me with respect to the proposed supervised release modifications?

Thank you,

Eden

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ARI TEMAN, | ) | No. 1:19-CR-0696 (PAE) |
| | ) | |
| Defendant. | ) | |

**[PROPOSED] ORDER GRANTING DEFENDANT'S**
**MOTION FOR MODIFICATION OF HIS CONDITIONS OF SUPERVISED RELEASE**

UPON CONSIDERATION of Defendant's Motion for modification of his conditions of supervised released, it is hereby ORDERED:

The Motion is GRANTED.

It is further ORDERED:

1. Defendant is not required to undergo drug testing.

2. Mr. Teman is authorized to travel domestically without further Court order, *provided* that he notifies his Probation Officer, in writing, seven days prior to any such travel, and *provided further* that he furnishes his Probation Officer with the details of such travel, including the location, dates, and itinerary.

3. Mr. Teman is authorized to travel internationally provided (a) 14 days prior to such travel Mr. Teman informs his Probation Officer, in writing of such proposed travel; (b) after obtaining the approval of the Probation Officer, Mr. Teman seeks and obtains Court approval for such travel; (c) Mr. Teman checks in with his Probation Officer on the days of departure and return for such international travel; and (d) Mr. Teman surrenders his passport to his Probation Officer 48 hours after returning to the U.S.

4. Mr. Teman is authorized to contact incarcerated individuals for volunteering and religious purposes.

5. Any work performed for JCorps or Mr. Teman's Jewish Prison Book Initiative shall be credited towards Mr. Teman's obligation to perform 300 hours of community service.

6. Mr. Teman is authorized to contact incarcerated individuals for work purposes, provided he furnishes the Probation Office with the details of any contemplated work to be performed by any inmates and the identity of any such inmates, and that he obtains the position of the Probation office prior to initiating any such work-related contacts.

7. Mr. Teman is authorized to obtain one or more credit cards and to apply for a line of credit and other forms of credit, provided the Probation Office is given advance notice of any credit application and Mr. Teman furnishes the Probation Office with all requested information relating to the application for, and intended use of, any credit card, lines of credit or other forms of credit.

SO-ORDERED

ENTERED this ____ day of ____, 2024.

_____
Judge Paul E. Englemayer
U.S. District Court for the Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

ARI TEMAN,

Defendant.

19-CR-696 (PAE)

ORDER ON MOTION

---

PAUL A. ENGELMAYER, District Judge:

The Court has reviewed (1) the June 26, 2024 letter from defense counsel requesting various modifications to and clarifications of the conditions of supervised release of defendant Ari Teman, Dkt. 450; (2) the July 8, 2024 letter from the Government on its behalf and that of the Probation Department responding to the defense's requests, Dkt. 452; and (3) a draft order submitted by the Government that would effect the modifications to the conditions of supervised release which the Government and the Probation Department do not oppose, Dkt. 452, Exh. A ("Draft Order"). The Court thanks counsel for the clarity of their respective submissions. The Court welcomes as well as the fact that the parties are in substantial agreement on most points.

The Court will issue today an order that is substantively identical to the Draft Order. The Court's judgment is that the modifications effected in the order that will issue are sensible and that the resulting conditions of supervised release reflect a sound balance of the 18 U.S.C. § 3583(e) factors. To the limited degree that Teman seeks additional modifications, including blanket approval for international travel, the Court's considered judgment is that that these proposed modifications are not justified.

The Court's denial of Teman's request is without prejudice to his right to seek future

modifications of conditions of supervised release.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: July 10, 2024
        New York, New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

ARI TEMAN,

Defendant.

19-CR-696 (PAE)

ORDER

---

PAUL A. ENGELMAYER, District Judge:

Upon the application of defendant Ari Teman ("Teman") to modify and/or clarify certain

of the conditions of his term of three years' supervised release, and without the objection of the

Government or the United States Probation Office for the Southern District of Florida (the

"Probation Office"), IT IS HEREBY ORDERED that:

1.      To the extent the requirement that Teman undergo drug testing was not

already suspended by the terms of the Revised Final Presentence Investigation Report, dated April

23, 2020 (the "PSR") and imposed by the Court at sentencing, Teman is not required to undergo

drug testing as a condition of his supervised release.

2.      To the extent Teman wishes to travel domestically or internationally,

consistent with the conditions of supervised release set forth in the PSR and imposed by the Court

at sentencing, he must first seek permission of the Court or the Probation Office. Specifically,

Teman must follow the following procedures:

        a.      Teman may travel domestically, outside the Southern District of

Florida, provided that: (i) he notifies his Probation Officer, in writing, seven (7) days prior to any

such travel, (ii) he furnishes his Probation Officer with the details of such travel, including the location, dates, and itinerary, and (iii) the Probation Officer approves such travel in advance.

b. Teman may travel internationally, outside the United States, provided that: (i) 14 days prior to such travel Teman informs his Probation Officer, in writing, of such proposed travel; (ii) after obtaining the approval of his Probation Officer, Teman seeks and obtains Court approval for such travel; (iii) Teman checks in with his Probation Officer on the days of departure and return from such international travel; and (iv) Teman surrenders his passport to his Probation Officer 48 hours after returning to the United States from any such travel.

3. Teman may communicate or interact with incarcerated individuals provided that, consistent with the conditions set forth in the PSR and imposed by the Court at sentencing, he first seeks and receives approval from his Probation Officer; and further provided that, to the extent such contact is for "work" purposes, Teman must first furnish his Probation Officer with the details of any contemplated work to be performed by or for any incarcerated individual and any such work-related contact, and receive prior approval from his Probation Officer for any such communication.

4. To the extent Teman wishes to obtain one or more credit cards and/or to apply for a line of credit and/or other forms of credit, consistent with the conditions set forth in the PSR and imposed by the Court at sentencing, Teman may do so provided that: (i) Teman provides his Probation Officer with advance notice of any such application; (ii) Teman furnishes his Probation Officer with all requested information relating to the application for, and intended us of, any credit card, lines of credit, or other forms of credit; and (iii) Teman's Probation Officer approves any such application in advance.

This Order does not modify any other conditions of Teman's supervised release imposed at

sentencing, and those conditions remain in effect.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: July 10, 2024
New York, New York

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Case: 1:19-cr-00696                                                  Dec 29, 2024

**Motion to move to non-reporting probation due to escalating war, religious, medical & mental health reasons. Alternatively to extend for 4 months to allow for safer, more affordable travel during peacetime.**

Honorable Judge Engelmayer:

Defendant Ari Teman files this motion respectfully pro se, as Mr. Butler is on limited appearance for the 2255 only, and Mr. Quainton is dealing with a family health issue.

Pursuant to the Court's prior ruling recognizing that Mr. Teman was authorized to remain in Israel until January 15, 2024, due to his commitments assisting his elderly parents, engaging in productive volunteer work, and the challenges and safety concerns associated with international travel, we respectfully move the Court for further relief in light of recent and significant developments including that situation is only more unsafe and challenging now, and the needs more intense. As well, Mr. Teman needs medical care that is better given in Israel with family to support his recovery.

Your Honor previously gave as the reasons to allow Mr. Teman to remain in Israel, "in recognition of the fact that Teman, with the Court's authorization, is presently situated in Israel assisting his elderly parents and doing productive volunteer work, and in light of Teman's representation that travel out of Israel is unsafe and/or challenging."

Furthermore, it is the recommendation of Mr. Teman's mental health providers, physicians, and clergy that Mr. Teman remains in close proximity to family for additional health & religious reasons outlined below.

Furthermore, Probation has confirmed that Mr. Teman can be effectively supervised on "non-reporting probation."

I. Background and Current Circumstances

Page 1

The Court previously acknowledged the complexities of Mr. Teman's situation, including the unsafe travel conditions stemming from the ongoing conflict in Israel. Since that time, the security environment has deteriorated further. The Houthi regime has escalated attacks, with nightly rocket fire targeting Tel Aviv and Central Israel. Mr. Teman, like millions of others, is required to take shelter during these attacks, often during early morning hours, significantly disrupting daily life and volunteer efforts.

Further, this past week multiple planes were shot out of the sky or downed by shrapnel from nearby ballistic missiles and counter-attacks. It is so unsafe to fly that every US airline refuses to do so and El Al has just begun cancelling certain flights out of Tel Aviv.

Additionally, Mr. Teman has made substantial progress in his volunteer work, including building an advisory team for Sunflower Centers with experts from top Israel institutions. However, the conflict has caused unavoidable delays as key personnel have been called into reserve duty, and frequent middle of the night sirens also impact productivity. These delays impact not only Mr. Teman but also the broader community he is assisting.

## II. Health Concerns and Financial Considerations

Contrary to prior representations by the Boro of Prisons, medical imaging taken after his release proves Mr. Teman suffers from significant *physical* health issues requiring medical intervention. Independent medical experts, including spine surgeons and a urologist at Mount Sinai (Dr. Wayne of Mount Sinai Miami Beach: https://www.msmc.com/doctor/george-wayne/ ), have confirmed the need for surgery, which would be more accessible, affordable, and safer for Mr. Teman to undergo in Israel.

Medical care in Israel is substantially less expensive, and Mr. Teman's financial condition, exacerbated by prior incarceration costs, makes seeking treatment in the United States an undue burden.

Furthermore, Mr. Teman's mental health providers agree the psychological toll of past delays in medical care, including severe pain rated at 9/10, necessitates immediate attention in a supportive environment surrounded by family.

## III. Practical and Safety Barriers to Travel

U.S. airlines continue to refuse flights into and out of Israel due to the ongoing conflict, and available alternatives, such as El Al, are prohibitively expensive. A single flight before January 15 costs thousands of dollars—an unreasonable expense given Mr. Teman's financial and medical circumstances.

The recent downing of a civilian aircraft due to shrapnel highlights the grave risks associated with air travel in the region. So much so that El Al has canceled more flights. Forcing Mr. Teman to travel under such conditions would be unnecessarily dangerous and inhumane.

It is also impractical. With flights being canceled this very week, it is not possible to guarantee Mr. Teman can return by January 15. It places him under extreme stress and undo burden without a reasonable means to travel to the United States at this time.

Furthermore, because Mr. Teman travels with an Emotional Support Animal, a small dog named Tzahala, it is not easy to quickly book and change flights as such an animal requires USDA veterinary certification and this is not as easily and reliably gotten in Israel during the ongoing war-caused delays and rescheduling.

## IV. Probation's Recommendations

Probation has confirmed that Mr. Teman can be effectively supervised on "non-reporting probation."

Monitoring Mr. Teman's financial activities is seamlessly achievable through electronic banking records, as all such records are maintained online.

There is no material difference between supervision of banking activity in Tel Aviv and Miami that would justify requiring Mr. Teman's physical presence in the United States.

## V. Constitutional and Religious Considerations

Forcing Mr. Teman to leave Israel would infringe on his religious beliefs, which hold that residing in Israel is a fundamental obligation.

The Court has already determined that Mr. Teman poses no flight risk or danger to the community. Mr. Teman never violated once during years of bond or supervision -- the Court has already gotten years of supervision of Mr. Teman due to unforeseen delays caused both by COVID and conflicted counsel needing to be replaced (a known conflict willfully hid by both thy Government and the defense attorney for which Mr. Teman should be credited the time).

Compelling him to abandon his faith-based requirement to live in Israel, particularly when Probation supports his continued presence there, raises serious constitutional concerns.

Page 3

## VI. Pending motions support nonreporting probation

The Court now has before it clear evidence submitted by Attorney Butler that Mr. Teman did have contractual authority to draft the RCCs and fees in question going back to 2018 and that these online Terms and subpages were emailed to him by corporate counsel who dictated their structure and content. Mr. Teman could have had no *mens rea* to defraud anyone with the structure or content of the terms as he did not structure the terms.

To be clear, multiple Federal and State Courts have since upheld the 2018 Dispute Terms. Surely if Federal and State judges believe the Dispute Terms are enforceable, Mr. Teman cannot be a criminal for believing the same.

Worse, the Court now has evidence that trial counsel -- whom the court already repeatedly chastized for being unscrupulous -- lied to the Court when it claimed it "tried" to get these Terms. Instead, evidence in the 2255 shows that trial counsel ignore multiple emails, sleep tracking records, suicide notes, and hospital visits provided to them by Mr. Teman showing that Mr. Teman was mentally unfit due to extreme illness and resulting sleep deprivation and could not function. The obvious result is that, as multiple experts confirmed in writing to Your Honor, Mr. Teman was in no condition to prepare for trial or make legal strategy decisions.

At the very least, in the same spirit for which Your Honor granted "Bond Pending Appeal", Mr. Teman should be allowed to remain with family and practice his faith and get medical care with them by his side until this issue is fully briefed and ruled-upon.

## VII. Mr. Teman's religious obligation and mental health needs to settle down and build a life and family

Mr. Teman's post-trial confinement was unique in history because he was kept thousands of miles away from family and his partner for nearly two years and for 20 hours a day in isolation on most days -- worse isolation than most prisoners face. While this was not the Court's intention, it is still something which happened and which caused severe trauma and damage to Mr. Teman's life and relationships.

Worse, because of Mr. Teman's mother's significant health issues, she could not travel to him during post-trial isolation or imprisonment and still cannot travel to him. It would be cruel to deny this connect when Probation agrees to move Mr. Teman to non-reporting probation.

Page 4

To deny Teman the ability to recover and rebuild with the stable support of his parents and loved ones after these years of 20 hours a day isolation and then painful incarceration (where it is now proven he was denied necessary medical interventions for months due to BOP lacking trained staff and equipment to properly diagnose and treat) thousands of miles away from family while severely ill is not rehabilitative. It would be deeply abusive and cruel torture, disrupting the necessary stability and family support Teman needs to recover, and it would be AGAINST Probation's own recommendation to move Teman now to non reporting supervision.

A period of supervision is meant to guide a person back into society and to be productive and contributory to society. Mr. Teman is that in Israel with family, friends, and loved ones, as the evidence shows. Your Honor has already stated that Mr. Teman is not a risk to the community. Therefore, forcing him to move back temporarily where he does not intend to or wish to settle and build a family overly complicates his ability to find stability and comfort needed to fully rehabilitate and form long lasting relationships.

This, too, has constitutional Establishment Clause implications as it is obvious any young woman whom Mr. Teman met in Miami might or might not want to live in Israel and raise a family here, but clearly someone he here meets in Israel has already made that choice. It is thus a significant harm to his religious faith and conviction to live in and volunteer in Israel to force him to live in an unstable and impermanent condition when Probation supports his moving to and settling in Israel now.

## VII. Conclusion

Given the substantial progress Mr. Teman has made in his volunteer efforts and their incredible importance to victims of terror, the worsening safety conditions in Israel, his documented medical and mental health needs, and the lack of any compelling governmental interest in requiring his return to the United States, we respectfully request that the Court modify Mr. Teman's supervision to non-reporting probation, allowing him to remain in Israel.

**This request is supported by Probation's own recommendations** and serves the interests of justice, safety, and fairness.

**In the alternative, we ask the Court to extend the trip to Israel for 120 days to allow for the wars in Syria, Lebanon, Gaza, and Yemen to be settled, G-d willing, such that air travel becomes more safe and affordable,** and for Mr. Teman to get treatment and recover by family.

**<u>Your Honor, please allow me to stay with family and rebuild my life in a stable and loving environment after years of extremely traumatic isolation and difficulty.</u>**

Please excuse this being filed pro se due to extenuating circumstances explained above.

Respectfully submitted,

s/Ari Teman/

Ari Teman



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 9, 2025

**By CM/ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

> Re: **United States v. Ari Teman**, S2 19 Cr. 696 (PAE)

Dear Judge Engelmayer:

The Government respectfully writes pursuant to the Court's December 30, 2024 Order and in response to defendant Ari Teman's *pro se* motion requesting that he be permitted to reside in Israel beyond his present return date of January 15, 2025. For the reasons set forth below, the Government opposes Teman's request. (*See* Dkts. 471, 472, 473). Conversely, the Government has been advised by the United States Probation Office for the Southern District of Florida (the "Probation Office"), which supervises Teman, that the USPO is not opposed to Teman's motion to extend his stay in Israel.

## I.      Background

On July 28, 2021, this Court sentenced Teman to a term of one year and one day in prison, to be followed by three years' supervised release. The Court also imposed $333,000 in forfeiture, $259,340.32 in restitution, and a mandatory $400 special assessment. (*See* Dkt. 253). The Court granted Teman bail pending appeal. On June 8, 2023, the U.S. Court of Appeals for the Second Circuit affirmed Teman's conviction, and, on or about October 10, 2023, Teman surrendered into the custody of the Bureau of Prisons ("BOP"). Teman was released from BOP custody in approximately May of 2024. Following Teman's release, he moved to modify the terms of his supervised release. In response, counsel for Teman and the Government jointly proposed modified terms, which the Court largely adopted. (*See* Dkt. 453).

As relevant here, the modified terms set forth specific procedures for Teman, after receiving authorization from the Court and the Probation Office, to travel internationally. Pursuant to those procedures, Teman later requested authorization to travel to Israel from September 18 through November 6, 2024, to which the Government did not object and the Court granted. *See* Dkt. 456. Several days before Teman was scheduled to return to the United States, counsel asked that he be permitted to remain in Israel indefinitely. There was no forewarning of that, with either the Government or the Court. While apparently a last-minute request, it also seems—at a minimum—like a course of action that would have required at least some advanced planning by Teman to get certain affairs in order in the United States were he not to return. Notwithstanding

those circumstances, on November 5, 2024, the Government advised Teman's counsel that it had no objection to Teman extending his stay in Israel for approximately two weeks, so that he could assist in caring for his parents and continue his charitable work, among other things—including negotiating complicated travel logistics and maintaining his personal safety. The Government also made clear that it had no objection to further international travel requested ahead of time, or to making reasonable accommodations for Teman, his family, and the ongoing war. Rather, the Government's objection was rooted in a request for a months-long extension that was not previewed ahead of time, and which was made only as a fallback to the Government's objection to transferring Teman to non-reporting supervision—especially in view of Teman having served well short of even one year of his three-year term of supervised release. In response, also on November 5, 2024, Teman filed a *pro se* motion to transfer his supervised release to non-reporting status. (*See* Dkt. 463).[1]

On November 7, 2024, the Court granted Teman's request, extending Teman's stay in Israel until January 15, 2025, while noting that "Teman should not expect the Court to further extend his stay in Israel. The Court ordered Teman to serve a three-year supervised release term, which the Court intended as a meaningful component of Teman's overall sentence." (*See* Dkt. 465). Nevertheless, on December 29, 2024, Teman filed another *pro se* request to transfer his supervision to non-reporting and extend his stay in Israel indefinitely, which was later supplemented by a declaration from his attorney. (*See* Dkts. 471, 473).

## II.    The Government's Position

In its December 30, 2024 Order, the Court directed the Government to set forth its position on Teman's request and that of the Probation Office. The Government's position remains unchanged. The Government remains more than willing to consider any travel requests by Teman consistent with the modified terms of his supervised release; moreover, the Government is sympathetic to Teman's desire to care for his parents and contribute to volunteer efforts, and is of course mindful of the ongoing war and attendant fears and challenges. These considerations are measured against the evident need for the sentence this Court imposed on Teman—and the entire sentence, including the need for a period of supervised release. As the Court has summarized on numerous occasions, the reasons for that sentence included "the brazen $333,000 wire and bank fraud Teman had carried out, his vindictive treatment of customers whose checks he fabricated for deposit, and his continuing failure to accept responsibility." (*See, e.g.*, Dkt. 449 at 5). And while Teman raises significant personal, family, and safety concerns in his recent request—and the Government gives those serious consideration—the Government also notes Teman's long track record in this case of specious claims, which have been rejected by this Court and the Second Circuit. (*See, e.g.*, Dkt. 380 at 7-8 & n.3). At bottom, Teman committed a serious crime—one that involved significant, premeditated dishonesty—and the below-Guidelines, carefully considered sentence the Court imposed is a just one. That sentence included a three-year term of supervised release for well-founded reasons.

---

[1] ████████████████████████████████████████████████████

Accordingly, the Government respectfully submits that the Court should deny Teman's motion; and, of course, has no objection to making reasonable accommodations for Teman's travel and safety.

### III. The Probation Office's Position

The Probation Office does not object to Teman extending his time in Israel past the present January 15, 2025 deadline for him to return to the United States. With the Probation Office's permission, their position is set forth below:

> The U.S. Probation Office would not be opposed to the defendant's motion to extend his time in Israel as the defendant has satisfied all his monetary obligations and has been compliant with his conditions of supervised release since he started supervision. Additionally, he has also been responsive to requests from the U.S. Probation Office.

> The U.S. Probation Office currently utilizes the evidence-based practice of the Risk-Needs- Responsivity Principle in supervising clients. As part of this principle, the Post-Conviction Risk Assessment Tool (PCRA) is utilized to determine the risk of recidivism posed by an individual. The PCRA indicated a low risk of recidivism for Mr. Teman with no dynamic risk factors identified. Based on the PCRA, low risk individuals have only a 3% re-arrest rate within the first 180 days from the initial assessment performed at the onset of supervision and less than a 1% revocation rate. Additionally, Mr. Teman was also categorized and scored with a Criminal History Category 1 during his presentence interview.

> Mr. Teman's compliance appears consistent with what is normally expected by clients under low-risk supervision, and he has not presented extenuating circumstances regarding the burden probation has on him. Evidence shows placing these individuals on a "Low Intensity Supervision" caseload is appropriate, in which clients require minimal supervision and field work is not required unless there is a change in circumstances.

> The U.S. Probation Office does not object to the defendant's motion to extend his time in Israel. If approved the defendant's case would be supervised as noted. The defendant has a supervised release file in the National Crime Information Center (NCIC) system which would alert the U.S. Probation Office if Mr. Teman returned to the United States at any time. Additionally, if needed Mr. Teman could be instructed to conduct telephonic check ins or monthly online reports to account for his whereabouts. All if any financial documents requested by U.S. Probation could also be collected through email and credit checks could be conducted if needed through a Credit Bureau Inquiry from U.S. Probation. If Mr. Teman were to not be in compliance with any of his conditions, he would be subject to the consequences and violations of supervised release.

**IV.    <u>Conclusion</u>**

For the reasons set forth above, the Government opposes Teman's request to transfer to non-reporting supervision and remain in Israel indefinitely; however, the Government has no objection to making reasonable accommodations for Teman's travel and safety.  The Probation Office, as also set forth above, does not object to Teman's request.

Respectfully submitted,

EDWARD Y. KIM
Acting United States Attorney for the
Southern District of New York

By:    ____/s/_____
Jacob H. Gutwillig
Assistant United States Attorney
(212) 637-2215

Cc:    Defense counsel (by CM/ECF)

4

# EXHIBIT A

Filed Under Seal

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

ARI TEMAN,

Defendant.

19-CR-696 (PAE)

ORDER

---

PAUL A. ENGELMAYER, District Judge:

The Court has received the letter from the Government and the Probation Department,

*see* Dkt. 474 ("G. Mem."), setting out their respective views on whether the Court should grant

the request of defendant Ari Teman, *see* Dkt. 471, for (1) an indefinite extension of his present

stay in Israel, and (2) if so, on a non-reporting basis. The Government opposes this application,

while stating that it does not oppose the current conditions of supervised release governing

foreign travel, which authorize Teman to travel internationally upon, *inter alia*, advance approval

of such travel from the Probation Department and the Court. *See* G. Mem. at 2–3; *see also* Dkt.

454 (order of July 10, 2024, governing foreign travel). The Probation Department does not

oppose an extension of Teman's time in Israel, based on his low risk of recidivism and his

responsiveness to requests from the U.S. Probation Office; it proposes to monitor Teman

telephonically and/or online. *See* G. Mem. at 3. The Court has also received a declaration from

Teman's counsel supporting his request. *See* Dkt. 473 ("D. Mem.").

The Court requires additional information to evaluate the pending requests. The Court

accordingly directs that the following submissions be filed, **by Friday, January 17, 2025**, from,

respectively, the Probation Department and defense counsel. To give the Court time thereafter to

1

make an orderly assessment of the issues presented, the Court extends until **Wednesday, January 29, 2025**, the date on which—barring an intervening Court order—Teman must return to the United States. For avoidance of doubt, Teman should order his affairs, and arrange travel plans, in the expectation that the Court will not further extend this deadline.

## I.     Submission from the Probation Department[1]

The Probation Department's submission does not adequately explain how it has gone about supervising Teman to date, both while in Florida before leaving for Israel on September 18, 2024, which the Court authorized, *see* Dkt. 456, and thereafter while in Israel. In particular, the Court seeks information from the Probation Department on the following points.

*Mental health and anger management program*: The Court set the following as a special condition of supervised release: "*The defendant shall participate in an outpatient mental health and anger management program approved by the U.S. Probation Office.*" Dkt. 253 at 6 ("Judgment") (special condition no. 3) (emphasis added).

At sentencing, the Court explained why that condition was necessary. Teman's offense—defrauding a bank by drawing unauthorized checks on the accounts of three customers with whom he had been feuding—had arisen from his "disproportionate rage, a vendetta, an animus towards these three customers, essentially, because they were dissatisfied with your product and your work." Dkt. 276 at 72 ("Sent. Tr."); *see also id.* ("[T]he level of venom, hate, and zeal to retaliate that you displayed toward them is distressing. . . . [T]he venom . . . and lack of proportion appears to persist well after trial."); *id.* at 77 (Teman's conduct towards his customers "calls into question . . . whether you have a firm grip on business reality" and

---

[1] The Court directs Government counsel to furnish this order forthwith to the Probation Department, to work with the Probation Department to assure its submission is fully responsive to inquiries here, and to file the Probation Department's submission on the docket of this case.

2

"whether you might respond to a future business dispute by, again, escalating to the point where you cross a legal red line"); *id.* at 78 ("The record does not inspire complete confidence that once you're done serving your sentence, you will not take liberties with other people's money, particularly if you feel yourself provoked to anger by them."). Relatedly, Teman had later baselessly blamed his criminal prosecution and conviction "on [his] victims, on the prosecution team, on unnamed others in the United States Attorney's office, on the law enforcement witnesses, . . . on the court, on [his] most recent set of counsel . . . who [he] accused of conspiring to rig [his] prosecution with the U.S. Attorney's Office, and most recently on the custodial witness called by the bank." *Id.* at 78–79. The Court stated that "[i]n blaming others for your predicament, you have not only shown no remorse, you have shown no signs, zero[,] of the self-examination and self-awareness that is a key to future self-restraint." *Id.* at 79. The Court added:

> "Mr. Teman, I cannot pretend to grasp the turbulence and currents afoot [in] your complicated life[. But] from the PSR, from your counsel's submission, and from the anguished letter you wrote to the Court prior before trial, it is apparent that you suffer from a more abnormal degree of inner turmoil. The letter you wrote before trial was particularly anguishing to read. It suggested a great deal of inner turbulence. Although that turbulence can never justify ruses to take other people's money, I can understand how they can interfere with your self-control. The mental health issues that counsel have drawn to my attention, and which your parents powerfully describe, which are corroborated [by] the letters from mental health professionals that were attached to the defense sentencing submission—all that I regard as mitigating. To help assure that you get the treatment you need, I'll order [that] while you are in prison, the BOP furnish you with access to mental health and anger management programs that are available. I will further make participation in such programs a condition of the term of supervised release that will follow."

*Id.* at 81 (cleaned up).

The Probation Department's submission yesterday does not explain how, if at all, it has enforced this important special condition since the start of Teman's term of supervised release in Spring 2024. The submission ignores that vital condition altogether.

3

The Court therefore directs the Probation Department to set out in detail all mental and anger management programs in which Teman has participated in under the supervision of the Probation Department since his term of supervised release began. The Probation Department should set out the dates and nature of Teman's participation in such programs. It should also address whether and how such participation has continued since Teman relocated to Israel in September. The Probation Department should also set out the assessments of the mental health providers in such programs as to Teman's progress and current status.

If the Probation Department's judgment is that Teman has satisfactorily completed such programs in his brief period of supervised release to date, such that no further such participation is warranted, the Probation Department should concretely explain whether and why the mental health providers who have treated Teman under the Probation Department's supervision agree with that assessment.

The Probation Department should also explain whether and how, in reaching its assessment of Teman's ongoing need for mental health and anger management treatment, it has taken into account Teman's post-sentencing conduct. In particular, the Probation Department should address whether, in its view, the circumstances surrounding Teman's arrest in Miami Beach on March 12, 2023, *see* Dkts. 344, 356, 358, suggest a continued need for mental health and anger management counseling. The Probation Department should also set out whether, in its view, the tenor of Teman's written communications to which the Probation Department is privy, including Teman's email to Government counsel on November 6, 2024, *see* Dkt. 474, Ex. A,[2] are

---

[2] The Court directs Government counsel to publicly file, in unredacted form, the letter at Docket 474, and its attached Exhibit A. There is no need for these materials to be redacted.

4

consistent with a determination that Teman today exhibits the proportionality and balance consistent with the lack of a continued need for mental health and anger management counseling.

*Method of supervision*: More generally, the Court directs the Probation Department to chronicle its supervision of Teman to date. How often, on what dates, and by what means has the Probation Department met and communicated with him? What has been the substance of those communications? Insofar as the Court may be called upon to evaluate the Probation Department's assessment that remote supervision of Teman is viable, the Court would benefit from a more concrete account of Teman's supervision to date.

*Community service*: The Court set a special condition that Teman perform 300 hours of community service under the direction of the Probation Department. *See* Judgment at 6 (special condition no. 4). The Probation Department's submission yesterday was silent as to that special condition. How many hours of such service has Teman performed since his term of supervised release began? What has this community service consisted of?

The Court wishes to ensure that the Probation Department's recommendations as to the nature of and need for future supervision have been approved by a supervisor. It is imperative that any decision to approve lessened supervision be based upon a considered determination that the goals of supervision (including as reflected in the special conditions of supervised release set by the Court) have been achieved—and not on the desire by an individual Probation Officer to forego the aggravation of dealings with a difficult supervisee. The Court thus directs that the Probation Department's submission be signed not only by the Probation Officer assigned to this matter but also by the head of the Probation Office in the District of supervision.

5

## II.     Submission from Defense Counsel

Defense counsel's submission states that travel to and from Israel is increasingly risky, citing an Associated Press ("AP") article to the effect that missiles from Houthi rebels have resulted in air raid sirens being set off in much of Israel, "keeping many foreign airlines away" to the detriment of Israel's "hard-hit tourism industry." *See* D. Mem. at 2.  Counsel argues that these facts will make it either unsafe or impossible for Teman to leave Israel or to return to Israel see his parents. *See id.*

The defense's submission does not, however, document these conclusions, beyond citing the AP article describing the fact of the air raid sirens and the reduction in tourism.  To the extent that the defense seeks to rely on these arguments, the Court directs the defense, in its submission due January 17, 2025, to submit evidentiary support for these two contentions.  Concretely, to what extent is a safety risk currently presented to a person on a commercial flight between the United States and Israel?  And, concretely, are flights currently realistically unavailable between the United States and Israel?

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: January 10, 2025
New York, New York

6

**Honorable Paul A. Engelmayer** B"H
 United States District Judge
 Southern District of New York
 Thurgood Marshall United States Courthouse
 40 Foley Square
 New York, NY 10007

January 13, 2025

**Re: United States v. Ari Teman**

**Motion to recuse for violating my sexual health privacy + Information confirming lack of flights and lack of affordable lfiths**

Dear Judge Engelmayer,

Please excuse my filing this letter pro se as I cannot afford to retain new counsel to handle this matter, which appears to be a simple question of documenting flight safety, and Mr. Butler has a limited appearance and Mr. Quainton has documented to Your Honor his personal family issues. As my ECF has been turned off I copy Mr. Butler and Mr. Quainton in this email and the Cleark and ask that they file this to the docket.

## Travel Risks and Financial Barriers

The Court inquired about the risks associated with travel to and from Israel, as well as the practical issues. As I have discussed with Probation Officer Wong, there are no flights at all in April direct from TLV to Miami. Flights in February and March are currently listed as being thousands of dollars

**Currently, all major U.S. airlines—United, Delta, and American Airlines and a total for 20 airlines  altogether — have suspended flights due to security concerns.**

Public statements from these airlines confirm that their decisions are based on safety risks posed to passengers and crew:

- United Airlines announced: "Beginning with this evening's flight from Newark Liberty to Tel Aviv, we are suspending **for security** reasons our daily Tel Aviv service as we evaluate our next steps" (Israel365 News: https://israel365news.com/394037/us-airlines-cancel-flights-to-israel/).

- Delta cited "ongoing violence and security concerns" in its decision to suspend flights (SAN News: https://san.com/cc/major-airlines-suspend-flights-to-israel-as-middle-east-conflict-grows/) .

- American Airlines has canceled flights through August 2025 due to escalating tensions (Mehr News: https://en.mehrnews.com/news/223971/American-Airlines-cancels-flights-to-Israel-through-Aug-2025).

## **Transportation Hubs Targeted**

Additionally, the U.S. Embassy in Israel warns that "terrorist groups, lone-actor terrorists, and other violent extremists continue plotting possible attacks in Israel, the West Bank, and Gaza" and that "tourist locations, **transportation hubs**" are primary targets. (U.S. Embassy in Israel: https://il.usembassy.gov/travel-advisory-updated-to-reflect-updated-information-regarding-the-security-situation-in-israel-and-the-west-bank/).

## **I cannot afford to fly El Al now**

Officer Wong suggested I have counsel memorialize this to Your Honor, so I include it here. The current lack of U.S. airline service makes travel not only unsafe but also prohibitively expensive in my current state, which also includes medical and legal expenses of which Your Honor is mostly aware.

The only available flights via El Al from Tel Aviv to Miami are priced between $2420 and $7,100 for a *one-way* ticket, such that a round-trip cost would exceed $10,000 to $14,000 — far beyond my current financial means.

**Right now, based on Google Flight Search, it appears there are no remaining direct flights from Tel Aviv to Miami on El Al before Your Honor's deadline of April 29.**

The next available flights are in February and they are listed as being $2420 *one way* which is also more than 3-4 times the cost of a normal ticket and out of my budget because I also travel with my emotional support animal (ESA) which incurs approximately $600 per trip in veterinary testing and USDA certification fees, plus $150 airline fees (El Al is international and does not waive the fee):



To put things in perspective, a one-way ticket on El Al now is more than my entire month's rent, whereas it is normally just $700.

Tickets were _thousands_ of dollars less when I flew to Israel and I could not have anticipated such extreme hikes.

**Consideration of Financial and Medical Factors:**

My monthly living and medical expenses in Israel are significantly lower than the cost of a single round-trip flight. Requiring me to travel at this time would impose an undue financial hardship

Moreover, my mother is scheduled for a medical procedure, and I require surgery, which is _much_ more cost-effective in Israel and _allows for recovery near family._

Thank you for your time and consideration.

## Request for Travel Modification

In light of these concerns, we respectfully request the following modifications to my travel restrictions:

1. **Grant Non-Reporting Probation _as recommended by Probation_:**

   Given the security risks preventing US airlines from flying until September 2025, and financial barriers, and the need for surgery and family support, we ask that I be placed on non-reporting probation to allow me to remain in Israel, **as recommended by Probation.**

Alternatively, allow Mr. Teman to remain in Israel indefinitely but that reporting be by video as Probation has confirmed they can do via Whatsapp.

2. **Extend Travel Authorization to September 30, 2025:**

If indefinite residence in Israel is not granted, we request an extension until September 15, 2025, when American Airlines is expected to resume flights, so that direct travel is safer and is affordable, and so that I can remain with family while my mother and I both undergo medical treatment.

## Objection to ordering the government to publish sexual health information

I respectfully request the Government <u>not</u> unseal the private and deeply personal information related to my private health and believe these topics are covered by HIPAA and that ordering the Government to publishing them could only have been done by the Court to embarras me and is a clear <u>form of sexual abuse by the Court.</u>

<u>I feel deeply violated by Your Honor</u> asking the Government publish what they knew <u>must be sealed</u>.

<u>**I ask that Your Honor recuse for attempting to violate my privacy in a sexual manner in such a way that even Mr. Guttwillig knew ethics should not permit it**</u>

I feel deeply unsafe and<u> deeply violated</u> and abused by that order and there was absolutely no value in terms of justice or prosecution to unseal it for a discussion about whether flights are available and affordable in the middle of a war that has gone on far longer than many predicted.

It is my deepest hope and prayer that incoming AG Pam Bondi  and DOJ Civil Rights Head Harmeet Dhillon (whose law firm is emphatic that I am innocent and that what this case accuses me of cannot be a crime, see *pro se* letter of Dhillon Partner, Ronald Coleman, attached) put an end to this brazen abuse immediately – especially as it now includes a judge embarrassing me publicly about sexual health issues.

**Respectfully submitted,**

s/Ari Teman/

Ari Teman
*Pro se*



RCOLEMAN@DHILLONLAW.COM
ADMITTED IN NEW JERSEY AND NEW YORK

November 30, 2020

**BY EMAIL**

The President
The White House
1600 Pennsylvania Avenue
Washington, DC  20500

The Honorable William Barr
Attorney General
United States Department of Justice
950 Pennsylvania Avenue N.W.
Washington, DC  20530

<div align="center">

Re:     **Pardon application of Ari Teman**
**U.S. v. Teman (S.D.N.Y. 1:19-cr-00696)**

</div>

Mr. President and Attorney General Barr:

I am a lawyer who has been active in the practice of Internet-related law, including issues concerning the formation of contracts and, in particular, the law relating to unfair and deceptive trade practices relating to the Internet for decades.  I have lectured and written extensively on these subjects,  and I write today to join with the esteemed legal authorities and figures, including Prof. Alan Dershowitz, Prof. Lawrence Lessig and outstanding attorneys such as Molly McCann (General Flynn's attorney), David Markus, Pat Nolan, Kurt Schlichter, Robert Barnes, David Safavian, and others – all of whom, like me, have made themselves available *pro bono publico* concerning this cause – in urging a full pardon for Mr. Ari Teman, the defendant in the referenced criminal matter.  Although I am using my professional letterhead in this instance because I am writing as a lawyer, Mr. Teman is not a

November 30, 2020
Page 2 of 5

client of our firm and has never been one. Moreover, I speak only for myself, albeit professionally, in this letter. I explain my reasoning below.

The President and Attorney General will doubtless be aware of correspondence received concerning Mr. Teman's case that addresses extensive claims of prosecutorial misconduct. I am neither familiar enough with the record nor qualified by experience or otherwise to offer an opinion concerning these matters; nor would I presume to address them in a pardon application given the procedural posture of the defendant at this time. I do, however, have the experience to address the very narrow issue of whether the criminal offense with which Mr. Teman was charged and convicted should properly be considered criminal, or even deceptive, at all.

Mr. Teman was essentially convicted on the basis of what is commonly called a "click-wrap" contract, meaning the web-based terms that an Internet business – in this case, Mr. Teman's company, GateGuard – uploads and requires users to agree to before offering a product or service. It is well established that such online contracts are, under virtually all circumstances, proper and enforceable, and that their terms govern the seller's relationship with its customers. The Government's theory of criminal liability was that the structure of GateGuard's online terms was evidence of an "intent to defraud" its customers, however. Ultimately, the District Court ruled that the jury could have reasonably convicted Teman of fraud because GateGuard's terms included hyperlinks to subpages, requiring them to follow those links in order to be fully apprised of the terms to which they were agreeing to be subject in their relationships with GateGuard. The premise of this ruling appears to be that the use of hyperlinks, as opposed to cutting and pasting text and information into the terms found online on one webpage, constituted a sort of deception.

With all due respect to the District Court judge, I write to urge that such an interpretation of the custom and practice utilized throughout the world of Internet commerce is incomprehensible. Certainly, there is no question that virtually all contemporary businesses utilize online contracts to offer their services to the public and subsequently to document the terms under which their customer relationships will continue to proceed. And it is beyond question that the practice of using hyperlinks to extend, elucidate or otherwise incorporate online contractual terms in e-commerce websites, using subpages and hyperlinks, is widespread and uncontroversial. Organizing terms and related information in this way benefits businesses and customers alike, allowing all parties access and reference to them, and the ability to update specific sections of the terms, when necessary and appropriate. There is no obvious or even rationale for claiming that it is deceptive or fraudulent for Internet-based customers, who are at this point in technology history intimately familiar with how the Internet works, to click a clearly-highlighted hyperlink to obtain information. Indeed, it can be argued that doing so is far more convenient, and makes the information more accessible, than repetitive scrolls down a massive screen jammed with

November 30, 2020
Page 3 of 5

verbiage. That is why the practice of using hyperlinks and subpages for contract terms is employed by companies such as Amazon, Google and Netflix.

Notably, GateGuard's terms are effectively identical in form and substance to those used by another national company Airbnb, a recognized leader in the same industry (property management) in which GateGuard operates. This should come as no surprise, because it is common practice among web designers and legal counsel advising new online businesses to recommend that new businesses "borrow" such terms where available online content in setting up their own e-commerce sites. The advantage of doing so are obvious: Similar businesses that are already successful in the same market have typically customized their terms of service to that market based on commercial experience, and are presumptively acceptable to regulators given the high profile and success of such market leaders. Despite the fact that the Government repeatedly emphasized the format and structure of GateGuard's terms as evidence of Teman's guilt during trial, I am aware of no claim by either criminal or regulatory authorities that the virtually identical terms and structure used by Airbnb are problematic, much less felonious. In fact,

The case law is clear that online contract terms that incorporate content via sub-pages and hyperlinks are legal and binding. I am also advised that testimony at trial by customers of GateGuard established that these consumers themselves were aware of this fact and that all the information needed to understand the applicable terms of service were no more than a click or two away at any time of the day or night. It is not necessary for consumers to actually click such supplementary links in order for them to enforceable parts of the contract between them and the online merchant. Thus, for example, in *Meyer v Kalanick (Uber),* the Second Circuit ruled that plain text disclosure of terms being applicable were binding whether or not the user clicked the link – just as a consumer, given the opportunity to read a long paper contract, has the discretion to go through each word on each page or not. Indeed, as Professor Lessig, the preeminent internet law expert, has attested in his letter to you, GateGuard's online terms are relatively concise compared to many common and unquestionably enforceable online terms.

The argument that consumers, much less business entities, are defrauded when they choose not to click a hyperlink to read a contract subpage turns generations of contract law as well as basic principles concerning fraud in the inducement of a contract on their heads. Even in the consumer context, fraud requires that the non-disclosing party not have a reasonable opportunity to obtain information by virtue of non-disclosure by the party against whom fraud is claimed – a situation that simply does not apply when full disclosure is available by clicking on a hyperlink. This obligation on the buyer to do a minimum of diligence on its own behalf applies even more powerfully in a commercial context such as the one in question here. Such "B to B" (business to business) online users can and should reasonably be expected by the law to not only review a prospective contract in depth but to have their legal representatives do so before entering into a contract of substantial value. For this

November 30, 2020
Page 4 of 5

reason, in *GateGuard, Inc. v. MVI Systems LLC*, (1:19-cv-02472) (S.D.N.Y. 2019), the Southern District upheld the GateGuard arbitration clause – found on the Dispute Terms subpage of GateGuard's Terms.

It is difficult indeed to understand how both this straightforward legal standard and testimony that GateGuard's customers not only should have, but did know the terms of their contracts with GateGuard before they agreed to them, could have been disregarded by the court and the jury at Mr. Teman's trial. I have learned that two of the three entities involved were, according to unrebutted testimony, shown not only to have read the first page of the terms in depth, but that they copy-pasted the paragraph referencing the Payment Terms into emails to Mr. Teman in order to ask him questions about those terms **before** they agreed to them! The third entity not only discussed the exclusivity and non-compete segments, moreover, but even emailed GateGuard's attorney asking for "a release" from certain terms. Under these circumstances, Mr. Teman was quite justified in understanding that the GateGuard terms were legal, binding and enforceable, and that taking action to enforce those terms could not amount to a criminal *mens rea* on the part of Mr. Teman. (As Professor Lessig points out, the high fees make sense, because these clients owed the majority of multi-year agreements and also incurred collections penalties, as are standard with equipment and service financing agreements.)

That Mr. Teman lacked criminal *mens rea* appears irrefutable, moreover, because as would be expected, Mr. Teman did not structure his company's terms, his company's law firm did – and, again, those terms were based on Airbnb's, which also faces the issue of illegal sublets, which is potentially devastating to its business. I am also informed, however, that this "structuring" theory of criminal liability was essentially sprung on the defense by the government at closing argument and post-trial motions, thus depriving Mr. Teman of the opportunity to rebut it by testimony and documentation proving that his attorneys who emailed him the terms, discussed how they were structured online in the same way as Airbnb's, and establish for the jury that in publishing those terms in that format Mr. Teman was relying on counsel – which, under *United States v. Scully*, would at least have required a jury instruction regarding the government's burden of proof concerning intent, a necessary component for a conviction on charges of wire fraud and bank fraud. 877 F.3d 464 (2d Cir. 2017). For the district court to have, instead, permitted the government's to rely on its "structuring" claim as a basis for the jury to find criminal intent was a miscarriage of justice.

I did not know Mr. Teman until he approached me, because of my background in this area of law, concerning his conviction. I agreed to assist him without charge or consideration in part because, from the point of view of e-commerce clients I represent, the conviction of Mr. Teman for fraud on the basis of his company's online terms creates a real danger for online businesses and their executives that is not justified by statute and which threatens all e-commerce enterprises. While contractual disputes between customers and online sellers are inevitable, they are properly addressed in **civil** proceedings except for the most egregious and

November 30, 2020
Page 5 of 5

impactful criminal conduct. That is not what happened here, and the criminal conviction of Ari Teman for the use and reliance on widely-used contract terms and business practices is deeply troubling and a threat both to online commerce but fundamental notions of justice and personal liberty.

      I am very grateful for your consideration concerning these remarks and, again, respectfully urge that Mr. Teman receive a pardon and that the Department of Justice issue appropriate guidance to prosecutors regarding criminal prosecutions of this nature.

Most respectfully,

Ronald D. Coleman

DHILLON LAW GROUP INC.

A CALIFORNIA PROFESSIONAL CORPORATION

8 HILLSIDE AVENUE, SUITE 103 | MONTCLAIR, NJ 07042 | 973-298-1723

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                -v-

ARI TEMAN,

                       Defendant.

19-CR-696 (PAE)

ORDER

---

PAUL A. ENGELMAYER, District Judge:

A *pro se* motion by defendant Ari Teman for the Court's recusal, dated January 13, 2025, was today filed at docket 478. The Clerk of Court is respectfully directed to terminate that motion, as the Court yesterday, acting on a similar request by Teman conveyed by email, declined to recuse. *See* Dkt. 477 at 2. Insofar as Teman's recusal motion asserts that the Court's direction to the Government to publicly file his November 6, 2024 email to AUSA Jacob Gutwillig, *see* Dkt. 475 at 4 n.2, was an attempt to violate Teman's privacy, the Court, in its order of January 13, 2025, explained that the medical information contained in Teman's email to AUSA Gutwillig had all been placed on the public record in multiple prior filings in this case by Teman and his counsel, *see* Dkt. 476 at 1 (citing prior filings). The Court nonetheless, in an excess of caution, authorized the Government to redact references to such information in the November 6, 2024 email as publicly filed. *Id.* The Government today has done so. *See* Dkt. 479 & Exh. B.

Separately, in its order yesterday, the Court—noting that Teman's email to the Court yesterday had stated that he was terminating all counsel and proceeding *pro se*—asked that the two counsel for Teman who represent him before this Court file letters on the docket confirming

1

whether their representations of Teman have been terminated. *See* Dkt. 477 at 2. The Court's chambers today received an email from Thomas Butler, Esq., stating that he will continue to represent Teman before this Court, but that that representation, consistent with his notice of appearance, is limited to Teman's pending 28 U.S.C. § 2255 petition, *see* Dkt. 457. In the interest of a clear public record, the Court directs Mr. Butler to file a letter on the docket, confirming that he continues to represent Teman in connection with the § 2255 petition. The notice of appearance of Teman's other attorney, Eden P. Quainton, Esq., did not indicate a limited purpose. *See* Dkt. 393. The Court directs Mr. Quainton to file a letter on the docket stating whether he continues to represent Teman before this Court.

For avoidance of doubt, if Teman remains represented by counsel, the Court will consider counsel's filings only, including as to the filing due January 17, 2025 with respect to Teman's pending request to extend his stay in Israel. *See* Dkt. 475 at 6. However, if Teman is not represented by counsel, the Court will consider Teman's *pro se* filings. *See* Dkt. 477 at 2.

SO ORDERED.

*Paul A. Engelmayer*

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: January 15, 2025
New York, New York

B"H

Ari B. Teman

**17 Feb, 2025**
United States v Teman

**<u>Re: Urgent Request for Dismissal and Protection from Judicial Retaliation by a Judge your administration identifies as corrupt</u>**

Dear Attorney General Bondi (via ECF),

I am writing to ask you to dismiss with prejudice this case which attorneys for President Trump and Mr. Musk have called a "legally baseless" "major injustice", and who have called out the repeated cheating by Judge Engelmayer -- who quarterbacked this unjust prosecution through ex parte calls (321-1) and meetings with both prosecutors *and defense counsel who did not disclose they were his friends* or meeting with him (EXHIBIT 2).

**I write with urgency because of a baseless & cruel demand by Engelmayer, which goes against even the recommendations of Probation and which causes me & my family to fear for my life.**

Thousands of legal experts, Rabbis, community leaders, veterans, and civilians join me on X asking you to free me immediately.

As well, I write to formally notify you of what appear to be material misrepresentations made by terminated counsel (terminated on the advice of highly respected, entirely *pro bono* law professors & legal experts), regarding their claimed efforts to obtain key evidence in my case in their affidavits related to our 2255 motion. The attached email sent to me <u>***yesterday morning***</u>, *17 Feb 2025,* (EXHIBIT 1) from attorney Jonathan "Yoni" Irom, former corporate counsel for GateGuard at GKH, confirms that neither trial counsel nor post-trial pre-sentencing counsel contacted him to verify the longstanding validity of GateGuard's *dispute terms,* which included authorization for RCCs. These terms, provided by corporate counsel, remained unchanged since 2016 and were central to my defense.

At trial, Mr. Gelfand stated:

> "Your Honor, we don't have the original payment terms, not for lack of trying, or for lack of availability, we haven't been able to actually obtain them." [Trial Transcript, p. 748]

However, the attached correspondence confirms that no effort was made to contact Attorney Irom, who was uniquely positioned to authenticate the *dispute terms a*nd provide critical exculpatory testimony. This failure constitutes a severe deficiency in legal representation.

I was only able to get this email when I happened upon Mr. Irom in a synagogue in Tel Aviv over Shabbat and he had "no idea" at all about the trial and its result. He was completely surprised. As a result of that conversation I later emailed him and he replied as attached in EXHIBIT 1.

1

Furthermore, I learned only yesterday for the first time that post-trial pre-sentencing counsel Noam Biale, identified by Judge Engelmayer as a close personal friend and mentee (EXHIBIT 2: "I think very highly of Mr. Biale, and **regard myself as something of a mentor of his and also as a friend.**"), also failed to pursue this evidence despite representing that he had done so to myself, Mr. Ronald Coleman, and others assisting in my defense. Such a conflict of interest should have necessitated recusal, yet it was not disclosed until after sentencing.

To be clear, this failure was not considered by the Second Circuit or by Judge Engelmayer, as it was discovered just today, less than 24 hours ago, and cannot be considered duplicative of any prior motions I mention this as Judge Engelmayer has threatened to sanction me if I bring up his friend and mentee's sabotage of the defense suggesting it was already addressed. This however, is new information as of today.

Given that Mr. Biale and his spouse, AUSA Margaret Graham, were neighbors of Emil Bove in the same condominium per Attorney Reinitz who investigated the issue upon learning of the conflict (5.5 months *after* Biale had been retained), I trust that Mr. Bove will act with integrity in reviewing this case and its troubling procedural history, or that, preferably given the admitted habit of ex parte calls with Englemayer, someone independent of SDNY will do so.

As well, trial counsel and Judge Engelmayer attempt to mislead by referring to the Payment Terms, but the terms subsection dealing with disputes and collections is the *Dispute Terms,* which remained unchanged since 2016 and were uploaded verbatim as emailed by counsel. Mr. Irom could have testified to this were he emailed and asked to come testify. No client denied reading the dispute Terms and they even submitted the Terms which include them into evidence. It cannot be a crime to enforce these terms, and certainly there can be no *mens rea* to do so.

Judge Engelmayer's novel argument, which is appears he fed to SDNY via ex parte call about 10 days before trial (See his admission at the end of Dkt 321-1 whereupon the entire team and strategy of SDNY changed), suggesting that I "buried" these terms on a subpage is also legally baseless and would void nearly all internet contracts and make them criminal. Ron Coleman explained *pro bono*:

> "With all due respect to the District Court judge, I write to urge that such an interpretation of the custom and practice utilized throughout the world of Internet commerce is incomprehensible. Certainly, there is no question that virtually all contemporary businesses utilize online contracts to offer their services to the public and subsequently to document the terms under which their customer relationships will continue to proceed. And it is beyond question that the practice of using hyperlinks to extend, elucidate or otherwise incorporate online contractual terms in e-commerce websites, using subpages and hyperlinks, is widespread and uncontroversial. Organizing terms and related information in this way benefits businesses and customers alike, allowing all parties access and reference to them, and the ability to update specific sections of the terms, when necessary and appropriate. There is no obvious or even rationale for claiming that it is deceptive or fraudulent for Internet-based customers, who are at this point in technology history intimately familiar with how the Internet works, to click a clearly-highlighted hyperlink to obtain information. Indeed, it can be argued that doing so is far more convenient…" (Full letter and more expert letters at JusticeForAri.org )

## Failure to Call Key Witnesses Constitutes Ineffective Assistance of Counsel

Had trial or post-trial counsel contacted Attorney Irom, he would have been able to confirm under oath that GateGuard's dispute terms were in place since 2016 and remained unchanged through corporate restructuring. This testimony would have directly refuted the prosecution's argument and supported my defense that I acted in accordance with legal advice and terms they provided to GateGuard verbatim.

2

Furthermore, the terms structure theory above could not and cannot support *mens rea*, because I did not structure the terms.

The failure to introduce this critical evidence is compounded by misrepresentations in trial counsel's affidavits:

> "The Defendant and his companies lacked the documentary evidence regarding the terms and conditions used by customers of GateGuard." [Docket 490, p. 3]

This statement is demonstrably false, as counsel had access to metadata confirming that clients repeatedly accepted updated terms upon logging into GateGuard's dashboard (EXHIBIT 3).

Additionally, multiple federal and state courts have upheld these same dispute terms in civil litigation (e.g., *GateGuard v. MVI (SDNY)*, *GateGuard v. Goldmont (SDNY)*, *3660 Broadway BCR, LLC v. GateGuard Inc.(NY CIVIL SUPREME*). Therefore, not only is trial counsel's representation false, already three independent courts have upheld and enforced the *Dispute Terms that trial counsel did not even bother to address at trial or in their affidavits*.

Trial Counsel also make clear they did not bother to learn the history of the terms and the corporate structure of GateGuard or that they are also willing to lie about this to defend their failure at trial. GateGuard began as a service of SubletSpy (Touchless Labs LLC) and was split into two operating companies, GateGuard Inc and PropertyPanel Inc, but the Terms were carried over, and the Dispute Terms remained from 2016 into even after trial. Again, Attorney Irom could have confirmed this as his firm handled the terms throughout the growth of the company. (As background, GKH is a large international firm which had attorneys licensed to practice in the USA and internationally, and counted Waze and other major internet companies as clients at the time of trial. They were recommended to us by Yossi Horwitz at Lowenstein Sandler, which represented and advised us as well.)

Trial Counsel's absurd attempt to cast aspersions by mentioning that our clients were not required to use "DocuSign" or physically sign a document is both misleading and legally unfounded -- and completely unethical. In the modern digital landscape, industry-standard "clickwrap agreements" are widely accepted and legally enforceable—just as they are when booking services such as Uber or Airbnb. Counsel's attempt to justify their failures by suggesting that CEOs of online companies should face criminal liability for the absence of third-party signature verification or a physical signature for an online service is not only legally unsupported but also a mischaracterization of established electronic contracting practices (see *Meyer v Uber (CA2)*).

Furthermore, they have failed to acknowledge clear and easily verifiable evidence (EXHIBIT 3) that clients repeatedly accepted updated terms, with their IP addresses and device information logged in our online dashboard as confirmation, and that the Terms clearly state they will be updated from time to time and it is the clients' responsibility to check for updates. This industry standard language appears in thousands of online terms agreements. It does not support *mens rea,* nor could it as I did not write it!

Contrary to their statements, DiRuzzo and Gelfand had full access to this data, or would have had they not rushed a very physically and mentally ill young man to trial because he could not pay their bills.

The reality is they proceeded to trial in a rush because they were representing a severely ill client who was unable to work and had no funds or income with which to compensate them. Rather than addressing these challenges appropriately, and being candid with the court about multiple, repeated, extremely explicit emails from me telling them *and providing medical records* that I was unfit to help them prepare for trial, they rushed through trial proceedings, ultimately costing an innocent individual five years of his life.

3

**Failure by conflicted counsel to pursue sound defense strategy warrants dismissal**

As you can clearly see, I emphatically and repeatedly asked Mr. Biale and Ms. Harris to obtain verification from Jonathan Irom that the terms allowing us to draft the accounts existed in 2016 (EXHIBITS 4 & 5). Biale and Harris did not do so, and lied to me and pro bono counsel assisting in a pardon/dismissal campaign (See the affirmation of Ronald Coleman at DKt 350-1).

Judge Engelmayer said explicitly that my failure to produce this evidence was proof I was guilty, and while that is absurd for a number of reasons, it shows the materiality of the failure by his friend and mentee.

Their firm was retained exclusively to motion of prosecutorial disclosure violations (Dkt 350-2) and instead hid that they were literally married to a prosecutor and that Biale was a friend and mentee of the judge.

It is obvious, given my clear statements about Judge Englemayer being corrupt, to which your Administration emphatically agrees, that I would never hire his friend or mentee, and the public has called this out regularly:



---



To be clear, I did not, do not, and will never waive the conflict, and thus a dismissal with prejudice is required as a matter of law -- and has only been denied because Judge Englemayer is, as you say, corrupt and protecting his friend and mentee.

## Judicial Conflicts and Procedural Irregularities

As you, President Trump, VP Vance, Congressman Crane, Senator Cotton, and Mr. Elon Musk noted in calling for his impeachment, Judge Engelmayer's handling of this case *and others* raises serious concerns regarding impartiality.

Regular ex parte communications between the court and the prosecution suggest improper coordination, warranting an independent review.

I will not rehash the many other accusations legal experts have made *entirely pro bono* against Judge Engelmayer, since you are no doubt well aware of his corruption as you begin to prosecute Judge Engelmayer for his impending impeachment.

---

[2] https://x.com/LoisWeiss/status/1334598775508250624

5

It is worth nothing, however, that recently "leaked" emails from SDNY attorney generals who quit rather than follow your orders to dismiss the Mayor Eric Adams matter, published to X evidence a pattern of deleting 3500 material (in my case, multiple interviews with Goldmont parties were not disclosed and were discovered after trial in civil matters -- see Dkt. 295), political targeting, and personal vendettas by politically motivated staff.

The rats scurrying off their sinking ship give only a hint of the deep corruption of the kangaroo court that is SDNY. (Kangaroos are *literally* more upstanding.) This should provide extra motivation to free me immediately.

## Request for Immediate Review and Dismissal

Given the documented misrepresentations by trial counsel, undisclosed conflicts of interest, and procedural irregularities, I respectfully request that you review this case and consider its dismissal with prejudice.

Additionally, I seek appropriate remedies for the substantial financial and reputational harm caused by these judicial and prosecutorial failures. Your DOJ can repay the substantial damages and harm to myself and GateGuard and extract these damages and penalties from the parties who violated their subpoenas.

While you consider this, I ask that you stipulate to allow me to remain in Israel and rebuild my life. Despite many experts saying I am innocent, I have done all the time, paid all restitution and fines, and completed all community service hours. I have and continue to attend weekly therapy by Zoom.

## Urgency : Baseless & cruel demand by Engelmayer causes me & my family to fear for my life

Despite the Probation department urging Judge Engelmayer to allow me to remain in Israel to assist my elderly parents, and to be near them as I get necessary medical treatment, and to be able to continue to work on charity projects which are important to those here, such as the Sunflower Centers Therapy and Rehab Center (sunflowercenters.com) as well as regularly volunteering with veterans and survivors, Judge Engelmayer has made clear he will order me back to the United States on Feb 28th.

As with his DOGE ruling, there is no basis for this -- his excuse is that Probation can supervise my mental health treatment, but my mental health counseling is over Zoom, as nearly everyone's is since COVID lockdowns. My therapist does not even reside in the USA much of the year! Even were in-person therapy suddenly demanded, there is no shortage of American-trained and licensed mental health professionals in the Jewish state!

It is therefore clear to myself, my family, friends, and reporters covering this matter that Judge Engelmayer intends to cause me further physical harm and suffering, as he did by putting me in a dangerous and violent prison for a non-violent offense that qualified for "Out" custody, and as he did further by ignoring the advice of multiple independent board-certified specialists who recommended I needed medical care *and suggested I was at risk of death*:

> "While it appears from your language regarding "3553" that **regardless of if Mr. Teman were dying or in constant agony, you would not issue a compassionate release**, in the event we are reading that incorrectly … we err on the side of caution and write to correct the major errors in your recent ruling and urge you to release Mr. Teman immediately to Home Confinement for the remaining 47 days of his time at FCI Miami."
>
> (Letter of Dr. Jonathan S. Harrison, M.D., F.A.C.P to Paul Engelmayer, 29 March 2024.)

6

Medical imaging taken immediately after my release confirmed the doctors were correct, that I was at extreme risk, and required immediate treatment. It was painful to move or sit for months, and I lost 20lbs during the 7.5 months at FCI Miami, and I still need surgery -- which I would like to get in Israel being by family.

*Engelmayer was and remains willing and eager to make this civil billing dispute into a death penalty. I am begging you to stop this unjust cruelty today.*

## Request for Review of All Engelmayer Cases

Given the clear and emphatic statements by you that Judge Engelmayer is "corrupt" and must be impeached, and the suspicious "judge shopping" that resulted in him taking the DOGE matter, I urge you in the interest of justice and fairness to ensure that all cases presided over by Judge Engelmayer are subject to scrutiny, ideally by another district with no personal connections to those in SDNY to avoid even unintended biases, as no individual should suffer wrongful conviction due to judicial overreach or attorney misconduct. This request is shared by thousands of people on X.

## Enemy's Donkey

This Shabbat we will read the Torah Portion of "Mishpatim", including Exodus 23, which begins, appropriately for this discussion:

a. You must not carry false rumors; you shall not join hands with the guilty to act as a malicious witness:
b. You shall neither side with the mighty to do wrong—you shall not give perverse testimony in a dispute so as to pervert it in favor of the mighty—
c. nor shall you show deference to a poor person in a dispute.
d. When you encounter your enemy's ox or ass wandering, you must take it back.
e. When you see the ass of your enemy lying under its burden and would refrain from raising it, you must nevertheless help raise it.
f. You shall not subvert the rights of your needy in their disputes.
g. Keep far from a false charge; do not bring death on those who are innocent and in the right, for I will not acquit the wrongdoer.
h. Do not take bribes, for bribes blind the clear-sighted and upset the pleas of those who are in the right.

Why does the Torah suddenly break into a discussion of *an enemy's donkey* in the midst of laws about acting truthfully? And why specify "an enemy's" donkey when we are required to be kind to all animals?

Rabbi Joseph Telushkin teaches in his book *Jewish Wisdom*: The Sages explain, when you go to assist an enemy with a burden, you will realize he is not an enemy, not a label, but a human being with struggles and hopes just like you have -- and in seeing his humanity, you will no longer have an enemy but a brother.

I may be on the other side of "v" in "United States v Teman", and I have legitimate grievances about corruption you acknowledge in the DOJ and Courts, but I am not your enemy. I am a fellow human standing alongside you in the face of evil corruption and asking you to do the right thing and free me.

Judge Engelmayer has made clear he will not consider exculpatory evidence, legal arguments, or even clear proof of sabotage by his friend and mentee.

7

Probation agrees I should remain in Israel, and stated they can supervise my mental health treatment here. They also fully supported moving me to non-reporting probation.

Thus Engelmayer's excuse that I must return to the USA to monitor my mental health treatment despite therapy being on Zoom and my therapist not even being in Miami Beach, causes my family and I fear that Engelmayer intends to cause me severe harm or death to further cover his corruption or seek revenge for exposing it. I fear for my life in the USA under Engelmayer, and nearly died when he refused me medical care for months in prison. I suffered agonizing pain. His abuse is not warranted, it's not just, and you can stop it today with a signature.

Many legal experts you trust and respect agree I am innocent. They too, have asked you and the President publicly to free me. Their videos and letters are at JusticeForAri.org and all over X.com .

I appreciate your prompt attention to this matter and trust that you will act in the interest of justice and that God will deliver me from this corruption and into freedom, for the sake of my family, my community, and those I can help as a free man. It is in God's hands -- he has given you the power to protect me and free me today.

Sincerely,
s/*Ari Teman/*
Tel Aviv, Israel
20th of Sh'vat, 5785
18 Feb, 2025

CC:

      Congressman Eli Crane
      Senator Tom Cotton
      U.S. Attorney for D.C. Edward Martin
      Mr. Elon Musk
      Mr. Ronald Coleman
      via Email and/or X

EXHIBIT 1: Email Correspondence with Attorney Jonathan Irom
EXHIBIT 2: Statement Confirming Judge Engelmayer's Relationship with Biale and Graham
EXHIBIT 3: Metadata Confirming Logins to GateGuard Dashboard and Acceptance of Terms
EXHIBIT 4: US Attorney Edward Martin saying I am innocent and should be pardoned
EXHIBIT 5-6: Emails showing Engelmayer's friend and trial counsel were asked to seek verification from
          Attorney Irom

8

**EXHIBIT 1 (Email thread with Attorney Jonathan "Yoni" Irom)**



**EXHIBIT 2: Engelmayer Identifies Biale and Graham as close family friends**

All right.  The next preliminary matter that I need to take up involves a disclosure I need to make that is occasioned by the appearance of Mr. Biale as new counsel for Mr. Teman. And the disclosure is that I am acquainted with Mr. Biale.

Mr. Biale's wife, Margaret Graham, worked for a summer at the law firm at which I used to work, and we worked together closely on a criminal appeal.  Ms. Graham and I have kept in touch over the years, and we have had lunch or coffee several times since she joined the U.S. Attorney's Office for the Southern District of New York.

Through Ms. Graham I have gotten to know Mr. Biale.  I recall spending an hour or so alone in my chambers with

SOUTHERN DISTRICT REPORTERS, P.C. ••••••••
(212) 805-0300

18

KC1VTEMC

Mr. Biale several years ago discussing his professional options before he joined the Sher Tremonte firm.  I have also personally appointed Mr. Biale and the Sher Tremonte firm to represent a *pro se* plaintiff in a case before me in which the plaintiff sued his lawyer from an earlier matter for allegedly misappropriating a $100,000 retainer.  Mr. Biale did an absolutely superb job in that case.  I think very highly of Mr. Biale, and regard myself as something of a mentor of his and also as a friend.

In the interest of full disclosure, I must also put on the record the sad fact that I attended shiva at Mr. Biale's apartment in Brooklyn in the summer of 2019.  And most recently, about six weeks ago, on October 10th, I was a recipient of a group email that Mr. Biale sent to friends and family announcing the joyous news of the arrival of a new son,

10

**EXHIBIT 3: Meta Data showing logins to GateGuard's dashboard and documenting acceptance of terms & updated terms. This screenshot is of Crystal the management company for 18 Mercer.**



| IP | Device | Browser | Browser version | Platform | Platform version | Last visit time |
|---|---|---|---|---|---|---|
| 2001:19f0:0:20aa:5400:ff:fe19:740d | | | | | | 10/29/2020 19:50:06 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 68.0.3440.106 | Windows | 6.3 | 09/10/2018 20:44:29 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 68.0.3440.106 | Windows | 6.3 | 09/11/2018 18:49:44 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 68.0.3440.106 | Windows | 6.3 | 09/11/2018 19:59:32 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 68.0.3440.106 | Windows | 6.3 | 09/12/2018 03:36:21 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 68.0.3440.106 | Windows | 6.3 | 09/12/2018 17:29:28 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 68.0.3440.106 | Windows | 6.3 | 09/13/2018 11:20:24 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 68.0.3440.106 | Windows | 6.3 | 09/17/2018 15:24:20 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 68.0.3440.106 | Windows | 6.3 | 09/18/2018 19:43:03 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 69.0.3497.100 | Windows | 6.3 | 09/19/2018 15:46:35 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 69.0.3497.100 | Windows | 6.3 | 09/21/2018 18:18:18 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 78.0.3904.108 | Windows | 6.3 | 11/20/2019 14:51:08 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 78.0.3904.108 | Windows | 6.3 | 11/20/2019 15:22:53 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 78.0.3904.108 | Windows | 6.3 | 11/20/2019 15:33:10 |
| 2604:2000:284d:2500:6195:8526:b7dc:c75d | | | | | | 11/20/2019 15:38:05 |
| 2604:2000:284d:2500:6195:8526:b7dc:c75d | WebKit | Chrome | 78.0.3904.97 | Windows | 6.1 | 11/20/2019 15:38:05 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 78.0.3904.108 | Windows | 6.3 | 11/20/2019 16:29:25 |
| 2001:19f0:0:20aa:5400:ff:fe19:740d | WebKit | Chrome | 78.0.3904.108 | Windows | 6.3 | 11/20/2019 16:34:40 |

11

**EXHIBIT 4: US Attorney (DC) Ed Martin says I am innocent and should be pardoned:**





EXHIBIT 5: Justin Harris, Noam Biale (friend & mentee of Engelmayer), Justin Gelfand provided Jonathan Iroms current email address to confirm terms and



 

**Ari B. Teman** <ari@teman.com>    Aug 19, 2020, 11:21 PM

to Justine, Noam, Ariel ▾

Hi Justine,

As to your question whether we can say the terms are legally sound, **they were reviewed by a top international law firm** months before GateGuard even existed for SubletSpy (the first company in this industry).

**A few notable things:**

1. They broke the terms into multiple pages. I didn't "structure" the terms, GKH did, based on Airbnb's structure (the draft was just me copying Airbnb's terms into a document and sharing it with some edits).

2. The Dispute terms have the **same language saying we can draw the accounts**

3. Section "vi" would be interesting if I decided to sue AUSA Bhatia or Gutwillig, who both admit to using the sites:

arbitration.

**Limitations** - You hereby undertake and agree: (i) to never sue us; (ii) to pay us a nonrefundable $5000 service fee for every individual call, email, or other from any attorney you hire or ask to contact us; (iii) to give us complete power of attorney to represent you in any matter, including in matters you may bring against us in any way; (iv) that we may order a freeze of your financial accounts, personal and business if we feel you are in breach of any agreement or in arrears; (v) the rights you confer to us remain ours in any jurisdiction in any country and are eternal and irrevocable, even upon cancellation of services, and even if you do not register for our services; (vi) to waive any and all immunity and to not claim immunity that might otherwise be offered to you as an officer of the court or otherwise, whether you are an attorney, law enforcement, or otherwise; or (vii) that we may withdraw fees from your accounts, in any way we'd like, at any time. You further agree to first make all claims for damage to your insurance company before contacting us. You agree to provide us with a full, written report from your insurance company regarding any claims of damage.

...

Please let me know how I can be helpful.

Ari

14

**EXHIBIT 6:**



**Ari Teman** <ari@friendorfraud....  Fri, Oct 2, 2020, 5:10 PM

to Justine, Noam

" , since we moved things around and separated the original terms of service into the different documents. "

---------- Forwarded message ---------
From: **Ran Hammer** < RanH@gkh-law.com>
Date: Tue, May 10, 2016 at 2:22 AM
Subject: SubletSpy Terms of Service
To: Ari Teman < ari@friendorfraud.com>
Cc: **Jonathan Irom** <jonathani@gkh-law.com>

**6 Attachments** · Scanned by Gmail ⓘ

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**United States of America,** *Plaintiff,*

v.

**Ari Teman,** *Defendant.*

**Case No. 1:19-cr-00696)**

**MOTION TO RECUSE JUDGE PAUL A. ENGELMAYER IN LIGHT OF IMPEACHMENT,**
**PUBLIC COMMENTS BY AG BONDI, ELON MUSK, PRESIDENT TRUMP, VICE PRESIDENT VANCE**

**INTRODUCTION**

Defendant Ari Teman respectfully moves for the recusal of Judge Paul A. Engelmayer from presiding over the above-captioned matter. This motion is grounded on the assertion that recent high-profile statements and actions by prominent government officials, including President Donald J. Trump, Vice President JD Vance, Attorney General Pamela Bondi, and Presidential Appointee Elon Musk, have publicly criticized Judge Engelmayer's impartiality and called for his impeachment.

This case has become a material part of the impeachment process against Judge Engelmayer, and the Defendant a party and likely fact witness before Congress against Judge Engelmayer. Already, Executive Branch officials others have cited publicly, and upon information and believe, are integrating allegations made against Judge Engelmayer by law professors, legal experts, and community leaders regarding this case. This includes the 24 Rabbis who publicly called for Judge Engelmayer of antisemitism for fabricating lies about Judaism and fabricating evidence (Dkt 321-1)

Additionally, articles of impeachment have been filed against Judge Engelmayer in the House of Representatives allege "high crimes" including abusing his position for personal gain. These developments raise substantial questions regarding the judge's ability to remain impartial in this proceeding.

Because Teman has been drawn into being a public adversary of Judge Englelmayer in a Congressional Impeachment case, with years-old posts requesting a pardon being brought to the forefront of a discussion involving millions of voters, and because the lead attorney in this matter for the United States, the Attorney General of the United States, Pamela Bondi, has conceded on television that Judge Englemayer is corrupt and worthy of impeachment, and because she is bound to follow the direction of the Chief Executive of the United

1

States, President Trump, who has declared Judge Engelmayer to be corrupt and worthy of impeachment, she cannot now come before the court are argue otherwise.

Given both parties in this matter concede Judge Engelmayer is "corrupt" and commits crimes including but not limited to ex parte collusion to violate civil rights (42 U.S. Code § 1985) to benefit his personal interest, recusal is required.

**ARGUMENT**

1. **Public Statements Questioning Impartiality**

   A. **Vice President JD Vance's Comments**

   Vice President JD Vance has called Judge Engelmayer's behavior "illegal":
   https://x.com/JDVance/status/1888607143030391287

   B. **President Trump's Criticism**

   President Trump has accused "highly political judges" of obstructing his efforts to overhaul the federal government, suggesting that such judges are attempting "to slow down, or stop" his plans. Citeturn0news23
   https://www.thetimes.com/us/american-politics/article/donald-trump-lashes-out-truth-social-elon-musk-083qpsld8?region=global

   C. **Elon Musk's Call for Impeachment**

   Elon Musk, appointed by President Trump to lead the Department of Government Efficiency (DOGE), publicly referred to Judge Engelmayer as "a corrupt judge protecting corruption" and demanded, "He needs to be impeached NOW!"

2



https://x.com/elonmusk/status/1888485948121366871

Elon Musk has liked and promoted a post by Defendant Ari Teman sharing allegations of corruption made by a 3rd party regarding this matter:



D. **Senator Tom Cotton calls Engelmayer an outlaw:**



https://x.com/SenTomCotton/status/1888335201652314487

2. **Articles of Impeachment Filed**

On February 18, 2025, Representative Derrick Van Orden introduced House Resolution 143, initiating impeachment proceedings against Judge Engelmayer for "high crimes and misdemeanors." The resolution alleges judicial misconduct and abuse of judicial authority. ( https://www.congress.gov/bill/119th-congress/house-resolution/143/text/ih?format=xml&overview=closed )

"Judge Paul Engelmayer has **abused his judicial office by using his authority to further personal or political interests,** contrary to the constitutional responsibility to apply the law impartially, including the improper handling of this case in a manner that demonstrates favoritism or undue influence, undermining the fundamental principles of justice."

Articles of Impeachment were also proposed by Rep Eli Crane:

4



**Rep. Eli Crane** ✓ 🟥
@RepEliCrane

🧵

I'm drafting articles of impeachment for US District Judge Paul Engelmayer.

Partisan judges abusing their positions is a threat to democracy.

The left has done "irreparable harm" to this country. President Trump and his team at @DOGE are trying to fix it.

👥 Rate proposed Community Notes →

4:46 PM · Feb 11, 2025 · **1.8M** Views

💬 7.4K      🔁 20K      ♡ 82K      🔖 1K      ↥

3. **Teman is a fact witness in a criminal proceeding against Englelmayer**

Teman has now become a witness and/or party in the impeachment proceedings and against Judge Engelmayer, as have attorneys for Teman. This adversarial relationship against Teman puts Teman at severe risk of retaliation and harm by Engelmayer. This is not mere speculation as DOGE head Elon Musk has liked and thus promoted allegations of corruption by Mr. Teman against Paul Engelmayer on X, as have other Government officials and pundits and legal experts.

As well, Teman has been cited by others involved in the impeachment of Judge Engelmayer due to the evidence Teman surfaced about Engelmayer's regular ex parte calls to prosecutors (Dkt 326-1) to assist one party versus another.

Teman and Engelmayer are therefore public adversaries in a matter before Congress and in matters outside of this case. Millions of people are seeing this and sharing it, even issues completely outside US v Teman, such as the shockingly high number of Jeffrey Epstein cases Judge Engelmayer has taken -- suggesting that there was "judge shopping" in those cases as there was in the DOGE matter which triggered Judge Engelmayer being impeached.

The accusations of "Judge Shopping" and ex parte coordination by Judge Engelmayer have been highlighted by members of the Judicial branch with oversight and leadership roles in the DOJ (Even Mr. Musk now has oversight, as DOGE has a DOJ division and/or X intake).

5

Teman is a fact witness or potential fact witness in criminal proceeding against Judge Englmayer, and thus Judge Englemayer cannot remain a judge in a case against Teman.

**LEGAL STANDARD**

Under 28 U.S.C. § 455(a), a judge must recuse himself in any proceeding in which his impartiality might reasonably be questioned. The standard is whether a reasonable person, knowing all the facts, would question the judge's impartiality. The Second Circuit has held that even the appearance of partiality requires recusal to maintain public confidence in the judiciary.

**DISCUSSION**

The convergence of public denunciations by high-ranking officials and the formal initiation of impeachment proceedings creates an environment where Judge Engelmayer's impartiality might reasonably be questioned. The public nature of these statements and actions could lead a reasonable person to doubt the judge's ability to adjudicate this case without bias, thereby undermining public confidence in the judicial process.

**CONCLUSION**

For the foregoing reasons, Defendant Ari Teman respectfully requests that Judge Paul A. Engelmayer recuse himself from this case to preserve the integrity of the judiciary and ensure a fair and impartial proceeding.

**s/Ari Teman**
Pro Se
19 Feb 2025
22nd of Sh'vat, 5785

**CERTIFICATE OF SERVICE**

I hereby certify that on 19 Feb 2025, a true and correct copy of the foregoing Motion to Recuse was served upon all counsel of record and AG Pamela Bondi via the Court's electronic filing system.

**CC: Alex Spiro, Attorney for Mr. Musk**

6

JD Vance calls Judge Engalmayer's actions "illegal":



https://x.com/JDVance/status/1888607143030391287

Senator Tom Cotton calls Judge Engelmayer an "outlaw":



https://x.com/SenTomCotton/status/1888335201652314487



4.

https://x.com/elonmusk/status/1888315706598731904

B"H

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA,** Plaintiff,

V.

**ARI TEMAN,** Defendant.                                      Case No. 1:19-cr-00696 (PAE)

## MOTION FOR DEFAULT JUDGMENT IN FAVOR OF DEFENDANT AND FOR RECUSAL OF JUDGE PAUL A. ENGELMAYER

**TO PAUL A. ENGELMAYER, UNITED STATES DISTRICT JUDGE:**

Defendant Ari Teman, pro se, respectfully moves this Court pursuant to Rule 55 of the Federal Rules of Civil Procedure (as applicable via Rule 12 of the Federal Rules of Criminal Procedure for procedural gaps) and 28 U.S.C. § 455(a) and (b) for entry of default judgment in favor of the Defendant on Docket #496 and for the immediate recusal of Judge Paul A. Engelmayer, effective today, February 21, 2025. This motion is based on the Government's failure to respond to Docket #496 by the designated return date and the extraordinary circumstance wherein the Executive Branch of the United States Government—including the President, Vice President, Attorney General, and head of the Department of Government Efficiency (DOGE)—has publicly agreed that Judge Engelmayer is corrupt and should be impeached.

Under Rule 47 of the Federal Rules of Criminal Procedure, a party may request relief by motion, and the court may rule based on the filings or the Government's failure to respond. Additionally, under Rule 12 of the Federal Rules of Criminal Procedure, when a party fails to contest a motion within the designated timeframe, the court may deem the motion unopposed and rule accordingly.

In this case, the Government failed to file any response or request an extension by the return date of February 20, 2025, at 5:00 PM. This failure constitutes an abandonment of its opposition and effectively concedes the merits of Defendant's motion at Docket #496. Given that the Government, represented by the U.S. Attorney's Office for the Southern District of New York, has not presented any counterarguments or objections, the Court should grant the requested relief as a matter of due process.

While criminal proceedings do not permit default judgment in the same manner as civil cases, courts have inherent authority under Rule 12 and Rule 47 to grant unopposed motions where the Government has

1

failed to justify continued litigation. In light of the **Executive Branch's public statements condemning Judge Engelmayer's impartiality** and the Government's own inaction, Defendant respectfully requests that the Court grant the relief sought in **Docket #496** and order the immediate recusal of Judge Engelmayer.

In support of this motion, Defendant states as follows:

# I. BACKGROUND

1. On 19 Feb 2025, Defendant filed an Emergency motion under Docket #496 in this case, requesting recusal of Judge Engelmayer following the filing of Articles of Impeachment by Congressman Van Orden. With a return date for the Government's response of 20 Feb, 2025 at 5:00PM. (For context, this amount of time is significantly longer than the Defense was given for some responses during trial.)

2. The Government, represented by the United States Attorney's Office for the Southern District of New York, failed to file any response or request an extension of time by the return date.

3. Subsequent to this failure, credible public statements from the highest levels of the Executive Branch—including the President of the United States, the Vice President, the Attorney General, and the head of DOGE—have emerged, asserting that Judge Paul A. Engelmayer is corrupt and should be removed from office via impeachment.

4. These statements align with a resolution introduced in the United States House of Representatives on or about February 18, 2025, by Representative Derrick Van Orden, seeking the impeachment of Judge Engelmayer for "high crimes and misdemeanors" (H. Res. 143).

5. Following the filing at Docket Number 496, Representative Elijah Crane ("Eli Crane") also drafted articles of impeachment against Judge Paul Engelmayer and announced they will be filed today, 21 Feb 2025 ( https://x.com/RepEliCrane/status/1892308510181892252/ ) , similarly seeking the impeachment of Judge Engelmayer for "high crimes and misdemeanors".

6. Representative Crane's staff spoke with Mr. Teman by telephone regarding the impeachment effort, and thus Mr. Teman is now an adversarial party / witness against Judge Paul Engelmayer in a highly publicized criminal proceeding against Judge Engelmayer, and thus will need to recuse.

7. The Government's failure to respond, combined with its own Executive Branch leadership's condemnation of the presiding judge, constitutes an abandonment of opposition to Defendant's motion and a basis for both default judgment and recusal.

# II. MOTION FOR DEFAULT JUDGMENT

6. Under Rule 55(a) of the Federal Rules of Civil Procedure, default judgment may be entered when a party against whom relief is sought "has failed to plead or otherwise defend" as required. While this is a criminal case, Rule 12 of the Federal Rules of Criminal Procedure permits the Court to apply civil rules where no criminal procedure is specified, particularly in post-conviction or ancillary proceedings such as this.

7. The Government's failure to respond to Docket #496 by the return date constitutes a failure to defend against Defendant's motion. This failure is particularly egregious given the lack of any request for an extension or explanation for the lapse.

2

8. Moreover, the Executive Branch's public position that Judge Engelmayer is corrupt undermines any presumption that the Government intends to prosecute or defend this case fairly under his oversight. This effectively concedes the merits of Defendant's position in Docket #496.

9. Defendant is entitled to relief sought in Docket #496 — Recusal of Judge Engelmayer —as a matter of law due to the Government's default. Entry of default judgment is therefore appropriate and just.

## III. MOTION FOR RECUSAL OF JUDGE PAUL A. ENGELMAYER

10. Under 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Additionally, under 28 U.S.C. § 455(b)(1), recusal is mandatory where the judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

11. The unprecedented public statements by the President, Vice President, Attorney General, and head of DOGE (Mr. Elon Musk) —key figures within the Executive Branch prosecuting this case—asserting Judge Engelmayer's corruption and calling for his impeachment create an irrefutable appearance of impartiality being compromised.

12. A reasonable observer, apprised of these statements, would question whether Judge Engelmayer can preside fairly over this case, particularly when the Government itself, through its highest officials, has accused him of misconduct. This situation is compounded by the Government's failure to respond to Docket #496, suggesting either tacit agreement with Defendant or an unwillingness to proceed under Judge Engelmayer's supervision.

13. Furthermore, Defendant asserts that Judge Engelmayer's continued involvement risks tainting the judicial process, especially given the pending impeachment proceedings in Congress, which amplify the public perception of bias or corruption.

14. Representative Crane's staff spoke with Mr. Teman by telephone regarding the impeachment effort, and thus Mr. Teman is now an adversarial party / witness against Judge Paul Engelmayer in a highly publicized criminal proceeding against Judge Engelmayer, and thus will need to recuse.

15. Immediate recusal, effective February 21, 2025, is necessary to preserve the integrity of these proceedings and to ensure justice is administered by a judge unburdened by such extraordinary allegations from the prosecuting authority.

# IV. RELIEF REQUESTED

WHEREFORE, Defendant Ari Teman respectfully requests that this Court:

A. Enter default judgment in favor of Defendant on Docket #496, granting the relief sought therein due to the Government's failure to respond by the return date;

B. Order the immediate recusal of Judge Paul A. Engelmayer from this case, effective February 21, 2025, pursuant to 28 U.S.C. § 455; and

C. Grant such other and further relief as the Court deems just and proper.

**Dated:** February 21, 2025 , Tel Aviv Israel

Respectfully submitted,
s/Ari Teman/
Fri, 21 February 2025
23rd of Sh'vat, 5785
CC Attorney General Pamela Bondi via ECF; Counsel for Mr. Musk via Email

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| -v- | 19 Cr. 696 (PAE) |
| ARI TEMAN, | ORDER |
| Defendant. | |

PAUL A. ENGELMAYER, District Judge:

This order addresses the deadline for defendant Ari Teman to return to the United States.

## I.      Background

On January 24, 2025, this Court ordered Teman, who is presently in his first year of a three-year supervised release term following service of a 12-months-and-one-day prison sentence on two counts apiece of bank and wire fraud, to return to the United States by February 28, 2025. Dkt. 484. As of then, Teman had been in Israel for four-and-a-half months, with the Court's permission. As the Court, supported by the United States Probation Office ("Probation"), explained, Teman's return to the United States was important, to enable Probation to meaningfully supervise him, in particular, with respect to the special condition of supervised release requiring Teman to obtain mental health treatment. *Id.* at 7. The Court, however, *sua sponte* extended the deadline for Teman's return (then, January 29, 2025) to enable Teman (and Probation) to plan for his return, to enable Teman to investigate economical air travel options, and to give Teman time to appeal the order to the U.S. Court of Appeals for the Second Circuit should he choose to do so. *Id.* at 9–10. The Court emphasized that its order was final, that it would not alter the February 28 deadline unless ordered to do so by the Second Circuit, and that

if Teman were to fail to return that day, he would be in violation of the supervised release condition prohibiting unauthorized international travel. *Id.* at 10.

Following that date, Teman, who is otherwise represented, instead repeatedly moved, *pro se*, for sanctions and for the Court's recusal, recycling claims of misconduct rejected by Second Circuit in its June 2023 summary order affirming Teman's convictions for wire and bank fraud. *See United States v. Teman*, No. 21-1920-cr, 2023 WL 3882974, at *3 (2d Cir. June 8, 2023) ("There is nothing to Teman's argument that Judge Engelmayer was required to recuse himself[.]"). The Court denied these motions as meritless. *See, e.g.*, Dkt. 514 (denying motion at Dkt. 513); Dkt. 498 (denying motion at Dkt. 496); Dkt. 480 (denying motion at Dkt. 478); Dkt. 477 (denying motion made by email).

On February 24, 2025, Teman, *pro se*, moved anew for relief from the Court's January 24, 2025 order, contending, for the first time that his return to the United States would be medically contra-indicated. *See* Dkt. 502. In support of this late argument, Teman attached a brief doctor's note from a Maurice Budow, MD, dated February 24, 2025, stating that, although Teman was "well," the change in air pressure caused by air travel could trigger his chronic sinusitis and cause acute sinusitis, and that his guidance is that Teman not fly for eight weeks. Dkt. 502-1. In an order the same day, the Court noted that Teman, with the Court's permission, had repeatedly engaged in air travel since his conviction in January 2020, including having flown to and from Australia to perform comedy while his appeal was pending and to Israel while on supervised release. *See* Dkt. 503. The Court directed the Government to investigate Teman's claim, including by determining, through inquiry of Dr. Budow, the extent to which the doctor had been aware, prior to signing the note, of Teman's prior plane travel and the impact, if any, it had had on his sinusitis. *Id.* at 1–2. The Court also directed Teman, by the following day, to file

2

records documenting the plane ticket, if any, that he had purchased to enable him to return to the United States by February 28. *Id.* at 2.

In a letter response filed on February 26, 2025, the Government explained that it had determined from public records that Dr. Budow is a doctor based in Israel. *See* Dkt. 506. However, the Government stated, it was unable to obtain the information requested by the Court or confirm Teman's representations about Dr. Budow's diagnosis, given limitations on evidence-gathering abroad. *Id.* at 1. The Government confirmed with Teman's Probation Officer that Teman had not provided him with any such documentation. *Id.* The Government urged the Court either to adhere to its order that Teman return to the United States on February 28, 2025, or direct Teman to produce supplemental medical records corroborating his claim. *Id.* at 2. Early on February 27, 2025, Teman, *pro se*, replied, demanding that sanctions be imposed on the Assistant United States Attorney who authored the letter. Dkt. 507.

In a lengthy order issued February 27, 2025, the Court expressed its firm view, with the Government, that Teman's proffered medical excuse for not complying with the Court's order to return to the United States tomorrow is a pretext. Dkt. 508 (the "February 27 order"). "Every indication," the Court stated, "is that Teman is advancing this rationale for not traveling to the United States in a last-ditch effort to avoid return, which he has repeatedly stated he does not wish to do." *Id.* at 3. Evidence of this, the Court stated, were that (1) as of February 25, 2025, Teman had not purchased a plane ticket for a trip he had been ordered to take by February 28, 2025; (2) alongside the medical excuse, Teman articulated a series of frivolous alternative bases why he purportedly could not travel to the United States; (3) Teman's doctor's note pronounced that, as of February 24, 2025, he was "well" and did not represent that Teman had sought out a medical opinion regarding the compatibility of air travel with his sinusitis condition until four

<div align="center">3</div>

days before the deadline for his return; and (4) then-recently filed sworn affidavits submitted by

Teman's two trial counsel, Joseph DiRuzzo, Esq., and Justin K. Gelfand, Esq., in connection with

Teman's pending motion pursuant to 28 U.S.C. § 2255, had refuted as factually untrue numerous

representations Teman had made to the Court, and had reported an attempt by Teman—rebuffed

by his ethical counsel—to arrange for an anonymous call to be placed from a burner phone to the

Federal Bureau of Investigation falsely claiming that a juror at his trial engaged in misconduct;

and (5) the overall case record "reveal[ed] a regrettable but persistent pattern of Teman's making

demonstrably false and self-serving statements and accusations." *See id.* at 3-4 (citations

omitted).

The Court's February 27 order stated that, although the Court would be well within its

discretion to deny Teman's application as contrived, in the interest of due care, it would seek out

additional evidence bearing on Teman's claim to be unable to safely fly due to recent sinusitis.

*Id.* at 4–5. The order extended Teman's return date until March 21, 2025, while setting deadlines

for Teman to file designated medical records, chronicle his plane flights since 2015 and identify

any medical complaints arising from them, and purchase a plane ticket for return to the United

States. The order also notified the Government that, on receipt of Teman's medical records, it

would likely be asked to obtain an independent assessment by a qualified medical professional,

*id.* at 5–6.

Teman partly complied with that order. On March 5, 2025, he filed a letter from Dr.

Budow stating that he had examined Teman on February 22, 2025, and had concluded that

Teman had injured his ear during hyperbaric oxygen therapy on January 22, 2025. Dkt. 513 at 6.

Dr. Budow now opined that Teman should not fly until June 1, 2025. *Id.* However, as the Court

noted in an order the next day, Teman had not attached any records of Dr. Budow's examination;

4

the Court directed Teman to file those by the following day. Dkt. 514. On March 10, 2025, Teman filed a one-page letter, which he stated, reflected his having had "hyperbaric oxygen therapy" on January 22, 2025. Dkt. 518-1. Teman also filed records of his medical care for an unrelated condition in 2024, while incarcerated. *Id.* at 518-2–4. However, notwithstanding having been ordered to do so, Teman did not file underlying records of his examination by Dr. Budow; chronicle his prior plane travel, save flights he had taken during his term of supervised release; or produce evidence of his having purchased a plane ticket to return to the United States by the deadline the Court had set. Instead, in what the Court understood to express a refusal to return, he stated that he "must remain in Israel until . . . Engelmayer is impeached and this case is dismissed with prejudice." Dkt. 518 at 2.

Since Teman's March 5, 2025 letter, the Court has extended his return date several times, at the Government's request, to enable it to secure an independent review of the medical records Teman had provided. *See* Dkt. 522 (extending return date to April 11, 2025); Dkt. 524 (extending return date to April 25, 2025); Dkt. 529 (extending return date to April 29, 2025).

On April 15, 2025, the Government filed a letter, Dkt. 530, attaching a report from Dr. Richard Nass, a specialist in otolaryngology and sinus issues, *id.*, Exh. A. Dr. Nass's evaluation noted that the medical records Teman has provided did not squarely address his claimed otolaryngological issues. *Id.* Teman, Dr. Nass noted, had seen only an internist (Dr. Budow). *Id.* Dr. Nass further noted that, although hyperbaric oxygen treatment can cause complications to the middle ear, which increase the risk of injury during air travel, "evaluation and management by an otolaryngologist can accurately make a diagnosis, assess the risk involved in the individual case," and "make air travel safe for the affected ear." *Id.* Teman, however, had either not seen a doctor with that specialty or produced records of such an

5

evaluation. As a result, Dr. Nass stated, the limited records Teman had supplied do "not allow a definitive answer as to whether Mr. Teman can safely fly at this time." *Id.*

The Government's letter stated that Teman's failure to submit relevant records had left Dr. Nass, and the Government, unable to render an opinion whether air travel was safe for Teman. Dkt. 530 at 2. It stated that it questioned "the motivation and provenance of Teman's claims." *Id.* It noted that Teman had agreed to jointly proposed conditions regarding international travel during his supervised release term but thereafter had repeatedly made motions to stay in Israel well past his original proposed return date of November 6, 2024. The Government stated:

> In view of that timeline and the content of the medical records Teman has submitted that he claims, show that it is unsafe for him to fly, the Government maintains its view that Teman is using claims about his medical conditions as a pretext to stay in the Israel and not serve his remaining term of supervised release. By submitting incomplete and irrelevant records, Teman has managed to create a circumstance where, as Dr. Nass' report concludes, it is not possible to determine whether what Teman claims is true; and indeed, Teman theoretically could continue to make such claims, whether or not based in fact.

*Id.* at 2. Nonetheless, the Government stated, because it was constrained to defer to the inconclusive determination in Dr. Nass's report and did not wish to jeopardize Teman's health, it had chosen "not to object to extending the deadline for Teman's return until June 1, 2025, the date by which Teman claims it will be safe for him to fly." *Id.* The Government, however, urged that no further adjournment of that date be granted. *Id.*

## II. Order

The Court extends, until June 1, 2025, the date by which Teman is required to return to the United States. That is the date before which Teman's internist, Dr. Maurice Budow, recommended Teman not fly. The Court extends the return date based on the assessment of Dr. Nass, the independent medical expert. As Dr. Nass explained, the limited paperwork

6

submitted by Teman—which did not include any assessment by a relevant specialist, like an otolaryngologist—"does not allow a definitive answer as to whether Mr. Teman can fly safely at this time." Dkt. 530, Exh. A at 2. The Court, like the Government, does not wish to jeopardize Teman's health. The Court therefore will extend by 33 days the deadline for Teman to return to the United States from the present April 29, 2025 deadline. It is undisputed that as of June 1, 2025, Teman can safely return.

That said, the Court's firm conclusion—along with the Government—is that Teman's claim that air travel is medically risky is pretextual. Numerous data points support that Teman invoked this in late February as a last-ditch excuse to avoid returning to the United States. These include those chronicled in detail in the Court's February 27 order; Teman's failure to abide by Court's orders to make a plane reservation for a return trip; Teman's non-compliance with other aspects of this Court's recent orders; Teman's offer of other bogus rationalizations for not traveling; and Teman's well-documented pattern in this case—now confirmed by the affidavits submitted by his trial counsel—of proffering bogus claims and accusations to suit his self-interest.

***Accordingly, the Court orders Teman to return to the United States by June 1, 2025.*** A breach of this order will be a breach of Teman's conditions of supervised release, inasmuch as Teman is authorized to travel and be abroad only to the extent of advance authorization by the Court. *See* Dkt. 453, 454. Teman is reminded that, as with any defendant, an adjudicated violation of a condition of supervised release can have a range of serious consequences. *See* 18 U.S.C. § 3583(e)(2)–(3), (h)–(i).

For avoidance of doubt, the Court does not restrict Teman in his mode of travel home. Teman may choose air travel, which he has often used in the past, as such is faster and less costly

7

than the alternative. But, provided that Teman has complied with his obligation to obtain advance authorization of international travel set out at Docket 454, Teman is at liberty to arrange return travel to the United States by boat, whether departing from Israel or a port elsewhere. The Court will therefore not honor, as a basis to further delay return, a claim by Teman that—contrary to Dr. Budow—air travel on or after June 1, 2025 would be medically contra-indicated.

***The Court further orders Teman, by May 9, 2025, to file on the docket of this case documentation sufficient to show reservations he has made for return travel to the United States on a date consistent with this order.*** Teman is at liberty to make refundable reservations, so as to enable him thereafter to secure more favorable price terms for travel within the deadline set above.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: April 17, 2025
New York, New York

8

B"H

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**


**UNITED STATES OF AMERICA**

v.

**ARI TEMAN**,

Defendant.

**Case No. 1:19-cr-00696-PAE**


**DEFENDANT'S PRO SE MOTION TO (a) EXTEND TRAVEL TO ISRAEL UNTIL AT LEAST AUGUST 14, 2025, (b) MODIFY PROBATION TO NON-REPORTING STATUS, AND (c) PERMIT SETTLEMENT IN ISRAEL FOR MEDICAL TREATMENT; (d) PROCEED IFP IN APPEAL COURT AND HERE, (d) Recusal due to pre-judging facts in 2255**


I, Ari Teman, the Defendant in the above-captioned case, respectfully submit this pro se motion to request that the Court:

 (1) extend my authorized travel to Israel until at least **August 14, 2025**, to complete the 90-day period recommended by Dr. Wolfovitz for my medical treatment (ending **July 23, 2025**) and allow a follow-up visit the following week to obtain clearance to fly, as shown in Exhibit 1 (Medical Notes of Dr. Wolfovitz);

(2) modify my probation to remotely-reporting or alternatively non-reporting probation; and

(3) permit me to settle **indefinitely** with my family in Israel to receive necessary medical treatment for my ear condition, varicocele, and other serious health issues, as confirmed by Dr. Georgiy Brusovanik in Exhibit 8  and Dr. Wayne (referenced in medical documentation).

If my ear condition does not improve by July 23, 2025, I will require surgery and must be seen by Dr. Wolfovitz the following week, as he only sees patients one day per week and operates on other days.

I also ask the Court to consider that there are no direct passenger boats from Israel to the United States, and my conviction makes alternative travel through Europe unaffordable and unduly burdensome.

Additionally, the Court has repeatedly falsely accused me of fabricating my medical conditions and not seeing an ENT, but in fact, I did see an ENT and was only delayed in reporting this due to delays in securing a follow-up visit and obtaining a copy of the report and records.

My request for an indefinite stay is supported by:

(a) the potential need for ENT surgery if my ear condition does not improve by July 23, 2025;

(b) my completion of one year of probation without violations, warranting non-reporting probation;

(c) month-to-month housing in Israel being nearly twice as expensive as long-term housing;

(d) my need for urgent urological surgery for a varicocele, as documented by Dr. Wayne and Dr. Brusovanik, requiring scheduling and recovery time; and

(e) my over five years of compliance with supervision during this case, including pre-trial, post-trial, and post-incarceration periods.

## BACKGROUND

- **My Medical Conditions Require Treatment in Israel**

  Dr. Wolfovitz has advised that I **must not fly** for 90 days, from April 24, 2025, to July 23, 2025, due

to my serious ear condition (Exhibit 1). If my condition does not improve by July 23, 2025, I will require ENT surgery and must be seen by Dr. Wolfovitz the following week for a follow-up to assess my condition and obtain clearance to fly. Dr. Wolfovitz only sees patients one day per week, as he operates on other days, necessitating a minimum stay until **August 14, 2025**, to accommodate this visit.

Additionally, as is documented by Dr. Brusovanik and Dr. Wayne, I suffer from severe back, neck, and genital pain due to chronic spinal disc issues and varicoceles, as confirmed by Dr. Georgiy Brusovanik, a Board-Certified Orthopedic Surgeon, and supported by MRIs and ultrasounds from Akumin and Mount Sinai after my release from Bureau of Prisons (BOP) custody (Exhibit 8, Page 1).

Dr. Wayne has also documented my varicocele, which requires urgent surgical intervention (referenced in medical records). These conditions demand ongoing care, including potential spinal steroid injections, urological surgery, a clean environment, an anti-inflammatory diet, and orthopedic support, all accessible in Israel with family support.

- **Court's False Accusations Regarding My Medical Conditions**
  The Court has repeatedly accused me of fabricating my medical conditions and claimed I did not see an ENT specialist. These accusations are false. I did see an ENT, as evidenced by Dr. Wolfovitz's recommendation (Exhibit 1), but I was delayed in reporting this to the Court due to challenges in securing a follow-up visit and obtaining a copy of the medical report. These delays were beyond my control and do not negate the validity of my medical conditions, which have been corroborated by multiple Board-Certified specialists and diagnostic imaging (Exhibit 8, Page 1).

- **Previous Medical Mismanagement**

  Dr. Brusovanik's letter details how my medical needs were ignored during BOP custody. Three Board-Certified specialists, including Dr. Brusovanik, recommended urgent treatment, but the BOP and the Court relied on a non-medically qualified administrator and a false report from a BOP-contracted doctor who never examined me (Exhibit 8, Page 1). This doctor wrongly denied my spinal and genital issues, claims disproven by later imaging. The BOP's use of X-rays, unsuitable for soft tissue, exposed me to unnecessary radiation (Exhibit 8, Page 1). This history underscores the need to remain in Israel for competent medical care. It also supports resentencing in consideration of the unnecessary and unjust suffering caused by the medical malpractice of the BOP-contracted physician.

- **Need for Surgeries and Recovery**

  If my ear condition does not improve by July 23, 2025, I will require ENT surgery, necessitating a follow-up with Dr. Wolfovitz the following week (Exhibit 8, Page 2).

  Additionally, Dr. Wayne and Dr. Brusovanik have documented my varicocele, which requires urgent urological surgery that must be scheduled and involves significant recovery time (Exhibit 8, Page 1). These procedures, combined with my spinal issues, require an indefinite stay in Israel to ensure access to specialized care and a supportive recovery environment.

- **Compliance with Probation and Supervision**

  I have completed one year of probation without any violations and have complied with all supervision conditions for over five years, including pre-trial, post-trial, and post-incarceration periods. Courts traditionally transition defendants to non-reporting probation after such a record, as it demonstrates rehabilitation and low risk to the public.

- **Housing Cost Challenges**

In Israel,  as in most places, month-to-month housing is nearly twice as expensive as long-term housing. An indefinite stay would allow me to secure affordable, stable housing,significantly reducing financial strain and supporting my recovery. Short-term housing would impose an undue burden given my limited resources due to my conviction.

Currently, I am dependent on help from family and loved ones as I rebuild my life and these added expenses make it unduly burdensome to rebuild.

- **No Viable Return Travel Options**

There are no direct passenger boats from Israel to the United States. The only sea travel option involves costly cruises through Europe, which I cannot afford due to my financial constraints and conviction. Dr. Wolfovitz's restriction that I **must not fly** until at least July 23, 2025, and potentially longer pending clearance, makes air travel impossible, rendering return to the United States impractical and unfairly burdensome.

- **No funds to hire Mr. Quainton to handle these matters**

The court incorrectly and falsely accused me of being unable to retain counsel on these matters due to lack of merit, but as the attached threat shows, I did ask Mr. Quainton to handle these matters, but he demanded an additional $10,000 which I did not have and my parents did not have (as they are also dealing with medical issues as well as associated costs of limited mobility in their elderly age.) The Could should reconsider my IFP motions and allow me to proceed in appeal and elsewhere under IFP.

- **Healthcare is cheaper in Israel**

Because of a national healthcare system, even though I am outside the system and required to pay for visits directly, they are significantly cheaper -- 75% to to 90% cheaper approximately -- than

visits in the USA. For example, a visit to a US doctor is $1000, but in Israel is is approximately $150 to $250 (400nis to 1000nis). As well, in the USA, medical insurance is $850/month (approx) and I am still required to pay copays and imaging expenses -- fors example $700 per MRI for 2 MRIs ($1400) that showed the degenerative disk issues discussed in Dr. Brusovanik's letter. These expenses right out of prison after years of legal bills and isolation are unmanageable and I do not have the funds.

- **Requiring me to beg is an undo burden**

  It is unethical and unreasonable to ask me to beg for funds from friends to file appeals or to get medical care and housing, when I can get affordable healthcare and housing in Israel. Additionally, given the tremendous expenses incurred in legal defense -- where the Judge has unethically showed his clear bias and prejudice on a 2255 before our reply was even filed and also ignored the documented years of medical issues prior to this case including repeated inpatient psychiatric hospitalizations for which Judge Englemayer was made aware on the record before trial -- is all completely unethical.

  What is happening here is that Judge Engelmayer is retaliating for me calling him a "corrupt Obama nominee" in a suicide note before trial (late 2019) that was forwarded by Abi Goldenberg to Mr. Soleimani who sent it to the Government and they to the judge -- but was not sent by me to the judge or Soleimani -- and the Government did not disclose the path of this document. Judge Engelmayer has repeatedly referenced this comment even in recent hearings, and has been punishing me for it throughout this case. This case is not about the law or contracts or evidence -- all of which Judge Engelmayer has explicitly refused to consider under the bogus excuse that I am "pro se". This case is just one Judge's ego retaliating for an insult. For this reason and for the above reasons where the judge is taking on face value accusations without evidence while ignoring clear emails that I reported the juror to counsel DURING trial (not "post-trial" as the judge falsely

accuses me) and trial counsel failed to report it immediately to the Court,  the Defendant motions for immediate recusal.

## REQUESTS AND REASONS

- **Extend My Travel to Israel Until at Least August 14, 2025**

  I ask the Court to extend my permission to stay in Israel until at least **August 14, 2025**, to complete the 90-day period recommended by Dr. Wolfovitz (April 24, 2025, to July 23, 2025) and allow a follow-up visit the following week to obtain clearance to fly (Exhibit 1). Dr. Wolfovitz only sees patients one day per week, requiring this additional time. If my ear condition does not improve by July 23, 2025, I will need ENT surgery and must be seen by Dr. Wolfovitz to confirm this, further justifying the extended stay. The Court has the authority to adjust probation conditions to accommodate medical needs.

- **Modify Probation to Non-Reporting Status**

  I request that my probation be changed to non-reporting status. I have completed one year of probation without violations and complied with supervision for over five years, including pre-trial, post-trial, and post-incarceration periods. Courts often grant non-reporting probation in such cases, as it supports rehabilitation while ensuring public safety. My severe medical conditions, as confirmed by Dr. Brusovanik and Dr. Wayne (Exhibit 8), require me to remain in Israel for treatment, and non-reporting status would allow me to focus on my health.

- **Permit Me to Settle Indefinitely in Israel for Medical Treatment**

  I ask to be allowed to settle indefinitely with my family in Israel to receive necessary medical treatment. My ear condition may require ENT surgery if it does not improve by July 23, 2025, and my varicocele requires urgent urological surgery, as documented by Dr. Wayne and Dr. Brusovanik (Exhibit 8, Page 1). These procedures need scheduling and recovery time, and my spinal issues

require ongoing care. An indefinite stay is also justified by: (a) the high cost of month-to-month housing compared to long-term housing; (b) my five-year compliance record, supporting non-reporting probation; (c) the need for a stable environment to manage my health; and (d) the Court's false accusations about my medical conditions, which I have proven through ENT visits and medical documentation despite reporting delays due to follow-up and report access issues. Israel's advanced medical facilities and my family's support make it the best place for my treatment and recovery.

- **Permit Me to Stay if Because Surgery is Urgently Needed (Urology) and may be needed (ENT)**

  I specifically request that the Court permit me to remain in Israel indefinitely because surgery is urgently needed (urology) for my varicocele, as documented by Dr. Wayne and Dr. Brusovanik, and may be needed (ENT) for my ear condition if it does not improve by July 23, 2025 (Exhibit 8, Page 2). Both procedures require scheduling, recovery time, and access to specialized care, which I can only ensure in Israel.

- **Travel Burdens Are Unfair**

  There are no direct boats from Israel to the United States, and I cannot afford or arrange costly cruises through Europe due to my conviction and financial constraints. Dr. Wolfovitz's restriction that I **must not fly** until at least July 23, 2025, and potentially longer pending clearance, eliminates air travel. Forcing me to return would be an unfair burden and could harm my health by delaying critical treatment.

## CONCLUSION

I respectfully ask the Court to:
- Reconsider my request to proceed IFP in appeals court and to issue IFP status. As the attached Exhibit D shows, emails with Attorney Quainton (redacting topics related to his representation of

GateGuard on civil cases), he was willing to represent me on these issues, but I could not afford to pay him $10,000 and my family could not afford to either. Thus, I filed pro se. This should be sufficient proof that we cannot afford the $1800+ in fees to proceed in appeals, as we did not even have the $1800 before the additional medical expenses. The court should therefore reconsider and allow me to proceed IFP in CA2.

- Extend my travel to Israel until at least **August 14, 2025**, to complete the 90-day period ending July 23, 2025, and allow a follow-up with Dr. Wolfovitz the following week;

- Modify my probation to remotely-reporting or non-reporting status;

- Permit me to settle indefinitely with my family in Israel to receive medical treatment; and

- Permit me to stay because surgery is urgently needed (urology) and may be needed (ENT) in approximately 90 days.

- Recusal so a judge who has not already pre-decided facts in the 2255 can hear it.

These changes are necessary to protect my health, follow medical advice, secure affordable housing, and avoid unfair travel burdens. The attached exhibits, my five-year compliance record, and my documented ENT visits, despite delays in reporting due to follow-up and report access issues, support the truth of my medical conditions and the need for this relief.

Previously the Government has agreed to follow the Doctors' recommendations and therefore at the very least travel should be extended until August 15, 2025. However, because this brings me to over 1 year under probation without violations, the Court should agree to allow me to find stable housing and get surgery now for the variocele -- which is agonizing and has impact on hormones and health  -- and to rebuild my life in health.

**Respectfully submitted,**

Ari Teman

Pro Se Defendant

Date: May 8, 2025

**Attachments:**

- Exhibit 1: Dr. Wolfovitz Records

- Exhibit 2: ETF Test

- Exhibit 3: Dr . Brusovanik letter

- Exhibit 4: Redacted Email with Mr. Quainton requesting an additional $10,000 to represent me in this matter and me and my family being unable to pay this.

**Certificate of Service**

I certify that on May 8, 2025, I served a copy of this motion on the Assistant United States Attorney assigned to this case by by Temp Pro Se email.

s/Ari Teman/

APPEAL RESPONSE EXHIBIT 1 - DR. WOLFOVITZ



ד״ר עמית וולפוביץ
מומחה ומנתח א.א.ג כירורגית ראש וצוואר
מומחה באוטולוגיה/נוירואוטולוגיה
(ניתוחי אוזניים, שיקום שמיעה, סחרחורת, טינטון
וגידולי בסיס הגולגולת הצידי)

24.4.25

**שם:** ארי תימן
**תאריך לידה:** 10.5.1982
**Email:** ari@teman.com
**כתובת:** ת״א
**הצהיר/ה שלא נפגשנו במסגרת מערכת הבריאות הציבורית בחצי השנה האחרונה**
**סיבת הפניה:**
לפני כחודשיים עבר טיפול בתא לחץ בשל סימפטומי GI. ככל הנראה סבל מצינון. ללא קושי במהלך ה״צלילה״. למחרת החל לחוש לחץ באוזן ימין. ללא שיפור בבליעה. ללא שינוי בשמיעה. ללא טינטון או סחרחורת. נמשך עד עכשיו. טורדני. בחשיפה לרעש בעיקר בתדר נמוך – אי-נוחות ואף כאב. ללא סחרחורת.
ללא קושי בהשוואת לחצים (טיסות וכדומה)
דלקות אוזניים בילדות
24.4.25 – השלים בדיקת שמיעה + טימפנומטריה + ETF: שמיעה תקינה למעט ירידה ת״ע סימטרית ב-UHF עד ל-50 ד״ב. 10/10SRT WRS 96/92%. טימפנו A/A. בבדיקת ETF– תת-תפקוד חצוצרה דו״צ.
פחות חמור משהיה כאשר פנו.
**בדיקה גופנית:**
פנים – סימטריות
אוטוסקופיה – תקינה משני הצדדים. תנועת תופית תקינה בולסלבה וטוויינבי משני הצדדים.
וובר לשמאל, רינה + משני הצדדים אך נשמע יותר משמאל
ללא ניד ספונטני, HIT – תקין דו״צ, HST – תקין, SKEW – תקין, VOR דו״צ, תחת פרנזל – תקין
24.4.25 – אוטוסקופיה – תקינה משני הצדדים עם תנועת תופית בולסלבה.
**רקע רפואי:**
ללא
**רקע ניתוחי:**
ניתוח לשחזור האף, אוטופלסטי
**אלרגיה לתרופות:**
פניצילין
**הרגלים:**
ללא
**סיכום והמלצות:**
תמונה חלקית של תת-תפקוד חצוצרה מימין עם קושי בהשוואת לחצים אך בבדיקה תקין סה״כ.
בנוסף, וובר לשמאל ואי-סבילות לרעש בתדר נמוך
מומלץ:

1. המנעות מטיסה ל-3 חודשים
2. בדיקת שמיעה בהקדם + טימפנומטריה + ETF – ישלח לי את התוצאות ל-
058-6268313
– 24.4.25

avoid airplanes for the coming three (3) months

The Eustachian Tube (ET) Function test point at ET Dysfunction Bilaterally
Hence Ari Should avoid barometric changes (for example: commercial flights,
climbing to high places, HBO chamber, etc..)
I would prescribe Steronase nasal spray for 3 months and would schedule visit
for inspection before approving traveling abroad. In case of increasing pain –
come in sooner.

Dr. Amit Wolfovitz
ד"ר עמית וולפוביץ
מ.ר 108124 מ.מ 33387
מומחה א.א.ג. וכירורגית ראש-צוואר

ד"ר עמית וולפוביץ
מ.ר 108124
מ.מ 33387

APPEAL RESPONSE - EXHIBIT 2 - ETF TEST

**The Chaim Sheba Medical Center**
Hearing, Speech, and Language Center
Tel:   03-5305842
Fax:  03-5302515

שיבא
תל השומר
עיר הבריאות של ישראל

המרכז הרפואי ע"ש חיים שיבא
מכון שמיעה, שפה ודיבור

טל.   03-5305842
פקס  03-5302515

204117/378690

## בדיקת טימפנומטריה\רפלקס אקוסטי

| | | | |
|---|---|---|---|
| ת.ז.   8801178200 | | שם הנבדק:   **ארי תימן** | |
| טימפנומטר | גיל בזמן הבדיקה**42** שנים | תאריך לידה:   **10/05/1982** | |
| רשיון:   13-142677 | שם הבודק: **ליאור רז** | תאריך הבדיקה:**03/04/2025** | |
| | | גורם מפנה: | |

### בדיקת טימפנומטריה



| אוזן שמאל | אוזן ימין | אפיוני התגובה |
|---|---|---|
| 226Hz | 226Hz | Probe |
| A -7 | A -3 | TYPE + PEAK (daPa) |
| 0.78 | 1.15 | הענות ביחס לנורמה (cm³) |
| 1.9 | 1.6 | Ear Canal Volume (cm³) |
| Type A עם ערכי<br>היענות בנורמה | Type A עם ערכי<br>היענות בנורמה | סיכום: |

הערות:   הגיע לבדיקת ETF בהפניית ד"ר וולפוביץ' בשל תלונות על כאבים ותחושה של לחץ באוזן ימין שהחלה לפני
כחודשיים אחרי טיפול בתא לחץ. ביצע אתמול בדיקת שמיעה: בשתי האוזניים שמיעה בתחום הנורמה,
בתדירויות העל שמיעה סימטרית ותואמת את המצופה בגילו.
בבדיקת ETF עם עור תוף שלם: התקבלה הסטת היענות הקטנה מ-15daPa, בעקבות שינויי לחץ בבליעה.
תוצאה זו תומכת בתת תפקוד של ET דו"צ.

המלצות:   - מופנה לרופא אא"ג המטפל להמשך בירור וטיפול
- המשך מעקב שמיעתי במידת הצורך

_____

קלינאי\ת תקשורת

תוכנת קולגרף פותחה על ידי מרוז מערכות תוכנה בעמ טלפון 02 6527501



GEORGIY BRUSOVANIK, MD
MINIMALLY INVASIVE SPINE & ORTHOPEDIC SURGERY
Tel: 305-467-5678   Fax: 305-821-6782

To Whom It May Concern,

My name is Dr. Georgiy Brusovanik, a Board-Certified Orthopedic Surgeon. I write to you with deep concern regarding the medical treatment of Mr. Ari Teman, whose case I have followed closely due to my involvement as one of the medical experts recommending his care.

Over several months, myself and two other Board-Certified specialists provided Judge Paul Engelmayer with detailed medical assessments indicating that Mr. Teman urgently required medical intervention for severe pain in his back, neck, and genitals. Our recommendations were based on comprehensive medical imaging which undeniably showed chronic spinal disc issues, as well as our having independently treated him over years.

Despite our professional consensus, Judge Engelmayer chose to disregard our expertise in favor of an opinion from a Bureau of Prisons (BOP) administrator lacking in medical qualifications and the obviously fraudulent reports from a private clinic's doctor contracted by the BOP. This doctor, who neither examined nor spoke with Mr. Teman, falsely documented the absence of physical issues in the genitals and spine, as well as COVID related issues and fall risk — claims contradicted by all available medical evidence.

Upon Mr. Teman's release from BOP custody, subsequent MRIs and ultrasounds by Akumin and Mount Sinai confirmed our earlier diagnoses, revealing multiple disc issues and a significant varicocele in the testicle, conditions that any competent medical professional could not have overlooked.

Moreover, the Department of Justice's insistence on using X-rays to examine Mr. Teman's neck and genitals was medically inappropriate as this modality is ineffective for visualizing soft tissue, thus exposing Mr. Teman to unnecessary radiation and risk.

Despite these clear indicators of medical mismanagement and the persistent plea from multiple experts to move Mr. Teman to home confinement for proper treatment, Judge Engelmayer not only declined but also appeared to trivialize Mr. Teman's suffering.

4770 Biscayne Blvd. Suite #1100 • Miami, FL 33137
Tel: 305-467-5678   Fax: 305-821-6782
www.spinedoctormiami.com



GEORGIY BRUSOVANIK, MD
MINIMALLY INVASIVE SPINE & ORTHOPEDIC SURGERY
Tel: 305-467-5678 Fax: 305-821-6782

When Mr. Teman visited my office post-release, he was in evident distress, suffering from conditions that necessitated spinal steroid injections and prolonged recovery to regain mobility without pain. His current need for surgery might have been mitigated had he received timely treatment in a sanitary environment, with access to an anti-inflammatory diet and appropriate orthopedic support, all of which were emphatically recommended by specialists to Judge Engelmayer, who ignored them.

Mr. Teman lives in fear of further physical torture by Judge Engelmayer, and I implore your assistance in ensuring Mr. Teman's safety from any additional abuse.

Thank you for considering this grave matter.

Sincerely,

Dr. Georgiy Brusovanik
Board Certified Orthopedic Surgeon

4770 Biscayne Blvd. Suite #1100 • Miami, FL 33137
Tel: 305-467-5678 Fax: 305-821-6782
www.spinedoctormiami.com



## Motion to extend · External → Inbox ×

✦ Summarize this email

**Eden Quainton** <equainton@gmail.com>
to me, David

Mon, Jan 13, 5:25PM · 📄 SAVE AS TEMPLATE

Ari,

In order to serve as defense counsel on this motion, we need a new engagement letter and I need a retainer of $10K. Any unused portion will be returned to you or applied to another matter if we so agree.

Let me know.

Regards,

Eden

--
Eden P. Quainton
Quainton Law, PLLC
2 Park Avenue, 20th Floor
New York, NY 10016
Tel: 212.419.0575
Fax: 212.376.5699.
Cell: 202.360.6296

245 Nassau St.
Princeton, NJ 08540
Tel: 609-356-0526
Cell: 202-360-6296
https://quaintonlaw.net

**Ari B. Teman** <ari@teman.com>
to Eden, David

Mon, Jan 13, 5:34PM · 📄 SAVE AS TEMPLATE

I don't have it because I need to hire defense counsel in Miami and not enough clients pay their bills.

[attorney-client conversation related to GateGuard civil cases redacted]

**David Teman** <david.teman@teman.com>
to Eden, me

Mon, Jan 13, 7:14PM · 📄 SAVE AS TEMPLATE

Hello Eden,

We are grateful for your help and appreciate your skill. 10k is a big hit for us just now because clients are still not paying what they owe promptly, while expenses have been high. Can we send $1500 now and revisit in two weeks, please?

We hope things look different in a couple weeks, new DOJ and support from Dhillon and Pam Bondi, which will help the Amazon case and other funding.

David

**Eden Quainton**
Sorry, I'm not taking on any more work for Ari without a 10K retainer. You will have to find a different lawyer.

Jan 13, 2025, 7:35PM

**Eden Quainton**
Ari, My engagement did not involve representing you in attempting to extend your stay in Israel or otherwise modifying the terms of your probation. If you would

Jan 13, 2025, 7:41PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

ARI TEMAN,

Defendant.

19-CR-696 (PAE)

ORDER

---

PAUL A. ENGELMAYER, District Judge:

The deadline for the return to the United States of defendant Ari Teman is June 1, 2025, a deadline that the Court has emphasized is firm. *See* Dkt. 531. Teman today again moved to adjourn his return deadline, attaching various materials. *See* Dkt. 534. The Court directs the Government to respond by Tuesday, May 13, 2025. The Court does not invite a reply.

For avoidance of doubt, the deadline for Teman's return to the United States remains June 1, 2025, and the Court's order requiring Teman, by May 9, 2025, to file, on the docket of this case, documentation of his return travel reservations, *see* Dkt. 531 at 8, also remains in effect.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: May 8, 2025
New York, New York