# EXHIBIT C

**_United States v. Teman_, No. 21-1920,
ECF Nos. 47, 75, 90, 133, 169
(2d Cir. Feb. 22, 2022)**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 21-1920 _____   _____ Caption [use short title] _____

Motion for: Motion to withdraw as counsel _____

_____

_____

Set forth below precise, complete statement of relief sought:

Alan Lewis moves to withdraw as counsel _____

_____          U.S.A. v. ARI TEMAN

_____

_____

_____

_____

MOVING PARTY: Ari Teman _____   OPPOSING PARTY: U.S.A. _____

[ ] Plaintiff     [✓] Defendant

[✓] Appellant/Petitioner   [ ] Appellee/Respondent

MOVING ATTORNEY: Alan S. Lewis _____   OPPOSING ATTORNEY: Won Shin _____
[name of attorney, with firm, address, phone number and e-mail]

Carter Ledyard & Milburn LLP _____   U.S. Attorney's Office for the Southern District of New York ___

2 Wall Street, New York, NY 10005 _____   1 Saint Andrews Plaza, New York, NY 10007 _____

(917) 533-2524 _____   (212) 637-2200; won.shin@usdoj.gov _____

Court- Judge/ Agency appealed from: U.S.D.C., S.D.N.Y., Hon. Paul A. Engelmayer _____

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
[✓] Yes   [ ] No (explain):_____
_____

Opposing counsel's position on motion:
[✓] Unopposed   [ ] Opposed   [ ] Don't Know
Does opposing counsel intend to file a response:
[ ] Yes   [✓] No   [ ] Don't Know

Is oral argument on motion requested?   [ ] Yes [✓] No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   [ ] Yes [✓] No If yes, enter date:_____

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has this request for relief been made below?   [ ] Yes [ ] No
Has this relief been previously sought in this court?   [ ] Yes [ ] No
Requested return date and explanation of emergency:   _____
_____
_____
_____
_____

**Signature of Moving Attorney:**

/s/ Alan S. Lewis _____   Date: 2/20/2022 _____   Service by: [✓] CM/ECF   [✓] Other [Attach proof of service]

Form T-1080 (rev.12-13)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

```
-----------------------------------------------------X
                                                     :
UNITED STATES OF AMERICA,                            :
                                                     :
                          Appellee,                  :        Docket No.  21-1920
                                                     :
        - against -                                  :
                                                     :
ARI TEMAN,                                           :
                                                     :
                          Appellant.                 :
                                                     :
-----------------------------------------------------X
```

**UNOPPOSED MOTION TO WITHDRAW AS COUNSEL**

11043045.2

Pursuant to Federal Rule of Appellate Procedure 27 and this Court's Rule 27.1, I hereby move to withdraw as counsel for Appellant Ari Teman.

On February 19, 2022, at approximately 7:15 p.m., Mr. Teman sent an email to me and to my co-counsel in this case, Nathaniel Z. Marmur, Esq., telling both of us that we were each terminated "immediately" and directing us to not file any brief on his behalf.[1]

The government has advised that it has no objection to this motion to withdraw, nor to the related withdrawal motion to be filed by Mr. Marmur.

WHEREFORE, I respectfully request that the Court grant this motion to withdraw as counsel for Mr. Teman.

Dated: February 20, 2022
     New York, New York

                    Respectfully submitted,

                    ALAN S. LEWIS, ESQ.

                    *s/ Alan S. Lewis*
                    Carter Ledyard & Milburn, LLP
                    2 Wall Street
                    New York, NY 10005
                    Tel: (917) 533-2524
                    Email: lewis@clm.com

                    *Attorney for Appellant Ari Teman*

---

[1] Mr. Teman's appeal brief is currently due on February 24, 2022.

11043045.2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served

electronically upon counsel for the government via ECF this 20th day of February,

2022, and by emailing a copy to Ari Teman via email at ari@teman.com


By:   /s/    Alan S. Lewis    
          Alan S. Lewis

11043045.2

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 21st day of April, two thousand twenty-two.

Before:      Jon O. Newman,
              *Circuit Judge,*

_____

| | |
|---|---|
| United States of America, | **ORDER** |
| Appellee, | Docket No. 21-1920 |
| v. | |
| Ari Teman, AKA Sealed Defendant 1, | |
| Defendant - Appellant. | |

_____

Appellant moves for a 30-day extension of time to May 25, 2022 to file his principal brief and appendix.

IT IS HEREBY ORDERED that the motion is GRANTED.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court



# 21-1920-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ARI TEMAN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

EDEN QUAINTON
QUAINTON LAW
*Attorneys for Defendant-Appellant*
2 Park Avenue, 20th Floor
New York, New York 10169
(212) 419-0575

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................v

JURISDICTIONAL STATEMENT ..........................................................................1

STATEMENT OF THE ISSUES................................................................................1

STATEMENT OF THE CASE...................................................................................3

      I.      FACTS...........................................................................................4

            A.     Elie Gabay ................................................................6

            B.     Bonnie Soon-Osberger .............................................11

            C.     Joseph Soleimani.....................................................16

      II.     PROCEDURAL HISTORY ...............................................24

POINT I

VENUE WAS IMPROPER IN THE SOUTHERN DISTRICT OF
NEW YORK .................................................................................................27

      I.      FACTS.........................................................................................28

      II.     STANDARD OF REVIEW ..........................................................30

      III.    ARGUMENT ..............................................................................31

           A. The Government Failed to Prove that Teman Began,
               Continued, Completed, or Took Action in Furtherance of,
               Any Alleged Fraud in the Southern District ...........................31

           B. Teman Could Not Have Foreseen That the Bank Review
               Would Take Place in the Southern District ..............................35

POINT II

THE INDICTMENT, WHICH SPECIFICALLY ALLEGED THAT
THE ALLEGED FRAUDS WERE COMMITTED BY THE
CREATION AND DEPOSITING OF "COUNTERFEIT"
CHECKS, WAS CONSTRUCTIVELY AMENDED BY THE
COURT'S INSTRUCTIONS PERMITTING CONVICTION ON
PROOF THE CHECKS WERE MERELY UNAUTHORIZED .................37

i

I.    FACTS ................................................................................. 37

II.    STANDARD OF REVIEW ..................................................... 39

III.    LEGAL ARGUMENT ........................................................... 41

    A.    By Conflating Counterfeit Checks and Unauthorized Checks, The Court Constructively Amended the Indictment ................................................................. 41

**POINT III**

TEMAN DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL .......................................................................... 44

I.    FACTS ................................................................................. 44

II.    STANDARD OF REVIEW ..................................................... 46

III.    LEGAL ARGUMENT ........................................................... 47

    A.    Trial Counsel's Decisions Were Outside the Range of Professionally Competent Assistance ....................... 47

    B.    Counsel's Ineffectiveness Prejudiced Teman ........... 49

        1.    Reinitz' testimony was toxic evidence virtually assuring a conviction ....................... 49

**POINT IV**

TEMAN'S CONVICTIONS MUST BE REVERSED BECAUSE OF REPEATED, FUNDAMENTAL VIOLATIONS OF HIS DUE PROCESS RIGHTS ................................................................. 51

I.    JUDGE ENGLEMAYER HAD A DUTY TO RECUSE HIMSELF BECAUSE OF HIS SUBSTANTIAL INTEREST IN BOA ................................................................................ 52

    A.    Facts ........................................................................ 52

    B.    Standard of Review ................................................. 54

    C.    Argument ................................................................ 56

        1.    BOA was the only alleged economic victim in the case, and, in a substantive sense, the real party in interest ..................................... 56

ii

2. The size of Judge Englemayer's interest in BOA is substantial ................................................... 57

3. Judge Englemayer's disclosure was untimely and inadequate ......................................................... 58

II. JUDGE ENGLEMAYER DISPLAYED IMPERMISSIBLE BIAS AGAINST TEMAN ........................................................... 60

    A. Facts ................................................................... 60

    B. Standard of Review ............................................... 68

    C. Legal Argument ................................................... 68

III. THE GOVERNMENT'S TACTICS REPEATEDLY CROSSED THE LINE INTO PROSECUTORIAL MISCONDUCT ........................................................... 70

    A. Standard of Review ............................................... 70

    B. Legal Argument ................................................... 71

        1. The prosecution sought to sandbag the defense and score a "win" by gamesmanship ............................. 71

        2. The prosecution failed to disclose to the Court that Teman's post-trial counsel was married to an assistant U.S. Attorney in the U.S. Attorney's Office for the Southern District of New York ............... 74

        3. The prosecution misled the jury with false statements and inflamed it with antisemitic statements ................................................... 75

IV. JUDGE ENGLEMAYER'S INSTRUCTIONS FAILED TO CHARGE THE JURY TO SPECIFY WHICH ENTITY OR ENTITIES WERE ALLEGEDLY DEFRAUDED ........................... 78

    A. Standard of Review ............................................... 78

    B. Facts ................................................................... 78

    C. Legal Argument ................................................... 79

        1. Completely different customer narratives cannot be coherently combined into a single count consistently with due process ............................. 79

2.    A special verdict form was necessary to ensure that any punishment fit any actual findings of the jury ..................................................................................81

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Arizona v. Fulminante*,
499 U.S. 279 (1991)............................................................................................68

*Berger v. United States*,
295 U.S. 78 (1935)............................................................................................74

*Bracy v. Gramley*,
520 U.S. 899 (1997)............................................................................................54

*Carella v. California*,
491 U.S. 263 (1989)............................................................................................78

*Chase Manhattan Bank v. Affiliated FM Ins. Co.*,
343 F.3d 120 (2d Cir. 2003) ..................................................... 53, 57, 58

*Church v. Sullivan*,
942 F.2d 1501 (10th Cir. 1991) .............................................................59

*Cuyler v. Sullivan*,
446 U.S. 335 (1980)............................................................................................70

*Drake v. Portuondo*,
553 F.3d 230 (2d Cir. 2009) ...............................................................71

*Evitts v. Lucey*,
469 U.S. 387 (1985).............................................................................................59

*Holland v. Irvin*,
45 F. App'x 17 (2d Cir. 2002) .............................................................68

*In re Interest Swaps Antitrust Litigation*,
16-MD-2704 .................................................................. 52, 55, 58

*Kimmelman v. Morrison*,
477 U.S. 365 (1986)............................................................................................47

*Liteky v. United States*,
510 U.S. 540 (1994)................................................................. 69, 70

*LoCascio v. United States*,
473 F.3d 493 (2d Cir. 2007) .............................................................54

v

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017) ........................................................................ 13, 23, 24

*Napue v. People of State of Ill.*,
  360 U.S. 264 (1959) ................................................................................................71

*Rickman v. Bell*,
  131 F.3d 1150 (6th Cir. 1997) ...............................................................................47

*State v. Saunders*,
  958 P.2d 364 (Wash. Ct. App. 1998) .....................................................................48

*Strickland v. Washington*,
  466 U.S. 668 (1984) ......................................................................................... 46, 48

*Sullivan v. Louisiana*,
  508 U.S. 275 (1993) ...............................................................................................68

*Swaby v. People*,
  No. 06-CV-3845 ENV, 2014 WL 1347204 (E.D.N.Y. Mar. 31, 2014) ......... 47-48

*U.S. ex rel. Washington v. Vincent*,
  525 F.2d 262 (2d Cir. 1975) ..................................................................................71

*U.S. v. Hwang*,
  22-cr-240 ................................................................................................................55

*U.S. v. Martinez*,
  667 F.2d 886 (10th Cir. 1981) ...............................................................................69

*United States v. Anderson*,
  188 F.3d 886 (7th Cir. 1999) ........................................................................... 31, 32

*United States v. Barnwell*,
  477 F.3d 844 (6th Cir. 2007) ........................................................................... 63, 69

*United States v. Bastian*,
  770 F.3d 212 (2d Cir. 2014) .......................................................................... 39, 40, 41

*United States v. Bishop*,
  469 F.3d 896 (10th Cir. 2006) ...............................................................................41

*United States v. Blackwell*,
  459 F.3d 739 (6th Cir. 2006) .................................................................................82

*United States v. Cabrales*,
  524 U.S. 1 (1998) ...................................................................................................27

vi

*United States v. Chambers*,
  408 F.3d 237 (5th Cir. 2005) ................................................................41

*United States v. Curcio*,
  680 F.2d 881 (2d Cir. 1982) ................................................. 2, 62, 70

*United States v. D'Amelio*,
  683 F.3d 412 (2d Cir. 2012) ...............................................................41

*United States v. Davis*,
  689 F.3d 179 (2d Cir. 2012) ........................................................ 34, 35

*United States v. Diaz*,
  176 F.3d 52 (2d Cir. 1999) ..................................................................34

*United States v. Dupre*,
  462 F.3d 131 (2d Cir. 2006) ...............................................................40

*United States v. Farnsworth*,
  302 F. App'x 110 (3d Cir. 2008) .........................................................78

*United States v. Farr*,
  536 F.3d 1174 (10th Cir. 2008) ..........................................................42

*United States v. Greenidge*,
  495 F.3d 85 (3d Cir. 2007) ..................................................................31

*United States v. Gugino*,
  860 F.2d 546 (2d Cir. 1988) ...............................................................43

*United States v. Gushlak*,
  728 F.3d 184 (2d Cir. 2013) ...............................................................54

*United States v. Kaid*,
  502 F.3d 43 (2d Cir. 2007) ..................................................................46

*United States v. Kirk Tang Yuk*,
  885 F.3d 57 (2d Cir. 2018) ..................................................................30

*United States v. Klein*,
  216 F. App'x 84 (2d Cir. 2007) ...........................................................41

*United States v. Lange*,
  834 F.3d 58 (2d Cir. 2016) ..................................................................35

*United States v. Leichtnam*,
  948 F.2d 370 (7th Cir. 1991) ........................................................ 41, 42

vii

*United States v. Little*,
    828 F. App'x 34 (2d Cir. 2020) ...............................................................41

*United States v. Lovaglia,*
    954 F.2d 811 (2d Cir. 1992) ...................................................................55

*United States v. McKeighan,*
    685 F.3d 956 (10th Cir. 2012) ...............................................................74

*United States v. Murray,*
    618 F.2d 892 (2d Cir. 1984) ...................................................................82

*United States v. Napue,*
    834 F.2d 1311 (7th Cir. 1987) ...............................................................64

*United States v. Nolan*,
    956 F.3d 71 (2d Cir. 2020) ......................................................... 46, 48, 49

*United States v. Orozco-Prada,*
    732 F.2d 1076 (2d Cir. 1984) ......................................................... 82, 83

*United States v. Perez*,
    129 F.3d 1340 (9th Cir. 1997) ...............................................................82

*United States v. Ravitch*,
    421 F.2d 1196 (2d Cir. 1970) ......................................................... 26, 53, 57

*United States v. Reed,*
    147 F.3d 1178 (9th Cir. 1998) ...............................................................82

*United States v. Rigas*,
    490 F.3d 208 (2d Cir. 2007) ......................................................... 39, 40

*United States v. Saneaux,*
    365 F. Supp. 2d 493 (S.D.N.Y. 2005) ...................................................34

*United States v. Stassi,*
    544 F.2d 579 (2d Cir. 1976), *cert. denied*, 430 U.S. 907, 97 S. Ct. 1176,
    51 L. Ed. 2d 582 (1977)..........................................................................82

*United States v. Stirone,*
    361 U.S. 212 (1960)..................................................................................43

*United States v. Svoboda*,
    347 F.3d 471 (2d Cir. 2003) ......................................................... 30, 31

*United States v. Thomas*,
315 F. App'x 828 (11th Cir. 2009) ........................................................................31

*United States v. Torres,*
845 F.2d 1165 (2d Cir. 1988) ...............................................................................70

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978)..............................................................................................69

*United States v. Weissman*,
899 F.2d 1111 (11th Cir. 1990) ...........................................................................41

*United States v. Wilson*,
629 F.2d 439 (6th Cir. 1980) ...............................................................................82

*United States v. Young,*
470 U.S. 1 (1985)..................................................................................................70

*United States v. Yunis,*
867 F.2d 617 (D.C. Cir. 1989)..............................................................................64

*United States v. Ziegenhagen*,
890 F.2d 937 (7th Cir. 1989) ...............................................................................74

*United States v. Zingaro,*
858 F.2d 94 (2d Cir. 1988) ............................................................... 39-40, 42, 43

*Warren v. Pataki,*
823 F.3d 125 (2d Cir. 2016) ................................................................................78

*White Buffalo Ventures, LLC v. Univ. of Texas at Austin,*
420 F.3d 366 (5th Cir. 2005) ...............................................................................29

*Wilson v. Mazzuca,*
570 F.3d 490 (2d Cir. 2009) ................................................................................47

*Wood v. Georgia,*
450 U.S. 261 (1981)..............................................................................................70

*Yohn v. Love,*
76 F.3d 508 (3d Cir. 1996) ..................................................................................69

**Statutes & Other Authorities:**

U.S. Const., Amend. V.................................................................... 37, 40, 43

U.S. Const., Amend. VI ....................................................................27

U.S. Const., Amend. XIV ............................................................ 54, 78

U.S. Const., Art. III, § 2, cl. 3 ........................................................27

18 U.S.C. § 1029.............................................................................42

18 U.S.C. § 1343.............................................................................34

18 U.S.C. § 3237(a) ................................................................... 27, 30

28 U.S.C. § 455...............................................................................57

28 U.S.C. § 455(a)(10).....................................................................55

28 U.S.C. § 1291 ...............................................................................1

Code of Conduct for United States Judges, Canon 3C(1) .........................54

Code of Conduct for United States Judges, Canon 3C(3)(c)....................55

Fed. R. Crim. P. 52(b).....................................................................70

x

## JURISDICTIONAL STATEMENT

On January 28, 2021, Appellant Ari Teman ("Teman") was convicted of two counts of bank fraud and two counts of wire fraud. Following the filing of motions pursuant to Rule 29 and Rule 33, Teman was sentenced on July 28, 2021 by Judge Paul Englemayer to the payment of restitution and forfeiture, in the amounts of $259,988.17 and $330,000, respectively, and to a term of one year and one day's imprisonment, to be followed by three years of supervised release. Notice of this appeal was timely filed on August 3, 2021. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

(1) Whether Teman's convictions must be vacated when his alleged fraudulent conduct, from beginning to end, occurred entirely outside New York and there was no competent evidence that any conduct *in furtherance of* those charges took place in the Southern District of New York.

(2) Whether the indictment, which specifically alleged that the alleged frauds were committed by the creation and depositing of "counterfeit" checks, was constructively amended by the Court's instructions permitting conviction on proof the checks were merely unauthorized.

(3) Whether Teman was deprived effective assistance of counsel by trial counsel's decision to call Teman's corporate counsel as a witness knowing that otherwise inadmissible "toxic" text messages would be published to the jury.

1

(4) Whether Teman was deprived of due process of law by (i) Judge Englemeyer's failure to disclose in a timely and complete manner his multi-million dollar interest in Bank of America ("BOA") and to recuse himself from the case, (ii) Judge Englemeyer's bias against Teman, as revealed notably in his false attribution of admissions to Teman and his *ex parte* contacts with the prosecutor's office, (iii) prosecutorial misconduct, including by inflaming the jury on religious grounds and failing to disclose a conflict of interest requiring a *Curcio* hearing, and (iv) flawed jury instructions that failed to ascertain which of three sharply different customer narratives was the basis for a jury finding of guilt.

## STATEMENT OF THE CASE

This case is about a civil dispute improperly dressed up as a criminal matter and tried in violation of fundamental fairness. Defendant-Appellant Ari Teman – the founder of JCorps, a non-denominational social volunteering force of young Jewish adults, and GateGuard, Inc., a cutting-edge artificial intelligence-enabled "smart" intercom system – was wrongly indicted, unfairly tried, incorrectly charged, and improperly convicted and sentenced.

The indictment was based on a fundamentally flawed theory of venue in which the government sought an improper tactical advantage in trying its case in the Southern District of New York when all the established elements of the alleged crime were committed and completed in Florida. The indictment was then constructively amended to write out of the indictment the key legal "counterfeiting" language the government knew it could not sustain and tried on an entirely different "authorization" theory.

Teman was tried before a conflicted judge who failed to disclose a multi-million-dollar interest in the only alleged economic victim in the case, BOA, until after the conclusion of the trial, and even then failed to disclose the extent of his financial interest. The trial itself, marred by ineffective assistance of counsel, unfolded in a manner that gave the government procedural advantages denied to defendant. Worse, in its closing argument, the prosecution was allowed to confuse

3

the jury with references to "fake" checks and inflame their passions with false statements impugning the appellant's religion.

At the close of the trial on two counts of bank fraud and two counts of wire fraud for the alleged "unauthorized" deposit of 29 RCC's, Judge Englemayer incorrectly charged the jury, resulting in a conviction that could have been based – consistently with the court's instructions – on a *single* $18,000 RCC "chargeback." The jury's verdict on what could have been this <u>one</u> chargeback resulted in the imposition of restitution of $259,000, forfeiture of $330,000, and a year's jail time— a result so grossly disproportionate it leaves no doubt that Teman's conviction must be reversed and the case remanded to a new judge in the Southern District of Florida.

## I.     FACTS

Appellant is the founder of JCorps and GateGuard, Inc. ("GateGuard"). JCorps is a seven-city international volunteer organization that has led thousands of young Jewish adults to volunteer in children's hospitals, senior centers, soup kitchens, animal shelters, parks, and more. A-2319. GateGuard, for its part, is a "cutting edge" technology company that provides intercom devices for multi-tenant properties and related services to both the tenants that live in those apartment buildings and the landlords and owners of the properties. A-716:24; A-870:8-11. The GateGuard system includes a face-recognition entry panel, an intercom, and an artificial intelligence "virtual doorman" + camera system. A-1856. The GateGuard

4

intercom is connected to a website panel that enables visual tracking of entrances into a customer's building, permitting the customer to see time-stamped logs and photographs of who was entering the building at a given time, thus providing value to the company far beyond a standard intercom. A-511:2-9. The website homepage contains a form through which the customer provides its contact information and information regarding its properties and also, as is customary for on-line businesses, contains a link to GateGuard's Terms and Conditions the customer must check to signify its agreement with the terms and place an order for desired products and services. A-872:21-25, A-873:1-9. Teman includes a link to this web landing page, Gateguard.xyz, on official correspondence with clients. A-1856. The Terms and Conditions expressly provide that the customer agrees to updates to the terms and other documents incorporated by reference without any requirement for express agreement to these updates. A-1809. The Terms and Conditions also contain a link to payment terms authorizing the use of "remotely created checks" – or RCC's – in the event of customer defaults or to secure payment of a device removal fee. A-1884 (Permission to Make Bank Draws and Other Account Draws). *Id.*

Teman's conviction and the present appeal revolve around three distinct RCC narratives involving three different customers: Elie Gabay ("Gabay"), Bonnie Soon-Osberger ("Soon-Osberger") and Joseph Soleimani ("Soleimani"). The different narratives were incoherently combined in single counts based not on any similarity

in the relationships but the timing of Teman's deposit of RCC's to collect what he believed were contractually enforceable customer debts. Thus, Counts I and III involved the deposit of 27 checks on April 19, 2019 against the accounts of entities related to Gabay and Soleimani and Counts II and IV involved the deposit of two checks against the accounts of entities related to Gabay and Soon-Osberger in March 18, 2019. Thus, the Gabay relationship was included in each count.

### A.  Elie Gabay

In 2016 or 2017, Gabay, managing director of a property management company, Coney Management ("Coney"), met Teman at a trade show. A-446:2, A-445:25, A-449:4-6. Coney manages a Manhattan property located at 518 West 204, owned by an LLC identified by the building's address, 518 West 204 LLC. A-447:16-19, A-447:25-A-448:1-3. Teman first marketed to Gabay a product called SubletSpy that helped property owners and managers detect illegal uses of their properties. A-449:11-14. Gabay then subscribed for the GateGuard intercom system, with the idea that Coney would use GateGuard's existing intercom suite at a single location and roll out an upgraded 2.0 version out across the company's property portfolio. A-451:21-25, A-452:1-5.

On January 19, 2018, Teman sent Gabay an email indicating that Coney would be invoiced $3,600 for the initial invoice installation, to be credited against monthly fees from the 2.0 roll-out, together with a security deposit of $849. A-1789. Gabay

6

took issue with the $849 and requested a copy of the invoice, which had not been attached to the initial email. A-1788.

Teman clarified in response that the $849 would be reflected as "0" (*i.e.*, not charged) and attached the requested invoice. *Id.* The cover email expressly requested payment through GateGuard's website portal and the invoice reminded Coney that the order was subject to GateGuard's Terms and Conditions, a link for which was provided to the left of the amount due. A-1790. The Terms and Conditions expressly reference GateGuard's Payment Terms, which provide for the use of RCC's to recover unpaid debts. A-1884.

The invoice also expressly noted the limitations of the initial version of the Intercom suite and the buyer's acceptance of the online Terms and Conditions.[1] Gabay testified that he did not recall whether he clicked on the Terms and Conditions link as requested in connection with the initial invoice. A-456:17-18. On January 28, 2018, Michael Haas ("Haas"), one of the other owners of the 518 W. 204 LLC, paid in full the $3,600 invoice stating that "Buyer accepts the Terms and Conditions at

---

[1] The invoice contained, on the bottom left, opposite the price, the following language:
> We are installing Version 1.0 ahead of 2.0 being available (~90 days). Client understands 1.0 device does not have 4G, IR, battery, etc. https://gateguard.xyz.
> **Terms**
> Buyer accepts terms & conditions at https://gateguard.xyz.

A-1790.

gateguard.xyz." A-549: 19-20, A-1725, A-1790.[2] In addition, the introductory paragraph to Section 5 of the Terms and Conditions contained the link to specific payment terms, including the use of RCC's, to which neither Gabay nor Haas objeted, and immediately below which Gabay had requested the addition of the word "reasonably." A-1801.

Despite the initial promise of Teman's relationship with Coney, the Version 1.0 of the Gateguard Intercom encountered connection problems. A-471:11-16. Gabay relayed his concerns to Teman over the next six weeks and many of the problems were resolved. A-477: 2-9. Indeed, as of March 13, 2018, Coney was considering an investment into GateGuard. A-1795. On this date, Teman emailed Gabay and stated he was providing a template for an order of twenty intercom panels, a proposed convertible note for a $40,000 investment into GateGuard, and his banking details for payment of the note. *Id.*[3] In response, on March 25, 2018, Gabay provided comments on the GateGuard Terms and Conditions, but not on the Payment Terms. A-1797-A1814. Teman responded that these changes appeared "mostly workable," but explained the reasoning behind certain provisions that were

---

[2] The Government did not obtain Haas' testimony at trial, but rather produced an affidavit in which Haas swore he was not familiar with GateGuard. A- 1727, A-327, A-1157-58.

[3] The government did not offer the attachments to the email into evidence and there was no questioning from the Court as to the status of the attachments.

important to GateGuard, including the need for a 10-year contract. A-1816. Teman followed up with an email stating "Updated with tracking. Most changes made as requested." A-1822. Gabay did not respond to Teman's explanation or updated Terms and Conditions but shared "the general feedback he was getting" that the entire GateGuard project should be placed on hold. A-473:8-9, A-1815. Teman countered that there was an unpaid invoice relating to an intercom panel that had been installed on January 19, 2018, stating he would "place a lien on your building on Pesach [Passover]." A-1820 at 1. GateGuard's unpaid invoice referenced the "full price" of the installed intercom panel, installation fees, and one year of service fees. A1828. The total amount invoiced for the initial panel, again with a reference to GateGuard's Terms and Conditions, was $18,286. A-1828.

The Government presented the foregoing facts in a manner that made logical narrative flow extremely difficult. The prosecution sought to elicit testimony that Gabay had not "signed" the online Terms and Conditions (which were not designed to be signed); that he believed he did not have an "agreement" about the Terms and Conditions (where assent was provided by a click-through mechanism customary in on-line contracts); that Teman had not sent him a copy of the "website" with the Payment Terms (when the link to the Payment Terms was immediately above a line on which he had commented); and that he "never saw" the device removal language in the Payment Terms and Conditions. A-465:12-13, A-478:12-15, A-469:15-16.

9

However, despite the Government's leading questions, Gabay testified that he did not "recall" whether he clicked on the Payment Terms. A-469:2-5.

For the remainder of 2018, relations between Teman and Coney deteriorated. A-493:14. Teman repeatedly warned customers, including Coney, that if they removed the GateGuard device, they would be subject to a device removal fee, which even the government conceded. A-497:13-18, A-865:4-5.

On March 28, 2019 Teman deposited a check for $18,000 drawn on Coney's account at Signature Bank ("Signature") for the property in question, identified as 518 W. 205 LLC,[4] A-1728, together with a separate check, A-1729, drawn on the account of 18 Mercer Equity, Inc., a different customer described below, *via* mobile deposit to his BOA account. A-335:21-24. Some days later, Gabay was contacted by Signature and asked whether he had authorized the $18,000 check deposited by Teman. A-494:12-4. Gabay responded that he had not. A-495:3-4. Haas, as noted, submitted a false affidavit stating he did not even know who GateGuard was. *See supra* at 8 and Note 2. At that point, Signature initiated a "chargeback," leaving Teman's account with a negative balance. A-345:16-22, A-347:10-11, A-348:5-9. According to Karen Finocchiaro, a BOA vice-president and senior fraud investigator

---

[4] The check contained a typo because the property was actually located at 518 W. 204, held by 518 W. 204 LLC. *See supra* at 6. The government made much of this typo, highlighting the check in red next to a "good" check for maximum visual effectiveness. A-1726.

10

("Finocchiaro"), the Internet Protocol (or IP) address associated with a mobile device corresponding to Teman's deposit, 74.203.64.198, was linked to a physical address in New York, New York. A-338:11-16, 20-21, A-339:7-12. However, no expert testimony was provided connecting this IP address to the physical location of Teman's phone and publicly available information shows that the IP address was monitored by a company called Level 3 that exclusively monitors fixed line devices. *See infra* at 29-30.

Approximately a month after the chargeback of the $18,000 check, Teman attempted to cash three additional checks drawn on 518 W. 205 LLC for a total amount of $33,000,[5] but the account had been closed and the checks were returned uncashed. A-504:13-16. Neither Gabay, Signature nor BOA suffered any loss from the attempted deposit of the three returned checks.

### B.   **Bonnie Soon-Osberger**

Like Gabay, Soon-Osberger met Teman at a trade show. A-556:19-24. Soon-Osberger was a member of the Board of Directors and Treasurer of a condominium cooperative corporation, 18 Mercer Equity. Inc. ("Mercer") that owned a cooperative condominium located at 18 Mercer St. ("18 Mercer") in Manhattan. A-552:21-25, A-553:1-8, A-554:9-13. Among her duties, Soon-Osberger was responsible for soliciting bids and obtaining devices for 18 Mercer. A-554:21-23. In

---

[5] These checks contained the same typo noted above. *See supra* at 10 and Note 4.

October, 2017, Soon-Osberger attended a condominium trade show at which she was looking for vendors to supply a new intercom system for 18 Mercer. A-556:21-24, A-557:1-5. GateGuard had a booth at the trade show and Soon-Osberger, attending the trade show with her husband and the President of Mercer, was attracted to the GateGuard Intercom panel because of its "smart" features. TR A-557:6-8, 14-16, 19-21.

According to Soon-Osberger, Teman discussed a "price point" for the GateGuard panel of $2,500. A-558:1-2. After the trade show, Soon-Osberger contacted Teman, indicated she was interested in the GateGuard intercom, and requested information on the product. A-561:8-10. Teman directed Soon-Osberger to the GateGuard website, where he told her she could sign up and order the product. A-561:10-15. Soon-Osberger testified that she "went through all" of GateGuard's Terms and Conditions. A-559:5. Teman expressly told her that the contract for the GateGuard Intercom panel was created through the company's on-line Terms and Conditions. A-561:20-24. Soon-Osberger testified she likely downloaded the Terms and Conditions on March 23, 2018. A-561:1-5. However, Soon-Osberger testified that she did not click on the Payment Terms in Section 5. A-565:1-5.

Notwithstanding the Terms and Conditions, which expressly state that the customer is simply paying for rights to use the panel and its associated intellectual property, Soon-Osberger testified that her "recollection" was that she would

purchase the panel outright because Teman gave her a "price." A-562:21-25.[6] Soon-Osberger testified that she had previously only executed agreements with a physical signature, implying that she was unfamiliar with customary online terms and conditions. A:563:19-24.[7]

Soon-Osberger also provided the Terms and Conditions to the members of the 18 Mercer Board and to Stephanie Phillips, the President of 18 Mercer, who, according to Soon-Osberger "looked at" the document. A-684:24-25, A-585:1-11. Soon-Osberger emailed Teman with specific questions on the GateGuard Terms and Conditions. A-1860. She did not, however, provide any comments on the Payment Terms, despite the prominent placement of the link to the terms in Section 5 of the Terms and Conditions. In response, Teman agreed to limit price increases, but otherwise explained the reasoning behind the clauses without modifying the language. A-1859. After receiving Teman's response, Soon-Osberger stated that Teman had addressed 18 Mercer's concerns. A-1858. Appellant provided an invoice for a total of $3,947 that included a "cooperator show price" for the GateGuard intercom panel, installation and one-year's prepaid services. A-1833. The invoice

---

[6] This does not explain why Soon-Ostberger would go through and then download the entire Terms and Conditions, but not read the Payment Terms.

[7] The Court can take judicial notice that online "clickwrap" and "browsewrap" agreements are customary. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017).

expressly stated that "Buyer accepts terms and conditions at gateguard.xyz." The Terms and Conditions notice was on the same line as the amount to be paid and clearly visible. The invoice, with its express limitation to the Terms and Conditions on GateGuard's website, was reviewed by 18 Mercer's management and, on April 4, 2018, sent to 18 Mercer's property management company, Crystal Real Estate Management, Inc. ("Crystal"), who paid the invoice in full. TR A-572:23-25, 573:1-7, A-1831-32, A-1838. Following payment, GateGuard installed the panel at the Mercer St. condominium. A-573:10-12.

According to Soon-Osterberger, 18 Mercer encountered difficulties with the GateGuard intercom, which Teman explained resulted from the building's poor Internet connection. A-574:2-10. For the remainder of the year, 18 Mercer and GateGuard attempted to resolve the connectivity issues. A-574:11-22. In January 2019, 18 Mercer decided to "move on" from GateGuard. A-574:23-25. In early January, 2019, Soon-Osterberger sent an email informing Teman that 18 Mercer intended to remove the GateGuard intercom, to which Teman responded that GateGuard would enforce its rights to a removal fee. A-1866. Soon-Osberger recalled several additional emails in which Teman threatened to enforce GateGuard's rights. A-577:24-25, A-578:1.[8]

---

[8] The Government did not seek to introduce any of these emails despite their relevance to Soon-Osberger's knowledge of the applicable contractual provisions on which Teman was relying.

In light of Teman's position, Soon-Osberger provided the GateGuard Terms and Conditions, referred to as the "contract," to Jacqueline Monzon ("Monzon") at Crystal, who in turn forwarded the contract to the entity that would replace GateGuard, Academy Intercom, Inc. ("Academy"). A-1862-A-1865. Academy reviewed the Terms and Conditions and refused to proceed with removing the intercom because of legal liability. A-1863-A1864. After receiving the contract, Crystal requested indemnification for itself and Academy if the removal work were to be authorized. A-1862. The Government did not produce evidence of any indemnification agreement and did not produce evidence as to when or under what circumstances the GateGuard device was removed.

However, after GateGuard had put 18 Mercer on notice that it intended to enforce its right to an $18,000 device removal fee; after Academy had refused to effect the removal; and after Crystal had demanded indemnification if the device were removed, on or about January 10, 2019, 18 Mercer removed the device. A-602:12, A-603:21.

On March 28, 2019, Teman deposited an RCC for the device removal fee in the amount of $18,000, which Soon-Osberger testified was "unauthorized." A-578:4-11. Meanwhile, Crystal had terminated its management contract with 18 Mercer on or about March 15, 2019. A-612:1-3. At the end of the month, Gina Hom ("Hom"), who, together with Monzon, was one of the two authorized signatories for

15

Crystal, noticed the GateGuard RCC, which she claimed not to recognize, and called Signature to place a hold on the check. A-611:18-19, A-612:13. Hom testified she did not ask anyone on the 18 Mercer Board whether the check was authorized. A-612:22-25.

Signature then processed a "chargeback" to BOA, leaving Teman's account with a negative balance. A-345:16-22, A-347:10-11, A-348: 5-11. The "chargeback" was combined with the chargeback for the $18,000 check drawn on Coney's account. A-348:6-9. BOA honored both chargebacks, leaving Teman's BOA account overdrawn by a total of $29,036.56. A-348:15. This negative balance was subsumed by the RCC deposits involving the last customer discussed below. As a result, neither Signature nor BOA suffered any independent loss in connection with the Soon-Osberger or Gabay checks.

## C. Joseph Soleimani

In late 2016, Soleimani, one of the owners of ABJ Properties ("ABJ"), a property management company that managed two real estate companies, ABJ Lennox, LLC ("ABJ Lennox") and ABJ Milano LLC ("ABJ Milano"), reached out to Teman to discuss his SubletSpy product. A-624:8-14, 21-22; A-626:3-8. Shortly after meeting Teman, ABJ subscribed for Teman's SubletSpy service. A-626: 9-12. Soleimani then asked Teman to give him a "demo" of the GateGuard Intercom system at Soleimani's office. A-723:6-9, 724:13-23.

16

At the office "demo," Soleimani had an opportunity to review not only the physical Intercom system but also GateGuard's "online interface." A-725:5. GateGuard's only interface includes a landing page with references to its Terms and Conditions. *See supra* at 5. After the office demo, Soleimani agreed to have seven GateGuard intercoms installed at ABJ properties. A-726:15-20. Soleimani testified that he "did not recall" whether he signed up for the GateGuard products and services through GateGuard's online platform. A-726:8-13. However, he acknowledged using the online platform, which requires acceptance of the online terms to sign in. A-727:5-6.

After Soleimani signed up for the seven GateGuard intercoms, ABJ used the system for "quite some time," during which ABJ had continuous access to the GateGuard online interface. A-726:21, A-727:2-6. In March, 2017, Soleimani received invoices for the seven intercoms and related services. A-728:2-9; A-1777-A-1784. The invoices contemplated delivery of the intercoms for a heavily discounted up-front cost of $499,[9] an installation fee of $650, a six-month service charge of $594 and a three-year contractual commitment. A-1777-A1784. As with

---

[9] *See supra* at 6-7 (referencing a discounted up-front initial price for a temporary device of $3,600) and 12 (referencing a discounted up-front price of $2,500 for installation of an initial device). The particularly heavy discounting for Soleimani must be seen in the context of the parties' negotiation of a separate, much larger, order covering 60 buildings. *See infra* at 19.

17

the invoices for Gabay and Soon-Osberger, all seven invoices expressly stated that they were subject to the GateGuard online Terms and Conditions available at https://gateguard.xyz/legal/terms/php. *Id.* However, Soleimani stated that "he did not see" the reference to the online Terms and Conditions. A-728:12.

After the system went live, there were several problems with the GateGuard system, which Teman attributed to connectivity issues, and, apparently, an unwillingness of ABJ to pay certain invoices. A-733:4-17, A-1928. In frustration, on March 9, 2018, Appellant sent ABJ an email stating that in light of client's non-payment, he "was done" and GateGuard would be "shutting down" in part because of ABJ's dangling of "fake orders" and "fake investments." A-1928-A-1929. Benjamin Soleimani, Soleimani's brother and the other owner of ABJ, responded by entreating GateGuard not to shut down and imploring GateGuard to work together with ABJ to resolve any issues they were having. A-1928, A-715:2-3. Specifically, Benjamin Soleimani pleaded with Appellant to come to dinner and discuss matters, stating: "Please don't do anything yet with the system. Let's keep it going how it was before the update. And let's discuss next week what we can do together to improve it." A-739:3-6.

For much of the rest of the year, relations between Soleimani and Teman oscillated between mutual recriminations and an attempt to patch things up and seek common ground for the installation of the GateGuard 2.0 devices. On the one hand,

18

billing disputes continued to plague the parties' relationship. On September 6, 2018, Ariel Reinitz ("Reinitz"), Teman's corporate attorney, contacted Soleimani to obtain payment of outstanding fees. A-1887. In response, ABJ requested that GateGuard discontinue service. *Id*. Reinitz responded by reminding Soleimani of the GateGuard Terms and Conditions, referenced in the initial GateGuard invoices and attached to Reinitz's email. *Id.* However, during the Soleimani cross-examination, the defense did not have a copy of the invoice and the Court did not permit cross-examination of Soleimani on the email, which drew Soleimani's attention to the specific online terms, identified in Reinitz' email with the hyperlinks "here" and "here." A-745:6-25. These specific online terms expressly referenced both the Terms and Conditions and the Payment Terms that authorized the use of remotely created checks for payment of outstanding fees. *See supra* at 5.

On the other hand, at the same time, ABJ was considering installing an upgraded, second generation, version of the GateGuard system across 60 buildings in the ABJ portfolio. A-748:14-24, A-750:12-14. As part of its purchase, ABJ sought a general release as to fees claimed by GateGuard up to that time, which it discussed with Reinitz. A-1889. Soleimani also testified that he continued to receive multiple emails from Teman during this time period, but these were not produced by the Government. A-751:4-10.

19

The negative aspect of the Soleimani/Teman relationship eventually came to dominate. In early January, 2019 Teman began discussions with Reinitz about using RCC's to recover amounts owed from ABJ. A-1872. At that time, Reinitz discouraged Teman from using RCC's to recover debts from ABJ without warning, saying he thought this would be a "bad idea." *Id.* After an extended back and forth over several months, Reinitz concluded, "ok invoicing and then collections is fine." A-1876. Following this exchange with Reinitz, Teman sent ABJ an invoice for, among other things, the device removal fee for seven devices, past due fees for the seven devices under the terms of the initial invoices, an attorney collections fee, and a device reinstallation fee. A-1775. The invoice also included amounts allegedly owed for 60 devices, apparently relating to the additional intercom panels the parties had been negotiating since October 2018.[10] The prosecution did not introduce any evidence of Soleimani disputing this invoice.

Two weeks later on April 19, 2019, the day before Passover began,[11] at the BOA Lincoln Rd. Branch in Miami Beach, Florida, Teman deposited a total of 24 checks drawn on ABJ's bank, JP Morgan Chase ("JP Morgan"), against amounts

---

[10] Given the Government's incomplete production of Solemani material, it is not possible to determine whether there had been a meeting of the minds with respect to the 60-building order.

[11] The importance of this detail is discussed *infra* at 64-69.

invoiced for a total of $264,000. A-1733-A-1756. Teman also deposited three additional checks drawn on Coney's 518 W. 205 LLC account with Signature, A-1730, A-1731, A-1732,[12] but the account had been closed and these checks were not processed for payment. *See supra* at11. With these three checks, the total amount deposited on April 19, 2019 was $297,000, A-357:19-20, and the ending balance on that date in the GateGuard account was $271,803.12. A-358: 9-10.[13]

On April 16, 2019, once the seven-day hold was lifted, Teman transferred $225,000 to GateGuard's parent company, Friend or Fraud, Inc. A-361:4-8. Friend or Fraud then transferred $4,500 to Teman's personal account. A-363:6-13. $180,000 was transferred to an account ending in 1046, identified as the account for Touchless Labs, LLC. A-363:18-20, A-344:4-7. On April 29, 2019, $125,000 was transferred back to the Friend or Fraud account. A-363:23-25. Two wire transfers were then made to suppliers in China. A-364:12-18. On May 8, 2019, Teman withdrew $4,000 in cash from BOA at 1 Penn Plaza in Manhattan. A-365:3-7. The Government did not provide testimony as to how this $4,000 related to any of the

---

[12] The actual name of the entity was 518 W. 204 LLC.

[13] The account had a negative balance as of April 2, 2019 of $29,036.56. Teman also deposited a non-RCC for $4,096 on April 19. Combining this check with the negative balance, and a few other small deposits and withdrawals after April 2, reconciles the $297,000 deposit with the $271,803.12 closing balance. *See infra* at 22.

21

RCC's at issue. Teman had deposited a check for $4,096 unrelated to the RCC's on April 19, 2022. *See* GX113, A-1657.1, at 483067038085.[14]

According to Finocchiaro, all of the $297,000 checks were subject to a chargeback. A-367:17-20. However, this was not quite correct. Finnocchiaro separately testified that only the ABJ (Soleimani) checks totaling $264,000 were subject to a chargeback. A-368:3-4. Gabay's 514 W 208 LLC account had been closed and the checks could not be credited to this account. *See supra* at 11. The testimony was exceedingly confusing because Finnochiario testified that the $264,000 chargebacks covered all 27 checks (with a total value of $297,000), which

---

[14] The virtually incomprehensible testimony relating to these fund movements was accompanied by the presentation of an Excel spreadsheet identified as GX 113 (referenced in Teman's Appendix as A-1657.1 and submitted to the Court in CD-Rom form). The jury requested delivery of the spreadsheet during deliberation, but the prosecution did not have the spreadsheet available in a paper form that could be provided to the jury. A-1245; A-1248:22-25. Rather, the prosecution had prepared a laptop containing the information on GX 113, but the laptop contained other information not germane to the case, such as mp3 files, and could not be provided to the jury. A-1247:19-23. The Court brought the jury back into the courtroom to review the spreadsheet on the courtroom screens, but then realized it was a "long document" that was illegible on the screen and sent the jury back to the jury room, while it conferred with the parties on a mechanism for providing a laptop to the jury. A-1250-A-1252. As the Court was conferring, the jury sent back a lapidary note, "No laptop." A-1254:22-23. The Court responded that this was "good news" and did not enquire as to whether the jury wanted the spreadsheet in some other form. A-1254:25. The jury may well have determined it could get to a verdict without GX 113 by concluding the check drawn on 518 West 205 LLC was "counterfeit" and that, as a result, there was "fraud" in the Gabay customer relationship, which, given the judge's instruction that the jury only had to agree as to a single customer in each count, and Gabay's presence in each count, obviated the need to scrutinize the detail on GX 113. *See supra* at 6; *see infra* at 78-84.

only works arithmetically if the three Gabay/West 205 checks totally $33,000 were not subject to a chargeback. Teman's GateGuard account was then closed, with a negative balance of $260,319.81. A-368:18. The Friend or Fraud account, which had a positive balance of $8,386, and the Touchless account, which had a positive balance of $86,558.18, were also closed. A-370:4-19. An additional account with a positive balance of $13,447.37 was not discussed at trial but was disclosed on the eve of sentencing, when it appeared that, instead of using these funds, which were available for offset to reduce the amount of its loss, BOA returned the funds to Teman in February 2021. A-2261. The Friend or Fraud and Touchless balances were sent to Appellant who returned them to BOA. A371:20-21. Once returned to BOA, the positive balances were sent to a BOA "hold harmless" account. A-370:22-25. Finocchario then testified that BOA was unable to offset the Friend or Fraud and Touchless positive balances against the GateGuard negative balances because the corporate entities all had different tax identification numbers. A-372:21-25, A-373:1-4. The Government did not provide any correspondence between BOA and Teman relating to the various positive balances.

Ultimately, because only BOA suffered any losses in connection with the three customer relationships involved in the Government's prosecution of Teman, *USA v. Teman* resolves into *Bank of America v. Teman*, a case that should have been brought in a civil proceeding based on the application of *Meyer v. Uber*, *supra* at 13

23

and Note 7, with full discovery and depositions, and from which Judge Englemayer would have been subject to *mandatory* recusal.[15]

## II.  PROCEDURAL HISTORY

On June 20, 2019, Magistrate Judge Sarah Netburn issued an arrest warrant based on a complaint charging bank fraud. *See United States v. Teman*, Case No. 19-MAG-5858. A- 46.2. On July 3, 2019, Teman was arrested pursuant to the warrant. *See United States v. Teman*, Case No. 1:19-mj-03082-JJO-1 (S.D. Fl.) On September 26, 2019, a grand jury returned a one-count indictment for bank fraud. A-49-A-52. On November 12, 2019, a grand jury returned a superseding indictment against Teman charging two counts of bank fraud and two counts of aggravated identity theft. A-96.1. Count 1 of the superseding indictment was dismissed by the trial court on December 20, 2019. A-97-A-120. On January 3, 2020, the United States Attorney for the Southern District filed a six-count superseding indictment charging two counts of bank fraud, two counts of wire fraud, and two counts of aggravated identity theft. A-121-A-128. On January 10, 2020, the Court held a pre-trial hearing at which various motions *in limine* were addressed. A-137.1-137.95. On January 14, 2020, the Government informed the trial court that it would not pursue counts 5 and 6 at trial. A-136.96. Following a five-day trial, on January 29, 2020 Teman was

---

[15] Recusal is discussed *infra* at 52-60.

convicted on all counts. A-1298.1-1298.2. The court granted bail pending appeal. A-1287-1294.

On February 26, 2020 Teman moved for an acquittal or, in the alternative, a new trial under Rule 29 and Rule 33. A-1437-1472. While the motion was pending, Teman filed a motion for a new trial on the basis of undisclosed *Brady* and *Jencks Act* material. A-1473-1497.

On June 5, 2020, the Court entered an order denying all of Appellant's post-trial motions and setting the case for sentencing. A-1937-2043. Sentencing was deferred on multiple occasions. A-2044, A-2107-2108, A-2111-2112.

On November 30, in anticipation of sentencing, Appellant informed the court that he had gathered the funds to pay the restitution amount calculated by the Probation Department of $259,988.17 but opposed the payment of forfeiture in addition to restitution. A-2113. At the same time, still encountering difficulties in calculating the precise amount of the BOA loss, the government notified the court that it intended to seek forfeiture for BOA in addition to the amount of restitution to be finally calculated. A-2114-2115.

On January 28, 2021, the Court entered an order seeking submissions on bail pending appeal and whether an award of forfeiture in addition to restitution was warranted. A-2170-2172. On April 23, 2021, the government filed its motion seeking restitution and forfeiture. A-2173-2180. In its motion, the government sought restitution

25

in the amount of $259,340.32 and forfeiture in the amount of $330,000. A-2179. At the same time, Teman informed the court that he would be seeking dismissal or vacatur of his conviction based on expert testimony to be provided by Professor Richard M. Fraher ("Fraher"). A-2195.1. On April 28, 2021, Teman then filed a Motion to Dismiss and a Motion for Vacatur and Bail Pending Appeal. A-2196-A-2222.

On May 5, 2020, ostensibly in response to Appellant's recent filings, the trial court disclosed for the first time its indirect interest in BOA through its ownership of stock of Berkshire Hathaway, approximately 11% of whose holdings are in BOA. A-2223-2224.[16] The court indicated that it believed recusal was not necessary in this circumstance under *United States v. Ravitch*, 421 F.2d 1196, 1205 (2d Cir. 1970). However, the Court did not disclose the extent of its interest in BOA, which appears to be close to $2,000,000.[17]

On May 12, 2021, Teman filed the Declaration of Richard M. Fraher (the "Fraher Dec'l"). A-2226-2235. Fraher opined that, contrary to Finnocchiaro's sworn testimony at trial, BOA had remedies that would enable it to reach the funds in Teman's personal, Friend or Fraud, or Touchless accounts. A-2232. Teman also moved for Judge Englemayer's recusal. Dkt. 230. On July 9, 2021, the Court denied Teman's motions and set sentencing for July 28, 2021. A-2247-2315. At sentencing,

---

[16] *See infra* at 52 and Note 30.

[17] *See infra* at 53.

26

Teman was ordered to pay restitution to BOA of $259,340.32, incur a forfeiture penalty of $330,000, and serve a year and a day in prison. A-2425-2430.

Recently, Teman filed an emergency motion with Judge Englemayer for the unsealing of certain portions of the January 10, 2020 hearing. A-2476-2478. This motion was granted on April 21, 2022. A-2483

## POINT I
## VENUE WAS IMPROPER
## IN THE SOUTHERN DISTRICT OF NEW YORK

The Constitution restricts criminal prosecutions to the judicial district(s) in which the charged crimes were allegedly committed. Thus, the Sixth Amendment guarantees a criminal defendant the right to be tried in the "district wherein the crime shall have been committed." Likewise, Article III, § 2, cl. 3 provides that "Trial of all Crimes … shall be held in the State where the said Crimes shall have been committed." *See United States v. Cabrales*, 524 U.S. 1, 6 (1998) ("the Constitution twice safeguards the defendant's venue right."). Accordingly, a defendant may only be tried in a district where the alleged crime "was begun, continued, or completed." 18 U.S.C. § 3237(a). Applying these principles here, Teman's convictions must be vacated as his alleged fraudulent conduct with respect to Counts I and III, from beginning to end, occurred entirely within Florida, and there was no competent evidence that any conduct relating to Counts II and IV, or *in furtherance of* any of

27

the charges on any count, took place outside of Florida, much less in the Southern District of New York.

## I.    FACTS

Counts One and Three charged Teman with committing bank fraud and wire fraud "from at least in or about April 2019 up to and including at least in or about June 2019, in the Southern District of New York and elsewhere." At Teman's arraignment, Judge Engelmayer raised the apparent lack of a sufficient nexus with the Southern District of New York, warning the government, "you should make sure that legally you're on sound footing contending that the New York activity, after the deposit of the fraudulent checks, is a necessary component or a component of the bank fraud here." A-70.

For the April checks, it was undisputed that Teman deposited them in person at a bank in Miami Beach, Florida. *See*, *e.g.* A-407, A-409. The only evidence connecting these checks to New York was the testimony of a Signature employee, John Motto. As Motto explained, the Manhattan-based third-party team of six used by Signature reviews checks which come in for payment does so only *after* the money has left its customer's account. *See* A-789, A-804-805, A-807. Occasionally, the review team routes a check to the branch where the customer's account is located for further review. A-814, A-816. Signature has 30 locations, so a check could be sent to any of these locations. A-816. If the branch determines that the check should

28

be rejected, it informs the central review team in Manhattan. A-818. There was no direct testimony as to any fraud review relating to the 24 ABJ checks totaling $264,000 drawn on ABJ's JP Morgan account.[18]

For the March checks, it was undisputed that the checks were deposited via a mobile telephone application. A-335-336. However, the only evidence connecting the checks to the Southern District of New York was the testimony of Finocchiaro that BOA had recorded an Internet protocol (IP) number or address associated with the mobile deposits. A-338. Finnochiaro did not describe BOA's internal network routing protocol or otherwise provide competent testimony that an IP address in BOA's network logs proves a defendant's physical location. Every communication over the Internet has two IP addresses, the address of the sender and the address of the recipient. *See, e.g.*, *White Buffalo Ventures, LLC v. Univ. of Texas at Austin*, 420 F.3d 366, 369 and Note 6 (5th Cir. 2005).

But Finocchiaro did not provide the IP address of the sender and recipient of the mobile deposits. She only provided a single IP address, which could have been *either* the network address associated with Teman's mobile phone *or* the network

---

[18] Despite the Government's reliance on Motto's testimony, none of the April checks was actually reviewed by Motto's team, which only reviewed checks *after* they had been paid. A-790:18-19. The three Gabay checks deposited on April 19 were never paid because the account had been closed. The ABJ checks were apparently reviewed in Texas. *See* A-1678. The affidavit of loss form was to be sent to a JP Morgan Ohio branch. *See* A-1902-1903.

address associated with a BOA computer to which his mobile communication was routed. Moreover, the Court can take judicial notice of the fact that IP address Finocchiaro did provide, 74.203.64.198, is administered by an entity known as "Level 3."[19] Level 3, in turn, provides wireline (*i.e.*, fixed, not mobile) telecom services.[20] Thus, the IP address given by Finnochario appears to be the IP address of a *bank* computer to which certain communications are routed, not the physical address of Teman's mobile phone. No expert testimony was provided that the logging of a customer device in Manhattan – which could have been routed from other boroughs or even from outside New York State – means the customer was physically in Manhattan.

## II.   <u>STANDARD OF REVIEW</u>

This Court reviews *de novo* a trial court's determination that venue was proper. *United States v. Kirk Tang Yuk*, 885 F.3d 57, 71 (2d Cir. 2018). A federal prosecution may be brought "in any district in which [an] offense was begun, continued, or completed." 18 U.S.C. § 3237(a). In *United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003), this Court held that venue is proper where "(1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in

---

[19] https://search.arin.net/rdap/?query=74.203.64.198

[20] https://www.bloomberg.com/profile/company/1552993D:US

the district of venue." *Id.* at 483.  Thus, under either of these alternatives, there must first be an act, in the district of prosecution, that *furthers* the offense. Judge Englemeyer found that venue was proper in denying Teman's motion to dismiss for improper venue at the close of the Government's case and his post-trial Rule 29 motion. A-859-864 and A-1984-2003.

### III.   **ARGUMENT**

####   A.   **The Government Failed to Prove that Teman Began, Continued, Completed, or Took Action in Furtherance of, Any Alleged Fraud in the Southern District.**

The evidence was insufficient to establish venue in the Southern District of New York because the government failed to prove that Teman began, continued, or completed a fraud in the Southern District. To the contrary, the alleged frauds were completed when Teman deposited the checks at the BOA branch in Florida or made his mobile deposits from an undisclosed location.

 "The crime of bank fraud is complete when the defendant places the bank at a risk of financial loss, and not necessarily when the loss itself occurs." *United States v. Anderson*, 188 F.3d 886, 888 (7th Cir. 1999). Thus, as Judge Engelmayer correctly observed, bank fraud is complete *at the time of the deposit.  See* A-1966; *see also United States v. Greenidge*, 495 F.3d 85, 101 (3d Cir. 2007) ("[W]e conclude that the conspiracy to commit bank fraud was 'executed' when the check was deposited."); *United States v. Thomas*, 315 F. App'x 828, 838 (11th Cir. 2009)

31

("[B]ank fraud was complete at the time that checks were deposited into the bank accounts.").

To apply these principles here is to recognize that the bank fraud was complete when Teman deposited the checks, because that is when the banks involved (Signature, JP Morgan and BOA) incurred the "risk of financial loss." *See Anderson*, 188 F.3d at 888.

Judge Englemayer held, however, that the alleged fraud was complete only when the checks *cleared*—a conclusion for which the court cited no authority. *See* A-1998.[21] In the court's view, in order for Teman "[t]o obtain the money he sought, it was necessary for Teman to deceive both [sic] banks." *Id.*[22] However, this ignores the authority cited above (and by Judge Engelmayer) which clearly holds that bank fraud is complete upon the making of a fraudulent *deposit*. Indeed, Motto from Signature testified that prior to the bank conducting its fraud review, the *funds had already left the depositing customer's account*. A-807. Thus, the creation of a risk of loss—the essence of the alleged crime—had already occurred by then. The district court not only failed to heed this authority and evidence, but illogically made the *completion* of the alleged crime dependent on acts *not* perpetrated by the alleged

---

[21] Contrary to Judge Englemayer's statement, there was no fraud review during the pendency of the 7-day hold. *See supra* at 29 and Note 18. The 518 W. 204 LLC account had been closed and the three checks drawn on this account were returned uncashed. *See supra* at 11.

[22] There were three banks involved, Signature, JP Morgan and BOA.

defendant, and instead on the subsequent acts of *victims* over which those charged have no authority or control.

Even assuming, *arguendo*, that the bank fraud was not complete until the checks *cleared* as opposed to when they were deposited, Signature's fraud review can still not be treated as an act in furtherance of the fraud. Judge Englemayer correctly recognized that Signature's internal wiring of the checks to itself in New York could not supply a basis for venue unless that conduct was "in furtherance of the charged offense." A-1998. However, he failed to explain how actions taken solely by the bank, designed to *prevent* unauthorized checks from being paid, was "in furtherance" of any alleged criminal acts by Teman. Although the district court claimed that the fraud review was part of the alleged crime because Teman needed the checks to pass the review for the funds to be released, *id.*, any acts that were designed to pass that review and were thus in "furtherance" of the alleged crime took place in Florida or outside Manhattan when Teman *created* the checks. In contrast, Signature's wiring of check images to itself and its examination of them did not *further* Teman's purportedly fraudulent conduct, and instead was for the opposite purpose. [23]

---

[23] As to JP Morgan, any fraud review would have occurred in Texas or Ohio. *See supra* at 29 and Note 18.

The conclusion that this conduct does not "further" criminal activity is reinforced by the cases that interpret the co-conspirator hearsay exception, where such statements must have been "in furtherance" of the conspiracy to be admissible. In those cases, courts have held that only statements which help *achieve* the conspiracy's goals should be treated as furthering the alleged crime, and those that are made for another purpose are not admissible. *See*, *e.g. United States v. Diaz*, 176 F.3d 52, 85 (2d Cir. 1999); *accord United States v. Saneaux*, 365 F. Supp. 2d 493, 501 (S.D.N.Y. 2005).

The "in furtherance" requirement has this common meaning in the venue context. For example, in *United States v. Davis*, 689 F.3d 179 (2nd Cir. 2012), this Court found venue proper based on acts "in furtherance" of a robbery where the defendant called someone in the district and that person continued to make calls from the district to find others willing to assist with the robbery. *Id.* at 190. The Court reasoned that the defendant had "entered" the venue by telephone to seek assistance accomplishing his crime. *Id.* Here, by contrast, Signature's review of the checks did not further any fraud, but rather, furthered an effort *to detect and prevent fraud*. Accordingly, Signature's review cannot provide a basis for venue.

For similar reasons, there was no venue for the wire fraud counts. The images were not wired to Signature "for *the purpose of executing*" the scheme, 18 U.S.C. § 1343, but to prevent theft. Moreover, with respect to the mobile deposits, no

34

evidence was given that the alleged fraud made use of *interstate* means of communication. The Government did not provide *any* competent evidence on the location of the mobile deposits.

> ` **B.** **Teman Could Not Have Foreseen That the Bank Review Would Take Place in the Southern District**

Even if Signature's fraud review in the Southern District was in furtherance of Teman's alleged criminal conduct, it was not *foreseeable to Teman* that the review would happen in the Southern District. Judge Engelmayer posited that Teman foresaw Signature's fraud review in New York because there had been a chargeback on the checks Teman had deposited the prior month. A-1999. However, even if the prior chargeback made it foreseeable to Teman that a review would occur, the venue issue was whether he should have foreseen that such a review would occur in the Southern District. *See*, *e.g United States v. Lange*, 834 F.3d 58, 70 (2d Cir. 2016) (to establish venue it must be "foreseeable [to the defendant] that such an act would occur *in the district*"); *Davis*, 689 F.3d at 186 (government must prove that the act's occurrence in the district of venue would have been reasonably foreseeable to the defendant).

But there was no such evidence. That the checks bore a Manhattan address for Signature or JP Morgan does not change this conclusion. Signature has branches throughout multiple states and districts – and thus its checks bear addresses throughout those states. Moreover, the executive account manager for fraud review

operations has offices in both Manhattan and New Jersey A-664, A-665:1-2, 18-19. Even the location of its central operations in Manhattan has nothing to do with its maintenance of branches in multiple districts and states. In other words, the location of a particular branch in Manhattan does not make it foreseeable that Signature conducts fraud review operations in the same state or district as that branch. In addition, the Government provided no testimony that Teman had any knowledge that Signature centralizes fraud review through a Manhattan-based third-party called "Oasis". A-788-A-789. There was no reason that Teman should or would have known that any fraud review would be outsourced to a team located in the Southern District, just because the check bore the address of a Manhattan branch. Signature could have just as easily contracted with a fraud review team located in a different district or even a different country.[24] In addition, the location of the third-party fraud review team for Signature was irrelevant to the venue issue relating to JP Morgan— the bank on whom the ABJ checks were drawn.

In sum, venue in the Southern District for these counts was improperly based on conduct by the victim whose purpose was not to further the offense but instead

---

[24] JP Morgan appears to operate its fraud review in Ohio and Texas. *See supra* at 29 and Note 18. The Court can take judicial notice that other large banks New York banks outsource fraud review to jurisdictions such as India. *See* Outsourced-service-providers.pdf (citibank.co.in).

to try to prevent it—and which review process in the Southern District was not foreseeable to Teman.

**POINT II**
**THE INDICTMENT, WHICH SPECIFICALLY ALLEGED**
**THAT THE ALLEGED FRAUDS WERE COMMITTED BY THE**
**CREATION AND DEPOSITING OF "COUNTERFEIT" CHECKS, WAS**
**CONSTRUCTIVELY AMENDED BY THE COURT'S INSTRUCTIONS**
**PERMITTING CONVICTION ON PROOF THE CHECKS WERE**
**MERELY UNAUTHORIZED.**

The Fifth Amendment provides that no person may be tried for a felony "unless on a presentment or indictment of a grand jury." That fundamental precept was violated here. Ari Teman was charged by indictment with committing fraud by knowingly depositing *counterfeit* checks. He was tried and convicted for committing fraud by knowingly depositing *unauthorized* checks – without any proof of a true act of counterfeiting. For this reason, the conviction must be vacated.

## I.    <u>FACTS</u>

The trial proceeded consistent with the government and the court's position that "counterfeiting" means in the "vernacular" sense, that "the defendant created these checks and that they were unauthorized by the account holder." A-1023. To that end, the government primarily relied on customer testimony that they had not authorized Teman to use RCCs, and photographs of the checks themselves, which, the government claimed, contained errors such as misspellings of the customers'

37

names, incorrect addresses, and out-of-sequence checks. The government presented no evidence that the RCCs purported to be anything other than what they were – checks created by Teman on his customers' accounts.

Although not necessary to a finding of constructive amendment, the defense offered significant evidence that the checks were exactly what they purported to be – RCCs – and were treated as such by the banks. Among other things, the instruments forthrightly revealed that they (i) were remotely created, (ii) drawn on customer accounts, (iii) based on contracts between GateGuard and the customers (and the checks expressly stating "DRAW PER CONTRACT.   NO SIGNATURE REQUIRED"). The Government's central bank witness at trial confirmed that the checks were remotely created checks.  A-384. They were not created to look like the customers' own checks, or to create a false impression that the customers had signed them.

Although the Indictment accused Teman of committing fraud by depositing "counterfeit" checks drawn on his customers' accounts, the court simply instructed the jury that Teman was charged with "creating, and then making the false pretense and representation to the bank that [Teman] had the account holders' authority to deposit [the] checks," A-1358-1359; A-1367; A-1210. And the jury convicted on that basis.

38

After the verdict, Teman made a Rule 29 motion to vacate the conviction on the basis that the Indictment was constructively amended at trial. Judge Engelmayer denied the motion. A-1937. He recognized that a constructive amendment occurs when "the trial evidence or jury instructions 'so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment.'" A-1956-1957 (quoting *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) (additional quotation omitted). However, he concluded that there was no constructive amendment because "the evidence at trial supported the core allegations in the Indictment (and later particulars) as to the dates, amounts, and payees of the checks, and that they had been drawn without customer authorization." A-1965.

## II.   STANDARD OF REVIEW

To establish a constructive amendment, a defendant must show that the trial evidence or jury instructions "so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Rigas,* 490 F.3d 208, 227 (2d Cir.2007) (internal quotation marks omitted). Even if an indictment might have been drawn in more general terms to encompass the ultimate conviction, where "only one particular kind of [criminal conduct] is charged . . . a conviction must rest on that charge and not another." *United States v. Zingaro,* 858 F.2d 94, 99 (2d

39

Cir.1988) (internal quotation marks omitted). Ultimately, whether an indictment has been constructively amended comes down to whether "the deviation between the facts alleged in the indictment and the proof [underlying the conviction] undercuts the constitutional requirements" of the Grand Jury Clause: allowing a defendant to prepare his defense and to avoid double jeopardy. *Rigas,* 490 F.3d at 228. *See United States v. Bastian*, 770 F.3d 212, 220–21 (2d Cir. 2014). The constructive amendment of an indictment is structural error and thus subject to *de novo* review. *See United States v. Dupre*, 462 F.3d 131, 140 (2d Cir. 2006) ("A constructive amendment of an indictment constitutes a *per se* violation of the Grand Jury Clause of the Fifth Amendment.").

## III.   LEGAL ARGUMENT

### A.   By Conflating Counterfeit Checks and Unauthorized Checks, The Court Constructively Amended the Indictment.

Here, Teman was charged with committing fraud through the use of "counterfeit checks." In holding that no constructive amendment had occurred, the district court relied on cases such as *United States v. Bastian*, 770 F.3d 212 92d Cir. 2014) and *United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012) for the proposition that no constructive amendment occurs so long as a defendant "has notice of the core of criminality alleged by the Government, is not taken by surprise at trial, and is not prosecuted later for the same offense," and that the government is not restricted to the "specific means" charged in the indictment. A-1963-1964.[25]

What the court ignored is that here, as preceded by a "to wit" clause, the allegation that Teman committed fraud by depositing counterfeit checks was the *only detail* alleged in the Indictment. That is, without the "to wit" clause, all Teman would

---

[25] The allegation regarding the counterfeit checks was contained in "to wit" clauses in the indictment. *See* Indictment. A-121-122. Some unreported decisions from this Circuit have held that "to wit" clauses are not binding and are not a "per se" bar on a conviction based on other details. *See*, *e.g. United States v. Klein*, 216 F. App'x 84, 87 (2d Cir. 2007); *accord United States v. Little*, 828 F. App'x 34, 38 (2d Cir. 2020). However, those cases do not hold that a "to wit" clause which contains *the only details* of an offense may be ignored, and, significantly, other circuits have held that "to wit" clauses *do become an essential part of the indictment which must be proven*. *See*, *e.g., United States v. Leichtnam*, 948 F.2d 370, 379 (7th Cir. 1991); *United States v. Weissman*, 899 F.2d 1111, 1112 (11th Cir. 1990); *United States v. Bishop*, 469 F.3d 896, 903(10th Cir. 2006); *United States v. Chambers*, 408 F.3d 237, 241 (5th Cir. 2005).

have had notice of is that he was charged with committing bank fraud and wire fraud "in or about March 2019" and "in or about April 2019 up to and including at least in or about June 2019." *See* Indictment. A-121-122.  Thus, the "to wit" clause which contains the charge that Teman obtained funds from his customers by depositing counterfeit checks is the *entire* "core of criminality" with which Teman was charged.

Similarly, the court ignored that once an indictment *does* specify the means by which the alleged crime was committed, a conviction may rest only upon those means and not any others. *See*, *e.g. United States v. Zingaro*, 858 F.2d 94, 99 (2d Cir. 1988); *accord United States v. Leichtnam*, 948 F.2d 370, 379 (7th Cir. 1991); *United States v. Farr*, 536 F.3d 1174, 1181 (10th Cir. 2008).

All charges upon which Teman was convicted rested on the indictment's allegations that he "deposited *counterfeit* checks." Whether the checks were counterfeit was not a peripheral issue but went to the essence of the charges. Counterfeit and unauthorized are distinct legal concepts. "Counterfeit, when used as an adjective - as it was in the indictment - has a clear and unambiguous meaning. Something is properly described as "counterfeit" when it is "made *in imitation of something else* with intent to deceive", that is "forged." Merriam Webster. Counterfeit and unauthorized are not synonymous. Indeed 18 U.S.C. § 1029 prescribes both the use of an "unauthorized" access device and the use of a "counterfeit" access device. This Court has held that these provisions are not

multiplicitous because "criminal use of a counterfeit device requires the forgery of a signature, while criminal use of an unauthorized device requires that the device be obtained in an improper manner." *See United States v. Gugino*, 860 F.2d 546, 550 (2d Cir. 1988). Thus, Teman proceeded with a defense that was premised on showing that the financial instruments he deposited were exactly what they purported to be—RCCs.

Although the government might not have been obligated to specify the type of instrument used to commit the alleged frauds, once it did so with its allegation of "counterfeit checks" it was bound to prove that type of instrument was in fact used—or amend the indictment. *See*, *e.g., United States v. Stirone*, 361 U.S. 212, 218 (1960); *Zingaro*, 858 F.2d at 102-03 (reversing due to constructive amendment where defendant was convicted based on debt collection regarding loan not charged in indictment). By instead allowing the government to proceed against Teman and obtain a conviction on evidence that he deposited financial instruments which were exactly what they purported to be – RCCs – but were allegedly unauthorized, Judge Englemayer constructively amended the indictment and infringed Teman's Fifth Amendment rights. Accordingly, the convictions must be reversed.

43

## POINT III
## TEMAN DID NOT RECEIVE THE EFFECTIVE
## ASSISTANCE OF COUNSEL

Trial's counsel decision to call Ariel Reinitz as a defense witness was catastrophic and virtually guaranteed a conviction in a case where the jury could easily have voted to acquit. Reinitz was the only defense witness.[26]

## I.      FACTS

On direct examination, Reinitz testified that he had expressly advised Teman orally that his use of RCC's to collect payments due from Coney, 18 Mercer and ABJ was legal. A-1058:2-5. However, contemporaneously with his oral advice, Reinitz authored a series of inflammatory text messages. On April 2, Reinitz wrote that "hitting" ABJ's account "out of the blue" would create "50/50" risk ABJ would "call the cops." A-1876.[27] Reinitz warned Teman in a text message, "you will be arrested." A-1872.

Any reasonably competent attorney would have known that Reinitz' text messages – none of which would have been available to the government but for counsel's decision to advance the advice of counsel defense and which were not

---

[26] By calling Reinitz, counsel waived attorney-client privilege with respect to Teman's oral and written communications at issue, including the text messages discussed below.

[27] As noted above, Teman in fact invoiced ABJ for amounts due well in advance of his deposit of the RCC's. *See supra* at 20.

44

necessary to establish Teman's good faith – would deal a death blow to the defense. The text messages placed Reinitz' explosive and unforgettable language front and center of an otherwise weak prosecution case, in which the Government did not present any evidence of contract terms that would have prohibited the use of RCC's to collect customer debts and key witnesses did not know or could not recall whether they had reviewed payment terms authorizing the use of RCC's of which they were on at the very least constructive notice.

Calling Reinitz completely undermined Teman's defense. Whatever arguments Teman had intended to make were destroyed by Reinitiz' text messages, in an inevitable cross-examination slaughter. The prosecution had to do no more than put up on the screen for the jury the simple exchanges between Teman and Reinitz – language that stood in stark contrast to the Government's confusing and in spots incomprehensible case, such as its use of the BOA account spreadsheet – and get Reinitz to confirm the words he used.

> MR. BHATIA: I would like to go back to the Elmo device.
> Q. This is Government Exhibit 704 up here.
> You wrote that: "If you are hitting their accounts Out of the blue, ***I expect this will become a criminal matter*** sooner or later." That's what you told Mr. Teman, right?
> A. That's what I wrote, yes.

A-963:15-22; A-1875 (emphasis added).

And again:

45

> MR. BHATTIA: He's referencing a contract when he's talking to you?
> A: Yes.
> Q: Any you say, a few lines down*, because they are likely to call the police*.
> Those are your words, right?
> A: Yup.
> Q: You told him you thought customers were likely to call the police?
> A: Yes.
> Q: *And you said: And you will be arrested*. Right?
> A: Mm-hmm. Yes.

A-1032:13-24; A-1872 (emphasis added).

Even on a cold, appellate record, the "bombshell" nature of the text messages and the electric effect they produced on the jury can be felt. The case was effectively over. Teman was relying on someone who told him he would likely be arrested and face criminal charges. A first-year law student could have seen that the defense would not be able to overcome the toxic effect of the text messages.

## II.   STANDARD OF REVIEW

The Court reviews ineffective assistance claims *de novo*. *United States v. Kaid*, 502 F.3d 43, 45 (2d Cir. 2007). As a rule, "To succeed on an ineffective assistance claim, a defendant must demonstrate, first, that in light of all the circumstances, the acts or omissions of trial counsel were outside the wide range of professionally competent assistance and, second, that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Nolan*, 956 F.3d 71, 79 (2d Cir. 2020) (citing *Strickland v. Washington*, 466 U.S. 668, 690, 694 (1984) (internal quotation

46

marks omitted). Moreover, even a single error by counsel can result in a finding of ineffectiveness. *See Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986).

## III.   **LEGAL ARGUMENT**

It is hard to imagine how counsel could have called Reinitz without recognizing that the jury would view the texts as proof-positive of criminal intent. Reinitz's testimony largely relied on oral advice he stated he had given Teman and there was no clear written legal opinion the defense could walk through Reinitz. To the contrary, disaster was inevitable, as the documents sounded a shrill alarm that the police would likely come and arrest Teman for depositing the RCC's. Counsel could have done no worse had he introduced his client's confessional.

### A.   **Trial Counsel's Decisions Were Outside the Range of Professionally Competent Assistance.**

Counsel's unjustifiable decision to call Reinitz as a defense witness, and thereby cause the introduction of harmful evidence that would otherwise been shielded from the jury, is a classic form of ineffectiveness that has led courts to overturn convictions. *See Wilson v. Mazzuca*, 570 F.3d 490, 505 (2d Cir. 2009) (finding counsel ineffective for calling witness that opened the door to the inevitable introduction of devastating evidence); *Rickman v. Bell*, 131 F.3d 1150, 1159 (6th Cir. 1997) (granting habeas where "the most damaging images of Rickman came from his own attorney," who effectively functioned as a "second prosecutor"); *Swaby v.*

47

*People,* No. 06-CV-3845 ENV, 2014 WL 1347204, at *13 (E.D.N.Y. Mar. 31, 2014) (counsel's "inquiry of [his own witness] cannot be seen as anything other than a significant blunder" where it opened the door to damning evidence); *State v. Saunders*, 958 P.2d 364, 367 (Wash. Ct. App. 1998) (finding ineffectiveness on direct appeal where counsel elicited otherwise inadmissible and damaging testimony).[28]

In sum, the trial record firmly established that "the acts . . . of trial counsel were outside the wide range of professionally competent assistance," *Nolan*, 956 F.3d at 79, and thus counsel here denied Teman his constitutional right to effective representation.[29]

---

[28] Moreover, Judge Englemayer knew that Teman was suffering from a grave mental illness, which prevented a meaningful allocution as to whether Teman understood the consequences of calling Reinitz as a witness. *See* A137.2-137.4.

[29] In granting bail pending appeal, Judge Engelmayer necessarily found that Teman had raised a substantial question on *Strickland*'s performance prong. Although he signaled that *he* might be disinclined to vacate the conviction, he recognized that "*another judge* could look at the decision to call a lawyer, knowing that those text messages would sail in, as beneath a standard of professional competence and producing error." A-2449 (emphasis added).

### B. Counsel's Ineffectiveness Prejudiced Teman

#### 1. Reinitz' testimony was toxic evidence virtually assuring a conviction.

Given the evidence of Teman's good faith that counsel had established in cross-examining the government's witnesses, the fundamentally commercial and civil nature of the dispute between Teman and his customers, the Government's reliance on witnesses who "could not recall" or deliberately chose not to review payment terms that expressly authorized the RCC's at issue, and the government's confused, meandering case that was virtually impossible to follow in key spots, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Nolan*, 956 F.3d 71 at 79.

Until counsel called Reinitz to testify, the jury could have found reasonable doubt that Teman was guilty of fraud based on, among other things, evidence (i) Teman was transparent in his dealings with BOA, using his regular branch and accounts; (ii) the RCC's provided sufficient information to allow both the depository and payor banks to confirm that they were authorized; (iii) Teman repeatedly directed his clients to review GateGuard's Terms and Conditions, which, in fact, they commented on and even negotiated by red-lining; (iv) Teman attempted to resolve fee disputes before he deposited the RCC's; (v) the customers had a strong incentive to deny authorization so they could claw back the funds from their banks; (vi) relatedly, one of the customers who paid a GateGuard invoice failed to appear

49

at trial and provided a false affidavit stating he was unfamiliar with GateGuard; (vii) the customers' credibility was sharply contested at trial; (viii) Teman invoiced his clients for amounts due before using RCCs; (ix) Teman repeatedly warned his customers about their liability for fees; and (x) the Government produced no evidence that contradicted Teman's right to use RCC's to collect customer debts.

Reinitz's testimony gutted the defense case. As Judge Engelmayer aptly noted, Reinitz was "an extremely important witness." A-969. Not surprisingly, the government was on-board with that characterization, and exploited Reinitz's testimony to its full advantage. In his initial summation, the prosecutor referenced Reinitz 24 times—on eight of the 34 transcript pages, hammering away at Reinitz' damaging text messages. *See, e.g.*, A-1137-1143. To sear the Reinitz text messages into the jury's minds, the PowerPoint presentation that accompanied the summation concluded with six consecutive slides displaying Reinitz's explosive text messages blown up on the screen for dramatic effect. A-1429-A1434.

On his rebuttal summation, the prosecutor went all-in. He referred to Reinitz on *every page* of the transcript. *And he did not mention any other witness*. The prosecutor also told the jury that Reinitz was "by far[] the least credible witness you heard from during this trial"; a witness who "got paid from the defendant's fraud scheme" and who was "essentially a member of the defense" team. Finally, the jury requested a readback of Reinitz's entire testimony (it only asked for a readback of

50

one other witness's testimony and, as noted, it decided not to review BOA's more complicated numbers). Evidently, it, too, viewed Reinitz's testimony as critical, if not dispositive.

Counsel's decision to call Reinitz as a defense witness transcended unsound strategy—it was inexplicably misconceived and disastrously executed. Had the defense stopped when the government rested, the jury may well have acquitted. By calling Reinitz, however, counsel all but assured a conviction. For that reason, counsel was ineffective, and the conviction should be set aside.

## POINT IV
## TEMAN'S CONVICTIONS MUST BE REVERSED BECAUSE OF REPEATED, FUNDAMENTAL VIOLATIONS OF HIS DUE PROCESS RIGHTS.

Under the Constitution, a criminal defendant has a right to fundamental guarantees of due process that include the right to trial by an impartial tribunal, free of prosecutorial misconduct, with jury instructions that permit conviction or acquittal based on the actual conduct of defendant. Error in any one of these areas provides a basis for reversal, but where, as here, there was error on all these fronts, Teman's conviction must be reversed.

**I.**   **JUDGE ENGLEMAYER HAD A DUTY TO RECUSE HIMSELF BECAUSE OF HIS SUBSTANTIAL INTEREST IN BOA.**

**A.**   **Facts**

On May 5, 2020, ostensibly in response to Teman's post-trial filings, the trial court disclosed for the first time its indirect interest in BOA stock through its ownership of stock of Berkshire Hathaway, over 10% of whose holdings are in BOA. *See supra* at 26. Judge Englemayer did not disclose at this time, or any other time during the proceedings, the extent of his interest in BOA, which is very substantial.[30] This Court can take judicial notice that in connection with his confirmation to the Southern District of New York in 2011, Judge Englemayer disclosed beneficial family ownership of $5.2 million in Berkshire Hathaway stock.[31] Berkshire Hathaway's value has increased substantially since 2011 and the Court's most recent available financial disclosure lists Berkshire Hathaway holdings in a range of $5-

---

[30] The relative weight of BOA in the Berkshire Hathaway portfolio appears to have remained constant. In recusing himself from *In re Interest Swaps Antitrust Litigation*, 16-MD-2704, *Dkt. 884, see infra* at 58, Judge Englemayer stated that his decision was triggered by BOA crossing a 10% threshold in the Berkshire Hathaway portfolio. The most recently available public information indicates that BOA constitutes approximately 11% of the Berkshire Hathaway portfolio. https://www.cnbc.com/berkshire-hathaway-portfolio/.

[31] https://legaltimes.typepad.com/blt/2011/02/new-york-judicial-nominees-report-income.html.

$25 million.[32] From 2011, Berkshire Hathaway stock had increased by nearly 300% by trial and nearly 400% by sentencing.[33] BOA stock during this period followed a similar trajectory. *See* https://finance.yahoo.com/quote/BAC/. Judge Englemayer's interest thus had a value during the relevant period in excess of $1.5 million and likely in excess of $2 million. In absolute terms, these are very substantial numbers.

After the trial was over, Teman's new counsel filed a motion for dismissal based on proposed expert testimony countering Finnochiaro's conclusions that BOA could not reach the accounts of GateGuard affiliates to limit its losses. A-2208. In response, Judge Englemayer finally disclosed that he had an interest in BOA. A-2223. Judge Englemayer asserted that this belated disclosure was made "in an excess of caution" because the defense had put at issue whether BOA would be entitled to restitution. *Id.* In finding that he was not subject to a conflict of interest that would require recusal, Judge Englemayer cited to *United States v. Ravitch*, 421 F.2d 1196, 1205 (2d Cir. 1970), a case involving a *de minimis* stock holding, but failed to reference *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 127 (2d Cir. 2003), a case in which the trial judge had a substantial interest in a subject bank involving an amount far less than Judge Englemayer's multi-million dollar interest.

---

[32] https://www.courtlistener.com/person/997/disclosure/29788/paul-adam-engelmayer/.

[33] https://finance.yahoo.com/quote/BRK-A?p=BRK-A&.tsrc=fin-srch

Judge Englemayer also failed to specify that he knew the government would likely be seeking restitution for BOA before the trial began, *see* A-96.20, A-157, or that the government formally declared BOA the victim on the second day of trial. A-662:18 (the "victim here is Bank of America"). Of course, Judge Englemayer knew that restitution for BOA in the event of a conviction was mandatory. *See United States v. Gushlak*, 728 F.3d 184, 190 (2d Cir. 2013)

## B. Standard of Review

The Second Circuit reviews a district court's decision to deny a recusal motion for abuse of discretion, *LoCascio v. United States*, 473 F.3d 493, 495 (2d Cir. 2007). However, when a judge has a substantial interest in an alleged victim of a crime, recusal is required.

The Due Process Clause of the Fourteenth Amendment "establishes a constitutional floor, not a uniform standard . . . But the floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997).

The Committee on Codes of Conduct of the Judicial Conference of the United States [the "Judicial Code of Conduct"], Advisory Opinion No. 57 (December 2017) (the "Advisory Opinion") states:

> Canon 3C(1) of the Code of Conduct for United States Judges provides that:
> (1) A judge **shall disqualify** himself [if] (c) *the judge* knows that the judge,

54

individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, *has a financial interest in the subject matter in controversy* or in a party to the proceeding, *or any other interest that could be affected substantially by the outcome* of the proceeding (emphasis added).

Under Canon 3C(3)(c), Judge Englemayer has a "financial interest" in BOA, as he recognized in recusing himself from *In re Interest Swaps Antitrust Litigation*, 16-MD-2704.[34]

The Second Circuit has elaborated on the principles that govern the recusal of a judge who has a financial interest in the victim of a crime:

> Thus, in assessing whether a judge's interest in a victim calls for recusal, there are three critical analytical factors: (1) the substantiality of the judge's interest; (2) the amount of restitution to be awarded; and (3) any other facts that would bear on the substantiality of the interest, such as the effect of a guilty verdict on the interests of the victim. The core inquiry is whether the judge's "impartiality might reasonably be questioned." *28 U.S.C. § 455(a)10.*

*United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992).

Here, there is no doubt that Judge Englemayer's undisclosed multi-million-dollar interest in BOA requires reversal for a new trial before an impartial judge.[35]

---

[34] Discussed *infra* at 58.

[35] Another SDNY Judge, Andrew Carter, recently recused himself from *U.S. v. Hwang*, 22-cr-240 because of his ownership of stock in JP Morgan, one of the victims in the case. *See* https://www.law360.com/articles/1495230/archegos-judge-backs-out-over-jpmorgan-stock-holdings (quoting Judge Carter as saying, "It's seems to me I need to recuse. I own JP Morgan stock.").

## C.    Argument

### 1.    BOA was the only alleged economic victim in the case, and, in a substantive sense, the real party in interest.

By the first day of trial, when the Court had heard testimony about the chargebacks to BOA and the loss suffered by BOA, Judge Englemayer was plainly aware that BOA was the alleged bank fraud victim to whom restitution would need to be paid in the event of a guilty verdict. A-662, A-663. Moreover, it was clear BOA *was the only party* that had suffered a loss. *See supra* at 23. *All* the other parties had been made whole, Teman's customers through their banks, Signature and JP Morgan through BOA. Only BOA was left with any out-of-pocket loss and only these losses were considered in assessing restitution, forfeiture, and jail time. Thus, in a fundamental economic sense, the trial was conducted and penalties assessed *for the benefit of BOA*, and BOA alone. In the event of a conviction, BOA would not only obtain restitution of funds it would otherwise need to expend its own resources to recover in civil court; it would also establish the principle of using the resources of the Department of Justice to externalize chargeback collection costs, with potentially enormous savings.[36] The substantiality of Judge

---

[36] The Court can take judicial notice that in a recent year, chargebacks cost banks approximately $31 billion.
https://www.finextra.com/pressarticle/73874/consumer-disputes-and-chargebacks-created-31-billion-in-financial-losses-in-2017

Englemayer's interest needs to be weighed *qualitatively* against the importance of the trial to the portfolio company in which he owned an interest.

### 2. The size of Judge Englemayer's interest in BOA is substantial.

Judge Englemayer's interest in BOA was substantial for a separate, *quantitative reason*. Judge Englemayer's interest in BOA *is over 100 times as large* as the interest at issue in *Ravitch*, making the reference to *Ravitch* misleading and unpersuasive. In *Ravitch*, the Second Circuit upheld a trial judge's refusal to recuse himself where his ownership of $10,000-$15,000 worth of shares representing .0072% of the bank's shares did not amount to a "substantial interest" 28 U.S.C. § 455. The facts could not be more different here.

In fact, Judge Englemayer's interest in BOA is almost *10 times the size* of Judge Pollack's bank stock ownership in *Chase Manhattan*, where this Court rightly expressed concern about the appearance of partiality. As the Court stated, "we are equally confident that Congress was right in apprehending that a headline (accurately) stating that the judge had entered a $92 million judgment to be shared by a corporation in which he owned $250,000 of stock would damage public confidence in the judiciary." *Chase Manhattan*, 343 F.3d at 129. Here a headline stating that the judge had entered a *quarter of a million-dollar* restitution judgment to benefit a bank in which he held an interest worth nearly *ten times* the amount of the bank's loss would equally damage public confidence in the judiciary.

57

The key question in all recusal cases is whether a reasonable person fully aware of all relevant facts would believe there was bias or the appearance of bias. Defendants – and the judicial system as a whole – need a trial free from even the appearance of partiality. *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 127 (2d Cir. 2003) (appearance of partiality requires "objective" evaluation and disqualification of judge and reversal of all decisions taken after conflict became apparent).

### 3. <u>Judge Englemayer's disclosure was untimely and inadequate.</u>

Perhaps the most troubling aspect of Judge Englemayer's approach was the timing and nature of his disclosures. It was evident from well before the trial began that BOA was the real economic victim alleged in the case. A-96.20. Moreover, Judge Englemayer's had just recused himself in another case involving BOA. In that case, *In re Interest Swaps Antitrust Litigation*, 16-MD-2704, Dkt. 844, Judge Englemayer stated that he had consulted with the Committee on Codes of Conduct of the Judicial Conference of the United States and had concluded that because BOA had crossed the 10% threshold in the Berkshire Hathaway portfolio, his "impartiality in supervising the case could otherwise reasonably be questioned." As a result, it was with "great regret" that Judge Englemayer recused himself from the case.

Yet in the Teman matter, coming shortly after his "careful consideration" of the conflict posed by his interest in BOA, he was presiding over a criminal case in which BOA was not simply one party among many, but the *only* economic victim—and yet he did not even raise the issue with the defense until *17 months after* the trial had concluded. Judge Englemayer claimed to have waited this long on the grounds that Teman was only then challenging BOA's right to restitution. A-2223. But it is obvious that Judge Englemayer had the exact same duty to disclose his interest in BOA at the beginning of the trial as he did 17 months later. Potential conflicts with respect to BOA were of clear concern to the defense, as evidenced in their proposed questions for jury *voir dire*, notably the following question: "Does any member of the panel have any ownership (for example, stock) in any bank or financial institution such as Bank of America?" A-135. It defies logic and common sense to believe that a potential juror with a financial interest in BOA would be unable to fairly sit in judgment over Teman, while the presiding judge could hold a multi-million-dollar interest in the same bank without conflict.

Moreover, failing to provide a defendant with an opportunity to object to a judge's potential conflict constitutes a violation of defendant's due process rights that requires reversal. *Evitts v. Lucey*, 469 U.S. 387, 402 (1985) (failure to provide adequate opportunity to present claims violates due process); *see also Church v. Sullivan*, 942 F.2d 1501, 1512 (10th Cir. 1991) (failure to apprise defendant of

59

conflict before trial requires remand). And when Judge Englemayer did finally disclose his interest, he failed to provide any indication of the magnitude of the interest, instead suggesting misleadingly that the interest was *de minimis* when it was in fact amounted to several millions of dollars. The substantiality of Judge Englemayer's interest and his failure to provide the defense with a timely and meaningful opportunity to object to his potential conflict require reversal.

## II. JUDGE ENGLEMAYER DISPLAYED IMPERMISSIBLE BIAS AGAINST TEMAN.

### A. Facts.

Throughout the trial, Judge Englemayer made numerous adverse decisions that were devastating to Teman's fundamental rights. *First*, As discussed, Judge Englemayer failed to raise a conflict of interest with BOA until well over a year after the trial had concluded, depriving Teman of the opportunity to be tried before an impartial tribunal.

*Second*, Judge Englemayer did not apply the law equally to the prosecution and the defense. Judge Englemayer intervened *sua sponte* during the defense cross-examination of Soleimani to prohibit the defense from introducing an email establishing that Soleimani had been explicitly directed to the Terms and Conditions and Payment Terms authorizing the use of RCC's to cover a device removal fee because the defense did not have the invoice referred to in the email. A-743. Yet Judge Englemayer permitted the Government to introduce the GateGuard Terms and

60

Conditions without introducing the explicitly referenced Payment Terms going to the heart of the case and that the Government should have been required to produce as part of its affirmative case—Teman's right to use RCC's to cover an $18,000 device removal fee. During the Reinitz cross-examination, Judge Englemayer repeatedly intervened to "control" the witness for the prosecution, demanding the Reinitz give yes/no answers. *See, e.g.*, A-930 ("it's a yes or no question"). Yet when a government witness rambled evasively on cross-examination and the defense attempted to limit her answers, Judge Englemayer sharply intervened "let the witness finish," leaving no doubt in the jury's mind that the judge had picked a side in the trial. A-587:20. When the defense sought to introduce expert testimony on the validity of RCC's, Judge Englemayer dismissed the request on the grounds expert testimony would "confuse the jury." A-173.39. But when the Government expanded Finnochiaro's testimony far beyond the fact testimony for which she was called as a witness, to present a legal conclusion as to the bank's rights of "set-off" and the network routing protocol of mobile devices connecting to the BOA servers, Judge Englemayer overruled all objections. A-137.35, A-2303. At the conclusion of the trial, Judge Englemayer listened silently as the prosecution in summation repeated over and over that the checks at issue were "fake" after refusing to allow the defense to introduce expert testimony as to genuineness of Teman's RCC's. A-137.39; A-137.41.

61

*Third*, Judge Englemayer failed to conduct a *Curcio* hearing affecting Teman's constitutional rights in a timely manner. On November 1, 2020, Noam Biale and Justine Harris of the Sher Tremonte firm entered an appearance and immediately filed a motion for additional discovery. A-2108.1, A-2108.2. The motion referenced communications between the Government and Sher Tremonte that had been ongoing for some time. A-2108.4. Yet Judge Englemayer did not raise any issue with Teman's representation by Biale in considering and then *ruling against* Teman on the motion. A-2109. However, *after* he had decided the motion, on December 1, 2020, during a remote sentencing conference, Judge Englemayer disclosed that he knew well both Mr. Biale, and Mr. Biale's wife, Ms. Graham, who worked in the United States Attorney's office for the Southern District. A-2132-2133. Judge Englemayer stated on the record that ensuring a defendant had non-conflicted counsel *before* any decisions were taken against him was "pivotally important" under *United States v. Curcio*, 680 F.2d 881, 888-890 (2d Cir. 1982). A-2138. The Court appeared to ignore the fact it had *already* ruled on a motion by conflicted counsel. A-2109. Moreover, Teman's thoughts, suggestions and knowledge of the case had *already* been shared with conflicted counsel and had already been placed at unacceptable risk of passing to counsel's spouse – with whom counsel was working together at home during the height of the Covid pandemic – and her colleagues seeking to put Teman in prison. The bell that had been rung could

62

not be un-rung. The Court's failure to allocute Teman in a timely manner infected all the subsequent post-trial proceedings during which Teman repeatedly attempted to demonstrate the need for a new trial based on theories and strategies that may well have passed to the Government improperly before Teman knew his own lawyer was, quite literally, married to the prosecution.

*Fourth*, Judge Englemayer communicated *ex parte* with the Chief of the General Crimes Unit at U.S. Attorney's office for the Southern District, a position Judge Englemayer had held from 1996-2000. A-137.5.[37] At some point before trial began, Judge Englemayer asked his contact at the U.S. Attorney's office to review the transcripts from the previous conferences to make sure there was "adequate supervision," a practice Judge Englemayer stated he followed "from time to time" when he had concerns about the Government's lawyers. *Id.* But this type of intervention is <u>never</u> permissible. *See United States v. Barnwell*, 477 F.3d 844, 850 (6th Cir. 2007) (*ex parte* communication between the prosecution and the trial judge can only be justified and allowed by *compelling* state interest). Even Judge Englemayer appeared uneasy, because he sealed the portion of the transcript relating to the *ex parte* transaction. A-137.5

---

[37] The Court can take judicial notice of Judge Englemayer's publicly available biography. https://en.wikipedia.org/wiki/Paul_A._Engelmayer.

Courts have found that matters of national security, *see, e.g., United States v. Yunis,* 867 F.2d 617, 620 (D.C. Cir. 1989), or the safety of witnesses or jurors, *see United States v. Napue,* 834 F.2d 1311, 1316–18 (7th Cir. 1987), may constitute a "compelling state interest." But intervening to ensure the government has the committed the resources, whether in numbers of lawyers or level of experience, necessary to convict a defendant or protect a financial institution is <u>never</u> a compelling state interest to be invoked by a judge meant to stand above the fray. Judge Englemayer's subsequent disclosure of the *ex parte* call in his robing room where defense counsel were caught off guard does not remedy Judge Englemayer impermissibly putting his thumb on the scales of justice.

As troubling as all the above examples are, there was also something more, something deeper, a personal animus against Teman himself that colored the Judge's thinking and turned the proceedings into a show trial or a morality play, rather than a forum for a sober, unbiased assessment of guilt or innocence. This something more has to do with Teman's Jewish faith, a theme to which the court returned again and again throughout the proceedings, both during the trial and afterwards. As noted above, Teman had stated in frustration to Gabay that he would put a lien on one of Coney's properties on Pesach (Passover). *See supra* at 9. Teman also deposited 27 of the checks at issue on the eve of Passover. *See supra* at 20. These actions appear to have shocked Judge Englemayer even though they were irrelevant to the charges

64

against Teman. As to the Pesach comment, there was no evidence that Teman carried out the threat and, even if he had, the incident long pre-dated the indictment and had no bearing on the bank fraud charges against Teman. As to the Depositing of checks on the eve of Passover, this was a business day like any other Friday and a seven-day hold was placed on the checks in any event. Moreover, the first two days of Passover that year – when Orthodox Jews do not use electronic devices – were weekend days when banks were closed, so *there could not possibly* have been any special hardship imposed on observant Jews. In fact, Soleimani testified that he did not notice the debits to his account until well into the week *after the last day* of Passover, on May 2 (the last day of Passover that year being April 26, 2019). A-754:4. Gabay never even saw the checks in question, because the relevant bank account had been closed by then, and he stated he never discussed religious matters with Teman. *See* A-505:1-6. And yet Judge Englemayer refers to the Passover incident over and over, citing it <u>*specifically as evidence of fraud*</u> and justification for the imposition of a harsh sentence. Judge Englemayer even suggests to the prosecution a line of argument that would feature prominently in the prosecution's summation:

> But is there some way that Mr. Teman's
> dealing with the customers here facilitates the fraud?
> understand that he makes a decision to time this for Pesach
> [Passover]; *and that he says, basically**, at various points,**
> **I'm going to do X, Y, Z on Pesach**.

A-855:14-18 (emphasis added).

65

However, there was _no_ evidence that Teman says, "*at various points,*" that he was "going to do" "x,y,z" on Pesach.[38] He made this comment *once*, in a context *unrelated* to the bank fraud allegations. Having suggested a false line of attack on Teman, Judge Englemayer then allowed the prosecution to inflame the jury with an appeal to religious passion (and prejudice), suggesting the timing of Teman's check deposit on the eve of Passover was proof of fraudulent intent. *See infra* at 76-78. Judge Englemayer even expands upon and further distorts Teman's actions, taking as a fact that Teman had intentionally used the eve of Passover to harm his clients:

> In addition, as noted, Teman acted to delay the bank in contacting
> the Customers and learning they disavowed the checks and
> the debts that they purported to cover. He did so by depositing
> the large checks on the Friday of Passover, when the
> representatives of 518 West 204 LLC and ABJ—on whose
> accounts the checks were drawn—would not be reachable.

A-1979.

Judge Englemayer deliberately distorts the facts by stating that Teman's Jewish clients "would not be reachable on the Friday of Passover." This was false, as the "Friday of Passover" would have been the following Friday and the Friday *before* Passover was a business day like any other until sundown when Passover began. Judge Englemayer then states the checks were deliberately deposited "over

---

[38] Contrast the loose inferences from an isolated instance of prior conduct with no bearing on fraud, *supra* at 9, to the Judge's extreme solicitousness towards the prosecution in keeping out potentially damning character evidence from Soleimani's conduct as a landlord. A-164-A-167, A-2109.

the Passover weekend." A-1977. In fact, as just noted, the checks were deposited on the Friday *before the Passover weekend* began when all Jews, however observant, are free to consult electronic devices and transact business.

At sentencing, Judge Englemeyer adopted an even more extreme and counterfactual Passover narrative:

> Mr. Teman, after all, had effectively announced to one of his religiously observant customers that he intended to move quickly to foil any attempt to block the deposits. *Mr. Teman stated that he would deposit checks on the eve of Passover when the customer would be disabled from learning about the deposits* and acting to promptly stop them. *Particularly, in light of this evidence,* it was fair comment to argue that Mr. Teman's decision to move funds quickly out of the GateGuard account after they had cleared was strategic and canny and that *it bespoke an intention on his part to assure that he got away with the deposits that he knew were improper.*

A-2302:21-25, A:2303:1-7 (emphasis added).

*Unfortunately, this is a complete fabrication.* Teman <u>never stated</u>, nor was there any testimony or evidence as to any such statement, that he would deposit checks on the eve of Passover. Yet Judge Englemayer doubles down and repeats the same falsehood at Teman's sentencing hearing (in front of family and friends participating by audio conference link).

> *As you yourself admitted*, *you timed the deposit of certain checks for when you knew* that your religiously observant customer would be observing Passover and thus not reachable. *You were explicit about that in your e-mails.* You took advantage of other people's religious faith, their devotion to Judaism and timed your scheme around it.

67

A-2404:4-9.

It is utterly false that Teman "admitted" that he timed the deposits of RCCs to interfere with religious Jews' Passover practices and that he was "explicit about this in his emails." There is *no evidence whatsoever for these comments*, which served to justify a finding that Teman intended to defraud his Jewish customers, that he was a criminal. Only a judge with an extreme and inexcusable animus against a defendant could have permitted himself to fabricate, over and over, incriminating statements out of whole cloth.

### B. Standard of Review

Judicial bias constitutes "structural error." S*ee Arizona v. Fulminante*, 499 U.S. 279, 309 (1991); *Sullivan v. Louisiana*, 508 U.S. 275, 283 (1993). With structural error, prejudice is presumed and review is *de novo*. *Holland v. Irvin*, 45 F. App'x 17, 19 (2d Cir. 2002).

### C. Legal Argument

Judge Englemayer's Passover comments – through which the district court mischaracterizes the record and fabricates statements in support of a false, religiously-based theory of criminality – are so far removed from the impartiality demanded of a judge that they cast doubt on the fairness of the entire trial and require reversal and remand for a new trial before a new judge. As the Supreme Court has put it:

68

Thus, judicial remarks during the course of a trial . . .ordinarily do not support a bias or partiality challenge. [But] . . . *they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.*

*Liteky v. United States*, 510 U.S. 540, 555–56 (1994) (emphasis added).

*Ex parte* communications by the judge are also *per se* grounds for reversal. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 462 (1978) (*ex parte* colloquy with jury foreman justifies reversal). Courts have found that *ex parte* communications between judges and prosecutors constitute grounds for reversal. *U.S. v. Barnwell*, 477 F.3d 844, 2007 FED App. 0081P (6th Cir. 2007) (*ex parte* communications between prosecutor and trial judge during jury's deliberation violated defendant's right to due process, effective assistance of counsel, and trial by an impartial judge and jury); *Yohn v. Love*, 76 F.3d 508 (3d Cir. 1996) (habeas writ granted for mid-trial *ex parte* conversation between prosecutor and Chief Justice of State Supreme Court concerning admissibility of evidence); *U.S. v. Martinez*, 667 F.2d 886 (10th Cir. 1981) (private meeting between prosecutor and judge to devise strategy to force a mistrial condemned, and retrial barred by double jeopardy). Here, the judge was concerned about the adequacy of the prosecution team and called the U.S. attorney's office to make sure there was "adequate supervision." A-137.5. Judge Englemayer was effectively picking sides and acting impermissibly to bring in "reinforcements" to convict Teman.

Further, the Court's failure to conduct a *Curcio* hearing in a timely manner, *Cuyler v. Sullivan*, 446 U.S. 335 (1980) "*mandates* a reversal when the trial court has failed to make an inquiry even though it knows or reasonably should know that a particular conflict exists." *Wood v. Georgia*, 450 U.S. 261, 273 and Note 18 (1981) (internal quotations omitted).

Finally, while adverse rulings generally cannot serve as a basis for a finding of judicial bias, their cumulative effect can show that "the defense cannot obtain a fair trial and reversal is required," *Liteky*, 510 U.S. at 555, particularly when combined with the court's failure to raise conflicts of interest fully and fairly in a timely fashion, its reliance on *ex parte* communications to advance the interests of the prosecution, and the demonstration of a "high degree of favoritism or antagonism" in the fabrication of admissions falsely attributed to the defendant in service of a theory of moral culpability rooted not in the law, but in flawed assumptions about religious faith and practice.

## III. THE GOVERNMENT'S TACTICS REPEATEDLY CROSSED THE LINE INTO PROSECUTORIAL MISCONDUCT

### A. Standard of Review

Prosecutorial misconduct as to which no objection is made at trial is subject to plain error review. *United States v. Young,* 470 U.S. 1, 14-20, (1985); *United States v. Torres,* 845 F.2d 1165, 1172 (2d Cir.1988); Fed. R. Crim. Pro. Rule 52(b).

## B.    Legal Argument

### 1.    The prosecution sought to sandbag the defense and score a "win" by gamesmanship.

From the beginning, the prosecution operated by "trial by ambush," using gamesmanship to secure tactical advantages, treating the judicial process as a combat to be "won," rather than a way for justice to be served, seizing Teman's RCC check stock to signal a classic "counterfeiting" and identity theft case, then dropping the identity theft charges and changing theories of liability without amending the indictment. On the eve of trial, the prosecution buried the out-of-town defense team with nearly 5,000 pages of documents, making it virtually impossible for the defense to prepare adequately. A-146. The Government then relied on a materially false affidavit of an unavailable declarant to bolster its case with respect to 508 W. 214 LLC, the focus of its summation.[39] The Government then deliberately withheld the

_____

[39] Having prepared Gabay for trial as one its witnesses, the Government knew the Hass affidavit was materially false. *See supra* at 8 and Note 2, 49-50. Introducing this affidavit, which gave the jury additional ammunition for a finding of unanimity with respect to the Coney/518 W. 204 relationship, constituted a fundamental violation of due process. *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959); *U. S. ex rel. Washington v. Vincent*, 525 F.2d 262, 267 (2d Cir. 1975); *Drake v. Portuondo*, 553 F.3d 230, 241 (2d Cir. 2009) (conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury).

71

existence of a personal reserve account that would have further reduced BOA's alleged losses until the eve of sentencing. A-2432.[40]

But even with this sandbagging approach, the Government produced reams of materials that were incomprehensible to the jury, *see* GX113, and failed to produce highly relevant evidence apparent from the face of the government's production, including (1) correspondence about Crystal and Academy's request for an indemnification if the GateGuard devices were removed in violation of the Terms and Conditions and Payment Terms, *supra* at 15; (2) Soleimani's and Teman's communications about the order for 60-additional second generation intercoms, *supra* at 20 and Note 10; (3) Soon-Osberger's relevant email exchanges with Teman on the issue of notice of GateGuard's contractual rights, *see supra* at 14 and Note 8; (4) BOA's communications with Teman about access to the funds in his personal, Friend or Fraud and Touchless accounts, *supra* at 23; or (5) correspondence with BOA relating to GateGuard's negative balance following the March chargebacks, and whether these chargebacks were treated as ordinary overdrafts or potential criminal violations.

---

[40] Judge Englemayer characterized the issue as one involving whether Finnochiaro has wrongly testified about the bank's ability to reach these personal funds. *Id.* In fact, however, the Government did not elicit *any* information from Finnochiaro as to the personal account, other than the false statement that BOA could not reach *any* of Teman's funds to reduce its loss.

Then, for its first witness, the prosecution presented Finocchiaro as a mere records custodian, but used her to present expert testimony on the bank's legal rights and on the technical inferences to be drawn from the IP address associated with a mobile deposit. *See supra* at 29-30. As if this were not enough, after the arrival of Teman's second set of post-trial counsel, who intended to offer the testimony of a banking expert, Professor Richard Fraher, to testify that Finocchiaro had provided improper and false expert testimony, requiring dismissal of the case against Teman, the prosecution violated its duty of candor to the tribunal. Fraher tendered an affidavit in which he affirmed that, although a "set off" was not technically available to mitigate the bank's loss:

> *The bank could have simply seized and kept the funds* [in Teman's other accounts] *and risked that the negatively impacted accountholders might take legal action to recover the funds from the bank. The bank's actions in these situations would not be limited by the principle of mutuality* of obligation *that limits the scope of the bank's right to set off*.

A-2231-A-2232 (emphasis added).

Rather than attempt to reconcile this analysis with the testimony of Finnochiaro that BOA was categorically *not* able to recover funds from the three accounts in question by *any* means, A-373:2-4, the Government simply omitted the relevant analysis and falsely claimed that Fraher's opinion was limited to the statement that set-off was not available. Judge Englemayer followed the prosecution's argument almost to the letter, ignoring Fraher's conclusions that the

73

bank had remedies that were not limited by its set-off rights. A-2298. Thus, the prosecution cut corners, knowingly introduced false evidence, engaged in gamesmanship, and deceived the court, rather than carrying out its duty to do justice. *Berger v. United States*, 295 U.S. 78, 88 (1935).

> **2. <u>The prosecution failed to disclose to the Court that Teman's post-trial counsel was married to an assistant U.S. Attorney in the U.S. Attorney's Office for the Southern District of New York.</u>**

As discussed above, the court's failure to allocute Teman in a timely manner as to whether he wanted to proceed with conflicted counsel whose wife was an Assistant United States Attorney in the very office prosecuting him was prejudicial. *See supra* at 62-63. But while Judge Englemayer stated he had simply missed the issue, the prosecution admitted it knew of the issue from the beginning but made the unilateral decision not to inform the court. A-2138:19-23, A-2141:20-25. Failure to disclose a known conflict of interest constitutes prosecutorial misconduct. *See, e.g.*, *United States v. Ziegenhagen*, 890 F.2d 937, 941 (7th Cir. 1989) (remanding case where prosecutor could have informed the trial court of conflict, but did not); *United States v. McKeighan*, 685 F.3d 956, 967–68 (10th Cir. 2012) (prosecution has duty to inform courts of defense counsel's potential and actual conflicts of interest).

### 3. **The prosecution misled the jury with false statements and inflamed it with antisemitic statements**

The most egregious example of prosecutorial misconduct occurred during the prosecution's summation. *First*, it was false and highly prejudicial to refer to the checks deposited by Teman as "fake." The uncontroverted evidence established that the checks were valid RCC's. *See supra* at 38, 43. Moreover, the Court had denied Teman's motion for expert testimony on the validity of the RCC's on the grounds that this issue was irrelevant and likely to confuse the jury. A-137.37-41. Having prevented Teman from presenting testimony that the RCC's were valid, the court should not have allowed the prosecution to represent to the jury that the checks were "fake." The only issue was whether the checks were "authorized." *See* A-137.37. By confusing the jury on this point, the prosecution was able to fix in the mind of the jury that certain checks, notably the $18,000 check drawn on Gabay's account with an incorrect identification of the payor, could be viewed as "fake," rather than "unauthorized," notwithstanding the judge's instructions that "fakeness" was not at issue. The jury could well have concluded that Teman was authorized to deposit RCC's as to Soleimani, but that the Gabay check was "fake" because it was accidentally drawn on the account of 518 W 205 LLC rather than 518 W 204 LLC, a facial error the prosecution exploited to maximum effect by highlighting this check

75

in red and enlarging it for the jury. A-1726. [41] Moreover, the jury only had to agree

unanimously on a *single* customer to convict Teman on all four counts with respect

to all customers. *See supra* at 6*; see infra* at 78-84. By wrongfully stressing the

"fake" nature of the checks, the prosecution deflected from what the court had

described as the real issue and made it easier for the jury to convict improperly and

on the basis of a single customer relationship.

Most egregiously, the prosecution was permitted to inflame the passion of the

jury on religious grounds with argument that was clearly out of bounds. The

prosecution argued:

> So, there is another reason you know the defendant
> acted with criminal intent: ***Look at when he timed his
> deposits***. You heard Mr. Gabay and Mr. Soleimani testify that
> they observed the Passover holiday. That's the holiday that
> started on the very day after the April 2019 checks which were
> drawn on their accounts. And they told you that as part of their
> observance of that holiday they don't use electronic devices for
> two days. ***When did Mr. Teman deposit these checks?*** The
> day before. ***That's fraudulent intent, ladies and gentlemen.***
> That shows you the defendant knew he didn't have permission.
> It shows you the defendant wanted a lead time to get these
> checks cleared. ***Why did he deposit that day of all
> days? Because he knew it was a fraud.*** **So** *there is another
> way you know the defendant had criminal intent*.

A-1129-1130.

---

[41] In the Government's summation PowerPoint, the ***only*** checks it included were
the 518 W. 205 LLC checks, including the one already highlighted for the jury as
"fake" rather than "unauthorized." A-1399, A-1420, A-1421.

This argument impermissibly uses religion to inflame the jury and paint Teman as a criminal because he deposited checks subject to a seven-day hold the day before Passover. A moment's reflection shows how profoundly offensive and prejudicial the "argument from Passover" is. Teman knew the checks were subject to a seven-day hold and that the first two days of Passover were non-banking days so there could not have been any "religious lead time" in depositing the checks on Friday, which was itself a normal business day, for Jews and non-Jews alike. And neither the timing of Teman's deposit nor Soleimani's religious practices had any effect on Soleimani's ability to contest the checks and secure a chargeback. In fact, the evidence was that Soleimani did not even notice the checks until days after Passover had ended, and he faced no difficulty challenging the deposits and having his account credited. *See supra* at 65. Gabay never discussed religion with Teman and never even saw the checks in question. For there to be *criminal intent*, the jury has to make stereotyping assumptions about what it means to observe Passover and what it means to be Jewish, that there is some special prohibition on doing business on the day before Passover, that Jews who do not conform to these stereotypes are *criminal*. The jury has to disregard the actual testimony, it has to ignore actual banking practice, it has to close its eyes to what actually happened. In a not-so subtle way, with no evidence in the record, the prosecution was attempting to activate anti-semitic bias against Teman by painting him as a "bad Jew." The prejudicial effect of

77

this portrayal of Teman cannot be overstated. No trial can be fair if the prosecution

is allowed to pander to potential ethnic bias and inflame passions along religious

lines.

## IV. JUDGE ENGLEMAYERS INSTRUCTIONS FAILED TO CHARGE THE JURY TO SPECIFY WHICH ENTITY OR ENTITIES WERE ALLEGEDLY DEFRAUDED.

### A.     Standard of Review

The Due Process Clause of the Fourteenth Amendment denies the State:

> the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense. Jury instructions relieving the government of this burden violate a defendant's due process rights. Such directions subvert the presumption of innocence accorded to accused persons and also invade the truth-finding task assigned solely to juries in criminal cases.

*Carella v. California*, 491 U.S. 263, 265 (1989) (internal citations and quotations omitted).

The Court reviews jury instructions *de novo*, considering the challenged

instruction in light of the charge as a whole. *Warren v. Pataki*, 823 F.3d 125, 137

(2d Cir. 2016). However, the failure to use a special verdict form

 is generally reviewed for harmless error. *United States v. Farnsworth*, 302 F. App'x

110, 114–15 (3d Cir. 2008).

### B.     Facts

Judge Englemayer instructed the jury that it would have to agree unanimously

on at least *one* customer narrative per count to convict on the count. A-1371.

However, the verdict form itself simply asked "guilty/not guilty" on each of the four

counts, without any requirement that the jury specify which customer relationship, in the event of a guilty verdict, was deemed to have been used to commit bank fraud. A-1394. And the jury returned a verdict of guilty on each count of the indictment. A-1298.1-A1298.2.

### C.   **Legal Argument**

#### 1.   **Completely different customer narratives cannot be coherently combined into a single count consistently with due process.**

Judge Englemayer sensed from his earliest interaction with the government that the proposed approach of lumping together different customer "narratives" into a single count would create a substantial legal problem. *See* A-65-66 (questioning why different victim accounts are "clustered" in a single count); A-220:1-3 ("there is a narrative that exists with each of these customer relationships"); A-543:2-10 ("it seems clear to me each customer has its own narrative"); A662:2-4 ("it's clear to me each customer narrative is its own story and they don't necessarily travel up or down together"); A-974:18-21 ("each of the three customer relationships is its own narrative"); A-975:13-16 ("where I am left is, in effect, with, for example, a bank fraud count that has three different customers embedded in it and three different narratives relating to authorization in fact or perceived authorization"); A-976:6-11 ("what is decisive here is that we have three very different narratives"); A-981:6-11 ("the three different narratives that come out from each customer group . . [e]ach has its own story to tell").

Judge Englemayer's solution to this problem was to require unanimity as to any *one* entity within the multiplicity of relationships embedded in a given count. A-1371. But this charge does <u>not</u> solve the problem of individual narratives that so concerned Judge Englemayer. Because 518 West 204 LLC (Gabay) was included in each count, the jury could have unanimously decided that Teman defrauded BOA through 518 West 204 LLC, *and no-one else*, and still returned a guilty verdict on all four counts. This was also the account that corresponded to the one check the prosecution highlighted *in red* for the jury as looking "fake" on its face, the only account whose checks the prosecution highlighted in its summation PowerPoint slides, and the account for which the Government introduced the false Haas affidavit. *See supra* at 71 and Note 39; *see also supra* at 76 and Note 41. Even though the judge had told the jury that that "fakeness" was not the issue, the government's insistence on stressing the "fake" nature of the checks in summation meant that the jury necessarily had its attention drawn to indicia of "fakeness" in the 518 W. 205 LLC check. A-1726. Given the focus on that particular check, much easier to understand that the convoluted spreadsheet relating to the Soleimani checks, the jury may have concluded that the entire relationship with Gabay was tainted by fraud. And the Gabay relationship involved no independent loss for anyone, not Gabay, not Signature, not JP Morgan, not BOA, who suffered no separate loss beyond the $264,000 from the ABJ checks.

Thus, if the jury unanimously agreed on Teman's guilt *only* with respect to 508 West 204 LLC – for which there was *no economic* loss at all – the full weight of the law still bore down on Teman and he was ordered to pay $259,000 in restitution, $330,000 in forfeiture and serve a year in jail. This is a potential result so completely unjust, so totally disproportionate to any possible aim of the criminal law, that the conviction must be reversed.[42]

### 2. A special verdict form was necessary to ensure that any punishment fit any actual findings of the jury.

Judge Englemayer was very conscious that the multiple different narratives that "did not travel up or down together" could not be coherently combined into a single count without some mechanism to understand what precisely the jury would agree on in the incoherently bundled counts of the indictment:

> *It seems to me there's a substantial argument here that the verdict form ought to inquire more specifically of the jury with respect to particular entities.*

A-149:12-21 (emphasis added).

---

[42] The problem was compounded by the Government's constructive amendment of the indictment. If the Government had truly been proceeding on a "counterfeiting" theory – despite the absence of evidence – it could have at least made the argument that checks deposited on the same day were part of the same counterfeit "batch." But since the government was proceeding on an authorization theory, there is simply *nothing* that can be inferred as to authority or lack thereof based solely on the date of deposit of the checks relating to different customers. Indeed, Teman also deposited a non-RCC on the same day he deposited the 24 Soleimani RCCs and the three Gabay RCCs. *See supra* at 21 and Note 13.

Despite this prophetic insight, Judge Englemayer ultimately let the verdict form remain with the simple up/down choice on each count. Even on the most stringent possible appellate review, the failure to include a special verdict form or special interrogatories to ensure that Teman could only be convicted of a crime on which the jury *actually agreed* constitutes reversible error. *See United States v. Perez*, 129 F.3d 1340, 1342 (9th Cir. 1997) (the district court's failure to submit a special verdict form that related to the type of weapon used by one defendant was not harmless and required new trial). As in *Perez*, because of the "immense consequences" that follow from finding bank fraud with respect to Gabay as opposed to Soleimani, "a jury finding on that issue is required."

Although special verdicts are generally not favored in criminal cases, this Court has upheld special verdicts when the information sought is relevant to the sentence to be imposed. *United States v. Orozco-Prada*, 732 F.2d 1076, 1084 (2d Cir. 1984); *see also United States v. Murray,* 618 F.2d 892, 895 n. 3 (2d Cir.1980); *United States v. Stassi,* 544 F.2d 579, 583–84 (2d Cir.1976), cert. denied, 430 U.S. 907, 97 S.Ct. 1176, 51 L.Ed.2d 582 (1977).[43]

---

[43] The resistance to special verdicts stems from a common law desire to protect the right of the jury to acquit defendants subject to politically motivated trials without having to answer detailed questions explaining their reasoning. *See United States v. Wilson*, 629 F.2d 439, 443 (6th Cir. 1980). Thus, the traditional hostility to special verdicts aimed to protect the rights of "criminal defendants by preventing the court from pressuring the jury to convict." *United States v. Reed,* 147 F.3d 1178, 1180 (9th Cir.1998); *United States v. Blackwell,* 459 F.3d 739, 766 (6th Cir. 2006). Here,

In *Orozco-Prada*, the defendant was convicted under Count 1 of a money laundering conspiracy that could have involved the proceeds of cocaine or marijuana sales and sentenced to a prison term applicable to cocaine sales. *Orozco-Prada*, 732 F.2d at 1083. This Court reversed on the grounds that the only proof at trial was of underlying marijuana sales, which, as a non-narcotic, carried a lower sentence than that applicable to cocaine. *Id*. The case was remanded for resentencing under the lower penalty or, if no resentencing occurred within 30 days, for a new trial. *Id*. at 1084.

Here, Counts I and III against Teman include the equivalent of marijuana (attempted bank and wire fraud with no loss as to Gabay) and cocaine (bank and wire fraud with $260,000 loss as to Soleimani), with the added complexity that this Court has no way of knowing whether the jury found Teman guilty with respect to Gabay or Soleimani. If Counts I and III (containing these two radically different fact patterns) are thrown out, the Court is left with the grossly disproportionate punishment resulting from one of two $18,000 checks in Counts II and IV, neither of which could support anything like the punishment meted out.

---

however, the absence of a special verdict operates in the exact opposite fashion and permits the imposition of a punishment unrelated to the conduct on which it is ostensibly based.

83

Thus, the problem is not just a sentencing issue, but the more fundamental one that Teman may have been punished for a crime the jury did not agree he had committed. On the record before the Court, there is no resentencing that could be ordered because there is no rational basis to choose between *any* possible punishment. Simply throwing the book at Teman if the jury only thought he had committed fraud in the Gabay relationship, with a single $18,000 cashed check, cannot be reconciled with foundational notions of fairness. The only way to cure this problem is to remand for a new trial either with separate counts for each customer relationship or a special verdict form to ensure that any punishment fits any crime that is found.

In the end, Judge Englemayer's limited unanimity instruction did not, and with the three unique customer narratives, could not, resolve the radical flaw at the heart of the government's entire, ill-considered criminal prosecution of Ari Teman.

Respectfully submitted,

New York, New York
May 25, 2021

QUAINTON LAW, PLLC
By:*/s/ Eden P. Quainton*_____
Eden P. Quainton
2 Park Ave., 20th Fl.
New York, NY 10016
Telephone: 212-419-0575
equainton@gmail.com
*Attorney for Appellant Ari Teman*

84

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the decision of the Court of Appeals permitting the filing of an oversize brief, dated April 22, 2022 (the "Decision"), I, Eden P. Quainton, an attorney duly admitted to practice before this Court, hereby certify that the foregoing memorandum of law contains 19,926 words, in compliance with the Decision and that this memorandum complies with the Court's applicable formatting rules. In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum.

This brief complies with the word count limitations of Fed. R. App. P. 32(a)(7)(B)(ii), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). The brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it was prepared in a proportionally spaced 14-point Times New Roman typeface font using Microsoft Word.

Dated: May 25, 2022            */s/ Eden P. Quainton*_____
        New York, New York           Eden P. Quainton

**SPECIAL APPENDIX**

# TABLE OF CONTENTS

**Page**

Judgment, dated July 29, 2021, Appealed From........   SPA-1

SPA-1

AO 245B (Rev. 09/19)   Judgment in a Criminal Case   (form modified within District on Sept. 30, 2019)
                       Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ARI TEMAN | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number:  S2 19-CR-696 (PAE)<br><br>USM Number:  18244-104<br><br>Susan Kellman<br>Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☑ was found guilty on count(s)      1ss, 2ss, 3ss & 4ss of the S2 Indictment
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1344 | Bank Fraud | 7/3/2019 | 1ss |
| 18 U.S.C. § 1344 | Bank Fraud | 7/3/2019 | 2ss |
| 18 U.S.C. § 1343 | Wire Fraud | 7/3/2019 | 3ss |

The defendant is sentenced as provided in pages 2 through      8      of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)   All open counts        ☐ is   ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

7/28/2021
Date of Imposition of Judgment

Signature of Judge

Paul A. Engelmayer, United States District Judge
Name and Title of Judge

7/29/2021
Date

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 1A

Judgment—Page  2  of  8

DEFENDANT:   ARI TEMAN
CASE NUMBER:   S2 19-CR-696 (PAE)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1343 | Wire Fraud | 7/3/2019 | 4ss |

SPA-3

AO 245B (Rev. 09/19) Judgment in Criminal Case
    Sheet 2 — Imprisonment

DEFENDANT:   ARI TEMAN
CASE NUMBER:   S2 19-CR-696 (PAE)

Judgment — Page    3    of    8

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
One (1) year and one (1) day on each count, the terms to run concurrently. The Court granted bail pending appeal, pursuant to 18 U.S.C. § 3143(B)(1)(b), with the defendant released on the same bail conditions as have applied to date.

☑ The court makes the following recommendations to the Bureau of Prisons:
   The Court recommends that the defendant be placed in any mental health and anger management programs for which he is eligible.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____   ☐ a.m.   ☐ p.m.   on _____ .

   ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before 2 p.m. on _____ .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

SPA-4

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
  Sheet 3 — Supervised Release

Judgment—Page    4    of    8

DEFENDANT:   ARI TEMAN
CASE NUMBER:   S2 19-CR-696 (PAE)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Three (3) years on each count, the terms to run concurrently.

## MANDATORY CONDITIONS

1.    You must not commit another federal, state or local crime.
2.    You must not unlawfully possess a controlled substance.
3.    You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

> ☐ The above drug testing condition is suspended, based on the court's determination that you
> pose a low risk of future substance abuse. *(check f applicable)*

4.    ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check f applicable)*

5.    ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check f applicable)*

6.    ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check f applicable)*

7.    ☐ You must participate in an approved program for domestic violence. *(check f applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
              Sheet 3A — Supervised Release

Judgment—Page    5    of    8

DEFENDANT:  ARI TEMAN
CASE NUMBER:  S2 19-CR-696 (PAE)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview cf Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

SPA-6

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 3B — Supervised Release

Judgment—Page    6    of    8

DEFENDANT:  ARI TEMAN
CASE NUMBER:  S2 19-CR-696 (PAE)

## ADDITIONAL SUPERVISED RELEASE TERMS

1. The defendant shall provide the probation officer with access to any requested financial information unless the defendant has satisfied his financial obligations.

2. The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment payment schedule.

3. The defendant shall participate in an outpatient mental health and anger management program approved by the U.S. Probation Office. The defendant shall continue to take any prescribed medications unless otherwise instructed by the health care provider. The defendant shall contribute to the costs of services rendered not covered by third-party payment, if the defendant has the ability to pay. The Court authorizes the release of available psychological and psychiatric evaluations and reports to the health care provider.

4. The defendant shall complete three hundred (300) hours of community service under the direction of the Probation Department.

5. The defendant shall be supervised in the district of residence.

SPA-7

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                Sheet 5 — Criminal Monetary Penalties

Judgment — Page   7   of   8  

DEFENDANT: ARI TEMAN
CASE NUMBER: S2 19-CR-696 (PAE)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment\*** | **JVTA Assessment\*\*** |
|---|---|---|---|---|---|
| **TOTALS** | $ 400.00 | $ | $ | $ | $ |

☑ The determination of restitution is deferred until  8/11/2021 . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $   0.00 | $   0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page    8    of    8

DEFENDANT:  ARI TEMAN
CASE NUMBER:  S2 19-CR-696 (PAE)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $    400.00    due immediately, balance due

☐ not later than         , or
☑ in accordance with ☐ C,    ☐ D,    ☐ E, or    ☑ F below; or

**B** ☐ Payment to begin immediately (may be combined with    ☐ C,    ☐ D, or    ☐ F below); or

**C** ☐ Payment in equal      *(e.g., weekly, monthly, quarterly)* installments of $      over a period of
     *(e.g., months or years)*, to commence      *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal      *(e.g., weekly, monthly, quarterly)* installments of $      over a period of
     *(e.g., months or years)*, to commence      *(e.g., 30 or 60 days)* after release from imprisonment to a
term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within      *(e.g., 30 or 60 days)* after release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:
See Order of Forfeiture filed separately.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# 21-1920-cr

## United States Court of Appeals

*for the*

## Second Circuit

———— • ————

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ARI TEMAN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT

EDEN QUAINTON
QUAINTON LAW
*Attorneys for Defendant-Appellant*
2 Park Avenue, 20th Floor
New York, New York 10169
(212) 419-0575

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

PRELIMINARY STATEMENT .......................................................................1

LEGAL ARGUMENT.....................................................................................1

   I.     THE GOVERNMENT HAS FAILED TO ESTABLISH
        VENUE IN THE SOUTHERN DISTRICT OF NEW YORK .............1

       A.     The Crime of Bank Fraud Effected Through Allegedly
            Illegitimate Checks is Complete Upon Deposit.........................1

       B.     It Was Not Reasonably Foreseeable that Any Fraud
            Review Would Occur in New York.............................................3

       C.     There was No Competent Evidence that Teman's
            Mobile Deposits Were Made in New York ...............................4

   II.    THE GOVERNMENT FAILS TO ESTABLISH THAT THE
        TRIAL COURT DID NOT CONSTRUCTIVELY AMEND
        THE INDICTMENT ........................................................................7

   III.   TEMAN'S TRIAL COUNSEL RENDERED INEFFECTIVE
        COUNSEL.........................................................................................12

       A.     Teman's Ineffective Counsel Claim is Ripe for Judicial
            Review......................................................................................12

       B.     Counsel's Decision to Call Reinitz Was a Catastrophic
            Error ........................................................................................12

   IV.   JUDGE ENGLEMAYER SHOULD HAVE RECUSED
        HIMSELF .........................................................................................18

   V.    JUDGE ENGLEMAYER EXHIBITED IMPERMISSIBLE
        BIAS AGAINST TEMAN ................................................................24

       A.     Judge Englemayer Falsely Claimed that Teman
            "Explicitly" "Admitted" He Timed His RCC Deposits
            to Exploit the Religious Practices of His Customers................24

       B.     Counsel's Failure to Object to Judge Englemayer's Ex
            Parte Call Does Not Bar Teman's Challenge .........................26

C.    The Failure to Conduct a Timely *Curcio* Hearing
Caused Significant Prejudice ......................................................30

VI.   THE GOVERNMENT FAILED TO PROVIDE
PERSUASIVE JUSTIFICATION FOR ITS MISCONDUCT ...........32

A.    The Government Failed to Disclose the Presence of a
Potential Conflict Requiring a *Curcio* Hearing ........................32

B.    The Government Inflamed the Jury with False and
Misleading Statements About Teman's Religion.....................33

VII.  THE FAILURE TO REQUIRE A SPECIAL VERDICT
FORM VIOLATED TEMAN'S CORE CONSTITUTIONAL
RIGHTS................................................................................36

CONCLUSION................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bains v. Cambra*,
204 F.3d 964 (9th Cir. 2000) ...............................................................34

*Beer v. United States*,
696 F.3d 1174 (Fed. Cir. 2012) ............................................................29

*Berger v. United States*,
295 U.S. 78 (1935).................................................................................33

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) .......................................... 16, 17

*Blakely v. Washington*,
542 U.S. 296 (2004)............................................................... 38, 39

*Caidor v. Onondaga Cnty.*,
517 F.3d 601 (2d Cir. 2008) ................................................................29

*Chapman v. California*,
386 U.S. 18 (1967)................................................................. 30, 33

*Freeman v. Class*,
95 F.3d 639 (8th Cir. 1996) ................................................................15

*Hirsch v. Citibank, N.A.*,
542 Fed.Appx. 35 (2d Cir. 2013)..........................................................16

*Holloway v. Arkansas*,
435 U.S. 475 (1978)...............................................................................30

*Hughes v. Bowers*,
711 F. Supp. 1574 (N.D. Ga. 1989), *aff'd*, 896 F.2d 558 (11th Cir. 1990)... 32, 33

*In re Cendant Corp.*,
260 F.3d 183 (3d Cir. 2001) ................................................................25

*In re Comverse Tech., Inc. Sec. Litig.*,
543 F. Supp. 2d 134 (E.D.N.Y. 2008) ................................................19

*In re Grand Jury Subpoena of Ali*,
No. M 11-188 (RPP), 1999 WL 595665 (S.D.N.Y. Aug. 6, 1999).....................29

iii

*Johnson v. Paul*,
  No. 17-CV-3654 (KMK), 2018 WL 2305657
  (S.D.N.Y. May 21, 2018) .................................................................................35

*Leucadia, Inc. v. Applied Extrusion Techs., Inc.*,
  998 F.2d 157 (3d Cir. 1993) ............................................................................25

*Liteky v. United States*,
  510 U.S. 540 (1994) .........................................................................................26

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017) ..............................................................................17

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ..............................................................................19

*Schnabel v. Trilegiant Corp.*,
  697 F.3d 110 (2d Cir. 2012) ............................................................................16

*Sparman v. Edwards*,
  154 F.3d 51 (2d Cir. 1998) ..............................................................................12

*Spriggs v. United States*,
  703 F. App'x 888 (11th Cir. 2017) ..................................................................15

*Strickland v. Washington*,
  466 U.S. 668 (1984) .........................................................................................15

*U.S. v. Aulet*,
  618 F.2d 182 (2d Cir. 1980) ............................................................................12

*U.S. v. Kidd*,
  394 F. Supp 357 (S.D.N.Y. 2019) .................................................................4, 5

*United States v. Agrawal*,
  726 F.3d 235(2d Cir. 2013) ...............................................................................9

*United States v. Aiello*,
  864 F.2d 257 (2d Cir.1988) .............................................................................36

*United States v. Booker*,
  543 U.S. 220 (2005)..................................................................................... 38, 39

*United States v. Brinkworth*,
  68 F.3d 633 (2d Cir. 1995) ...................................................................... 27, 28, 29

*United States v. Cabrera,*
222 F.3d 590 (9th Cir. 2000) ...................................................................................34

*United States v. Crisci,*
273 F.3d 235 (2d Cir. 2001) .....................................................................................2

*United States v. Curcio,*
680 F.2d 888- (2d Cir. 1982) ................................................................. 30, 31, 32

*United States v. D'Amelio,*
683 F.3d 412 (2d Cir. 2012) .....................................................................................9

*United States v. Domres,*
142 F.2d 477 (7th Cir. 1944) ...................................................................................27

*United States v. Fairchild,*
69 F.3d 536 (5th Cir. 1995) .......................................................................................2

*United States v. Fruchter,*
411 F.3d 377 (2d Cir. 2005) ................................................................................ 38, 39

*United States v. Geninez,*
280 F. App'x 47 (2d Cir. 2008) ........................................................................... 21-22

*United States v. Goodale,*
530 F. App'x 338 (5th Cir. 2013) ..............................................................................2

*United States v. Greenidge,*
495 F.3d 85 (3d Cir. 2007) .........................................................................................2

*United States v. Grey,*
422 F.2d 1043 (6th Cir. 1970) .................................................................................34

*United States v. Gushlak,*
728 F.3d 184 (2d Cir. 2013) .....................................................................................38

*United States v. Heller,*
785 F.2d 1524 (11th Cir. 1986) ...............................................................................34

*United States v. Hood,*
920 F.3d 87 (1st Cir. 2019) ........................................................................................5

*United States v. Jenkins,*
No. 18 CR 181, 2019 WL 1568154 (N.D. Ga. Apr. 11, 2019) ...............................5

*United States v. Kelley,*
712 F.2d 884 (1st Cir. 1983) ....................................................................................26

v

*United States v. Kidd,*
  394 F. Supp. 3d 357 (S.D.N.Y. 2019) ......................................................................4, 5

*United States v. Lauersen,*
  348 F.3d 329 (2d Cir. 2003) ................................................................. 22, 23

*United States v. Matos,*
  905 F.2d 30 (2d Cir. 1990) ......................................................................12

*United States v. Milstein,*
  401 F.3d 53 (2d Cir.2005) ......................................................................10

*United States v. Mollica,*
  849 F.2d 723 (2d Cir. 1988) ..................................................................11

*United States v. Ravich,*
  421 F.2d 1196 (2d Cir. 1970) ............................................................ 21, 22, 23

*United States v. Sindona,*
  636 F.2d 792 (2d Cir. 1980) .....................................................................1

*United States v. Swanson,*
  360 F.3d 1155 (10th Cir. 2004) .................................................................2

*United States v. Thomas,*
  315 F. App'x 828 (11th Cir. 2009) .............................................................1

*United States v. Walsh,*
  700 F.2d 846 (2d Cir.), *cert. denied,* 464 U.S. 825 (1983) ...............................27

*United States v. Wozniak,*
  126 F.3d 105 (2d Cir. 1997) ....................................................................10

*United States v. Young,*
  952 F.2d 1252 (10th Cir.1991) ..................................................................2

**Statutes & Other Authorities:**

28 U.S.C. § 455 ................................................................................ 21, 26

28 U.S.C. § 455(a) ........................................................................... 26, 27

28 U.S.C. § 455(d)(4)(i) ..................................................................... 18, 20

28 U.S.C. § 994(j) ................................................................................40

1 J. Bishop, *Criminal Procedure* § 87 (2d ed. 1872) .........................................39

ABA Standards for Criminal Justice 3–1.2 (3d ed. 1993)......................................32

ABA Standards for Criminal Justice 3–1.2(c) (3d ed. 1993) ...............................33

Fed. R. Evid. 201(b)..............................................................................................19

Jessica Lile, *Internet Privacy Regulations and the Carpenter Decision*,
   87 UMKC L. Rev. 777 (2019)....................................................................5

Juliet M. Moringiello, *Signals, Assent and Internet Contracting*,
   57 Rutgers L. Rev. 1307 (2005) ...............................................................17

Nancy S. Kim, *Wrap Contracts: Foundations and Ramifications* (2013) .............17

Richard H. Fallon, Jr., *A Theory of Judicial Candor*,
   117 Colum. L. Rev. 2265 (2017)................................................................25

Tom Lininger, *Green Ethics for Judges*,
   86 Geo. Wash. L. Rev. 711 (2018)............................................................25

United States Sentencing Commission, Sentencing Guidelines Manual,
     §2B1.1(b); Ch. 5, Part A......................................................................39

United States Sentencing Commission, Sentencing Guidelines Manual,
     § 5C1.1, comment 4.............................................................................40

## PRELIMINARY STATEMENT

The Government's wooden responding brief ("GBr.") does little more than regurgitate abstract legal principles or inapposite case law, and provides little, if any, helpful analysis of the issues raised by Defendant Ari Teman. When Teman's appeal is considered with close attention to the facts and the law, it becomes clear the Teman's conviction must be reversed.

## LEGAL ARGUMENT

### I.   THE GOVERNMENT HAS FAILED TO ESTABLISH VENUE IN THE SOUTHERN DISTRICT OF NEW YORK.

#### A.   The Crime of Bank Fraud Effected Through Allegedly Illegitimate Checks is Complete Upon Deposit.

In attempting to argue that Teman's alleged crime was complete only after the fraud review of the RCC's in question and the release of funds to Teman, the Government cites inapposite cases that deal with elaborate schemes, such as the multi-year, multi-jurisdictional fraud perpetrated by Michele Sindona in *United States v. Sindona*, 636 F.2d 792 (2d Cir. 1980). GBr. at 16-17. But Teman is charged with a far simpler crime of depositing counterfeit checks, a crime courts uniformly hold to be complete upon deposit. Incredibly, in its venue analysis, not a single case brought forward by the Government is a counterfeit or forged check case, which leaves it tilting at windmills in the face of overwhelming authority against it. *United States v. Thomas*, 315 F. App'x 828, 838 (11th Cir. 2009)("we

1

agree that bank fraud was complete at the time that checks were deposited into the bank accounts with the intent to eventually withdraw the funds for personal use."); *United States v. Fairchild*, 69 F.3d 536 (5th Cir. 1995) (Fairchild's fraud was complete when he deposited the fraudulent checks into the bank accounts); *United States v. Crisci*, 273 F.3d 235, 240 (2d Cir. 2001)(bank fraud satisfied on showing of risk that the forged checks would be "presented" to a bank for payment); *United States v. Swanson*, 360 F.3d 1155, 1161 (10th Cir. 2004) (eventual presentation of the stolen and forged checks to the drawee banks, which exposes the banks to a potential risk of loss"); *United States v. Goodale*, 530 F. App'x 338, 343 (5th Cir. 2013) ("presentation" of forged checks exposes banks to a potential risk of loss); *United States v. Young,* 952 F.2d 1252, 1257 (10th Cir.1991) (holding that the government's proof that "the bank was put at potential risk by the scheme to defraud" was sufficient to support a finding that the defendant knowingly executed a scheme to defraud a bank); *see also United States v. Greenidge*, 495 F.3d 85, 101 (3d Cir. 2007) (conspiracy to commit bank fraud was complete when the stolen and altered check was deposited).

Indeed, *the Government's own case undermines its venue theory*. Three of the checks deposited in April drawn on the account of 518 W. 205 LLC totaling $33,000 were returned uncashed because the drawee's account had been closed.

Appellant's Brief (hereafter, "Br.") at 11, 21; GBr. at 6. Yet the Government claims Teman has committed bank fraud by depositing these checks even though no funds were ever received by Teman. A-121; GBr. at 6. Obviously, with respect to these checks, the Government's own theory is that the alleged crime was complete upon deposit.

**B.      It Was Not Reasonably Foreseeable that Any Fraud Review Would Occur in New York.**

The Government argues repeatedly that because the RCC's deposited by Teman were drawn on New York banks with NYC addresses with whom he had done business in Manhattan, this means it was foreseeable that any fraud review would occur in New York. GBr. at 19-20. This is nonsense. It is widely known that many large commercial banks based in New York have outsourced their fraud review functions offshore for cost savings. Br. at 36 and Note 24. More to the point, Teman's most significant commercial counterparties in the alleged scheme charged by the Government were the ABJ entities controlled by Joseph Soleimani and his brother. Br. 20-21. The RCC's for the ABJ entities were drawn on JP Morgan accounts in Manhattan. *Id.* But the fraud review for these entities occurred in Texas and Ohio, not in New York. Br. 29 and Note 18; Br. 36 and Note 24. If the fraud review for the vast majority of the checks at issue (24 ABJ checks for a total of approximately $260,000) was subject to fraud review outside of New York,

3

it can hardly be reasonably foreseeable that a small minority of the checks (5 checks for a total of $69,000) would be subject to fraud review in New York.

### C. There was No Competent Evidence that Teman's Mobile Deposits Were Made in New York.

The Government argues that because a government fact witness testified that a spreadsheet showed online banking deposits were made in Manhattan, this Court is required to sustain the jury's finding that Teman was in New York when he made the deposits in question. GBr. at 21-22. On close inspection, this argument fails.

The government witness, Karen Finocchiario, testified to the contents of a "microscopically small" spreadsheet the Court recognized the jury could hardly see. A-339. The spreadsheet, identified as GX-113 was never able to be produced to the jury in the jury room, Br. 22 and Note 14, and was submitted to this Court in CD-Rom form. *Id.* Column E of the "Device" Tab in the spreadsheet lists IP addresses and column P of the Device tab lists a corresponding physical address. A-1675.1. For the mobile deposits at issue here, column E shows an IP address that corresponds to a New York, New York location shown in column P.

But it is well-known that an IP address does **_not_** correspond to a user's physical location, a position the Government itself has taken in the Southern District. *See United States v. Kidd*, 394 F. Supp. 3d 357, 359–60 (S.D.N.Y. 2019). Unlike Cell Site Location Information ("CSLI") which provides precise tracking of

4

a mobile user's location by the connection of her phone to cell phone towers, "IP address data . . . does not itself convey any [user] location information." *United States v. Hood*, 920 F.3d 87 (1st Cir. 2019). The IP address is simply the point at which data sent from a device (fixed or mobile) connects to the Internet. "IP address information merely shows the location at which a device accesses the internet during a specific session. It does not follow that person around. Indeed, it does not even identify the user, just the location of internet access." *U.S. v. Kidd*, 394 F. Supp at 363 (quoting *United States v. Jenkins*, No. 18 CR 181, 2019 WL 1568154, at *1 (N.D. Ga. Apr. 11, 2019). A cell phone connects to the closest physical cell tower and data from the phone is then routed through the carrier's network of towers until the data reaches an Internet node, with a discrete address, and is sent through the Internet to the recipient's device in a reverse process. *See* Jessica Lile, *Internet Privacy Regulations and the Carpenter Decision*, 87 UMKC L. Rev. 777, 795–96 (2019). The location information carried by an IP address is not an esoteric point, but a crucial one for law enforcement, including the government in the Southern District. *United States v. Kidd*, 394 F. Supp. 3d at 359–60.

The key point here is that, without analysis of a cellular access provider's physical infrastructure *it is impossible* to correlate a user's location and the cellular network's Internet access point. It is not more likely than not; it is *unknown*.

5

Teman could have been in the Bronx, Queens, Brooklyn or even New Jersey, with his carrier routing data to a node in Manhattan. This is not a preponderance of the evidence issue; one cannot say, based on the data on GX-113, that it is more likely than not that Teman was physically in New York City simply because the data he sent through a cellular network connected to the Internet in New York City. One cannot say *anything* about the relationship between the two data points (Column E and P) *without more information* that was not provided. Ms. Finocchiaro, as a bank record keeper was obviously incompetent to provide expert cellular network testimony necessary to address the issue. Indeed, her testimony was very narrowly directed at the "location at which at on-line banking log-in occurs," A-340, which properly interpreted means the point at which data sent from a user's cell phone connects to the Internet, not the physical location of the sender or her device.[1]

As a result of the foregoing there was no basis for venue in New York and the matter must be remanded for one or more trials in the proper venues.

---

[1] The Government's remaining theory, that the withdrawal of $4,000 weeks after the deposit of the last of the checks can support venue for the entire prosecution, also fails. First, as Judge Englemayer rightly pointed out, any alleged fraud scheme, even on the most expansive possible conception of "execution," was complete well before the $4,000 withdrawal occurred. A-1995-96. Second, under no theory could the withdrawal provide venue for Counts I and III. Finally, the withdrawal did not reduce funds available to cover BOA's alleged loss but was part of a pool of funds that were ultimately placed in a "hold harmless" account. Br. at 23.

## II.   THE GOVERNMENT FAILS TO ESTABLISH THAT THE TRIAL COURT DID NOT CONSTRUCTIVELY AMEND THE INDICTMENT.

The Government argues, for the first time on appeal, that there was no constructive amendment because they were permitted to prove, consistently with the indictment, that the Teman RCC's were **_both_** "counterfeit" **_and_** "unauthorized." GBr. at 25. But this argument does not make sense and, in fact, highlights a core issue underlying the bar on constructive amendments. Judge Englemayer unambiguously ruled that whether the checks were "counterfeit" in a technical sense was **_irrelevant_** to the charges and prevented Teman from introducing evidence that the checks were **_not_** "counterfeit." A-137.39-40. Judge Englemayer believed, and let the Government proceed on the theory that, there is a "vernacular" or "lay" meaning of "counterfeit" that can be conflated with the notion of "unauthorized." A-137.41. This is not only counter-intuitive but also wrong. The "vernacular" meaning of counterfeit is "forged." Br. at 42.  No amount of "authorization" can make a "forgery" genuine. Moreover, the Government admitted it had not provided a definition of "counterfeit," whether in the "lay" or technical sense, to the grand jury. A-137.43. Nonetheless, Judge Englemayer made clear that, for him, "counterfeit" and "unauthorized" were synonyms. *See* A-1023; A-137.38. Thus, because for Judge Englemayer "counterfeiting" **_means_** "unauthorized," the Government's argument that it could prove "counterfeiting"

7

***and*** "unauthorized" (*i.e.*, that counterfeiting means something other than, and in addition to, unauthorized) demonstrates that the indictment was constructively amended in such a way by Judge Englemayer that even the government no longer understood what its own indictment meant.[2]

The Government fares no better with its "to wit" argument. The Government argues that if the "core of criminality" is set out in the indictment, the Government is not bound by the "illustrative" provisions of the "to wit" clause. GBr. at 24. However, the Government fails to address Teman's argument that where the "to wit" clause contained *the only detail* alleged in the indictment, the "to wit" clause which contains the specific charge *is* the *entire* "core of criminality". *See* Br. 40-41. Likewise, the Government does not offer any persuasive authority to counter the proposition that once an indictment *does* specify the means by which the alleged crime was committed, a conviction may rest only upon those means and not any others. Br. 42.

Instead, the Government serves up a trio of cases that are easily distinguishable. In *Bastian*, GBr. at 26, the Court reviewed the defendant's constructive amendment argument under a plain error standard because the defendant failed to raise the argument in the trial court. *Bastian*, 770 F.3d at 221-23. Thus, the Court affirmed the conviction even though it held that the fact that

---

[2] This was clearly not a "carefully crafted indictment." *See infra* at 11.

the plea allocution differed from the allegations in the indictment as to the type of gun possessed, the date, and the purpose for which the gun was possessed "raised concerns about fair notice and double jeopardy that the constructive amendment doctrine seeks to avoid." *Id.* at 223.

In *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012)*, GBr. *at 26*, the "to wit" clause specified that the defendant had "used a computer and the Internet" to solicit an underage minor. *See D'Amelio,* 683 F.3d at 414. However, at trial the government introduced evidence of conversations over the internet *and* the telephone. *Id.* Thus, although the defendant was convicted based in part on evidence regarding his use of the telephone – a detail not specifically alleged in the indictment – he was also convicted based on his use of the internet, a detail which was specifically alleged in the indictment.  Here, Teman was charged *only* with fraud through the use of "counterfeit checks", but the jury could convict him based on a finding *only* that the checks were unauthorized, not that the checks were unauthorized *and* counterfeit, in the way the charged and uncharged details were combined *D'Amelio*. *See supra* at 7.

In *United States v. Agrawal*, 726 F.3d 235, 261(2d Cir. 2013), GBr. at 26, the general provisions of the indictment listed 17 specific means of stealing trade secrets and the "to wit" clause repeated one of these and added two more. Argawal was convicted of conduct that came within the 19 identified terms. *Id.* This has no

9

application to an indictment that includes generic language in the body of the indictment and then adds a single, specific means of carrying out the criminal conduct, which is then amended to have a "vernacular" meaning not evident on the face of the indictment.

More pertinent are *United States v. Milstein,* 401 F.3d 53, 64 (2d Cir.2005) and *United States v. Wozniak,* 126 F.3d 105 (2d Cir.1997). In *Milstein*, the defendant was charged with forging product packaging but was convicted of adulterating the contents of the package. *Id.* On those facts, which parallel the manner in which Teman was charged with counterfeiting (or forging) checks but convicted of unauthorized conduct, the Court held a constructive amendment had occurred. *Milstein*, 401 F.3d at 64-65.

In *Wozniak*, the various counts of the indictment alleged offenses relating to cocaine and methamphetamines, whereas the evidence at trial related "mostly" to use and distribution of marijuana. *Id.* at 106-107. Had the indictment remained at a high level of generality charging offenses relating to "controlled substances," the defendant could have been convicted of conduct involving either cocaine or marijuana. *Id.* at 110. Yet, because the indictment charged offenses related to specific controlled substances and the Government proof related to an unnamed substance, this Court vacated the defendant's conviction on all counts. *Wozniak*, 126 F.3d at 111.

10

This Court has previously admonished that "[i]n light of the current broad range of conduct covered by the federal fraud statutes, it is critical that courts vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury," and that "[i]n order to avoid amending an indictment in violation of the Fifth Amendment, the government in fraud cases should think through the nature of the crime it wishes to allege and then spell out the offense in a carefully crafted indictment." *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) (quotation omitted).

Had the Government not specified "counterfeiting" as the specific means of violating the bank fraud statute, it could conceivably have obtained a valid conviction on the basis of evidence of the deposit of "unauthorized" checks. But once the government decided to charge "counterfeiting" it was required to meet its proof as to that element. Judge Englemayer's sleight of hand, that attempts to amend the indictment *sub silencio* by making "counterfeiting" simply a "vernacular" synonym for "unauthorized," does not even persuade the Government, which maintains counterfeiting and unauthorized are distinct concepts. By writing out counterfeiting from the indictment when counterfeiting was the **_only_** particular kind of conduct alleged to constitute bank fraud, the court constructively amended the indictment and Teman's conviction must be reversed.

11

### III. TEMAN'S TRIAL COUNSEL RENDERED INEFFECTIVE COUNSEL.

#### A. Teman's Ineffective Counsel Claim is Ripe for Judicial Review.

The Government argues that there is an insufficient factual record for the review of Teman's ineffective assistance claim, citing *Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) and *United States v. Matos*, 905 F.2d 30, 32-34 (2d Cir. 1990). The Government's arguments are misplaced. It is true that, "[g]enerally, a claim for ineffective assistance must be made in the first instance to the district court in order that there be a full factual record on review." *Matos,* 905 F.2d at 32. However, "this Court may decide such a claim, even when it is raised for the first time on appeal, when its resolution is 'beyond any doubt' or to do so would be in the interest of justice." *Id*. (citing *U.S. v. Aulet,* 618 F.2d 182, 186. (2d Cir. 1980). In *Aulet*, the Court reached the question of ineffective assistance on direct appeal because the issue was "beyond any doubt" and to remand for further fact-finding would be a "waste of judicial resources." *Aulet*, 618 F.2d at 186. So, too, here.

#### B. Counsel's Decision to Call Reinitz Was a Catastrophic Error.

The Government accuses Teman of "hyperbole" in asserting that counsel's decision to call Reinitz was a disastrous error. GBr. at 31. On the contrary, disastrous may be an understatement.

Without Reinitz' testimony, Teman faced a threadbare Government case that most likely would have failed to secure a unanimous verdict beyond a reasonable

12

doubt. The Government's rambling, incoherent case failed to introduce the online terms and conditions that should have been part of its affirmative burden.[3] The Government failed to secure the testimony of critical witnesses its own exhibits indicated would have known whether the RCC's were authorized or would have been responsible for authorizing the instruments: Michael Haas, one of the owners of 518 W. 204 LLC who paid an invoice expressly acknowledging the application of GateGuard terms and conditions, *see* Br. at 7-8, but provided a false affidavit saying he was unfamiliar with GateGuard and failed to appear at trial, Br. at 49-50; Jacqueline Monzon, who was an authorized signatory for Crystal Real Estate Management, Br. at 15-16, the property management company for 18 Mercer Equity Inc., who approved GateGuard's invoices that stated the invoices were subject to the Company's online terms and conditions, and who knew that third parties required an indemnification to violate the Contract's device removal fee provisions, Br. at 15; and Benjamin Soleimani, one of the two owners of ABJ, who

---

[3] The online click-wrap terms and conditions that Teman's customers referred to as the "Contract", Br. at 15, authorized the use of RCC's. Br. at 5, 7,49. The Court instructed the jury that RCC's were a valid legal device. A-154. Given that the Court had written out of the indictment the specific charge that the RCC's were "counterfeit," the only issue at trial – as narrowed by Judge Englemayer – was whether the use of the RCC's by Teman was explicitly or implicitly authorized, and whether Teman had a good faith belief in the legality of conduct. Applicable on-line contract law and the evidence in the Government's case, summarized in Appellant's opening brief at 7-20 and 48-49, strongly suggest the answer to both questions was a clear yes. *See infra* at 16-17.

13

pleaded with Teman not to shut down the GateGuard services. Br. at 18. The Government relied on evidence that was incomprehensible to the jury (such as the Government's GX 113, the "microscopic," multi-tab Excel spreadsheet set forth at A-1657.1). Perhaps most importantly, the Government failed to establish any *mens rea* on the part of Teman, resorting to religious smears when the evidence clearly showed that Teman acted at all times in the sincere belief that GateGuard's terms and conditions permitted the use of RCCs and that his clients had authorized their use. *See* Br. at 49-50; *infra* at 17.

The Reinitz testimony overshadowed all of this and exploded in the middle of the defense case like a laser guided missile. Even though Reinitz was no doubt using hyperbole to try to dissuade his client from taking a course of action he thought was a "bad idea" from a commercial perspective, and even though the core of his advice exonerated Teman ("ok invoicing and collections is fine," Br. at 20) Reinitz' words were devastating.

Gone were the flaws in the government's case, gone were the gaps in its evidence, gone the central theme that the case was just a commercial dispute dressed up as criminal trial: when Reinitz was heard reading back his own words that "I expect ***this will be a criminal matter***," that Defendants were "likely to call ***the police***" and that "you ***will be arrested***," the defense case was essentially over. Calling Reinitz, despite the positive elements of his testimony, guaranteed that the

14

words "criminal," "police," "arrested" coming from the mouth of Teman's own lawyer would sear themselves into the jury's memory and constitute an insurmountable obstacle.

This was not some contingent, unforeseeable occurrence counsel could not have predicted. Rather, any second-year law student would have known that soliciting what positive testimony there was from Reinitz would open the door to cross-examination and admission of devastatingly incriminating testimony—an unpardonable error. *See Freeman v. Class*, 95 F.3d 639, 643 (8th Cir. 1996) (counsel's introduction of evidence that his client was guilty of stealing an automobile was "almost incredible" and undermined the "reasonable probability that, absent this error, the jury would have had reasonable doubt respecting the defendant's guilt"). Merely failing to challenge the admission of damaging evidence has been held to constitute ineffective assistance. *Spriggs v. United States*, 703 F. App'x 888 (11th Cir. 2017). But affirmatively acting to permit the introduction not of marginally harmful evidence but testimony that would undermine the core of the defense case and leave an indelible negative mark on the minds of the jurors falls below any reasonable standard of competent assistance.

Contrary to the government's position, the enormity of counsel's blunder is not the product of the "distorting effect of hindsight." GBr. at 29 (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Nor was it "within the range

15

of reasonable professional assistance." *Id.* It was a colossal, avoidable mistake that virtually guaranteed a conviction, an error no reasonable lawyer would ever repeat on remand. The Government's citations to Judge Englemayer's transparent attempts to protect the verdict only highlight remarkable blind spots in the district court's view of the case. Judge Englemayer sought to rehabilitate Reinitz, who according to the district court, "at least gave the defense something," GBr. at 32, and went out of his way to praise as "superb," *id.*, the lawyers he had accused of "blowing their credibility" with him, A-182, and chastised for failing "lawyering 101," A-884. In claiming that Reinitz "at least gave the defense something," Judge Englemeyar painted an inaccurate picture of the defense case. According to Judge Englemayer,

> There is no evidence that the customers saw, for example, any of the terms, the link that they were in place at the relevant time, that would have even authorized remotely created checks, let alone checks in the dollar amounts at issue. GBr. at 33.

This is not correct, as Teman has shown in detail in his opening brief. Br. at 7-20. A party's willful blindness to online terms and conditions does not prevent these terms from having binding contractual force. *Hirsch v. Citibank, N.A.,* 542 Fed.Appx. 35, 37 (2d Cir.2013). It is black letter law that, "an offeree is still bound by the provision[s] if he or she is on *inquiry* notice of the term[s]. *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394 (E.D.N.Y. 2015) (quoting *Schnabel v. Trilegiant Corp.,* 697 F.3d 110, 119, 126–27 (2d Cir.2012). "Inquiry notice is actual notice of

16

circumstances sufficient to put a prudent man upon inquiry." *Berkson* 97 F. Supp.

3d at 395. This Court has held that browsewrap agreements that do not require an

affirmative manifestation of assent are still valid if existence of the terms is

reasonably communicated to the user. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76

(2d Cir. 2017). *See also* Juliet M. Moringiello, *Signals, Assent and Internet

Contracting*, 57 Rutgers L. Rev. 1307, 1318 (2005) ("[B]rowse-wrap encompasses

all terms presented by a web site that do not solicit an explicit manifestation of

assent."). Moreover, on-line contract doctrine permits the updating of terms and

conditions with binding force as of the date of the initial contract and there is no

question that an updated version of the payment terms permitting RCC's *was*

produced by the defense. *See* Nancy S. Kim, *Wrap Contracts: Foundations and

Ramifications* 109-111 (2013). That Teman took seriously on-line contract doctrine

does not make him a criminal.

Teman's good faith belief was supported by his inclusion of the words

"Draw Per Contract" and the telephone number at which he could be contacted in

the event of any issues. A person bent on committing fraud would hardly alert the

bank to the existence of a contract justifying the checks and open himself to

questioning before any amounts were drawn.[4]

---

[4] Inexplicably, it does not appear that anyone at BOA or the other banks involved
thought to contact Teman before clearing the funds to his account.

None of these arguments were realistically possible once the jury saw texts from Teman's own lawyer – albeit concluding "ok invoicing and collections" – with the giant red flags, "***criminal***," "***police***," "***arrest***." There was no conceivable benefit to any testimony Reinitz could give that could possibly weaken the explosive force of his toxic text messages. The decision to take a course of action that guaranteed the admission of the damning texts and their exploitation to maximum effect by the prosecution transcended any possible sound strategy and stands as a testament to utter incompetence. Looked at calmly from this Court's perspective, the ineffective assistance of Teman's counsel in permitting the introduction of deadly evidence is beyond doubt. It would truly constitute a waste of judicial resources to engage in further fact-finding on such a cut and dried issue.

## IV. JUDGE ENGLEMAYER SHOULD HAVE RECUSED HIMSELF.

In arguing that Judge Englemayer properly exercised his discretion in not recusing himself despite holding a $2,000,000 beneficial ownership in the only crime victim in the case, the Government makes two basic points. First, the Government cites to 28 U.S.C. § 455(d)(4)(i) for the proposition that "[o]wnership in a mutual or common investment fund that holds securities is not a 'financial interest' in such securities unless the judge participates in the management of the fund." GBr. at 38-39. Second, the Government asserts that a small percentage ownership in a crime victim, regardless of the value of the ownership interests,

18

does not constitute a substantial enough interest to require recusal. GBr. 39-40.

Neither point is convincing.

With respect to the first point, Berkshire Hathaway, the vehicle through

which Judge Englemayer owns his indirect interest in Bank of America, is not a

"mutual fund" or a "common investment fund." The Government's contention to

the contrary is a frivolous point easily disputed through publicly available

information. Berkshire Hathaway is a holding company with subsidiaries engaged

in numerous diverse business activities, including insurance, rail transportation and

energy, that also has significant cash and equity holdings. *See*

[https://www.berkshirehathaway.com/2021ar/202110-k.pdf](https://www.berkshirehathaway.com/2021ar/202110-k.pdf) at K-1, K-70.[5]

Approximately $440 billion of Berkshire Hathaway's assets are held in cash and

marketable equity securities. [https://www.berkshirehathaway.com/2021ar/202110-k.pdf](https://www.berkshirehathaway.com/2021ar/202110-k.pdf). at K-40. Equity securities make up nearly 40% of the Company's total assets

of close to $1 trillion. [https://www.berkshirehathaway.com/2021ar/202110-k.pdf](https://www.berkshirehathaway.com/2021ar/202110-k.pdf).

at K-70. Berkshire Hathaway's equity holdings are concentrated in four

companies, Apple Inc, Bank of America, American Express and Coca-Cola.

---

[5] The Court can take judicial notice of public filings with the Securities and Exchange Commission. *See* Fed.R.Evid. 201(b); *Rothman v. Gregor*, 220 F.3d 81, 88, 92 (2d Cir. 2000); *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 153 (E.D.N.Y. 2008).

19

https://www.berkshirehathaway.com/2021ar/202110-k.pdf. at K-84 and Note 4.

Judge Englemayer himself knew perfectly well that his ownership in Berkshire

Hathaway was not somehow exempt from ethical rules surrounding judicial

financial interests. Shortly before the Teman trial began, Judge Englemayer had

recused himself from presiding over an important antitrust trial in which Bank of

America was one of the parties on the grounds that Berkshire Hathaway had

exceeded a 10% threshold ownership in Bank of America. *See In re Interest Swaps*

*Antitrust Litigation*, 16-MD-2704, Dkt 844; Br. 52 and Note 30. In recusing

himself from *In re Interest Swaps*, Judge Englemayer made no mention of 28

U.S.C. § 455(d)(4)(i). Judge Englemayer stated that he had consulted with the

Committee on Codes of Conduct of the Judicial Conference of the United States

and had concluded that because BOA had crossed the 10% threshold in the

Berkshire Hathaway portfolio, his "impartiality in supervising the case could

otherwise reasonably be questioned." A-58. No "mutual fund" or "common

investment fund" exception came to his defense.

The only question is thus whether Judge Englemayer's indirect interest in

Bank of America, sufficient to trigger his recusal in a civil case in which Bank of

America was one of dozens of parties, was substantial enough to call for his

recusal in a criminal case in which Bank of America was the only crime victim.

20

As a threshold matter, it should be clear that, from the public's perspective, separate from the technical rules that may be applicable, the appearance of impropriety and prejudice is at least as great in a criminal case in which the judge has an economic interest in a victim as in a civil case in which the judge has an identical interest. Judge Englemayer himself acknowledged that his indirect ownership of BOA stock would cause his "impartiality" to be "reasonably" "questioned." Judge Englemayer does not make a technical argument about the unfortunate application of technical recusal rules in civil cases; rather, he concedes that the ownership interest is substantively problematic and requires his recusal to avoid the reasonable questioning of his impartiality.

In order to convince this Court that Judge Englemayer's interest is not substantial, the Government proposes a share ownership test. According to the Government, if the judge owns a very small percentage of a company's equity interest (directly or indirectly), such ownership would not qualify as "substantial" for recusal purposes in a criminal case regardless of the dollar amount involved. GBr. at 37-39. In *United States v. Ravich*, 421 F.2d 1196, 1205 (2d Cir. 1970), the trial judge held 325 shares of stock in Franklin National Bank worth between $10,000 and $15,000 and representing .0072% of the bank's 5,391,527 shares, a percentage so small the trial judge declined to disqualify himself, considering he did not have a 'substantial interest' in the case under 28 U.S.C. § 455. In *United*

21

*States v. Geninez*, 280 F. App'x 47, 49 (2d Cir. 2008) and *United States v. Lauersen*, 348 F.3d 329, 335-38 (2d Cir. 2003) the district courts likewise did not recuse where the share ownership interests were .00009 and .000091 percent, respectively. The Government concludes that the beneficial percentage ownership of Bank of America owned by Judge Englemayer (.00075 per cent) is so small that following *Ravich*, *Geminez* and *Lauernsen*, the Court should uphold Judge Englemayer's decision not to recuse.

But the government's proposed share ownership rule would lead to absurd results and should not be adopted. If Judge Englemayer held .00075 percent of the shares of Tesla, this would be worth $5.25 million. If he held the same percentage of Apple shares, this would be worth over $16 million. It would be impossible to maintain with a straight face to an average American earning $50,000 a year that beneficial ownership of $16 million in shares is an insubstantial sum.

Moreover, the substantiality of the interest needs to be evaluated in context. Repeatedly, throughout the trial, the prosecution and the court stressed the substantial amount of money involved in Teman's allegedly unauthorized use of RCCs.  A-1114 ("more than a quarter of a million dollars"); A-1180 ("there's $260,000 – more than a quarter million dollars – missing"). Judge Englemayer endorsed this view that a quarter of a million dollars was a very substantial amount.  A-2310 ("quarter of a million dollars" constituted a "large loss"); A-2399

22

("close to a third of a million dollars" is "a significant amount of money)." It is not credible to argue that $260,000 is a substantial sum warranting the imposition of jail time when looked at from the point of view of an alleged crime victim, while $2,000,000 is insubstantial from the point of view of the judge tasked with ruling impartially in the case.[6]

On the contrary, Judge Englemayer's interest is more than 130 times as valuable as Judge Friendly's in *Ravich* and more than 150 times as valuable as Judge Newman's in *Lauersen*. Ultimately, this is not a difficult call. In a world in which the judge was meeting out punishment, including jail time, based on the notion that a quarter of a million dollars is a "significant" amount of money, it violates the Code of Judicial Conduct to conclude an amount nearly 10 times greater is insubstantial. Public confidence in the judiciary would suffer a serious blow if such a clear double standard were to stand.

---

[6] As noted, Judge Englemayer does not really believe that his indirect ownership of BOA is immaterial. On the contrary, he concedes that it would lead to a reasonable questioning of his impartiality. *See supra* at 22. From BOA's point of view, the principle that the United States Justice Department will devote its resources to prosecuting chargeback issues – a $31 billion problem the banking sector would much rather not have to litigate in civil cases – is very important indeed.

23

## V. JUDGE ENGLEMAYER EXHIBITED IMPERMISSIBLE BIAS AGAINST TEMAN.

### A. Judge Englemayer Falsely Claimed that Teman "Explicitly" "Admitted" He Timed His RCC Deposits to Exploit the Religious Practices of His Customers.

Perhaps not surprisingly, given the seriousness of the issues raised by Judge Englemayer's alleged religious bias against Teman, the Government largely ignores the issue in its reply. The Government asserts that Teman does not identify any "error or improper conduct;" makes the false claim that depositing checks on the Friday before Passover somehow gave Teman a "head start" in his alleged fraud; states that Judge Englemayer's comments about Teman reflected a view formed during trial; and then, without a hint of self-awareness, quotes from Judge Englemayer's comments as though placing a capstone on its refutation of improper conduct. GBr. 41-43.

Yet these comments go to the heart of the problem. According to Judge Englemayer, Teman "admitted" that he timed his check deposits for when he knew his religiously observant customers would be observing Passover and would not be reachable. *Id.* But Teman *never made such an admission*. Had he made the admission it would likely have been damning, but *no such admission, or anything remotely close to it, exists anywhere in the record*. Judge Englemayer then doubles down and states that Teman "*was explicit*" in his emails about timing his RCC

24

deposits to exploit the religious practices of his customers. GBr. at 42. Again, there is *nothing in the entire record* of the case to support this assertion. This was not a momentary lapse on a tangential issue, but a fundamental misstatement repeated over and over. See Br. at 67 ("Mr. Teman ***stated*** *that he would deposit checks on the eve of Passover when the customer would be disabled from learning about the deposits. . .****evidence****. . .which bespoke an intention to assure that he got away with the deposits that he knew were improper).* Yet the statement referred to by Judge Englemayer *does not exist* and cannot be *evidence*.

Like litigants, judges are held to the highest standards of candor, and few would disagree that judges have a duty to avoid making deliberately misleading or false statements and to take reasonable steps to avoid foreseeable and likely misapprehension. *See* Richard H. Fallon, Jr., *A Theory of Judicial Candor*, 117 Colum. L. Rev. 2265, 2297 (2017); *see also In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001) (stressing the importance of assuring that judges perform their duties in "an honest and informed manner") (quoting *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 161 (3d Cir. 1993). Judges who deliberately falsify evidence are doubtlessly very rare. But Judges are not immune from mischaracterizing facts or even misstating them. *See, e.g.*, Tom Lininger, *Green Ethics for Judges*, 86 Geo. Wash. L. Rev. 711, 736 (2018) ("The potential for judicial bias suggests a potential for judges to mischaracterize fact").

25

Because they are so rare, outright misstatements or false descriptions of the record strongly suggest the presence of bias or some other disqualifying prejudice that would explain the judicial lapse. Misstatements of the record cannot be explained by reference to a benign principle that would justify them. Judge Englemayer's misstatements go to a core basis for a finding of criminal intent and surely bring into question the impartiality of the judge in the mind of a reasonable person. Section 455(a) of Title 28 of the United States Code requires a federal judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Liteky v. United States*, 510 U.S. 540, 541 (1994). "The proper test ... is whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. § 455, but rather in the mind of the reasonable man." *United States v. Kelley*, 712 F.2d 884, 890 (1st Cir. 1983). A judge who points to statements, admissions, and emails that *do not exist* as *evidence* of fraud, raises precisely such a doubt.

### B. Counsel's Failure to Object to Judge Englemayer's *Ex Parte* Call Does Not Bar Teman's Challenge.

The Government does not provide any justification for Judge Englemayer's *ex parte* call to the United States Attorney's Office requesting "adequate supervision" of the United States attorneys prosecuting Teman. Such an *ex parte*

26

call violates a core principle of due process, namely, that "a defendant is entitled to be tried by an impartial and fair judge, who shall maintain his role of judge and not assume that of prosecutor." *United States v. Domres*, 142 F.2d 477, 479 (7th Cir. 1944). *Ex parte* communications between the trial judge and the prosecution team "should not be conducted except in extraordinary circumstances." *United States v. Walsh,* 700 F.2d 846, 858 (2d Cir.), *cert. denied,* 464 U.S. 825 (1983). See Br. at 63-64. By, in effect, calling in reinforcements to make sure the Government was adequately staffed to secure a conviction, Judge Englemayer improperly put his finger on the scale for the prosecution.

The Government does not substantively contest this proposition, other than in the most general terms. GBr. at 45. Rather, the Government relies almost entirely on a waiver theory, citing *United States v. Brinkworth*, 68 F.3d 633, 639 (2d Cir. 1995). But *Brinkworth* involved a situation in which hearsay rumors about the defendant's affair with the judge's wife and the judge's resulting animus against the defendant had been "prevalent in the community" and known to Brinkworth for years. *Id.* The Court concluded that in light of Brinkworth's long involvement in this case and knowledge of the rumor, his § 455(a) motion, conveniently filed soon after the district court refused to make a pre-plea commitment to sentencing, was untimely. *Id.*

27

The facts here could not be more different than those in *Brinkworth*. Judge Englemayer casually notified counsel of his actions after the fact in his robing room where counsel were less likely to be on guard for objectionable conduct and the topic of the conference was Teman's mental health, who was under the care of multiple health providers, including a mental health care provider and a sleep specialist. *See* A-137.2-A-137.3. The court then sealed the record and kept even the existence of the sealed transcript off the docket, making it impossible for any post-trial counsel reviewing the docket to know of the existence of the call. Judge Englemayer himself appears to have forgotten about the transcript. A-2479-2480. With no trace of the conference on the case docket, Teman's post-trial counsel had no basis to assert or even suspect that the Court had engaged in impermissible *ex parte* contact with the U.S. Attorneys' Office for the Southern District of New York. It was only after multiple motions by Teman and his current appellate counsel, in March and April of this year, A-2549-2568; Judge Englemayer's rejection of Teman's request for the sealed transcript because of Teman's "vexatious claims of conspiratorial misconduct," A-2463; the court's denial of the existence of the transcript, A-2473-74; and the refusal of Judge Englemayer to even consider Teman's request, A-2573, that the sealed transcript was located, disclosed, unsealed and filed on the public docket. A-2479-2483. Under these circumstances, where the *ex parte* communication was only reported after the fact

28

in an offhand manner during an unrelated discussion and then erased from the docket altogether, the waiver principle articulated in *Brinkworth* does not apply and this Court is free to exercise its discretion to reach the merits under *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 603 (2d Cir. 2008). The Court has "exercised this discretion where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding." *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 603 (2d Cir. 2008).

On consideration of the merits, the Court should hold that a request by a trial judge from for additional "supervision" of line attorneys from the prosecutors' office responsible for the matter constitutes impermissible favoritism to the interests of the Government and undermines the proper functioning of the adversarial system under the aegis of a neutral, impartial judge beholden neither to the defense nor the prosecution.[7]

---

[7] To excuse the *ex parte* communication, the Court would either need to announce a rule that a trial judge must inform the superiors of all attorneys appearing before him or her, whether prosecutors, public defenders or private attorneys, whenever the appearing attorneys seem to require additional "supervision," or concede that only the Government attorneys are entitled to this solicitude, which renders the judiciary an extension of the prosecution, an approach antithetical to the American constitutional order. *See Beer v. United States*, 696 F.3d 1174, 1176 (Fed. Cir. 2012) ("[t]he Constitution erects our government on three foundational corner stones—one of which is an independent judiciary"); *In re Grand Jury Subpoena of Ali*, No. M 11-188 (RPP), 1999 WL 595665, at *5 (S.D.N.Y. Aug. 6, 1999) ("the judiciary in this country is independent of the prosecution").

**C.    The Failure to Conduct a Timely *Curcio* Hearing Caused Significant Prejudice.**

"A criminal defendant has an absolute right under the Sixth Amendment to be represented by an attorney who has no conflict of interest." *Holloway v. Arkansas*, 435 U.S. 475 (1978). Indeed, the assistance of counsel is among those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Id.* (quoting *Chapman v. California,* 386 U.S. 18, 23 (1967). "Accordingly, when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage" of a trial, reversal is automatic. *Holloway*, 435 U.S. at 489.  To ensure that a criminal defendant's right to conflict-free counsel is protected, this Court has outlined procedures that must be followed before any substantive decisions are taken while the defendant is represented by conflicted counsel. *United States v. Curcio*, 680 F.2d 888-890 (2d Cir. 1982). So important are the interests protected by the rule that no decisions may be taken until a *Curcio* hearing has been held.

In addressing the conflict raised by Teman's representation by an attorney married to an assistant U.S. Attorney in the office seeking to put Teman in prison, the Government proceeds as though there had been "no harm, no foul" and the Court had promptly called a halt to the proceedings until Teman could either waive his right to separate counsel or seek substitute counsel. GBr. at 47 ("Judge Englemayer did exactly what Teman says was required."). Not so.

Judge Englemayer recalls that he received a childbirth announcement from Noam Biale, an attorney he considered to be his mentee and at whose apartment he sat shiva the previous year,[8] shortly before Biale entered an appearance in the case as one of Teman's new post-trial counsel. A-22; A-2133. Biale's wife was a friend and former colleague of Judge Englemayer's with whom he had worked "closely." A-2133. As a result, as soon as Judge Englemayer saw the name of Noam Biale on the Court docket, a name that was fresh in his memory because of the recent childbirth announcement and that involved multiple personal and possibly familial associations, he should have immediately halted the proceedings and put in place the *Curcio* procedures to protect Teman's Sixth Amendment rights. Instead, Judge Englemayer proceeded to consider and rule on a motion prepared by the conflicted counsel *before* raising the *Curcio* issue with the Government, defense counsel or Mr. Teman. A-2109.

Thus, even though Judge Englemayer was on notice that Teman was being represented by an attorney "literally married to the prosecution" and that all Teman's communications, strategic thoughts and tactical considerations were at risk of being compromised, particularly in the middle of the then-raging pandemic

---

[8] Shiva is the seven-day period of mourning observed for the deceased in Judaism. "Sitting shiva" refers to the mourning process of certain close relatives of the deceased. https://www.chabad.org/library/article_cdo/aid/281586/jewish/Who-Sits-Shiva-and-Mourns-for-Whom.htm. Judge Englemayer's language implies a close relationship with the deceased relative of Biale or his wife.

when both government and private firm attorneys were working from home, Judge

Englemayer let this situation fester for four weeks before raising the issue with

Teman at the December 1, 2022 conference. A-2116, 2133. This is not "exactly

what Teman" wanted or anything close to what *Curcio* requires.

## VI. THE GOVERNMENT FAILED TO PROVIDE PERSUASIVE JUSTIFICATION FOR ITS MISCONDUCT.

### A. The Government Failed to Disclose the Presence of a Potential Conflict Requiring a *Curcio* Hearing.

In the hearing at which Judge Englemayer raised the *Curcio* issue discussed

above, the Government admitted it had known of the potential conflict involving

Biale and his wife before Biale entered an appearance. A-2108.7. In fact, Biale had

been working with Teman since the summer, which Biale's wife would obviously

have known. A-2141. The U.S. Attorneys' Office would have had potential access,

through Biale and his wife, to Teman's communications, reflections, thoughts,

ideas and tactics for possibly as long as six months before the conflict was first

raised. Such a delay in bringing a critical constitutional issue bearing on core Sixth

Amendment rights to the attention of the Court does not comport with a

prosecutor's duty as "an administrator of justice, an advocate, and an officer of the

court." *Hughes v. Bowers*, 711 F. Supp. 1574, 1584 (N.D. Ga. 1989), *aff'd*, 896

F.2d 558 (11th Cir. 1990) (quoting ABA Standards for Criminal Justice 3–1.2(b)

(3d ed.1993). As the Supreme Court has explained, "[t]he United States Attorney is

32

the representative ... of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88, (1935); *see also* ABA Standards for Criminal Justice 3–1.2(c) ("The duty of the prosecutor is to seek justice, not merely to convict."). In these circumstances, where Teman's entire post-trial strategy was potentially compromised, the burden is on the Government to explain its conduct. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 25 (1967). As a trial court has cogently explained:

> [Once an] actual conflict of interest arose . . . the special prosecutor had a duty to disclose the policy but had a conflicting interest to conceal it. He chose to conceal it. By any standard, this deliberate, affirmative concealment from the court and the defense of important evidence constitutes a serious act of misbehavior which disregarded the rights of the defendant. The special prosecutor abdicated his duty to seek justice rather than conviction, and [defendant's] trial was rendered fundamentally unfair.

*Bowers*, 711 F. Supp. at 1584.

### B. The Government Inflamed the Jury with False and Misleading Statements About Teman's Religion.

The Government's cavalier attitude in attempting to play to the jury's potential religious prejudices and seeking to inflame the jury against Teman on religious grounds only becomes more disturbing the more the Government

33

attempts to minimize its conduct. *United States v. Grey*, 422 F.2d 1043, 1046 (6th Cir. 1970) (stating that appeals to prejudices are "foul blows" not tolerated by the United States courts ); *United States v. Heller*, 785 F.2d 1524, 1527 (11th Cir. 1986) (stating that appeal to a jury's racial and religious prejudices "prevents the impartial decision-making that both the Sixth Amendment and fundamental fair play require."); *Bains v. Cambra*, 204 F.3d 964, 974 n. 5 (9th Cir. 2000) (stating that, "although perhaps to a lesser extent" than racial or ethnic-based arguments, "religion-based prosecutorial arguments also are prohibited under clearly established federal law"); *United States v. Cabrera*, 222 F.3d 590, 594 (9th Cir.2000) ("Appeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant's Fifth Amendment right to a fair trial.").

The Government contended, in essence, that by depositing certain checks on the day before Passover, Teman was deliberately seeking to defraud Jewish clients who observed the Passover holiday. A-992-93. The implication was that, as a Jew taking advantage of fellow Jews, Teman had committed a particularly opprobrious act establishing criminal *mens rea*. This injects prejudice and negative stereotypes about Jews and projects them onto Teman. Such arguments would be extremely distasteful – to say the least – under the best of circumstances. But the government's claims are factually incorrect, which demonstrates that the purpose of the comments is to inflame the jury on religious grounds, not to provide fair

34

argument to assist the jury in reaching its decision. Contrary to the Government's claims, there was simply no "head start" to be gained by depositing checks during the day on Friday before Passover began. That Friday was a normal working day and the next business day was an "intermediate" day on which even very observant Jews are not prohibited from using electronic devices, driving, checking bank accounts, and taking action to avoid financial loss.[9] The Government thus deliberately mislead the jury with the false assertion that that Teman timed his allegedly fraudulent activity "to coincide with the beginning of Passover, *when he knew certain customers would not be checking their bank accounts.*" GBr. at 49 (emphasis added).

The notion that there was some evil scheme to pull one over on fellow Jews celebrating one of the year's most important holidays lacks any foundation in reality and only served to inject impermissible prejudice into the jury's deliberations. Moreover, given the confusing nature of the Government's presentation of the evidence on the real issues for the jury – whether the clients had approved the on-line Terms and Conditions and whether Teman had acted in the reasonable good faith belief that he was exercising a legitimate contractual right –

---

[9] https://www.chabad.org/library/article_cdo/aid/1000452/jewish/Chol-Hamoed.htm. The Court can take judicial notice of undisputed matters of Jewish religious practice. *See Johnson v. Paul*, No. 17-CV-3654 (KMK), 2018 WL 2305657, at *1 (S.D.N.Y. May 21, 2018).

35

distorting the facts to play on the jury's emotions and misusing religion to tarnish Teman's character no doubt had an outsized effect on the jury in the deliberation room and constitutes the kind of misconduct that calls for reversal and remand.[10]

## VII. THE FAILURE TO REQUIRE A SPECIAL VERDICT FORM VIOLATED TEMAN'S CORE CONSTITUTIONAL RIGHTS.

In its reply brief, the Government fails to address the radical flaw at the heart of the case: because of the combination of different customer narratives within each count, the jury could have agreed on only a single $18,000 cashed check and still convicted *on all four counts*, with wildly disproportionate monetary damages and unwarranted jail time. Br. 79-84. According to the Government, Teman's claim is untimely and must be rejected for that reason. GBr. at 52 (citing *United States v. Aiello*, 864 F.2d 257, 265 (2d Cir.1988). But the issue in *Aiello* was not timeliness standing alone, but the fact that plaintiff had originally opposed special interrogatories and attempted to switch its position in the middle of jury deliberation, more an estoppel than a timeliness issue. *Aiello*, 864 F.2d at 265. Nothing remotely comparable occurred here and the Government acknowledges that Teman's claim is reviewable. GBr. at 52. Even under the most stringent standard of appellate review, the error below is so serious, and implicates such

---

[10] That Judge Englemayer endorsed this approach does not justify or excuse it, but rather points up a blind spot in Judge Englemayer's view of Teman that also prevented him from receiving a fair trial. *See supra* at 23-26.

fundamental constitutional concerns, that this Court must reverse Teman's conviction.

In attempting to protect the jury's verdict, the Government reiterates that unanimity as to a particular customer was required for conviction on a particular count. GBr. at 53. This ducks the issue. The problem was that the jury could have agreed unanimously on one customer narrative *within* a count but not on another, with radically different outcomes in terms of potential victim harm and appropriate punishment.

Counts I and III consisted of 24 ABJ (Soleimani) checks cashed for $260,000 (Br. 16-21) and three uncashed Coney/518 W. 204 (Gabay) checks for $33,000 (Br. 11, 21). Counts II and IV consisted of one 18 Mercer (Soon-Osberger) check for $18,000 (Br. 11-16) and one Coney/518 W. 204 check for $18,000 (Br. 6-11). By combining the ABJ checks for which BOA suffered a $260,000 chargeback with the Coney checks that were *never* cashed (and *cannot* have caused BOA harm), the prosecution made it possible for the jury to convict on *all* counts based solely on a *single* customer relationship (Coney/Gabay, present in all four counts) that allegedly caused BOA total economic harm of $18,000. *All four counts and the entire trial* may have boiled down to nothing more than agreement by the jury that bank fraud existed with respect to *a single customer and $18,000 in damages*. A-83-84. For this, Teman was sentenced to restitution of

37

$264,000, forfeiture of $330,000 and a year in jail. This result is so disproportionate to any possible aim of the criminal justice system, so utterly shocking and unjust, that reversal and remand are necessary.

Rather than providing the Court with helpful analysis, the Government attempts to confuse the issue with inapposite, poorly applied, precedent. *United States v. Gushlak*, 728 F.3d 184, 195 (2d Cir. 2013), cited by the Government on p. 54 of its brief, does *not* stand for the proposition that in a count involving different customer relationships a court can apply a preponderance of the evidence standard to one customer relationship if the jury has found unanimity with respect to another. *Gushlak* simply says that when the jury is unanimous as to guilt on all counts, and all relationships within a count, the Court can calculate individual victims' losses based on a preponderance of the evidence (with factors such as time of purchase and sale of securities weighing in the balance). This is eminently sensible and unrelated to the issue in the Teman case.

*United States v. Fruchter*, 411 F.3d 377, 380-84 (2d Cir. 2005) only addresses *forfeiture* in the RICO context and expressly distinguishes *United States v. Booker,* 543 U.S. 220 (2005) and *Blakely v. Washington,* 542 U.S. 296 (2004) that remain applicable to incarceration and restitution. *Booker* and *Blakely* broadly hold that any fact that increases the punishment imposed on a defendant must be found by a jury beyond a reasonable doubt. *Fruchter*, 411 F.3d at 382 (2d Cir.

2005). As the Supreme Court has said, "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, and the judge exceeds his proper authority." *Blakely*, 542 U.S.at 304 (citing 1 J. Bishop, *Criminal Procedure* § 87, p. 55 (2d ed. 1872)). Because it is possible that the jury only agreed beyond a reasonable doubt on conduct involving total harm of $18,000, restitution of $260,000 based on this determination is unconstitutional under *Booker* and *Blakely*.

With respect to jail time, the Sentencing Guidelines for bank fraud provide for a base offense level of 7 and an enhancement of 4 if the economic loss is greater than $15,000 and less than $40,000, resulting in a total Zone B level for a non-violent first-time offender of 11 and a range of 8-14 months in prison. United States Sentencing Commission, Sentencing Guidelines Manual, available at https://www.ussc.gov/guidelines/2021-guidelines-manual-annotated (the "Sentencing Guidelines"), §2B1.1(b); Ch. 5, Part A. However, Judge Englemayer calculated Teman's jail sentence of one year based on a Guidelines level of 19 and an incarceration range of 30 and 37 months, applying the loss calculation from the ABJ checks as to which no certainty of jury agreement existed. A-2345. Had Judge Englemayer started from a significantly lower offense level, he would likely have imposed no jail time at all. The Sentencing Guidelines themselves call on judges to

39

consider a sentence other than imprisonment for offenses in the Zone A or B range. Sentencing Guidelines, § 5C1.1, comment 4. *See also* 28 U.S.C. § 994(j).[11]

Ultimately, none of the cases cited by the Government can get around the fundamental flaw in the charging and instructing decisions that arises when different customer narratives are grouped together in a single count and the jury is permitted to convict on the entire count based on only one of the different narratives. Br. 79-84. Such a conviction offends the fundamental Constitutional rights of the accused.

---

[11] A drug analogy may help sharpen the issue. Suppose the Government charges a defendant with sales of a controlled substance to A and B and combines the two alleged sales in a single count. The Government produces evidence at trial that the defendant has allegedly sold an ounce of marijuana to A and 100 grams of fentanyl to B. The court requires the jury to agree unanimously that all the elements of illegal trafficking of a controlled substance are met as to A *or* B, but there are no special interrogatories or special verdict form. The jury returns a guilty verdict. It is impossible to know whether the jury has agreed as to A or B, but the court sentences the defendant, a second-time non-violent offender, based on the sale to B, which carries an offense level of 24, as opposed to the sale to A, which carries an offense level of 6. The sentencing guidelines indicate a range of 1 to 7 months imprisonment for the sale to A and 57-71 months for the sale to B. The judge sentences the defendant to five years imprisonment. Teman submits that the result would violate the defendant's sixth amendment jury trial rights, fifth amendment due process rights and eighth amendment proportionality rights.

# CONCLUSION

For the reasons set forth above, Teman's conviction must be reversed.

Respectfully submitted,

New York, New York
October 14, 2022

QUAINTON LAW, PLLC
By:*/s/ Eden P. Quainton*
Eden P. Quainton
2 Park Ave., 20th Fl.
New York, NY 10016
Telephone: 212-419-0575
equainton@gmail.com
*Attorney for Appellant Ari Teman*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(I), and the word limit of Fed. R. App. P. 32(a)(7)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,961 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

# 21-1920-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ARI TEMAN,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PETITION FOR REHEARING *EN BANC* FOR DEFENDANT-APPELLANT

EDEN QUAINTON
QUAINTON LAW, PLLC
*Attorneys for Defendant-Appellant*
2 Park Avenue, 20th Floor
New York, New York 10169
(212) 419-0575

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................... i

TABLE OF AUTHORITIES ............................................................................. ii

PRELIMINARY STATEMENT .........................................................................1

LEGAL ARGUMENT........................................................................................2

    I.   The Court Incorrectly Found the Government Had Met its Burden of Demonstrating Venue, in an Analysis that Conflicts with Precedent in the Second Circuit and Sister Circuits.....................................................................................2

    II.  The Court Incorrectly Held That the Record Lacked Any Evidence of Appellant's "Surprise" and Misapprehended the Constructive Amendment of the Government's Indictment. .......................................................................................8

    III.   The Court Improperly Characterized Judge Englemayer's Repeated Factual Misstatements as a Matter of "Opinion." ...........................................................12

    IV.   The Court Erred in Finding that Judge Englemayer's Over $2 Million Stake in BOA Is Not a "Financial Interest" that Warrants Recusal .....................14

CONCLUSION.................................................................................................16

i

# TABLE OF AUTHORITIES

## Cases

*Burks v. United States*,
437 U.S. 1, 15 (1978)............................................................................................4

*In re Interest Swaps Antitrust Litigation*,
16-MD-2704 ............................................................................... 14, 15

*Liteky v. United States*,
510 U.S. 540 (1994)...........................................................................................13

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ...............................................................................12

*United States v. Crisci*,
273 F.3d 235 (2d Cir. 2001) .................................................................................1

*United States v. D'Amelio*,
683 F.3d 412 (2d Cir. 2012) ..............................................................................10

*United States v. Fairchild*,
69 F.3d 536 (5th Cir. 1995) ..................................................................................1

*United States v. Greenidge*,
495 F.3d 85 (3d Cir. 2007) ...................................................................................1

*United States v. Hood*,
920 F.3d 87 (1st Cir. 2019)................................................................................1, 7

*United States v. Kidd*,
394 F. Supp. 3d 357 (S.D.N.Y. 2019) ..................................................................7

ii

*United States v. Ravich,*
    421 F.2d 1196 (2d Cir. 1970) ....................................................................16

*United States States v. Rutigliano,*
    790 F.3d 389 (2d Cir. 2015) ....................................................................5, 6

*United States v. Taleb-Jedi,*
    566 F. Supp. 2d 157 (E.D.N.Y. 2008) .......................................................11

*United States v. Thomas,*
    315 F. App'x 828 (11th Cir. 2009).............................................................1

*United States v. Thompson,*
    76 F.3d 442 (2d Cir. 1996) ........................................................................15

*United States v. Young,*
    952 F.2d 1252 (10th Cir.1991) ..................................................................1

*USA v. Teman*, 19-cr-0696.........................................................................4, 15

## Constitutional Provisions

United States Constitution, Fourth Amendment.......................................................7

## Rules and Regulations

Federal Rule of Appellate Procedure 35....................................................................1
Federal Rule of Appellate Procedure 40(a) ..............................................................1
Local Circuit Court 35.1 ............................................................................................1
Local Circuit Court Rule 40.1....................................................................................1
Regulation CC, 12 CFR 229.34 .................................................................................5

iii

## **Other Authorities**

89 C.J.S. Trial § 754 ...........................................................................................14
Black's Law Dictionary, 11th Ed. (2019)..............................................................10

## PRELIMINARY STATEMENT

Pursuant to Federal Rules of Appellate Procedure 35 and 40(a), and Local Circuit Court Rules 35.1 and 40.1, Defendant-Appellant Ari Teman ("Appellant" or "Teman") hereby petitions for a rehearing *en banc* of this Court's Summary Order, dated June 8, 2023 (the "Summary Order"), affirming the judgment of the District Court sustaining Teman's conviction on two counts of bank fraud and two counts of wire fraud stemming from the use of remotely created checks ("RCCs") pursuant to the online payment terms of GateGuard, Inc., of which Appellant is CEO. Rehearing *en banc* is appropriate because:

(1)     The Court's venue analysis (a) conflicts with applicable law both in the Second and other Circuits that the crime of bank fraud is complete upon deposit or placement of a bank at risk, *see United States v. Crisci*, 273 F.3d 235, 240 (2d Cir. 2001) (risk of presentment of check to bank); *United States v. Thomas*, 315 F. App'x 828, 838 (11th Cir. 2009) (bank fraud complete upon deposit); *United States v. Fairchild*, 69 F.3d 536, 1995 WL 625420 at * 3 (5th Cir. 1995) (same); *United States v. Greenidge*, 495 F.3d 85, 101 (3d Cir. 2007) (conspiracy to commit bank fraud complete upon deposit); *United States v. Young*, 952 F.2d 1252, 1257 (10th Cir.1991) (placement of bank at risk); (b) conflicts with law in other circuits that IP addresses do not convey user location data, *see United States v. Hood*, 920 F.3d 87, 92 (1st Cir. 2019); and (c) raises a question of

1

exceptional importance as to whether lay witnesses should be permitted to draw

geolocation conclusions from technical IP address data.

(2)     The Summary Order raises a question of exceptional importance as to

whether, when an indictment specifies only one means of committing a crime, the

indictment is constructively amended when the Government is permitted to prove

another means of committing the crime not specified in the indictment.

(3)     The Summary Order raises a question of exceptional importance as to

whether a District Court may misstate evidence supporting an inference of *mens*

*rea*.

(4)     The Summary Order raises a question of exceptional importance as to

whether, when a judge has recused himself from a civil case to avoid the

appearance of impropriety resulting from his substantial indirect ownership of

stock in a party, the judge should be required to recuse himself when he holds the

identical interest in the only victim in a criminal case.

## **LEGAL ARGUMENT**

I.     **The Court Incorrectly Found the Government Had Met its Burden of Demonstrating Venue, in an Analysis that Conflicts with Precedent in the Second Circuit and Sister Circuits.**

Counts 1 and 3 of the Government's superseding indictment against Teman

involved the deposit of 27 RCCs at a Bank of America branch in Miami, Florida in

the total amount of $297,000. Summary Order at 2. These checks consisted of two

2

unrelated batches of checks drawn on separate accounts. The larger batch involved

24 checks in the total amount of $264,000 drawn on JP Morgan Chase accounts for

two entities referred to collectively as ABJ. Appellant's Br. at 16, 20-21. The

smaller batch involved three checks in the total amount of $33,000 drawn on a

Signature Bank account for an entity called 518 W. 204 LLC. Appellant's Br. at

21. This account had been closed before the checks were deposited and the three

checks were returned uncashed. Appellant's Br. at 11, 32 and Note 21. Teman

never had access to these funds and no harm occurred to any party from the deposit

of these checks. Appellant's Br. at 11.

The Court's venue determination with respect to Counts I and III relied

*exclusively* on the analysis of the three uncashed checks drawn on Signature bank.

Summary Order at 3. The Government did not establish, and the Court did not find,

that venue existed with respect to the 24 checks presented in the total amount of

$264,000, checks that served as the principal basis for Teman's sentencing to payment of $330,000 in restitution, $330,000 in forfeiture and a year in prison.[1]

Incredibly, to convince the Court that venue was proper with respect to the three uncashed checks, the Government relied on matter outside the appellate record. In responding to this Court's request for clarification of the timing of the deposit and alleged "fraud review" of the three uncashed checks, the Government relied on Exhibit 149. *See* Transcript of Oral Argument, at 49:20-21. The Government stated that his exhibit was "in the appendix." However, Government Exhibit 149 is *not* in the Joint Appendix and was not filed on the trial docket in response to a court order. *See USA v. Teman*, 19-cr-0696, Dkt. 128. The Government's misrepresentation of the appellate record alone warrants reversal. *See Burks v. United States*, 437 U.S. 1, 15 (1978).

Beyond the Government's reliance on matter outside the record, the Court's holding on venue conflicts with the applicable law in this Circuit and sister Circuits. In a footnote, the Court dismissed Appellant's argument that the crime of bank fraud is complete upon deposit of checks that place the bank at risk of loss.

---

[1] Any "fraud review" of the 24 checks occurred in Ohio or Texas. Appellant's Br. at 29 and Note 18; 33 and Note 33. Judge Engelmayer rejected the Government's additional arguments with respect to the 24 checks. *See* A-727; Appellant's Reply Br. at 6 and Note 1. This Court was also unpersuaded by these additional arguments.

*See* Summary Order, at 4 and Note 2 (*citing United States States v. Rutigliano*, 790 F.3d 389, 397 (2d Cir. 2015) ("scheme to defraud is not complete until the proceeds have been received"). However, in the present case, the Court was wrong as a matter of law. Bank fraud relating to *RCC's* drawn on a *closed* account must be complete on deposit.

First, with respect to RCCs, any crime of bank fraud involving the deposit of RCC's *must be complete* at the time of deposit. Under Regulation CC, 12 CFR 229.34, as amended, a Federal Reserve regulation relating specifically to RCC's, once a first bank accepts an RCC for deposit, all subsequent banks to whom the check is presented or transferred benefit from a warranty that the check has been duly authorized. A-2232-A2233 (Affidavit of Professor Richard Fraher at ¶ 31). Thus, a bank subsequent to the bank of first deposit can suffer a breach of warranty, which is indeed how most of the checks at issue were labelled, *see* A-1904-A-1920, and it can issue a charge-back, but only the bank of first deposit can be *criminally* defrauded, as the Government itself acknowledged in recognizing that Bank of America was the only victim in this case, A-662. In this circumstance, the Court's reliance on *Rutigliano* conflicts with settled precedent in this and other Circuits that the crime of bank fraud is complete upon deposit or presentment of a check. *See supra* at 1; Appellants Reply Br. at 1-2.

5

Moreover, when RCC's presented to a bank of first deposit are uncashed, like the three checks at issue for venue purposes in Counts I and III, it is *impossible* for the defendant to receive the proceeds of the check from the closed account. The *Rutigliano* analysis *cannot* apply unless the bank of first deposit releases the funds upon deposit. If the bank of first deposit places a hold on funds drawn on a closed account, as occurred here, no funds will *ever* be received and *Rutigliano* is inapplicable. Whether there is a fraud review at the level of the drawee bank is irrelevant since the check must be rejected regardless. The *only* party that is potentially placed at risk is the bank of first deposit (here, BOA in Miami). In this scenario, the Court erred as a matter of law in failing to follow the well-established jurisprudence holding that the crime of bank fraud is complete upon deposit or placement of the bank at risk. *See supra* at 1, 5.

Counts II and IV involved two checks deposited in March for a total of $36,000. *See* Appellant's Br. at 6, 10, 15. These two checks were deposited *via* a mobile telephone application. Appellant's Br. at 29. The only evidence of venue was testimony of a fact witness, Karen Finocchiaro. Appellant's Reply Br. at 4. Ms. Finochiario testified, based on a "microscopically small" spreadsheet, that the IP address associated with Teman's mobile deposits was correlated with "New

York, New York" in the bank's records. *Id.*[2] The Court ignored case law from within the Second Circuit that an IP address does *not* correspond to a user's physical address. *See United States v. Kidd*, 394 F. Supp. 3d 357, 359–60 (S.D.N.Y. 2019). Other circuits have clearly held that IP addresses do not "convey. . . user location information." *See United States v. Hood*, 920 at 92 (citing cases). It would be a grave error for this Court to affirm the proposition that IP addresses can be used as the core evidence to support a geolocation finding—a holding that would have significant consequences for the Fourth Amendment and citizens' expectations of privacy.

Moreover, the relationship of an IP address to physical location is a highly technical matter. Appellant's Reply Br. at 4-6. In addition to the Court's error in concluding that it was reasonable to infer physical location from a user's IP address, it was plain error for the Court to find that the prosecution can satisfy its burden of proving venue by a preponderance of the evidence when it relies on evidence a jury could not reasonably evaluate without *expert* testimony, upending the balance between Government and accused.

---

[2] The spreadsheet only exists in electronic form and the jury's difficulty in reviewing it is described in Appellant's Br. at 21 and Note 14.

II.     **The Court Incorrectly Held That the Record Lacked Any Evidence of Appellant's "Surprise" and Misapprehended the Constructive Amendment of the Government's Indictment.**

In finding that the indictment under which Teman was convicted had not been constructively amended, the Court relied heavily on an alleged absence of "surprise" at the change in theory. Summary Order, dated June 8, 2023 (the "Summary Order") at 5. This is not correct. In the weekend between the first two days of trial and the three concluding days, Teman's counsel opposed the Government's tactics and argued that the theory pursued by the Government, supported by rulings of Judge Englemayer, constituted a constructive amendment of the indictment. *See* January 26, 2023, Letter from Joe DiRuzzo to Judge Englemayer, Dkt. 90 at 1.

The "surprise" registered by Teman's counsel followed the Court's decision to prohibit the introduction of evidence – which formed a core aspect of Teman's planned defense to the charge of depositing counterfeit checks – that remotely created checks were a valid financial device. Trial Transcript A137.28-29. In ruling that a Federal Register extract attesting to the validity of RCC's was inadmissible, Judge Englemayer did not refer to the operative language of the indictment – the depositing of counterfeit checks – but articulated a different theory, namely, "the indictment alleges instead that Teman deposited the checks while pretending to have authorization from the account holders to do so, whereas

8

in fact he had created and negotiated the checks without such permission." However, this is *not* what the indictment alleges, as there is no reference to authorization or pretending to have such authorization on the face of the indictment. *See* A121-124; Dkt. 55. In the same ruling on motions *in limine*, Judge Englemayer also granted the Government's motion to preclude the testimony of J. Benjamin Davis, Defendant's proposed expert who was to have provided testimony that the GateGuard checks were "valid RCCs and thus not counterfeit." A127.37. According to the District Court, this testimony was irrelevant and confusing, because it distracted from the issue of whether Teman "lacked authorization," which Judge Englemayer claims is the operative core of the indictment. A 127.38.

But the only specific criminal conduct alleged supporting the charge of bank fraud is contained in the "to wit" clause and alleges that Teman deposited "counterfeit" checks. *Id.* The flaw in Judge Englemayer's reasoning is that although a counterfeit check, by definition, lacks authorization, a check that lacks authorization is not necessarily counterfeit. For example, a corporate check that requires two signatures but is only presented with a single signature may be unauthorized, but it is plainly not counterfeit. Similarly, a promissory note issued without minority shareholder approval may be unauthorized, but it is obviously not counterfeit. Because lack of authorization is an *element* of counterfeiting, this does

9

not make the absence of authorization *the same thing* as counterfeiting, or that the Government can prove counterfeiting by proving one of its elements, any more than the Government could prove a charge of assault with a deadly weapon merely by proving possession of the weapon.

*United States v. D'Amelio*, 683 F.3d 412, 416, 421–22 (2d Cir. 2012), relied on in the Summary Order at 5, does not address the flaw in Judge Englemayer's theory. *D'Amelio* merely says that where multiple means of committing a crime are specified in an indictment, the Government need not prove that each of the means specified was actually used by the Defendant. *D'Amelio* says nothing about the present case, in which the *only* means of committing bank fraud specified in the indictment is the depositing of counterfeit checks.

Furthermore, the Court follows Judge Englemayer's incorrect reading of Black's Law Dictionary to find that counterfeit *means* unauthorized, which is not what the dictionary states and further rewrites the indictment. Summary Order at 5. Black's Law Dictionary, 11th Ed. (2019) defines "counterfeit" as follows:

> To unlawfully forge, copy or imitate an item, esp. money or a negotiable instrument (such as a security or a promissory note) or some other officially issued item of value (such as a postage stamp or a food stamp), or to possess such an item without authorization with the intent to deceive or defraud by presenting the item as genuine.

The definition makes clear that the essence of a counterfeit item (whether possessed without authorization or presented as genuine) is that it has been

10

unlawfully forged, copied or imitated. Yet Judge Englemayer's instruction with respect to "remotely created checks" effaces the "counterfeiting" crime with which Teman was accused, telling the jury they should not "concern themselves" with whether the checks in question "meet the technical definition" of an RCC. A-367. In essence, the jury is told not to consider whether the item is forged, copied, or imitated – in sum, counterfeit – as it could be none of those things if it met the "technical" requirements of an RCC. The only issue for Judge Englemayer is whether the RCC was authorized—which varies the "core of criminality" from counterfeiting to acting without authorization.[3]

Judge Englemayer's final instructions to the jury make clear he has eliminated the notion of counterfeiting entirely from the indictment:

> [Defendant is charged] with committing a bank fraud scheme in connection with the deposit in April 2019 of 27 checks, allegedly by creating, and then making the false pretense and representation to the bank that he had the account holders' authority to deposit these checks.

A-1209-10.

In the above instruction, the verb "creating" is left dangling without an object or a qualifier; it is creating the checks *as such* that is made the predicate to the unauthorized use of the check, which destroys the counterfeiting charge, since,

---

[3] If there were no "to wit" clause, but simply a generic reference to bank fraud, the indictment would be void for vagueness. *See United States v. Taleb-Jedi*, 566 F. Supp. 2d 157, 181 (E.D.N.Y. 2008). Without the counterfeiting charge, there is no constitutionally sufficient "core of criminality" of which Teman was put on notice.

11

contrary to Judge Englemayer, it is not creating a check *per se* that constitutes counterfeiting, but creating a copy, an imitation, or a forgery—concepts that are entirely written out of the indictment, in violation of Teman's constitutional rights.[4]

### III. The Court Improperly Characterized Judge Englemayer's Repeated Factual Misstatements as a Matter of "Opinion."

On several occasions, Judge Englemayer insisted that Teman had stated that he would deposit checks on the eve of Passover to prevent his Orthodox Jewish clients from challenging the RCC's drawn on their accounts in a timely fashion. *See* A-2302-2303 ("Mr. Teman *stated* that *he would deposit checks* on the eve of Passover when the customer would be disabled from learning about the deposits and acting to promptly stop them") (emphasis added); A-2404 ("As you yourself *admitted* [addressing Teman], *you timed the deposit of certain checks* for when you

---

[4] Judge Englemayer compounded his error by failing to instruct the jury that, with respect to online agreements, authorization can result from constructive notice. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017). Had the lack of authorization truly been the core of criminality, the issue of constructive notice should have been placed front and center. All GateGuard's customers who testified at trial were on at least constructive notice that the GateGuard Payment Terms authorized the use of remotely created checks. Appellant's Br. at 8 (Gabay); 13 (Soon-Obsberger); 17-19 (Soleimani). Numerous parties submitted letters to Judge Englemayer warning of the dangers of criminalizing widespread and customary commercial conduct. *See, e.g.,* Trial Dkt. 350, Ex. 3 (Letter from Professor Lawrence Lessig) at 2 ("the reality of online commerce is that agreements such as [GateGuard's] are the norm"). On rehearing, the Court should heed the warning of these scholars and find that the failure to provide an instruction on constructive notice constitutes reversible error.

knew that your religiously observant customer would be observing Passover and thus not reachable. *You were explicit about that* in your *e-mails*.") (Emphasis added). There is no evidence for these assertions.[5]

In the Summary Order, the Court found that Judge Englemayer had simply expressed a reasonable opinion formed during trial. Summary Order at 8 (*citing Liteky v. United States*, 510 U.S. 540, 555 (1994)). However, the Court's finding cannot be squared with Judge Englemayer's express statements cited above since Judge Englemayer purports to describe *actual words* spoken by Teman*, an actual admission* made by Teman*, actual emails* he sent to Jewish clients. But there are no such statements, no admissions, no explicit emails.

Indeed, Judge Englemayer refers to his own assertions *as evidence* justifying the Government's argument that Teman's conduct "bespoke an intention to assure he got away with the deposits that he knew were improper." A-2302-2303. Judge Englemayer is not expressing an opinion as to Teman's character, right or wrong. He is making the statement that the record contains evidence – in the form of actual statements and admissions by Teman – supporting the most fundamental

---

[5] In 2018, a year before the events at issue in Teman's prosecution, Teman had stated to a client that he would place a lien on the client's property "on Pesach." Appellant's Br. at 9. This comment had nothing to do with the deposit of any of the checks at issue in this case.

13

element in the Government's entire case: that Teman acted with the requisite *mens rea* in depositing RCC's.

As this Court rightly points out, trial judges are entitled to opinions shaped by their intimate knowledge of the case and their first-hand impressions of the defendant. Summary Order at 8. But they may not misstate evidence on a material point. *See* 89 C.J.S. Trial § 754. Such misstatements are rare. But when they do occur, public confidence in the integrity of the judicial process requires that they be corrected and that a judgment reached under their shadow be reversed.

IV. **The Court Erred in Finding that Judge Englemayer's Over $2 Million Stake in BOA Is Not a "Financial Interest" that Warrants Recusal**

The Court held that there was "nothing to" Teman's claim that Judge Englemayer was required to recuse himself because he held his interest in the only victim in the case through Berkshire Hathaway. Summary Order at 7. According to the Court, such an interest is not a "financial interest" unless the "judge participates in the management of the fund." *Id.* This is flatly wrong. Judge Englemayer had already concluded, as the presiding judge in the multi-district litigation, *In re Interest Swaps Antitrust Litigation*, 16-MD-2704, that his holding in BOA through Berkshire Hathaway *was* a financial interest and required his recusal in that case. As Judge Englemayer wrote in that case:

> After consultation with the Committee on Codes of Conduct of the Judicial Conference of the United States, and after careful consideration, I have concluded that I must recuse [because of the

14

> family's holding in Berkshire Hathaway] . . . As Advisory Opinion No. 57 reflects, the Committee's view is that a company's 10% ownership of stock in another company is a benchmark measure of parental control over a subsidiary, and that, in a case in which the subsidiary is a party, recusal (or divestiture) by a judge whose household has a legal or equitable interest in the parent is necessary, *as the judge's impartiality in supervising the case could otherwise reasonably be questioned* (emphasis added).

*Interest Swaps Antitrust Litigation*, Dkt. 844.

Judge Englemayer and the Committee on Codes of Conduct of the Judicial Conference of the United States unequivocally confirm that Judge Englemayer has a financial interest in BOA through his holding in Berkshire Hathaway stock. Moreover, they conclude that recusal is mandated not because of a technicality but because Judge Englemayer's interest is such that, absent recusal, "his impartiality in supervising the case could otherwise reasonably be questioned." There is no principled reason to conclude that an interest in a civil case that would cause the judge's impartiality to be questioned is of no moment in a criminal case. The interest that required recusal in *Interest Swaps Antitrust Litigation* is no more or less "remote, contingent, indirect or speculative," *see* Summary Order at 7 (citing *United States v. Thompson*, 76 F.3d 442, 451 (2d Cir. 1996)) than the interest in *USA v. Teman*. It is the exact same interest. It cannot be direct enough to require recusal in one case but too indirect for recusal in another. The only question is whether there is something particular about the criminal context that distinguishes the interest so that, while the judge's impartiality could

15

reasonably be questioned in a civil case it cannot be so questioned in a criminal case. While recusal is mandatory in one case but discretionary in another, this does not resolve the issue since the problem of impartiality is present in both. Indeed, in some ways, the concern is heightened in the criminal context. Where the stakes involve personal liberty and the full coercive power of the state, a judge's interest in the victim of a crime requires perhaps greater scrutiny than the judge's interest in a party to a civil case. And the Court's reliance on the *de minimus* holding in *United States v. Ravich*, 421 F.2d 1196, 1205 (2d Cir. 1970) falls flat. *Ravitch* involved ownership of stock worth at most $15,000. *Id.* Judge Englemayer's interest in BOA amounts to over $2 million dollars. Appellant's Br. at 53. And the stakes in this case, which involve shifting the enforcement risk of RCCs and chargebacks to the US Government, are of substantial importance to BOA, underscoring the need for recusal.

## <u>CONCLUSION</u>

For the foregoing reasons, Appellant respectfully requests that the Court reconsider the Summary Order *en banc* and reverse and remand for a new trial.

Dated:   July 12, 2023
   New York, NY

        Respectfully submitted,

        QUAINTON LAW, PLLC

16

By: _Eden Quainton_
Eden P. Quainton
2 Park Ave., 20th Fl.
New York, New Yok 10016
Tel: 212-419-0575
Fax: 212-376-5699
eden.quainton@quaintonlaw.net
*Attorneys for Appellant Ari Taman*

17

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

ARI TEMAN,

     Appellant,                             Case No. 21-1920

v.

UNITED STATES OF AMERICA

     Respondent.

## CERTIFICATION OF CONFORMITY

The undersigned hereby certifies that this petition has been prepared in Times Roman 14-point font and consists of 3,897 words in accordance with the length requirements for briefs and supporting papers before this Court.

Dated: July 12, 2023

                                    */s/ Eden P. Quainton*_____
                                    QUAINTON LAW, PLLC
                                    2 Park Ave., 20th Fl.
                                    New York, New Yok 10016
                                    Tel: 212-419-0575
                                    Fax: 212-376-5699
                                    eden.quainton@quaintonlaw.net
                                    *Attorney for Appellant Ari Teman*

18

21-1920-cr
*United States v. Ari Teman*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.  CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1.  WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER").  A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 8th day of June, two thousand twenty-three.

Present:

> JOHN M. WALKER, JR.,
> WILLIAM J. NARDINI,
> EUNICE C. LEE,
>      *Circuit Judges.*

_____

UNITED STATES OF AMERICA,

>           *Appellee*,

>      v.                                                              21-1920-cr

ARI TEMAN,

>           *Defendant-Appellant.*[1]

_____

| | |
|---|---|
| For Appellee: | KEDAR S. BHATIA (David Abramowicz, *on the brief*), Assistant United States Attorneys, *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY. |
| For Defendant-Appellant: | EDEN P. QUAINTON, Quainton Law, PLLC, New York, NY. |

_____

[1] The Clerk of Court is respectfully directed to amend the caption accordingly.

1

Appeal from a judgment of the United States District Court for the Southern District of New York (Paul A. Engelmayer, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Defendant-Appellant Ari Teman appeals from a judgment in a criminal case entered on July 29, 2021, in the United States District Court for the Southern District of New York (Paul A. Engelmayer, *Judge*).  On January 29, 2020, a jury convicted Teman of two counts of bank fraud in violation of 18 U.S.C. § 1344 and two counts of wire fraud in violation of 18 U.S.C. § 1343.  At trial, the government presented evidence that Teman had created and deposited unauthorized checks in the names of four customers of his business, GateGuard, which sold apartment building intercom systems.  Teman deposited two such checks, totaling $18,000, on March 28, 2019, and 27 such checks, totaling $297,000, on April 19, 2019.  Count Two (bank fraud) and Count Four (wire fraud) relate to the March 2019 checks and Count One (bank fraud) and Count Three (wire fraud) relate to the April 2019 checks.  On July 28, 2021, the district court sentenced Teman to a year and a day in prison and three years of supervised release.  The court ordered $333,000 in forfeiture penalties, $259,340.32 in restitution, and a mandatory $400 special assessment.  The court entered judgment on July 29, 2021.  Teman now appeals. We assume the parties' familiarity with the case.

Teman first argues that there was insufficient evidence of venue in the Southern District of New York for any of the four charges.  This court reviews venue determinations *de novo*.  *United States v. Kirk Tang Yuk*, 885 F.3d 57, 71 (2d Cir. 2018).  "Both the Sixth Amendment and Fed. R. Crim. P. 18 require that a defendant be tried in the district where his crime was committed."  *United*

*States v. Rutigliano*, 790 F.3d 389, 395 (2d Cir. 2015) (internal quotation marks omitted). The government must prove venue "by a preponderance of the evidence." *United States v. Hoskins*, 44 F.4th 140, 157 (2d Cir. 2022) (internal quotation marks omitted). "Where the Government has prevailed at trial, we review the sufficiency of the evidence as to venue in the light most favorable to the Government, crediting every inference that could have been drawn in its favor." *Id*. (internal quotation marks omitted). In fraud cases, venue is proper "in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003).

The evidence of venue was sufficient for all four Counts. As to Counts Two and Four (the March 2019 checks), the government introduced bank records showing that Teman deposited the checks from a cell phone associated with an IP address traceable to Manhattan. A Bank of America employee testified that the IP address data showed "a distinct location in which an online banking login is being conducted." App'x at 339–40. Teman argues that the address might correspond to the location of the bank server processing the deposit or the location of the node through which the mobile device had been routed to the internet. But viewing the evidence in the light most favorable to the government, a reasonable juror could have concluded that the preponderance of the evidence demonstrated that Teman made the deposits in Manhattan.

Venue was proper on Counts One and Three (the April 2019 checks) because employees of Signature Bank, which held an account on which some of the checks were drawn, reviewed the checks for fraud in Manhattan. This review was an act "in furtherance of the scheme to defraud," because Teman needed the bank to approve the checks to gain access to the full amount. *See United States v. Vilar*, 729 F.3d 62, 95 (2d Cir. 2013). It is immaterial that Signature Bank's

3

employees intended to defeat, not further, fraud, because even acts of third parties unaware of the attempted fraud can be made part of the fraudulent scheme by the defendant.  *See, e.g., United States v. Kim*, 246 F.3d 186, 192–93 (2d Cir. 2001) (wire fraud venue proper in the Southern District of New York where the defendant could reasonably have foreseen that his fraud would cause his employer to direct Chase Manhattan Bank to initiate a wire transfer).

Teman argues that he could not have reasonably foreseen that the fraudulent checks would be processed by Signature Bank in Manhattan.  We disagree.  The checks listed Signature Bank's address as 485 Madison Ave., 11th Floor, New York, NY 10022, and Teman knew by April that the March checks had been flagged for fraud, so it was reasonable to foresee that Signature Bank would flag and review the April checks as well.  *See Svoboda,* 347 F.3d at 483 (venue proper in the Southern District where the defendant could have reasonably foreseen that his trade would be executed on the New York Stock Exchange).[2]

Teman also argues that the government constructively amended the indictment by arguing to the jury that Teman had presented the banks with "unauthorized" checks—that is, facially valid checks he falsely claimed had been authorized by his customers—rather than "counterfeit" checks, as the indictment alleged.  We review claims for constructive amendment to indictments *de novo*. *United States v. Dove*, 884 F.3d 138, 145 & 148 (2d Cir. 2018).  We are not persuaded.  To establish a constructive amendment, Teman must demonstrate that "the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether

---

[2] Teman also argues that the fraud review cannot establish venue because the fraud was complete when he deposited the checks in Miami.  But "a scheme to defraud is not complete until the proceeds have been received." *Rutigliano*, 790 F.3d at 397 (internal quotation marks omitted).  And while Teman claims that the account on which the Signature checks had been drawn had been closed before Teman was able to access any of the funds, the evidence established that the fraud review was a critical part of the scheme because it took place while Bank of America had placed a hold on the deposited funds in GateGuard's account.

the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021) (internal quotation marks omitted). "[C]ourts have constantly permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." *United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 310 (2d Cir. 2009) (emphasis and internal quotation marks omitted). As an initial matter, the definition of "counterfeit" covers the government's theory. *See* Black's Law Dictionary (11th ed. 2019) (defining "counterfeit" to mean, among other things, "to possess . . . an item without authorization and with the intent to deceive or defraud by presenting the item as genuine"). Even if "counterfeit" did not include "unauthorized," the government's case at trial, and the district court's jury instructions, would still have fallen well within the core of criminality alleged in the indictment. *See, e.g., United States v. D'Amelio*, 683 F.3d 412, 416, 421–22 (2d Cir. 2012) (no constructive amendment where jury was instructed it could find the defendant guilty of attempted enticement of a minor based on his use of either the telephone or the internet when the indictment specified only the internet because, whether he used the telephone or the internet, his communications "took place as part of a single course of [fraudulent] conduct" (internal quotation marks omitted)). There is also no indication that Teman was "surprised" by the government's theory of the case at trial, which "is further indication that the [evidence was] encompassed in the core of criminality charged in the indictment." *Id*. at 422 (internal quotation marks omitted). On several occasions before the trial, the government explained its theory that Teman had deposited "unauthorized" checks.

Teman challenges the verdict form, arguing that the district court's failure to require the jury to specify which customers they found had been defrauded may have resulted in Teman being sentenced on an erroneous factual predicate. He argues that because both the March and April

5

deposits contained checks in the name of 518 West 204, LLC, the jury could have convicted on all four counts if the jurors believed that the other companies had authorized the checks, but that 518 West had not—and that in that scenario, the jury would have found Teman had committed only part of the fraud, but he would be punished for the whole thing. Teman did not request a special verdict form below, so we review for plain error. *See United States v. Shaoul*, 41 F.3d 811, 817 (2d Cir. 1994). Teman cannot show that any error was "so plain that the trial judge and prosecutor were derelict in countenancing it" because his proposed jury form would have made no difference. *Id.* (cleaned up). The district court instructed the jury that it must find unanimously that the elements of each offense had been met with respect to at least one applicable entity. Once the jury had found that Teman had defrauded at least one of the companies, the district court was entitled to consider the evidence of the entire fraud as relevant conduct at sentencing. *See* U.S.S.G. § 1B1.3(a) (relevant conduct includes acts taken in the course of commission of the offense of conviction).

Teman next argues that his trial attorneys were ineffective because they called as a defense witness Teman's and GateGuard's corporate counsel, Ariel Reinitz, opening the door to damaging text messages between Teman and Reinitz. This claim is premature. "[I]n most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance" because the trial record "in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis." *Massaro v. United States*, 538 U.S. 500, 504 (2003). That is true here, since the record is not sufficiently developed to allow for appellate review. In the district court, the claim was raised only orally, at a post-sentencing hearing. Teman's trial counsel thus did not have a chance to explain the strategy behind the decision to call Reinitz, and a court facing an ineffective assistance claim "should, except in highly unusual circumstances, offer the assertedly

6

ineffective attorney an opportunity to be heard and to present evidence." *Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998). Teman may present this claim in a § 2255 motion.

There is nothing to Teman's argument that Judge Engelmayer was required to recuse himself, a claim that we review for abuse of discretion. *Sacerdote v. New York University*, 9 F.4th 95, 121 (2d Cir. 2021). Teman points to Judge Engelmayer's disclosed holding in Berkshire Hathaway, which in turn owns stock in Bank of America, the victim in this case. But such an ownership interest "in a mutual or common investment fund that holds securities" does not require recusal because it "is not a 'financial interest' in such securities unless the judge participates in the management of the fund." 28 U.S.C. § 455(d)(4)(i). Moreover, the interest Teman alleges Judge Engelmayer *indirectly* held in Bank of America amounted to approximately 0.00075 percent of the bank's $265 billion market capitalization during the relevant timeframe, a stake that could not be meaningfully affected by the $259,340.32 in restitution the district court ordered. *See United States v. Ravich*, 421 F.2d 1196, 1205 (2d Cir. 1970) (ownership interest of 0.0072 percent "not merely unsubstantial but non-existent"). And indirect financial interests such as this one do not require recusal or disqualification. *See United States v. Thompson*, 76 F.3d 442, 451 (2d Cir. 1996) ("[R]emote, contingent, indirect or speculative interests" do not require recusal). Here, there is no direct financial interest in a party to the litigation and there is no doubt that Judge Engelmayer promptly disclosed the interest in an "excess of caution" once he learned that the parties disputed Bank of America's entitlement to restitution. App'x at 2223.

Teman also argues that Judge Engelmayer displayed impermissible bias against him, but we can discern no impropriety in the district court's conduct. Teman points to the district court's memorialization of a brief and inconsequential *ex parte* communication with the government, but we find no prejudice, and such a communication "does not require reversal if it does not affect the

7

fairness of the trial." *United States v. Walsh*, 700 F.2d 846, 858 (2d Cir. 1983).  Teman also complains of the court's comment that he timed his deposits of the checks for the eve of Passover to ensure that his counterparties, observant Jews, would not be able to contest the checks for the next two days.  But the court's observation was an "opinion[] formed by the judge on the basis of facts introduced . . . in the course of the current proceedings," which does not provide a basis for recusal.  *Liteky v. United States*, 510 U.S. 540, 555 (1994).  That opinion was, moreover, reasonable: Teman had told one of his clients, "I will . . . place a lien on your building on Pessach," and the checks were, in fact, deposited on the eve of Passover.  App'x at 1820.  Finally, the district court did not err in failing to hold a hearing under *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), after a post-trial lawyer with an arguable conflict appeared for Teman.  The court raised the issue *sua sponte* at the next conference and directed Teman to confer with independent counsel; later that day, Teman terminated the representation of the law firm at issue.[3]  Because nothing significant transpired in the case between the attorney's appearance and his dismissal, Teman was not prejudiced.

---

[3] There is likewise no merit to Teman's accusations of prosecutorial misconduct.  Teman accuses the government of, *inter alia*, (1) "sandbagging" the defense by turning over documents at the last minute, (2) relying on an affidavit containing an allegedly false statement, (3) failing to disclose supposedly exculpatory evidence, and (4) appealing to antisemitic biases by portraying him as a "bad Jew."  Appellant's Br. 71–72, 77.  He raised none of these arguments below, so we review only for plain error, a standard Teman cannot satisfy. *Johnson v. United States*, 520 U.S. 461, 466–67 (1997).  He does not explain how the late production prejudiced him; why the allegedly false statement in the affidavit did not merely go to credibility; why the government was obliged to introduce the allegedly exculpatory evidence; or how the government raised the specter of antisemitism by noting that he deposited the April checks on the eve of Passover, when it was Teman himself who had threatened to place a lien on the victim's building "on Pessach."  App'x at 1820.

We have considered Teman's remaining arguments and find them unpersuasive. Accordingly, the judgment of the district court is **AFFIRMED**.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of the Court